Sandford L. Frey (State Bar No. 117058)
Robyn B. Sokol (State Bar No. 159506)
**LEECH TISHMAN FUSCALDO & LAMPL, INC.**
1100 Glendon Avenue, 15th Floor
Los Angeles California 90024
Telephone: (424) 738-4400; Facsimile: (424) 738-5080
E-mail: *sfrey@leechtishman.com*
        *rsokol@leechtishman.com*

Attorneys for Tree Lane, LLC
Debtor and Debtor-in-Possession

## UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

## LOS ANGELES DIVISION

| | |
|---|---|
| In re | **Case No. 2:24-bk-13201-BB** |
| TREE LANE LLC, | **Adv. Case No.** |
| Debtor. | **Chapter 11** |
| | **COMPLAINT FOR:** |
| TREE LANE LLC, | **(1) AVOIDANCE OF FRAUDULENT TRANSFER PURSUANT TO 11 U.S.C. § 544 AND CAL. CIV. CODE §§ 3439.04(a)(1), 3439.04(a)(2), AND, 3439.05;** |
| Plaintiff, | |
| v. | |
| ZACHARY VELLA, an individual, | **(2) RECOVERY OF AVOIDED TRANSFER FOR BENEFIT OF ESTATE PURSUANT TO 11 U.S.C. §§ 550(a)(1) AND 551 AND CAL. CIV. CODE § 3439.07(a)(1);** |
| Defendant | |
| | **(3) CANCELLATION OF INSTRUMENTS;** |
| | **(4) TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE; AND** |
| | **(5) UNJUST ENRICHMENT/QUANTUM MERUIT/RESTITUTION** |

**TO THE HONORABLE SHERI BLUEBOND, UNITED STATES BANKRUPTCY JUDGE, AND DEFENDANT:**

Plaintiff, Tree Lane LLC, debtor and debtor in possession ("**Plaintiff**" or "**Debtor**") hereby files this *Complaint for (1) Avoidance of Fraudulent Transfer Pursuant to 11 U.S.C. § 544(b) and Cal. Civ. Code §§ 3439.04(a)(1), 3439.04(a)(2) and 3439.05; (2) Recovery of Avoided Transfer for Benefit of Estate Pursuant to 11 U.S.C. §§ 550(a)(1) and 551 and Cal. Civ. Code § 3439.07; (3) Cancellation of Instruments; (4) Tortious Interference With Prospective Economic Advantage; and (5) Unjust Enrichment/Quantum Meruit/Restitution* against Zachary Vella ("**Vella**") alleging as follows:

**STATEMENT OF JURISDICTION AND VENUE**

1.      On April 25, 2024 ("**Petition Date**"), the Debtor filed a Voluntary Petition under Chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.*

2.      The Bankruptcy Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. § 1334 and 11 U.S.C. §§ 544, 550, and 551. This adversary proceeding is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (H) and (O).

3.      The Bankruptcy Court has constitutional jurisdiction to enter a final judgment in this adversary proceeding. To the extent the Court does not have constitutional jurisdiction to enter a final judgment, the Trustee consents to the Court entering a final judgment in this proceeding.

4.      Venue lies properly in this judicial district in that the civil proceeding arises under title 11 of the United States Code as provided in 28 U.S.C. § 1409.

5.      This adversary proceeding arises out of the case entitled *In re Tree Lane LLC*, Case No. 2:24-bk-13201-BB, filed on April 25, 2024, and currently pending in the United States Bankruptcy Court, Central District of California, Los Angeles Division.

**PARTIES**

6.      Plaintiff is presently, and at all times relevant to the allegations of this Complaint was, a California limited liability company located and doing business in the County of Los Angeles, State of California, including in particular its business activities relating to the facts, as alleged herein and the Property (defined below).

7.      Defendant Vella is an individual who on information and belief, (a) residing in the State of Florida, (b) resided at the timing of most of the events alleged herein in the County of Los Angeles, State of California, California, (c) is the co-founder and managing director of Skylark Capital Management, LLC, a California limited liability company, (d) is the signor for agreements and loan documents identified herein, and (e) has been and is doing business in the County of Los Angeles, State of California, including in particular his activities relating to the Debtor and real property described and as alleged herein.

## GENERAL ALLEGATIONS

8.      Prior to certain of the transfers of real property described herein, the Debtor owned 4.2 acres of a developable real property located at 2451 Summitridge Drive, Beverly Hills, California 90210 which it acquired in 2013 ("**Property**").  The Debtor has completed development plans and had permits for the development of the Property as a one-of-a-kind, luxurious, state-of-the-art single-family residential home with approximately 30,000 square feet of living space, a private pool and spa, a home theater, and an eight (8) car garage with a car lift ("**Project**").

9.      Vella is the co-founder and managing director of Skylark Capital Management, LLC, a California limited liability company ("**Lender**"), the entity that provided the Debtor with a construction loan to complete the Project in 2018.  Without the Debtor's knowledge or consent, Vella transferred 1.39 acres of the Property owned by the Debtor to Vella in his personal capacity, made lot line adjustments to the Property and transferred certain real property consisting of .63 acres of hillside owned by Vella to the Debtor without the Debtor's knowledge.

10.      In particular, (1) Vella orchestrated a series of lot line adjustments relating to the Property; (2) Vella took title to an approximate 1.39-acre portion of the Property; and (3) Vella transferred an adjacent parcel of real property owned by Vella to the Debtor without the knowledge or consent of the Debtor.

11.      By and through this Complaint, the Debtor seeks to avoid the fraudulent transfer of the 1.39-acre portion of the Property by the Debtor to Vella and cancel the grant deed whereby Vella transferred to the Debtor a .63-acre parcel of land abutting the Property commonly referred to as 9702 Hensal Road ("**Vella Property**") which at the time of the transfer was owned by Vella

4858-3799-7555, v. 2

personally and heavily encumbered by Vella prior to the transfer and remains heavily encumbered. These transfers were made without the knowledge or consent of the Debtor. The Debtor also seeks damages resulting from Vella's unauthorized and unlawful acts which interfered with and continue to interfere with the Debtor's economic benefits relating to the Property.

## FACTUAL ALLEGATIONS

12.     In or around September 28, 2018, Lender agreed to lend the Debtor $31,300,000.00 to complete the Project ("**Loan**"). The Loan was evidenced by certain prepetition loan documents ("**Loan Documents**"), including a *Loan Agreement* dated September 28, 2018 ("**Loan Agreement**") and secured by, among other things, a *Construction Deed of Trust, Assignment of Leases and Rents, Security Agreement and Fixture Filing dated October 4, 2018* recorded against the Property ("**Deed of Trust**") and the Debtor's personal property.

13.     Prior to the Loan, the Debtor had no prior interactions or business dealings with Lender or Vella. Instead, Vella, on behalf of Lender, sought out Mohamad Hadid ("**Hadid**"), the Debtor's principal, in mid-2018 and offered to lend the Debtor $31,300,000.00 to fund a pay-off of the then current secured debt on the Property and for development of the Property.

14.     Unbeknownst to the Debtor, at around the time the Loan was made, Vella, the Lender's manager and co-founder, purchased from a third-party real property abutting the Debtor's Property. Attached hereto as **Exhibit 1** and incorporated herein by this reference is a Los Angeles County parcel map ("**Parcel Map**") for the area where the Property is located which shows the Property and neighboring parcels. Lots 20, 21 and 13 on the Parcel Map are the real property in which Vella held title prior to the recordation of grant deeds on November 30, 2020. Lot 20 which is Assessor's Parcel Number 4385-023-020, the Vella Property, is the real property transferred by Vella to the Debtor by and through the Grant Deed recorded on November 30, 2020 with the Los Angeles County Recorder's Office as instrument no. 20201531691 ("**Vella Property Grant Deed**"). Vella currently retains title to Lots 21 and 13.

15.     Before the maturity date of the Loan, Vella began the process of obtaining certain documents signed by the Debtor's principal so that he could seize control of 1.39 acres of the Property which abuts the Vella Property ("**1 Acre Lot**"). Lot 22 on the Parcel Map currently

assigned Assessor's Parcel Number 4385-023-022 is the 1 Acre Lot.  *See* **Exhibit 1**.

16.    At the same time that the Loan Documents were executed, while not referenced in the Loan Documents, the Lender and/or Vella required the Debtor to enter into the Purchase and Sale Agreement wherein the Debtor would sell the Lender "a 50,000-60,000 square foot lot sufficient to construct the Improvements" of the Property for $1,000,000 ("**PSA**").  The real property referenced in the PSA is the 1 Acre Lot.  At the time the PSA was executed, the 1 Acre Lot had a value of $10,000,000.  Attached hereto as **Exhibit 2** is the PSA.

17.    The PSA was executed the same day as the Loan Documents and was presented to the Debtor by Vella as a precondition to and part of the Loan itself.

18.    The Debtor is informed and believes and, on that basis, alleges that the PSA requirement was planned by the Lender under the control of Vella in anticipation of his purchase of the abutting real property including the Vella Property by Vella shortly after the Loan closed.  By grant deed recorded in Los Angeles County on January 2019, with instrument number 2019007890, Vella received title to real properties commonly referred to as 9703 Hensel Road and 9702 Hensel Road, Parcel numbers 20 (Vella Property), 21, 13,

19.    The 1 Acre Lot abuts the Vella Property and Parcel numbers 21 and 13 which are also owned 100% by Vella.

20.    The PSA required: (i) that the Property be subdivided first before the 1 Acre Lot could be transferred to the Lender (**Exhibit 2**, PSA,¶1(a)) [in other words dividing the Property into lots that could be separately developed but would still be fully owned by the Debtor (the "**Subdivision**")]; and (ii) that the Lender would pay the Debtor $1,000,000.00 (**Exhibit 2**, PSA, ¶ 2) (the "**1 Acre Lot Conditions**").

21.    The Debtor relied on Vella and the Lender to comply with the terms of the PSA, as well as an oral promise by Vella for a reduction in the amount owed on the Loan to compensate the Debtor for the significantly reduced purchase price of the 1 Acre Lot provided by the PSA, before the 1 Acre Lot could be transferred to Lender.

22.    The Debtor was not paid the $1,000,000.00 required pursuant to the PSA, nor did the Lender reduce the Loan principal balance or fees.  Instead, the 1 Acre Lot was transferred to Vella,

in his individual capacity without the Debtor's knowledge or consent.

23.    In or around January 16, 2020 and thereafter, Vella engaged in various improper acts and title recordings including but not limited to recording numerous grant deeds and purported lot line adjustments involving the Vella Property and the Property, resulting in the 1 Acre Property being transferred from the Debtor to Vella for no consideration and the Vella Property being transferred to the Debtor by Vella without the knowledge or consent of the Debtor.

24.    The Vella Property consists of a steep hillside located adjacent to 2451 Summitridge Drive, APN No. 4384-023-023 ("**Parcel 23**").  The Vella Property requires costly erosion control work and remediation work. But for the transfer of the Vella Property to the Debtor, the Debtor would not be saddled with these costs.

25.    On or about November 30, 2020, Vella caused the grant deed in which the Debtor granted to Vella the 1 Acre Lot to be recorded in the Los Angeles County Recorder's Office as instrument number of 20201531690 ("**1 Acre Grant Deed**").  The 1 Acre Grant Deed contains a legal description for Parcel 22.  Attached hereto as **Exhibit 3** and incorporated herein by this reference is a true and correct copy of 1 Acre Grant Deed.  With the recording of the 1 Acre Grant Deed on November 30, 2020, the Debtor's interest in the 1 Acre Parcel that was originally part of the Property was transferred to Vella for no consideration ("**1 Acre Lot Transfer**").

26.    The Debtor is informed and believes, and on that basis alleges, that the end result of the unauthorized transfers is that Vella: (1) obtained title to 1.39 acres of the Property (the 1 Acre Parcel); (2) accomplished the Lot Line Adjustments which divided the Debtor's Property into two separate lots, Lot 22 (1 Acre Parcel) and Lot 23 (the remainder of the Debtor's original Property); and (3) granted the Vella Property to the Debtor (Lot 20).  *See* **Exhibit 1**, Parcel Map, Lots 20, 22 and 23 and ¶ 28 below.

27.    The unauthorized Vella transfers ("**Unauthorized Transfers**") consist of the following:

a.    The grant deed recorded on November 30, 2020, with an instrument number of 20201531688 in which Vella grants himself an increase in Parcel 2 from 36,415.29 square feet to 70,035.06 square feet ("**Parcel 2 Grant Deed**", attached as **Exhibit 4).**

b.    The grant deed recorded thereafter on November 30, 2020, with an instrument number

1    of 20201531689 reduces the Debtor's interest in Parcel 1 from 175,063.88 square feet to 141,44.11

2    square feet.  ("**Parcel 1 Grant Deed**", attached hereto as **Exhibit 5**). The Parcel 2 Grant Deed

3    appears to increase some portion of Vella's Property by 33,619 square feet and Parcel 1 Grant Deed

4    appears to decrease some portion of the Debtor's Property by the exact same 33,619 square feet.

5        c.    The recording of the 1 Acre Grant Deed on November 30, 2020 which resulted in the 1

6    Acre Lot Transfer. **Exhibit 3.**

7        d.    The recording of the Vella Property Grant Deed (attached as **Exhibit 6**) with the Los

8    Angeles County Recorder's Office as instrument no. 20201531691 transferred the Vella Property to

9    the Debtor ("**Vella Property Transfer**") without the Debtor's knowledge or consent.

10       28.    As a result of the 1 Acre Lot Transfer, the Vella Property Transfer and Lot Line

11   Adjustments, the Los Angeles tax records show ownership as follows:



| Record Title Holder | Location Address | Parcel Number | Acres |
|---|---|---|---|
| Tree Lane LLC | 2451 Summitridge Dr | 4384-023-023 | 2.62 |
| Zachary Vella | 2451 Summitridge Dr | 4384-023-022 | 1.39 |
| Tree Lane LLC | 9702 Hensal Road | 4384-023-020 | 0.63 |

29.    The Debtor is informed and believes and, on that basis, alleges that the documents that were brought to Hadid for signature in or around January 16, 2020 were later falsified by Vella as the grant deeds were missing and/or had blanks for the description of the property being transferred. At the time of execution, it was misrepresented to Hadid that the grant deeds were merely for the subdivision of the Property and not to change ownership of the Property.

30.    The documents that were presented to Hadid, the principal of the Debtor at the time, for execution did not include the legal descriptions and were essentially blank grant deeds.  The blank grant deeds executed by Hadid were subsequently altered to add legal descriptions that resulted in the transfer of the 1 Acre Lot to Vella when the 1 Acre Grant Deed was recorded in Los Angeles County on November 30, 2020, the transfer of the Vella Property to the Debtor that occurred when the Vella Grant Deed was record in Los Angeles County on November 30, 2020, and the Lot Line Adjustments all without the Debtor's knowledge or consent.

31.    With the recording of the 1 Acre Grant Deed, the Debtor transferred 1.39 acres that it owned to Vella for no consideration.

32.    At the time of the 1 Acre Lot Transfer the Debtor was insolvent.  *See* **Exhibit 3**.

33.    At the time of the 1 Acre Lot Transfer, the Loan was in default and the Debtor owed its vendors substantial sums for work that had been completed, but for which the Debtor had no funds to pay. At the time of the 1 Acre Lot Transfer the Debtor had no revenue or funding and it was unable to pay its bills as they became due.

34.    At the time of the 1 Acre Lot Transfer, the Debtor's creditors included but were not limited to the Lender.  After the 1 Acre Lot Transfer, the Debtor had many creditors.  A list of the Debtor's creditors as of the Petition Date is in the Debtor's Schedules filed on April 25, 2024.  Dkt. No. 2.

35.    The 1 Acre Lot Transfer resulted from misrepresentations, false statements, improper notarizations, and improper recordation of grant deeds by Vella.

36.    The actions of Vella resulted in Vella exchanging the 1 Acre Parcel for the less desirable and much smaller Vella Property which directly reduced the value of the Debtor's assets and has made it exceedingly difficult to develop the Debtor's primary asset let alone market and sell

the real property of the Debtor.

## FIRST CLAIM FOR RELIEF

### Avoidance of Fraudulent Transfer

### 11 U.S.C. § 544 and Cal. Civ. Code §§ 3439.04(a)(2) and 3439.05

37.    Plaintiff realleges and incorporates by reference each and every allegation set forth in the foregoing paragraphs of this Complaint as though fully set forth herein.

38.    Within four years of the Petition Date, the Debtor transferred the 1 Acre Parcel to Vella – the 1 Acre Lot Transfer.   The 1 Acre Lot Transfer occurred with the recording of the 1 Acre Grant Deed on November 30, 2020.

39.    The Debtor received no consideration from Vella in exchange for the 1 Acre Lot Transfer.

40.    The Debtor received less than reasonably equivalent value in exchange for the 1 Acre Lot Transfer.

41.    At the time of the 1 Acre Lot Transfer, the Debtor (i) was engaged or was about to be engaged in a business or transaction for which its remaining assets were unreasonably small in relation to the business or transaction, or (ii) intended to incur, or reasonably should have believed that it would incur debts beyond its ability to pay as they came due.

42.    At the time of the 1 Acre Lot Transfer, the Lender and others were creditors of the Debtor.

43.    By reason of the foregoing, the 1 Acre Lot Transfer is avoidable pursuant to 11 U.S.C. § 544 and Cal. Civ. Code §§ 3439.04(a)(2) and 3439.05.

## SECOND CLAIM FOR RELIEF

### Avoidance of Fraudulent Transfer

### 11  U.S.C. § 544(b) and Cal. Civ. Code § 3439.04(a)(1)

44.    Plaintiff realleges and incorporates by reference each and every allegation set forth in the foregoing paragraphs of this Complaint as though fully set forth herein.

45.    Within four years of the Petition Date, the Debtor transferred the 1 Acre Parcel to Vella – the 1 Acre Lot Transfer.   The 1 Acre Lot Transfer occurred with the recording of the 1 Acre Grant

Deed on November 30, 2020.

46.    The Debtor received no consideration from Vella in exchange for the 1 Acre Lot Transfer. *See* **Exhibit 3**.

47.    The Debtor received less than reasonably equivalent value in exchange for the 1 Acre Lot Transfer.

48.    The 1 Acre Lot Transfer was made with the actual intent to hinder, delay, or defraud creditors of the Debtor.

49.    By reason of the foregoing, the 1 Acre Lot Transfer is avoidable as a fraudulent transfer pursuant to 11 U.S.C. § 544(b) and Cal. Civ. Code § 3439.04(a)(1).

## **THIRD CLAIM FOR RELIEF**

### **Recovery of Avoided Transfer for Benefit of Estate**

### **11 U.S.C. § 550(a)(1) and 551 and Cal. Civil Code § 3439.07**

50.    Plaintiff realleges and incorporates by reference each and every allegation set forth in the foregoing paragraphs of this Complaint as though fully set forth herein.

51.    Plaintiff is informed and believes and thereon alleges that Vella took the 1 Acre Lot not in good faith for less than reasonably equivalent value, and with knowledge of the voidability of the 1 Acre Lot Transfer.

52.    By reason of the foregoing, Plaintiff is entitled to recover from Vella and preserve for the benefit of the Estate the 1 Acre Lot or the value thereof pursuant to 11 U.S.C. §§ 550(a)(1) and 551, Cal. Civil Code § 3439.07.

## **FOURTH CLAIM FOR RELIEF**

### **Cancellation of Instruments**

### **11 U.S.C. § 544(b) and Cal. Civ. Code § 3412**

53.    Plaintiff realleges and incorporates by reference each and every allegation set forth in the foregoing paragraphs of this Complaint as though fully set forth herein.

54.    Code of Civil Procedure section 3412 provides that "[a] written instrument in respect to which there is a reasonable apprehension that if left outstanding it may cause serious injury to a person against whom it is void or voidable, may, upon his application, be so adjudged, and order to

4858-3799-7555, v. 2

be delivered up or canceled."

55. The Lender required the Debtor to sell to Lender the 1 Acre Lot from the 4.02 acre Property owned by the Debtor for the highly discounted amount of $1,000,000.00, when the 1 Acre Lot was valued at approximately $10,000,000.00.  The PSA was executed the same day as the Loan Documents on September 28, 2018 but, while not mentioned in the Loan Documents, was a precondition to, and part and parcel of, the Loan itself.  This was planned by Vella in anticipation of Vella's purchase of the Vella Property on or about January 1, 2019. Vella also purchased Lots 21 and 13 on or about January 10, 2019. **Exhibit 6**.

56. The 1 Acre Lot Conditions were not met by the Lender or Vella.

57. Vella caused the Unauthorized Transfers to be recorded without the knowledge or consent of the Debtor.

58. The Unauthorized Transfers are void or voidable, due to, including but not limited to, fraud as to the 1 Acre Lot Grant Deed, Vella Grant Deed, Parcel 2 Grant Deed, and Parcel 1 Grant Deed (collectively, "**Grant Deeds**") and Lot Line Adjustments, slander of title, unconscionability, breach of contract, and/or other reasons to void the 1 Acre Grant Deed and the Vella Property Grant Deed.

59. The Debtor has been harmed by the improper and untrue recordings on public title that have diminished the Debtor's ownership and right to maintain and own the Property and/or all portions thereof as described in ¶¶ 8-36 herein.

60. To be effective, an instrument conveying real property must be written and must name a grantor and a grantee, and it must be subscribed by the grantor or the grantor's agent, and it must be delivered to and accepted by the grantee, and these are the minimum requirements for a valid deed. If one of the essential elements is missing, the deed is ineffective to transfer title.  *In re Marriage of Wozniak*, 59 Cal. App. 5th 120, 273 Cal. Rptr. 3d 421 (4th Dist. 2020).  Acceptance by the grantee is necessary to make a delivery effective and the deed operative. *Luna v. Brownell*, 185 Cal. App. 4th 668, 110 Cal. Rptr. 3d 573 (2d Dist. 2010).

61. The Debtor was unaware of the transfer of the Vella Property to the Debtor pursuant to the Vella Property Grant Deed, did not consent to the transfer of the Vella Property to the Debtor

1   and did not accept the Vella Property Grant Deed.

2       62.    The Debtor was unaware of the transfer of the 1 Acre Lot to Vella by the Debtor

3   because the grant deeds executed by Hadid were incomplete and did not include any attachments

4   describing the property to be transferred, and the Debtor did not consent to the transfer of the 1 Acre

5   Lot to Vella.

6       63.    Therefore, the Debtor hereby applies to this Court for an Order determining that the 1

7   Acre Grant Deed and the Vella Property Grant Deed are void and canceled.

8                               **FIFTH CLAIM FOR RELIEF**

9                   **Tortious Interference with Prospective Economic Advantage**

10      64.    Plaintiff realleges and incorporates by reference each and every allegation set forth in

11  the foregoing paragraphs of this Complaint as though fully set forth herein.

12      65.    The Property is Plaintiff's most valuable asset and is the sole source of its future

13  economic benefit.  The Debtor intended to develop the Project and then sell the Property to a third-

14  party buyer.

15      66.    Vella is, and at all times relevant hereto, aware of the fact that the Property was

16  Debtor's most valuable asset and the source of its future economic benefit.

17      67.    The Debtor is informed and believes and, on that basis, alleges, that Vella intentionally

18  perpetrated a scheme to transfer a 1.39 acre portion of the Property to Vella in his individual

19  capacity.

20      68.    Vella represented to Hadid that the Lender wanted him to sign certain documents that

21  were intended to perform the Subdivision and which would not entail any transfer of the Property.

22  Instead, the blank grant deeds presented to Hadid to sign were missing and/or had blanks for the

23  description of the property being transferred, and Vella mispresented to Hadid that they were merely

24  for the Subdivision.  It was not until later that they were falsified by or at the direction of Vella by

25  adding legal descriptions to effectuate a transfer of the 1 Acre Lot to Vella, personally, without any

26  compensation to the Debtor.

27      69.    The result of Vella's intentional wrongful acts was the transfer of the 1 Acre Lot to

28  Vella personally, thus significantly reducing the size and value of the Property.  Further, Vella's

transfer of the Vella Property to the Debtor by the Vella Property Grant Deed without the Debtor's knowledge or consent, while it increased the acreage of the Debtor's real property, was not land originally utilized by the Debtor in its development plans and permits for the Project. The Vella Property is a hillside lot which requires costly erosion control and remediation work. This interference with the Debtor's Property by Vella has proximately caused economic harm to the Debtor.

70.     All of these acts and the consequences therefrom have damaged the Debtor in an amount to be determined at trial.

## SIXTH CLAIM FOR RELIEF

### Unjust Enrichment/Quantum Meruit/Restitution

71.     Plaintiff realleges and incorporates by reference each and every allegation set forth in the foregoing paragraphs of this Complaint as though fully set forth herein.

72.     Through the unauthorized actions of Vella as alleged herein, Vella has been unjustly enriched by the 1 Acre Lot.

73.     Vella received the benefit of his individual ownership of the 1 Acre Lot through the recording of the 1 Acre Grant Deed through fraud and misrepresentations to the Debtor. The 1 Acre Grant Deed is unenforceable and void or voidable.

74.     As such, this Court may Order Vella to pay restation to the Debtor in the form of cancellation of the 1 Acre Grant Deed, and or an award against Vella and in favor of the Debtor for the fair market value of the 1 Acre Lot, in an amount to be proven at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for a judgment as follows:

1.     On the First and Second Claims for Relief, avoidance of the 1 Acre Lot Transfer pursuant to 11 U.S.C. § 544(b)(1), California Civil Code §§ 3439.04(a)(1), 3439.04(a)(2) and 3439.05;

2.     On the Third Claim for Relief, a judgment that the Debtor recover the avoided 1 Acre Lot Transfer from Vella or any immediate or mediate transferee of the Debtor under 11 U.S.C. §§ 550 and 551 and Cal. Civ. Code § 3439.07;

4858-3799-7555, v. 2

3.      On the Fourth Claim for Relief, for an Order determining that the 1 Acre Grant Deed and the Vella Property Grant Deed are void and canceled;

4.      On the Fifth Claim for Relief, for judgment in favor of the Debtor and against Vella in an amount to be determined at the time of trial for Vella's tortious interference with the Debtor's prospective business advantage;

5.      On the Sixth Claim for Relief, for judgment in favor of the Debtor and against Vella cancelling the 1 Acre Lot Grant Deed, or alternatively, damages in an amount to be determined at the time of trial representing a monetary determination of the amount Vella benefited from the unauthorized transfer of the 1 Acre Lot;

6.      For costs of suit; and

7.      For such other and further relief as the Court may deem appropriate.

DATED: November 8, 2024                LEECH TISHMAN FUSCALDO & LAMPL, INC.

By: /s/ Robyn B. Sokol
    Robyn B. Sokol
    Attorneys for Tree Lane, LLC
    Debtor and Debtor-in Possession

4858-3799-7555, v. 2

Exhibit 1



Exhibit 2

## PURCHASE AND SALE AGREEMENT

PURCHASE AND SALE AGREEMENT dated as of September 28, 2018 (this "**Agreement**", and such date, the "**Effective Date**") among **SKYLARK CAPITAL MANAGEMENT, LLC**, a California limited liability company (together with any assignee of its rights hereunder, "**Buyer**"), **TREE LANE, LLC**, a California limited liability company ("**Seller**"), and Mohamed Hadid, an individual who, directly or indirectly owns all of the equity interests in Seller ("**Mr. Hadid**", or, together with Seller, sometimes the "**Seller Parties**"). Buyer, Seller and Mr. Hadid are referred to collectively herein as the "**Parties**" and each of them individually as a "**Party**".

### RECITALS

A.       Seller owns certain undeveloped real property consisting of approximately 4.02 acres located in the City of Los Angeles, County of Los Angeles, California more particularly described (via metes and bounds) on **Exhibit A-1** attached hereto (the "**Land**").

B.       Buyer desires to purchase, and Seller desires to sell, the Property (defined below) on the terms and conditions set forth below.

### AGREEMENT

NOW, THEREFORE, in consideration of mutual covenants set forth herein and for other consideration the receipt and sufficiency of which is hereby acknowledged, Seller Parties and Buyer hereby agree as follows:

1.       **Purchase and Sale**.  Upon the terms and conditions set forth herein, Buyer agrees to buy from Seller, and Seller agrees to sell to Buyer, the Property (as hereinafter defined), which constitutes the portion of the Land designated in the site plan attached hereto as **Exhibit B**, which shall be a 50,000-60,000 square foot lot sufficient to construct the Improvements (as defined in **Section 5(d)**) and shall be more particularly described on **Exhibit A-2** attached hereto and made a part hereof, together with all rights, privileges, easements, tenements, hereditaments, rights-of-way and other appurtenances thereon or in any way pertaining thereto, development rights, air and water rights to the extent owned by the Seller (collectively, the "**Real Property**").  The "**Property**" shall include the Real Property and does not include any equipment or other personal property but shall expressly include all intangible personal property, if any, owned by Seller and related to the Property that can be assigned, including, without limitation: any warranties, surveys, engineering reports and other material technical information relating to the Real Property and/or the improvements (if any); any Contracts (as defined in **Section 9(a)** below) and other contract rights related to the Property (but only to the extent Seller's obligations thereunder are expressly assumed by Buyer); and any governmental permits, approvals and licenses (including any pending applications) (collectively, the "**Intangible Property**"), all to be assigned to Buyer at Closing.  If the assignment of any such Intangible Property requires the approval of a third party, Seller Parties will use best efforts to obtain any necessary approvals allowing for such assignment.

a.       Land Division.  It is understood and agreed by and between or among Buyer and Seller Parties that, in order to accomplish the sale of the Property to Buyer, Seller must complete a subdivision of the Land (the "**Land Division**").  The Land Division shall be at Seller Parties' sole cost and expense, and in furtherance hereof Seller Parties shall cause the Land to be subdivided into

two (2) separate legal parcels, one of which shall be the Real Property, in compliance with the California Subdivision Map Act. Seller Parties' acknowledge the existence of that certain Covenant and Agreement to Hold Property as One Parcel dated December 17, 1985 and recorded on December 18, 1995 as document number 85-1494484 (the "**Covenant and Agreement**") restricting the subdivision of the Land; Seller Parties shall cause the Covenant and Agreement to be released removed by the City of Los Angeles ("**City**") prior to Closing so that the Land Division can be accomplished in strict accordance with this Agreement. The Land Division shall be deemed complete upon the recordation by Seller of a parcel map, a tract map or another instrument, approved by the City or applicable governing body, such that the Real Property constitutes a separate legal parcel / lot that is legally identifiable as separate and distinct from the remainder of the Land, which remainder shall continue to be Seller's property (Seller's "**Hadid Parcel**"). Seller Parties shall complete the Land Division prior to Closing, which shall occur not later than the Outside Closing Date (as hereinafter defined). As part of the Land Division, Seller Parties shall also cause, at Seller Parties' sole cost and expense, an updated survey ("**Survey**") of the Real Property to be made and certified by a reputable and competent registered land surveyor and such Survey shall be delivered to Buyer and Seller. The Land Division is a non-waivable condition to closing for the benefit of Buyer. Once the Land Division is completed, **Exhibit A-2** of this Agreement shall be automatically amended to include the updated legal description of the Real Property being purchased by Buyer at Closing. In the event that Seller fails, though no fault of Buyer, to cause the Land Division to actually occur prior to March 31, 2020 (the "**Outside Subdivision Date**"), then Buyer shall be entitled to terminate this Agreement, the Earnest Money (*less* the Independent Consideration) shall be returned by Seller Parties to Buyer, and Buyer may elect its choice of remedies pursuant to **Section 16(b)** of this Agreement.

Power of Attorney. Seller hereby irrevocably makes, constitutes and appoints Buyer or any of Buyer's designees as Seller's true and lawful attorney-in-fact with full power, to take any action available to Seller to effect or in furtherance of the Land Division, and execute any document or instrument in the name and on behalf of Seller which is necessary or desirable in connection therewith, and record any document or instrument in the official records of the City of Los Angeles or County of Los Angeles, as applicable, and to do any and all other acts necessary or proper to carry out the intent of this Agreement and effect the Land Division, in any such case if Seller fails so to do not later than eighteen months after the Effective Date, *provided* that prior to the first exercise of this power of attorney, Buyer shall make written demand upon Seller Parties for full performance of their obligations under this **Section 1(a)** at least 30 days prior to such first exercise (which demand shall be made no earlier than 30 days prior to the end of such eighteen month period after the Effective Date). Each Seller Party hereby ratifies and confirms all that Buyer or its designee as such attorney-in-fact shall properly do by virtue of this power of attorney.

b. Construction of Driveway Across the Hadid Parcel. In connection with the Land Division, Seller Parties shall cause, at Seller Parties' sole cost and expense, the creation, grading and construction of a driveway beginning at the access way to the Hadid Parcel from Summitridge Drive depicted on the site plan attached hereto as **Exhibit B**, and running across and over the Hadid Parcel to and through the Real Property ("**Driveway**") for the purpose of granting the owner of the Real Property unrestricted ingress / egress rights to the Real Property, all as to be more particularly set forth on the parcel map prepared in connection with the Land Division. The Parties acknowledge that, after the Land Division is completed, the two subdivided parcels which comprise the Land will share a common gated access way from Summitridge Drive, which would be a shared driveway subject to the REA (as hereinafter defined); *provided*, that Buyer may acquire (if available), at its election and at its own expense, an easement in the parcel adjacent to the Land for ingress / egress

rights to the Real Property, in which event, the 'Driveway' shall be direct access from Summitridge Drive to the Real Property across such easement, and shall be private to the Real Property, as depicted in **Exhibit B**.

      c.      Easement / Shared Access Agreement. Prior to the expiration of the Feasibility Period, Buyer and Seller Parties shall cooperate and use good faith efforts to agree upon the final form of an easement / shared access agreement ("**REA**") to be executed and notarized by the Parties and recorded at Closing.   The REA shall contain Seller Parties' obligations respecting the construction of the Driveway and customary provisions for granting perpetual shared access to each Party's respective parcel / lot (*i.e.*, Buyer shall have access to the Real Property and Seller shall have access to the Hadid Parcel). In addition, the REA shall contain such other provisions and restrictions as Buyer and Seller may reasonably deem appropriate including: (a) utility access rights of Buyer to construct utilities from Summitridge Drive to the Real Property; (b) the shared obligations of each party to maintain and repair the Driveway (subsequent to the initial construction by Seller), (c) any landscaping or building restrictions respecting walls or fences along any shared property line deemed mutually agreeable to the parties.  For avoidance of doubt, the rights and obligations set forth in the REA shall be perpetual and shall "run with the land" for the benefit of each of the Real Property and the Remainder Property as applicable. If the Parties cannot agree on the final form of the REA prior to the initially determined expiration of the Feasibility Period, the same shall be extended for such additional time as reasonably deemed necessary by Buyer to finalize the REA; *provided*, that, in the event such extension of the Feasibility Period exceeds the Outside Closing Date, then Buyer may elect to terminate this Agreement, in which case this Agreement shall automatically terminate, the Earnest Money shall be returned by Seller Parties to Buyer, and the Parties shall have no further obligation hereunder except for those duties that expressly survive the termination of this Agreement.

      **2.**      **Purchase Price**:  The Purchase Price shall be One Million And No/100 Dollars ($1,000,000.00) payable in cash through escrow at Close of Escrow (as hereinafter defined) except as otherwise provided herein.

      **3.**      **Escrow**:  This Agreement shall be consummated through Fidelity National Title Insurance Company, as escrow holder (attention: Bobbie Purdy, email: BobbiePurdyTeam@fnf.com) (in such capacity, "**Escrow Holder**") and issuer of the Title Policy (as hereinafter defined) (attention: Michael Brinkman, email: mike.brinkman@fnf.com) (in such capacity, "**Title Company**").  Buyer and Seller shall deliver a signed copy of this Agreement to Escrow Holder within one (1) business day following Buyer and Seller Parties' mutual acceptance and execution of this Agreement and escrow shall be deemed opened when Escrow Holder delivers a countersigned copy of this Agreement to all parties hereto ("**Opening of Escrow**").  Additionally, within three (3) business days following Opening of Escrow, or as soon as possible thereafter, Escrow Holder is instructed to deliver a current commitment for title insurance ("**Title Commitment**"), including legible copies of all referenced documents, to Buyer.

      **4.**      **Earnest Money**:

      a.      Within thirty (30) days after the Effective Date, Buyer shall deliver to Seller a deposit in the amount of Five Hundred Thousand and No/100 Dollars ($500,000.00) (the "**Earnest Money**").  The Earnest Money shall be fully refundable by Seller Parties to Buyer until such time as Buyer has waived all contingency items to Buyer's full satisfaction by delivering an "**Approval Notice**" (as defined in **Section 5(f)** below) to Seller on or before the expiration of the Feasibility

Period. At Closing, to the extent the same occurs, the Earnest Money shall be retained by Seller in partial payment of the Purchase Price at Close of Escrow.

b.  Contemporaneously with the execution and delivery of this Agreement, Buyer shall deliver to Seller as further consideration for this Agreement, in cash, the sum of One Hundred And No/100 Dollars ($100.00) (the "**Independent Consideration**"), in addition to the Purchase Price and independent of any other consideration provided hereunder, which Independent Consideration is consideration for Seller entering into this Agreement, fully earned by Seller upon delivery and is non-refundable under any circumstances. At Closing, to the extent the same occurs, the Independent Consideration shall be applied as a credit against the Purchase Price.

### 5.  Buyer's Feasibility Period and Title Review.

a.  Delivery of Materials. Within five (5) days following the Effective Date, Seller shall provide Buyer with copies of all reports, studies, legal documents and correspondence ("**Seller's Due-Diligence Information**") affecting the Property for which Seller has actual knowledge of and are in Seller's possession or control, including, but not limited to, the following items: (i) surveys, (ii) soils density reports, (iii) environmental reports, (iv) plans and specifications for improvements, (v) any option or use agreements (all of which shall be terminated prior to the Close of Escrow), and (vi) correspondence with the City and/or other governmental agencies exercising authority over the Property, (vii) any third party contracts or agreements that encumber or affect the property in any manner, and (viii) any other information relevant to the Property.

b.  Feasibility Period. In addition to any other contingency expressly set forth in this Agreement, Buyer shall initially have until September 30, 2019 (following the Effective Date, the "**Feasibility Period**"), to conduct Buyer's due diligence and to complete a feasibility study for its proposed development of the Property, including evaluating title and the environmental condition of the Property (together with the Governmental Approvals below, "**Buyer's Contingencies**"). Buyer and its affiliates, employees, attorneys, lenders (including prospective lenders), agents, contractors, consultants, investors, and representatives (collectively, "**Buyer's Agents**") may enter the Property and undertake any and all necessary studies, tests and assessments as Buyer deems necessary to evaluate the condition of the Property, at Buyer's sole cost.  Buyer shall be responsible for curing any liens that may attach to the Property arising out of Buyer's testing or inspections and Buyer's Pre-Closing construction of the Improvements (defined below), and shall hold harmless, defend and indemnify Seller Parties from any actual costs, claims or liabilities arising out of work done by or on behalf of Buyer (or Buyer's Agents) on or about the Property except for those costs, claims or liabilities caused by the negligence of the Seller Parties or Seller's breach of this Agreement. Additionally, during the Feasibility Period, Buyer or Buyer's Agents may apply for or request, at Buyer's expense, any and all Government Approvals (defined below) or other approvals or permits from all applicable governing agencies, with conditions of approval acceptable to Buyer, in Buyer's sole and absolute discretion, necessary to permit the development of the Improvements (defined below) and Seller shall cooperate, in good faith, and assist Buyer or Buyer's Agents with all aspects of the procurement of such Government Approvals at all times prior to Closing. Each of Buyer's, Seller's and Seller Parties' respective obligations herein shall survive the termination of this Agreement or Closing.

c.  Feasibility Studies. At all times prior to Closing (or, at Buyer's election, the earlier terminating of this Agreement), Buyer or Buyer's Agents shall be permitted to perform any environmental tests or studies on the Property. In connection with such studies, Buyer agrees to

provide (or cause Buyer's Agents to provide) reasonable liability insurance, which shall name Seller as an additional insured or loss payee. All information derived from Buyer's tests and test results shall, to the extent permissible under existing law, remain confidential and not be disclosed to any party other than as is necessary to consummate the transaction contemplated hereby or to exercise Buyer's rights hereunder, including, without limitation, Buyer's Agents, Buyer's counsel and any other consultants. The foregoing confidentiality provision shall survive the termination of this Agreement, but not the consummation of the purchase and sale contemplated hereby. Buyer shall furnish a copy to Seller of any reports or analyses (without warranty as to accuracy, completeness or reliability) at the time Buyer receives any such report or analysis, which are prepared by third parties as part of Buyer's feasibility study of the Property. Buyer shall bear the costs and expenses with respect to its feasibility studies hereunder, including, without limitation, all environmental matters and investigations.

        d.     Pre-Closing Construction of the Improvements. Seller hereby acknowledges and agrees that at all times from and after the Effective Date and prior to Closing, Buyer shall be permitted to construct the Improvements on the Real Property in accordance with this **Section 5(d)**. The term "**Improvements**" includes all improvements necessary or desirable for the construction of a not less than 20,000 square feet above-grade single family residence on the Real Property substantially as depicted in **Schedule B**.

        i.     The Parties acknowledge and agree that all architect drawings, plans and specifications required for Buyer's development of the Real Property and construction of the Improvements shall be prepared and implemented in general conformance with the site plan attached hereto as **Exhibit "B"** ("Site Plan"), provided that such final drawings, plans and specifications (and expressly including the Site Plan) shall be subject to Buyer's final review and approval and may be revised by Buyer, in Buyer's sole and absolute discretion, as deemed necessary by Buyer in order to Complete the Improvements. Seller Parties shall reasonably cooperate, in good faith, as required by Buyer respecting the construction of the Improvements, including, without limitation, timely execution and delivery of contraction documents, contracts and supplementary documents as may be deemed necessary by Buyer to enable Buyer to complete the Improvements as planned. Contracts, documents and any other materials prepared (or deemed necessary by Buyer) in connection with the proposed construction of the Improvements shall be referred to herein collectively as the "**Proposed Plans**" or singly as a "**Proposed Plan**".

        ii.     Within three (3) business days of the submission of any Proposed Plan by Buyer to Seller which requires the approval or cooperation of Seller Parties, Seller Parties shall provide such approval or (to the extent applicable) written notice of Seller Parties' approval. Buyer acknowledges and agrees that all final plans shall remain subject to approval by the applicable governing body. In addition, Seller shall cooperate and use good faith efforts to assist Buyer in the revision of any approved plans to resolve differences between version of the approved plans and the requirements of the City.

        iii.     Buyer, without cost or expense to Seller, shall undertake to obtain all necessary governmental approvals, licenses and permits from each and every authority having jurisdiction thereof for the construction of the Improvements, including, but not limited to, conditional use permits, excavation, building and use permits, architectural approvals and environmental permits and approvals (collectively, the "**Government Approvals**"). Seller shall cooperate, in good faith, and assist Buyer or Buyer's Agents with all aspects of the procurement of such Government Approvals at all times prior to Closing. Government Approvals shall specifically

include the actual building permit that authorizes the contractor to commence construction of the Improvements prior to Closing.

    iv. Buyer shall, at Buyer's sole cost and in its sole discretion, select a contractor or contractors for the construction of the Improvements ("**Contractor**") and shall enter into a contract or contracts for such construction (collectively, the "**Construction Contract**"). Seller shall cooperate, in good faith, and assist Buyer or Buyer's Agents with all aspects of the procurement of such Construction Contract at all times prior to Closing.

    v. Buyer and Seller agree to cooperate and use commercially reasonable good faith efforts to cause any shared expenses (i.e., "hook-up" or "connection" fees or deposits required to be paid to providers of utility services as a condition to the mutual benefit of the Real Property and the Hadid Parcel receiving such service) (collectively, "**Shared Construction Expenses**") to be split equally (50/50) between Buyer and Seller. Seller shall pay its share of the Shared Construction Expenses within ten (10) days after receipt of any such request. The obligations pursuant to this **Section 5(d)** shall expressly survive Closing.

    e. Title Objections. Prior to the expiration of the Feasibility Period, Buyer shall have the right to object in writing to any title matters that appear on the Title Commitment, and/or the Survey, (collectively, the "**Title Objections**"). After the expiration of the Feasibility Period and at any time prior to Closing, Buyer shall have the right to object in writing to any title matters which adversely affect Buyer's title to the Real Property (as reasonably determined by Buyer in good faith) if (i) such matters first appear on any update to the Title Commitment issued after the expiration of the Feasibility Period or in an Updated Survey (which is a survey delivered to Buyer after the end of the Feasibility Period that is based on information not known to Buyer prior to the end of the Feasibility Period), and (ii) such new title or survey exception was not caused by Buyer (collectively, the "**New Title Matters**").

    f. Seller's Cure Option. Prior to the expiration of the Feasibility Period, Seller may elect to remove any such Title Objections of Buyer and Seller may notify Buyer in writing within five (5) days after receipt of Buyer's notice of Buyer's applicable Title Objections. Within three (3) business days after Seller's election or deemed election (but, in any event, prior to the expiration of the Closing Date), Buyer may elect in in its sole and absolute discretion in writing to either (i) terminate this Agreement, in which event the Earnest Money (*less* the Independent Consideration) shall be automatically returned to Buyer by Seller Parties, this Agreement shall automatically terminate and the parties shall have no further rights or obligations hereunder except for obligations which expressly survive the termination of this Agreement, or (ii) waive such Title Objections and proceed to Closing.

    g. Buyer's Approval Notice. Except as expressly set forth herein, if the Property shall be unsatisfactory to the Buyer for any reason or no reason in the Buyer's sole and absolute discretion, then Buyer shall have the right to terminate this Agreement at any time prior to the expiration of the Feasibility Period by delivering written notice to Seller, in which event the Earnest Money (*less* the Independent Consideration) immediately shall be refunded by Seller Parties to Buyer and neither Party shall have any further rights or obligations hereunder, except for those that expressly survive such termination. In the event that the Buyer fails to terminate this Agreement prior to the end of the Feasibility Period, Buyer shall be deemed to have disapproved the condition of the Property, the Earnest Money (*less* the Independent Consideration) immediately shall be returned by Seller Parties to Buyer, this Agreement shall automatically terminate, and neither Party shall have

any further rights or obligations hereunder, except for those that expressly survive such termination. Conversely, at any time prior to the expiration of the Feasibility Period, Buyer, in its sole and absolute discretion, may approve the condition of the Property and elect to proceed to Closing in accordance with this Agreement by delivering a written notice of such approval (an "**Approval Notice**"), in which event the Earnest Money shall be nonrefundable to the Buyer, except as otherwise expressly provided in this Agreement.

        h.   Seller's Cure Responsibility. After the delivery of Buyer's Approval Notice (if at all) and prior to Closing, Seller Parties shall be affirmatively obligated to remove any and all New Title Matters and all Required Removal Items (defined below). At any time prior to Closing, Buyer shall notify Seller of any New Title Matters that require Seller Parties' cure. Seller shall be affirmatively obligated to cause such New Title Matters to be cured prior to Closing. If Seller elects or is deemed to have elected not to remove one or more of Buyer's Title Objections or New Title Matters, then, within three (3) business days after Seller's election or deemed election (but, in any event, prior to the Closing Date), Buyer may elect in its sole and absolute discretion in writing to either (i) exercise Buyer's rights and/or remedies under **Section 16(b)**, or (ii) waive such New Title Matters and proceed to Closing.

        i.   Required Removal Exceptions. Notwithstanding anything contained herein to the contrary, Buyer shall not be required to object to and Seller Parties shall be affirmatively obligated to remove the following title defects prior to the Closing Date, collectively referred to as the "**Required Removal Items**" (i) judgment liens, mechanic's liens, materialman's liens, real estate tax liens, or any other liens evidencing monetary encumbrances (other than liens for non-delinquent real estate taxes) created as a result of the acts or omissions of either Seller Party, its or his agents or affiliates, including any mortgage, deed of trust or other financing instrument securing indebtedness of either Seller Party or any of its or his affiliates, (ii) title matters created by either Seller Party, its or his agents or affiliates in violation of the terms of this Agreement; and (iii) any exception to title that Seller has specifically agreed in writing to remove pursuant to the terms of **Section 5(d)**. **For avoidance of doubt, Seller Parties shall also be affirmatively required to cause the Covenant and Agreement to be released and removed or amended so as to permit the Land Division.** If this Agreement is not terminated by Buyer in accordance with the provisions hereof, Seller Parties shall, at or prior to Closing, be obligated to remove all Required Removal Exceptions. If Seller is unable to remove any Required Removal Exceptions prior to the Closing Date, Buyer may at Closing elect to either (A) exercise all of Buyer's rights and/or remedies under **Section 16(b)**, or (B) accept in writing such exceptions to title and solely in the event of such written waiver, the Closing shall occur as herein provided without any reduction of or credit against the Purchase Price.

### 6.   Representations and Warranties of Seller Parties and Buyer.

        a.   Seller Parties' Representations and Warranties. Seller Parties, jointly and severally, represents and warrants to Buyer, both as of the date hereof and as of the Closing Date, as follows (collectively, "**Seller's Warranties**"):

        i.   Seller's Authorization. (a) Seller is duly or formed, validly existing and in good standing under the laws of the State of California, (b) the person(s) executing this Agreement and the Pledge Agreement (defined below) on behalf of Seller has the consent and authority to execute this Agreement and the Pledge Agreement and consummate the transaction and fulfill all of Seller's obligations hereunder and under all closing documents to be executed by Seller, and (c) such instruments, obligations and actions are valid and legally binding upon Seller,

enforceable in accordance with their respective terms. The execution and delivery of this Agreement and the Pledge Agreement and all closing documents to be executed by Seller and the performance of the obligations of Seller hereunder or thereunder will not (i) result in the violation of any law or any provision of Seller's organizational documents, (ii) conflict with any order of any court or governmental instrumentality binding upon Seller, or (iii) conflict or be inconsistent with, or result in any default under, any contract, agreement or commitment to which Seller is bound.

      ii.    Title to Property. Seller has good and marketable title to the Land, free and clear of all liens and encumbrances, except as shown on the Title Commitment.

      iii.    Due Diligence Materials. Seller Parties have delivered or otherwise made available to Buyer all books, records, and other writings in either Seller Party's, and/or any of their respective agent's, representative's or employee's possession, related in any material way to the use, ownership, development or operation of the Property. To each Seller Party's knowledge, the documents heretofore or hereafter delivered or otherwise made available to Buyer prior to closing are true, correct and complete in all material respects.

      iv.    Hazardous Materials. Each Seller Party has no knowledge of the existence of any hazardous materials or toxic substances on the Property and has not received any notice of (i) any violation of any hazardous materials laws or (ii) any potential studies or investigations into the existence of any such environmental hazards on the Property.

      v.    No Third-Party Rights. Each Seller Party has not entered into any agreements currently in effect pursuant to which either Seller Party has granted any rights of first refusal to purchase all or any part of the Property, options to purchase all or any part of the Property or other rights whereby any individual or entity has the right to purchase all or any part of the Property.

      vi.    Litigation. To each Seller Party's knowledge, there is no action, suit, arbitration, unsatisfied order or judgment pending, or action, suit, arbitration, governmental investigation or proceeding threatened, against the Property or transaction contemplated by the Agreement, wherein either Seller Party or any of its or his affiliates is/are a plaintiff, defendant or other named party, which could individually or in the aggregate affect the Property, adversely or otherwise, or the operation thereof.

      vii.    Zoning. Each Seller Party has not received any written notice that the Property is currently in violation of any applicable zoning, building, fire or other safety laws or regulations and each Seller Party has not received any written notice of any violation, default, intended or threatened non-renewal, suspension or revocation of any licenses and permits, the loss of which would materially adversely affect the value of the Property.

      viii.    Delivery of Property at Closing. Seller shall deliver the Property at Closing free and clear of any rights of any parties claiming a possessory interest in any portion of the Property.

      ix.    Compliance with Applicable Law; No Seller Party Defaults.    (i) Seller has not received any notice of a violation of any applicable law with respect to the Property which has not been cured or dismissed, (ii) no administrative proceeding, investigation or inquiry is pending or,

to either Seller Party's knowledge, threatened with respect to any violation of applicable law with respect to the Property, and (iii) to each Seller Party's knowledge, there is no violation of any applicable law with respect to the Property which has not been cured or dismissed. In addition, each Seller Party has not received nor sent any written notice of default by either Seller Party under the terms of any of any leases, service contracts, CC&Rs, restrictions running with the Land, or other contracts to which either Seller Party is a party.

     x.  Bankruptcy. No petition has been filed by Seller, nor has Seller received written notice of any petition filed against or by Seller under the Federal Bankruptcy Code or any similar laws and Seller has not caused, suffered or consented to the appointment of a receiver, trustee, administrator, conservator, liquidator or similar official in any federal, state or foreign judicial or non-judicial proceedings, to hold, administer and/or liquidate all or substantially all of its respective property, or made an assignment for the benefit of creditors.

     xi.  Taxes / Special Assessments. (a) All taxes that are due and owing by Seller with respect to the Property have been timely paid (or will be timely paid prior to the Closing Date); (b) Seller has duly and timely filed all federal, state, local and foreign tax returns with respect to the Property as required by applicable law, and such tax returns are true, correct and complete in all material respects; (c) each Seller Party has not received any written notice for an audit or examination of any taxes with respect to the Property which has not been resolved or completed; (d) no deficiency, assessment or proposed adjustment concerning any tax liability with respect to the Property has been claimed or raised by any governmental authority; and e) there is no currently pending appeal or abatement proceeding with respect to the real estate taxes assessed on the Real Property.

     xii.  Exclusivity of Contract. Seller has not contracted with and shall not enter into negotiations for the sale of the Property with any parties other than Buyer during the term of this Agreement.

     xiii.  Employees. Seller has not, nor has ever, had any employees or employment agreements or collective bargaining agreements at the Property for which Buyer will be responsible after the Closing.

     xiv.  No Leases. Seller warrants that there are no Leases leasing any portion of the Property.

     xv.  Condemnation. Seller has received no written notice of any pending condemnation proceeding or other proceeding in eminent domain, and to Seller's knowledge, no condemnation proceeding or eminent domain proceeding is threatened affecting the Property or any portion thereof.

     xvi.  Assets. Seller represents and warrants that it will maintain reasonable reserves as required by law to satisfy its post-closing obligations under this Agreement.

     xvii.  Good Faith. Each Seller has negotiated and hereby covenants to continue to negotiate in good faith with Buyer, and Seller shall complete the Land Division and finalize the Improvements all as more particularly set forth herein.

Seller Parties' Warranties set forth in this Agreement shall survive the Closing and not be merged therein for a period of twelve (12) months after the Closing Date (the "**Survival Period**").

b. **Buyer's Representations and Warranties**. Buyer represents and warrants to Seller Parties, both as of the date hereof and as of the Closing Date, as follows (collectively, "**Buyer's Warranties**"):

i. Buyer's Authorization. (a) Buyer is duly organized (or formed), validly existing and in good standing under the laws of the State of California, (b) the person executing this Agreement on behalf of Buyer has the consent and authority to execute this Agreement and consummate the transaction and fulfill all of Buyer's obligations hereunder and under all closing documents to be executed by Buyer, and (c) such instruments, obligations and actions are valid and legally binding upon Buyer, enforceable in accordance with their respective terms. The execution and delivery of this Agreement and all closing documents to be executed by Buyer and the performance of the obligations of Buyer hereunder or thereunder will not (i) result in the violation of any law or any provision of Buyer's organizational documents, (ii) conflict with any order of any court or governmental instrumentality binding upon Buyer, or (iii) conflict or be inconsistent with, or result in any default under, any contract, agreement or commitment to which Buyer is bound.

ii. Buyer's Solvency. Buyer is not bankrupt or insolvent under any applicable federal or state standard, has not filed nor intends to file at this time for protection or relief under any applicable bankruptcy or creditor protection statute, and has not been threatened by creditors with an involuntary application of any applicable bankruptcy or creditor protection statute.

iii. Experienced Buyer. Buyer is an experienced purchaser of property similar to the size and/or function of the Property, and is familiar with matters that typically impact the future use of such property and, without limiting any representations, warranties and covenants of Seller set forth in this Agreement or any document to be delivered in connection herewith, will conduct its own investigation and inspection of the Property in reliance upon the aid and advice of Buyer's independent experts in purchasing the Property.

iv. As-Is Condition. Except as expressly set forth in this Agreement, Seller Parties make no representations about the condition of the Property, and Buyer is relying solely on its own investigations, tests, analyses and advice of its consultants. Except in the event of fraud on the part of Seller or otherwise expressly set forth herein, including the representations, warranties and covenants of Seller, (A) Buyer is purchasing the Property in its "AS IS, WITH ALL FAULTS" condition, and (B) as of Closing, Buyer releases Seller Parties from any and all claims, demands, causes of action, obligations, damages and liabilities of any nature, known or unknown, relating to the physical condition of the Property.

v. Release of Claims. Except as expressly set forth in this Agreement, Seller Parties have no obligation to repair, correct or compensate Buyer for any conditions of the Property, and upon Closing, Buyer shall be deemed to have waived any and all objections to the condition of the Property, whether or not known to Buyer or its officers, directors, partners, employees, agents, trustees, representatives, contractors, attorneys, successors or assigns (with Buyer, collectively, "**Buyer Parties**"). Except as otherwise provided in the Agreement, including Seller Parties' representations, warranties and covenants in the Agreement, from and after the Closing, and except with respect to any agreements which survive the Closing, Buyer hereby completely releases and forever discharges the Seller Parties and Brokers from and against all claims, liabilities, demands, judgments, damages, losses and costs (collectively, "**Claims**"), including, without limitation, those arising from or related to: (a) any condition of the Property, whether known

CR

or unknown by either of the parties as of Closing; (b) any claim for indemnity or contribution arising under any federal, state or local laws, statutes or regulations relating to liability of property owners for hazardous substances (as that term is defined under federal and state laws); (c) any use, handling, treatment, storage, transportation or disposal of hazardous substances at or from the Property after Closing; and (d) any latent or patent defect affecting the Property (collectively, the "**Released Matters**"). Buyer's release obligations under this **Section 6(b)(v)** shall survive the termination of the Agreement or Closing.

      7.     **Closing**. The closing hereunder ("**Closing**") shall be held and delivery of all items to be made at the Closing under the terms of this Agreement shall be made through escrow at Escrow Holder's office on the date that is the later to occur of (a) fifteen (15) days after the completion of the Land Division or (b) such other date and time as Buyer and Seller may mutually agree upon in writing (the "**Closing Date**" or "**Close of Escrow**"); provided that, the Closing Date shall occur no later than the date that occurs fifteen (15) days after the expiration of the Outside Subdivision Date (the "**Outside Closing Date**"), unless such extension of the Closing Date is approved by Buyer in writing. Except as otherwise provided in this Agreement, the Outside Closing Date may not be extended without the prior written approval of both Seller Parties and Buyer.

      8.     **Conditions Precedent**. In addition to the documents and funds that must be placed into escrow prior to or on the Closing Date, the following are conditions precedent to Buyer's obligation to proceed with the Close of Escrow:

      a.     Seller Parties' Warranties set forth herein will be true and correct in all material respects on the Closing Date;

      b.     Title Company's irrevocable commitment to issue to Buyer an Owner's ALTA Extended Coverage Policy of Title Insurance in the amount of the Purchase Price showing title to the Real Property vested in Buyer (or Buyer's designee), subject only to the title exceptions approved by Buyer and otherwise in accordance with the provisions of this Agreement ("**Title Policy**");

      c.     As of the Close of Escrow, no suit, action or other proceeding will be pending that seeks, nor will there exist any judgment the effect of which is, to restrain the purchase and sale of the Property, or otherwise prohibit Buyer's proposed ownership and use of the Property, or affect title or the condition of the Property, provided, however, that any such suit, action, proceeding, judgment, restraint, prohibition, or effect on title or Property conditions shall not have been due to any acts of the Buyer Parties or any of them;

      d.     No petition has been filed by or against either Seller Party under the Federal Bankruptcy Code or any similar State or Federal Law, whether now or hereafter existing.

      e.     The REA is recorded at Closing.

In the event that any condition set forth in this **Section 8** does not occur, Buyer may terminate this transaction upon written notice to Seller and Escrow Holder and the Earnest Money (less the Independent Consideration) shall be promptly returned by Seller Parties to Buyer and Buyer shall be entitled to exercise any and all remedies pursuant to **Section 16(b)** below. In the event that Buyer does not terminate this Agreement prior to the Close of Escrow, Buyer will be deemed to have

waived the condition herein. The foregoing, however, shall not negate or limit remedies for a breach hereof by Seller Parties, the remedies for which are set forth in **Section 16**.

9.    **Seller Parties' Covenants.**

a.    Covenants of Performance and Good Faith. On or before the Closing, Seller Parties shall cause the Land Division and the construction of the Shared Driveway to occur and shall use commercially reasonable good faith efforts to negotiate the REA and otherwise comply with the other obligations of Seller Parties under this Agreement.

b.    Maintenance of Property. Seller Parties shall operate and maintain the Property in a manner consistent with Seller Parties' past practices with respect to the Property. Between the Effective Date and the Closing, Seller Parties will advise Buyer of any written notice either Seller Party receives after the Effective Date from any governmental authority respecting taxation, zoning, environmental notices, condemnation, Land Division, the construction of the Shared Driveway, or the violation of any laws regulating the condition or use of the Property.

10.    **Casualty and Condemnation.**

a.    Condemnation. Prior to Closing, the risk of loss by condemnation shall remain with Seller. In the event of the actual or threatened condemnation of all or any portion of the Property prior to the Close of Escrow or access to the Property is materially impaired, Buyer has the right to either (i) cancel this Agreement by written notice to Seller, in which event, notwithstanding anything to the contrary contained in this Agreement, all Earnest Money (*less* the Independent Consideration) will be promptly refunded by Seller Parties to Buyer, or (ii) elect to close escrow in accordance with its terms notwithstanding such actual or threatened taking, in which event all awards or payments made or to be made by the condemning authority to either Seller Party with respect to the Property will be paid over and assigned to Buyer at Close of Escrow.

b.    Casualty. Prior to Closing, Seller Parties shall maintain adequate insurance respecting the Land and the risk of loss for any improvements affecting the Real Property other than the Improvements to be constructed by Buyer shall remain with Seller; provided that Buyer shall obtain (or if required by Buyer's insurer, the parties shall cooperate to obtain mutually agreeable) insurance coverage respecting the Improvements, at Buyer's sole cost and expense. In the event of the actual damage or destruction of all or any portion of the Property prior to the Close of Escrow or access to the Property is materially impaired, Buyer has the right to either (i) cancel this Agreement by written notice to Seller, in which event, notwithstanding anything to the contrary contained in this Agreement, all Earnest Money (*less* the Independent Consideration) will be promptly refunded by Seller Parties to Buyer, or (ii) elect to close escrow in accordance with its terms notwithstanding such damage or destruction taking, in which event all insurance proceeds or claims paid or payable to Seller with respect to the Property will be paid over and assigned to Buyer at Close of Escrow and Buyer shall receive a credit at Closing for the amount of any deductible respecting Seller's insurance and incurred or to be incurred by Buyer and for the amount of any uninsured loss with respect to the Property. Seller acknowledges and agrees that any such credit respecting such insurance claims may exceed the Purchase Price. Seller Parties shall cooperate with Buyer in the processing of any insurance claims.

11.    **Fees and Costs**. Closing costs shall be allocated between Buyer and Seller in accordance with local custom except as expressly set forth below:

a.    Buyer's Responsibility. Buyer shall pay the following closing costs: (i) the premiums charged by the Title Company for the extended coverage portion of the Owner's Title Policy (including endorsements), (ii) the cost of the Updated Survey, (iii) one-half (1/2) of all recording and filing charges in connection with the instrument by which Seller conveys the Property, (iv) one-half of all escrow or closing charges, and (v) all fees due its attorneys and all costs of Buyer's due diligence, including fees due its consultants).

b.    Seller's Responsibility. Seller shall pay the following closing costs: (i) all fees due its attorneys, (ii) the premium charged by the Title Company for the CLTA (or "base") coverage portion of the Owner's Title Policy, as well as all costs incurred in connection with causing the Title Company to remove any Required Removal Exceptions, (iii) one-half (1/2) of all recording and filing charges in connection with the instrument by which Seller conveys the Property, (iv) one-half of all escrow or closing charges and (v) all City and County transfer taxes and other transfer or sales taxes applicable to the transfer and sale of the Property to Buyer.

The obligations of the Parties under this **Section 11** shall survive the Closing (and not be merged therein) or any earlier termination of this Agreement.

**12.**    **Prorations.**

a.    If any income or expenses associated with the Property (excluding the items listed in **Section 12(b)** below) are to be assumed by Buyer, a preliminary estimate of the closing prorations of income and expenses set forth above shall be reflected on a preliminary closing statement to be prepared by Seller and submitted to Buyer for Buyer's approval not later than five (5) business days prior to the Closing Date (the "**Preliminary Closing Statement**"). The Preliminary Closing Statement shall be subject to Buyer's review, comment and reasonable approval. Each of Buyer and Seller shall act reasonably and in good faith in finalizing the Preliminary Closing Statement, and Seller shall provide the backup for the items in the Preliminary Closing Statement. The final Closing Statement, once agreed upon, shall be signed by Buyer and Seller and delivered to the Escrow Holder for purposes of making the proration of income and expenses at Closing, subject to the final adjustment / re-proration between Buyer and Seller as more particularly set forth below.

b.    All real property taxes, personal property taxes, assessments, governmental licenses or permit fees, utility costs, and all other items of income and expense normally apportioned in sales of property in similar situations in the county in which the Property is located shall be apportioned on a *per diem* basis at the Closing as of the close of business on the day immediately preceding the Closing Date.

**13.**    **Closing Documents.** At least one (1) business day prior to the Closing Date (other than the funds, which may be deposited by Buyer or Seller on the scheduled Closing Date if permitted by the Escrow Holder), the Parties must deposit into escrow the funds and documents described below.

a.    Seller Deliveries. Seller will deposit the following:

(i)    An original duly executed and acknowledged Grant Deed respecting the Real Property, in the form attached hereto as **Exhibit C**;

(ii)     Two (2) original counterparts of a bill of sale and assignment and assumption of the Contracts and Intangible Property, in the form of **Exhibit D** attached hereto ("**Bill of Sale and Assignment Agreement**"), executed by Seller;

(iii)     Such affidavits and agreements concerning parties in possession, mechanics' liens, gap coverage and other title matters as may be reasonably required by Title Company in order to issue the Title Policy in accordance with the provisions of **Section 5** of this Agreement;

(iv)     A closing statement respecting the Property prepared in writing by Escrow Holder and approved in writing and duly executed by Seller;

(v)     An affidavit pursuant to Section 1445 of the Code with respect to Seller, duly executed, as applicable, by Seller, and upon which Buyer is entitled to rely, that each Seller is not a "foreign person" within the meaning of Section 1445, in the form of **Exhibit E** attached hereto and any similar certificates required by the State of California in respect of such matters (such as the Form 593-C); and

(vi)     Such other documents and funds, including without limitation, escrow instructions, as may be reasonably required of Seller to close the transaction in accordance with applicable laws and this Agreement.

b.    Buyer Deliveries. Buyer will deposit the following:

(i)     The Purchase Price, *less* the Earnest Money, *plus* or *minus* Buyer's portion the Closing costs and prorations pursuant to this Agreement;

(ii)     A closing statement respecting the Property prepared in writing by Escrow Holder and approved in writing and each duly executed by Buyer;

(iii)     Two (2) original counterparts of the Bill of Sale and Assignment Agreement, executed by Buyer;

(iv)     duly executed affidavits, disclosures and reports as are required of Buyer by applicable state or local law in connection with the conveyance of the Property; and

(v)     Such other documents and funds, including without limitation, escrow instructions, as may be reasonably required of Buyer to close the transaction in accordance with this Agreement.

**14.**    **Notices**. All notices related to this Agreement are to be delivered, in writing, to the following respective addresses:

| **SELLER:** | Tree Lane, LLC<br>9454 Wilshire Boulevard, Suite 208<br>Beverly Hills, California 90212<br>Attention: Mohamed Hadid<br>email: hadidaspen@aol.com | **BUYER:** | Skylark Capital Management, LLC<br>8445 Santa Monica Boulevard<br>West Hollywood, California 90069<br>Attention: Zachary A. Vella<br>email: zach@vellagroup.com: |
|---|---|---|---|

| COPY TO: | Abdulaziz, Grossbart & Rudman<br>6454 Coldwater Canyon Ave.<br>North Hollywood, CA 91606<br>Attention: Bruce D. Rudman<br>Telephone: (818) 760-2000<br>email:  bdr@agrlaw.com | COPY TO: | Eisner, P.C.<br>9601 Wilshire Blvd., 7th Floor<br>Beverly Hills, California 90210<br>Attention: Brian D. Kilb<br>Telephone: (310) 855-3249<br>email:   bkilb@eisnerlaw.com |
|---|---|---|---|

**15.**      **Brokerage**:  The parties represent and warrant to each other that no broker or finder was instrumental in arranging or bringing about this transaction.  If any person brings a claim for a commission or finder's fee based upon any contact, dealings or communication with Buyer or Seller, then the party through whom such person makes his claim shall defend the other party (the **"Indemnified Party"**) from such claim, and shall indemnify the Indemnified Party and hold the Indemnified Party harmless for, from, and against any and all costs, damages, claims, liabilities or expenses (including without limitation, court costs and reasonable attorneys' fees and disbursements) incurred by the Indemnified Party in defending against the claim.  The provisions of this Section 15 shall survive the Closing or, if the purchase and sale is not consummated, any termination of this Agreement.

**16.**      **Seller's and Buyer's Remedies.**

a.      If Buyer fails to pay or materially perform when due any act or obligation required by this Agreement, which material failure continues uncured after five (5) business days' written notice from Seller to Buyer, Buyer shall be in default, in which event Seller's sole and exclusive remedy is to cancel this Agreement and retain the Earnest Money then on deposit as Seller's liquidated damages.

b.      (i)      If either Seller Party fails to pay or perform when due any act or obligation required by this Agreement, which failure continues uncured after five (5) business days' written notice from Buyer to Seller Parties, Seller shall be in default, in which event, at the election of Buyer made at any time thereafter in its sole discretion, Buyer may immediately cancel this Agreement, and be entitled to pursue any or all remedies at law or in equity, including, without limitation, specific performance, suit for damages, and/or other alternative relief.

(ii)      The Parties agree that damage to Buyer caused by any breach of Seller Parties' obligations under this Agreement would be difficult or impossible to ascertain because, among other things, of the unique characteristics of the Real Property.  The Parties further agree that a reasonable estimate of such damage is an amount (the **"Liquidated Damages Amount"**) equal to the sum of (x) $5,000,000 *plus* (y) the Earnest Money therefore delivered by Buyer to Seller Parties (or either of them) *plus* (z) the sum of (A) all amounts expended by Buyer after the Effective Date to obtain Government Approvals, (B) all Shared Construction Expenses paid by Buyer, (C) all amounts expended by Buyer in conducting due diligence during the Feasibility Period pursuant to **Section 5**, including surveys, environmental reports soils reports, and engineering analyses and reports, and (D) all amounts expended by Buyer after the Effective Date for the design and construction of the Improvements (*provided* that the sum of the amounts described in clauses (A), (B), (C) and (D) shall not exceed $300,000.00 unless Seller Parties have consented in writing in advance to expenditure thereof).

(iii)    If, upon termination of this Agreement by Buyer after breach hereof or default hereunder by Seller Parties, (A) Seller Parties execute a confession of judgment in a form acceptable to Buyer it in sole discretion, pursuant to which Seller Parties confess judgment in favor of Buyer in an amount equal to the Liquidated Damages Amount, and (B) Seller Parties pay to Buyer, within ten (10) business days after such termination, an amount equal to the aggregate amounts described in **clauses (y)** and **(z)** in the definition of the term "Liquidated Damages Amount" in **Section 16(b)(ii)**, Buyer agrees that it will not seek to collect payment in respect of such judgment or otherwise seek to enforce such judgment in respect of the remaining Liquidated Damages Amount until the earlier of (A) the "Maturity Date" (as defined in the Loan Agreement dated as of September 28, 2018 (the "Loan Agreement") between Seller, as borrower thereunder, and Buyer, as lender thereunder), as such Maturity Date may be extended in accordance with the Loan Agreement, or (B) the date upon which the loan made to Seller by Buyer pursuant to the Loan Agreement is repaid in full (including by any refinancing thereof). If indefeasible payment of the Liquidated Damages Amount is not made in full on or prior to such earlier date, then Buyer may exercise each and every right and remedy available to it at law or in equity to enforce payment thereof and the judgment confessed by Seller Parties with respect thereto, including, without limitation, by exercising its rights and remedies under the Pledge Agreement (as hereinafter defined). Nothing in this **Section 16(b)(iii)** shall prohibit, impair or impede in any respect Buyer from maintaining an action for specific enforcement of Seller Parties' obligations hereunder, to which Seller Parties stipulate Buyer shall be entitled after breach hereof or default hereunder by Seller Parties

With respect to the liquidated damages available to each of Buyer and Seller herein the Parties hereby acknowledge and agree as follows:

IT IS IMPRACTICABLE OR EXTREMELY DIFFICULT TO FIX, PRIOR TO THE EFFECTIVE DATE, THE ACTUAL DAMAGES THAT SELLER WOULD INCUR IN THE EVENT OF BUYER'S FAILURE TO PURCHASE THE PROPERTY AS REQUIRED IN THIS AGREEMENT AND IT IS IMPRACTICABLE OR EXTREMELY DIFFICULT TO FIX, PRIOR TO THE EFFECTIVE DATE, THE ACTUAL DAMAGES THAT BUYER WOULD INCUR IN THE EVENT OF SELLER PARTIES' FAILURE TO FULFILL THEIR RESPECTIVE OBLIGATIONS AS REQUIRED IN THIS AGREEMENT. THEREFORE, UPON SELLER'S CANCELLATION OF THIS AGREEMENT RESULTING FROM BUYER'S FAILURE TO PURCHASE THE PROPERTY AS REQUIRED IN THIS AGREEMENT, SELLER IS ENTITLED TO ALL EARNEST MONEY AS CONSIDERATION FOR TAKING THE PROPERTY OFF THE MARKET AND NOT AS A PENALTY AND UPON BUYER'S CANCELLATION OF THIS AGREEMENT RESULTING FROM SELLER PARTIES' FAILURE TO SATISFY EACH OF SELLER PARTIES' OBLIGATIONS AS REQUIRED IN THIS AGREEMENT, BUYER IS ENTITLED TO AN AMOUNT EQUAL TO THE LIQUIDATED DAMAGES APPRAISAL AS CONSIDERATION FOR INDUCING BUYER TO ENTER INTO THIS AGREEMENT, INVEST IN THE REAL PROPERTY AND CONSTRUCT THE IMPROVEMENTS, AND NOT AS A PENALTY.   SUCH SUMS ARE A REASONABLE ESTIMATE OF SELLER'S DAMAGES FOR BUYER'S DEFAULT AND BUYER'S DAMAGES FOR SELLER PARTIES' DEFAULT (AS APPLICABLE).

WITH RESPECT TO SELLER ONLY, THE FOREGOING LIQUIDATED DAMAGES REMEDY IS SELLER'S SOLE REMEDY FOR BUYER'S FAILURE TO PURCHASE THE PROPERTY AS REQUIRED IN THIS AGREEMENT AND IS IN LIEU OF ANY OTHER REMEDY AT LAW OR IN EQUITY. UPON SELLER'S RECEIPT OF THE EARNEST MONEY, BUYER IS RELEASED FROM ANY FURTHER LIABILITY TO SELLER EXCEPT FOR ANY OBLIGATIONS TO REPAIR THE PROPERTY OR TO INDEMNIFY SELLER AS EXPRESSLY PROVIDED HEREIN. IN SUCH EVENT, ANY ESCROW CANCELLATION FEES AND TITLE COMPANY CHARGES ARE BUYER'S RESPONSIBILITY.

WITH RESPECT TO BUYER ONLY, THE FOREGOING LIQUIDATED DAMAGES REMEDY IS BUYER'S SOLE REMEDY FOR SELLER'S FAILURE TO COMPLETE THE LAND DIVISION OR OTHERWISE COMPLY WITH THE OBLIGATIONS OF SELLER REQUIRED UNDER THIS AGREEMENT AND IS IN LIEU OF ANY OTHER REMEDY AT LAW OR IN EQUITY. UPON BUYER'S RECEIPT OF THE LIQUIDATED DAMAGES AMOUNT, EACH SELLER PARTY IS RELEASED FROM ANY FURTHER LIABILITY TO BUYER EXCEPT FOR ANY OBLIGATIONS TO INDEMNIFY BUYER AS EXPRESSLY PROVIDED HEREIN. IN SUCH EVENT, ANY ESCROW CANCELLATION FEES AND TITLE COMPANY CHARGES ARE SELLER'S RESPONSIBILITY.

BY INITIALING BELOW, EACH OF BUYER AND EACH SELLER PARTY ACKNOWLEDGE THAT THEY HAVE READ AND UNDERSTAND THE PROVISIONS OF THESE LIQUIDATED DAMAGES PARAGRAPHS.

MR. HADID'S INITIALS _____   SELLER'S INITIALS _____   BUYER'S INITIALS __ __

17.     **Escrow Instructions**. Buyer and Seller Parties shall engage Escrow Holder to act as their Escrow Holder in connection with this transaction. This Agreement shall serve as the Escrow Instructions. Escrow Holder, as the person responsible for closing the escrow, must file all necessary information regarding this transaction required by the Code, and provide copies to the parties. If this Agreement is canceled in accordance with its terms for any reason whatsoever (other than a Party's default, in which event the "Seller's and Buyer's Remedies" provision shall apply), Buyer and Seller agree to promptly execute any escrow cancellation instructions required by Escrow Holder, however in the event Buyer or Seller fail to execute the escrow cancellation instructions within ten (10) days following Escrow Holder's delivery of said cancellation instructions, Escrow Holder shall proceed with the cancellation of the escrow as if said party had signed the cancellation instructions. In the absence of a default, Seller shall pay any customary escrow cancellation charges; otherwise, such charges are paid by the defaulting party.

18.     **Collateral Security**. The Seller Parties' obligations under this Agreement are secured by a security interest in favor of Buyer arising under the Pledge Agreement of even date herewith (the "**Pledge Agreement**") between Mr. Hadid, as pledger, and Buyer, pursuant to which Mr. Hadid pledged, as security for Seller Parties' performance of all of their obligations under this Agreement, a fifty percent (50%) membership interest in Summitridge Development II, LLC, a California limited liability company and the sole member of Seller.

19.     **Standard Provisions**.

a.     Assignment. At any time prior to the Closing, Buyer may nominate and/or assign its rights and obligations under this Agreement.

b.     Time is of the Essence. Time is of the essence of this agreement.

c.     Notices. All notices under this Agreement must be in writing and are deemed received (i) upon receipt or refusal of delivery, if personally delivered; (ii) on the next business day, if deposited for next day delivery with a nationwide overnight courier; (iii) upon delivery if emailed to email address designated in the notice addresses above (a written confirmation of successful transmission from the transmitting computer is sufficient evidence of such receipt) (if email is sent after business hours or on a non-business day then receipt shall be deemed to occur on the next business day); or (iv) on the third day following the date of mailing, if mailed by certified mail, postage prepaid, return receipt requested. Notice received by a party's legal counsel is notice to such party for all purposes.

WITH RESPECT TO BUYER ONLY, THE FOREGOING LIQUIDATED DAMAGES REMEDY IS BUYER'S SOLE
REMEDY FOR SELLER'S FAILURE TO COMPLETE THE LAND DIVISION OR OTHERWISE COMPLY WITH THE
OBLIGATIONS OF SELLER REQUIRED UNDER THIS AGREEMENT AND IS IN LIEU OF ANY OTHER REMEDY AT
LAW OR IN EQUITY. UPON BUYER'S RECEIPT OF THE LIQUIDATED DAMAGES AMOUNT, EACH SELLER
PARTY IS RELEASED FROM ANY FURTHER LIABILITY TO BUYER EXCEPT FOR ANY OBLIGATIONS TO
INDEMNIFY BUYER AS EXPRESSLY PROVIDED HEREIN. IN SUCH EVENT, ANY ESCROW CANCELLATION FEES
AND TITLE COMPANY CHARGES ARE SELLER'S RESPONSIBILITY.

BY INITIALING BELOW, EACH OF BUYER AND EACH SELLER PARTY ACKNOWLEDGE THAT THEY HAVE READ
AND UNDERSTAND THE PROVISIONS OF THESE LIQUIDATED DAMAGES PARAGRAPHS.

MR. HADID'S INITIALS ⟨⟩     SELLER'S INITIALS ⟨⟩     BUYER'S INITIALS _____

17.    **Escrow Instructions**. Buyer and Seller Parties shall engage Escrow Holder to act as their Escrow Holder in connection with this transaction. This Agreement shall serve as the Escrow Instructions. Escrow Holder, as the person responsible for closing the escrow, must file all necessary information regarding this transaction required by the Code, and provide copies to the parties. If this Agreement is canceled in accordance with its terms for any reason whatsoever (other than a Party's default, in which event the "Seller's and Buyer's Remedies" provision shall apply), Buyer and Seller agree to promptly execute any escrow cancellation instructions required by Escrow Holder, however in the event Buyer or Seller fail to execute the escrow cancellation instructions within ten (10) days following Escrow Holder's delivery of said cancellation instructions, Escrow Holder shall proceed with the cancellation of the escrow as if said party had signed the cancellation instructions. In the absence of a default, Seller shall pay any customary escrow cancellation charges; otherwise, such charges are paid by the defaulting party.

18.    **Collateral Security**. The Seller Parties' obligations under this Agreement are secured by a security interest in favor of Buyer arising under the Pledge Agreement of even date herewith (the "**Pledge Agreement**") between Mr. Hadid, as pledger, and Buyer, pursuant to which Mr. Hadid pledged, as security for Seller Parties' performance of all of their obligations under this Agreement, a fifty percent (50%) membership interest in Summitridge Development II, LLC, a California limited liability company and the sole member of Seller.

19.    **Standard Provisions**.

a.    Assignment. At any time prior to the Closing, Buyer may nominate and/or assign its rights and obligations under this Agreement.

b.    Time is of the Essence. Time is of the essence of this agreement.

c.    Notices. All notices under this Agreement must be in writing and are deemed received (i) upon receipt or refusal of delivery, if personally delivered; (ii) on the next business day, if deposited for next day delivery with a nationwide overnight courier; (iii) upon delivery if emailed to email address designated in the notice addresses above (a written confirmation of successful transmission from the transmitting computer is sufficient evidence of such receipt) (if email is sent after business hours or on a non-business day then receipt shall be deemed to occur on the next business day); or (iv) on the third day following the date of mailing, if mailed by certified mail, postage prepaid, return receipt requested. Notice received by a party's legal counsel is notice to such party for all purposes.

        d.      Authorization / Binding Effect. Buyer warrants and Seller warrants that each has the authority to enter into the Agreement. This Agreement is binding upon the respective heirs, personal representatives, successors and assigns of the parties.

        e.      Integration; Waiver. This Agreement embodies and constitutes the entire understanding between the parties with respect to the transaction and all prior agreements, understandings, representations and statements, oral or written, are merged into this Agreement. Neither this Agreement nor any provision hereof may be waived, modified, amended, discharged or terminated except by an instrument signed by the parties hereto. No waiver by either party hereto of any failure or refusal by the other party to comply with its obligations hereunder shall be deemed a waiver of any other or subsequent failure or refusal to so comply.

        f.      Captions Not Binding; Exhibits. The captions in this Agreement are inserted for reference only and in no way limit the scope or intent of this Agreement or of any of the provisions hereof. All Exhibits attached hereto shall be incorporated by reference as if set out herein in full..

        g.      Severability. If any term or provision of this Agreement or the application thereof shall, to any extent, be invalid or unenforceable, the remainder of this Agreement or the application of such term or provision to persons or circumstances other than those as to which it is held invalid or unenforceable shall not be affected thereby, and each term and provision of this Agreement shall be valid and enforced to the fullest extent permitted by law.

        h.      Counterparts; Electronic Signatures. This Agreement may be executed in counterparts, each of which shall be an original and all of which counterparts taken together shall constitute one and the same agreement. Signatures to this Agreement transmitted by electronic means shall be valid and effective to bind the party so signing.

        i.      Governing Law. This Agreement is governed by the laws of the State of California.

        k.      Attorney's Fees. If any claim or legal proceeding is made or commenced between the parties hereto concerning the Property, this Agreement, or the rights and duties of either in relation thereto, the prevailing Party in such matter shall be entitled, in addition to such other relief as may be granted, to receive from the losing Party a reasonable sum as and for its costs and attorneys' fees incurred both at and in preparation for arbitration, trial and any appeal or review, such sum to be set by the arbitrator(s) or court(s) before which the matter is heard.

        l.      Survival. All representations and warranties by Seller and warranties by Buyer, and the right to enforce or assert a breach of the same, shall survive Closing (subject to any express limitations herein) and shall not be merged into any document delivered by Seller and/or Buyer at Closing.

       m.       <u>No Joint Venture</u>. Seller and Buyer do not intend to form a partnership or joint venture by executing this Agreement and neither party may bind the other to a third party.

       n.       <u>Binding on Successors</u>. This Agreement shall be binding upon, and inure to the benefit of, the successors, heirs, and permitted assigns and transferees of the parties.

*[Remainder of Page Intentionally Blank]*

IN WITNESS WHEREOF, Buyer and each Seller Party have executed this Agreement, to be effective as of the Effective Date.

**SELLER:**

**TREE LANE, LLC,**
a California limited liability company

By:
Name: Mohamed Hadid
Title: Member

**BUYER**:

**SKYLARK CAPITAL MANAGEMENT, LLC**

By:
Name:
Title:

MR. HADID

Mohamed Hadid

IN WITNESS WHEREOF, Buyer and each Seller Party have executed this Agreement, to be effective as of the Effective Date.

**SELLER:**

**TREE LANE, LLC,**
a California limited liability company

By:_____
Name:
Title:

**BUYER:**

**SKYLARK CAPITAL MANAGEMENT, LLC**

By:_____
Name: Jon Shapiro
Title: Managing Director.

MR. HADID

_____
Mohamed Hadid

## LIST OF EXHIBITS

Exhibit "A-1"  Legal Description of Land

Exhibit "A-2"  Legal Description of Real Property

Exhibit "B"  Site Plan of Property

Exhibit "C"  Form of Deed

Exhibit "D"  Form of Bill of Sale and Assignment and Assumption of Contracts and Intangible
Property

Exhibit "E"  Non-Foreign Affidavit

Exhibit "F"  Pledge Agreement

**EXHIBIT A-1**

**LEGAL DESCRIPTION OF LAND**

THE LAND REFERRED TO HEREIN BELOW IS SITUATED IN THE CITY OF LOS ANGELES
(BEVERLY HILLS AREA) IN THE COUNTY OF LOS ANGELES, STATE OF CALIFORNIA,
AND IS DESCRIBED AS FOLLOWS:

PARCEL 1:

THAT CERTAIN REAL PROPERTY SITUATED IN THE CITY OF LOS ANGELES, COUNTY
OF LOS ANGELES, STATE OF CALIFORNIA, BEING PORTIONS OF LOT 3, IN SECTION 2,
TOWNSHIP 1 SOUTH, RANGE 15 WEST, SAN BERNARDINO BASE AND MERIDIAN, AS
PER MAP FILED IN BOOK 45, PAGE 40 OF RECORD OF SURVEYS AND LOT 1 OF TRACT
32693 AS PER MAP RECORDED IN BOOK 918, PAGES 13 AND 14 OF MAPS, IN THE
OFFICE OF THE COUNTY RECORDER OF SAID COUNTY, DESCRIBED AS FOLLOWS:

THAT PORTION OF LOT 3 OF SAID RECORD OF SURVEY AND THAT PORTION OF LOT 1
OF SAID TRACT 32693 MORE PARTICULARLY DESCRIBED AS FOLLOWS:

BEGINNING AT THE NORTHEAST CORNER OF SAID LOT 3;

THENCE ALONG THE EASTERLY LINE OF SAID LOT 3, SOUTH 0° 21' 54" WEST, 576.12
FEET;

THENCE PARALLEL WITH THE NORTH LINE OF SAID LOT 3, NORTH 89° 33' 00" WEST,
352.00 FEET;

THENCE NORTH 11° 16' 17" WEST 169.69 FEET TO A POINT DISTANT 20.00 FEET,
MEASURED AT RIGHT ANGLES, FROM THE SOUTHEASTERLY LINE OF TRACT 21845,
AS PER MAP FILED IN BOOK 619, PAGES 83 AND 84 OF MAPS, IN THE OFFICE OF THE
COUNTY RECORDER OF SAID COUNTY;

THENCE    PARALLEL    WITH    THE    SOUTHEASTERLY,    SOUTHERLY    AND
SOUTHWESTERLY LINES OF SAID TRACT 21845 AND DISTANT 20.00 FEET
THEREFROM, MEASURED AT RIGHT ANGLES ALONG THE FOLLOWING COURSES AND
DISTANCES

SOUTH 71° 40' 52" WEST 101.21 FEET;

THENCE SOUTH 87° 31' 21" WEST 209.42 FEET; NORTH 20° 03' 46" WEST, 133.22 FEET TO
THE POINT IN THE SOUTHERLY SIDE LINE OF HENSAL ROAD, 34.00 FEET WIDE, AS
PER SAID TRACT 32693;

THENCE NORTHEASTERLY ALONG SAID SOUTHERLY LINE, NORTH 38° 02' 06" EAST,
11.95 FEET TO THE BEGINNING OF A TANGENT CURVE CONCAVE SOUTHEASTERLY
HAVING A RADIUS OF 83.00 FEET,

THROUGH A CENTRAL ANGLE OF 07° 42' 52" A DISTANCE OF 11.18 FEET TO THE NORTHWESTERLY CORNER OF LOT 12 OF SAID TRACT 21845, SAID CORNER ALSO BEING THE NORTHEASTERLY CORNER OF LOT 1 OF SAID TRACT 32693;

THENCE SOUTHEASTERLY ALONG THE SOUTHWESTERLY LINE OF SAID LOT 12, SAID LINE ALSO BEING A PORTION OF THE NORTHEASTERLY LINE OF LOT 12, SAID LINE ALSO BEING A PORTION OF THE NORTHEASTERLY LINE OF SAID LOT 1, SOUTH 20° 03' 46" EAST 130.14 FEET;

THENCE CONTINUING ALONG THE SOUTHERLY, SOUTHEASTERLY AND NORTHEASTERLY LINE OF SAID TRACT 21845, THE FOLLOWING COURSES AND DISTANCES:

NORTH 87° 31' 21" EAST 192.00 FEET; NORTH 71° 40' 52" EAST 155.90 FEET;

THENCE NORTH 52° 04' 00" EAST 86.21 FEET; NORTH 24° 03' 26" EAST 183.98 FEET;

THENCE NORTH 24° 18' 16" WEST, 102.04 FEET;

THENCE NORTH 37° 01' 29" WEST 72.98 FEET TO A POINT IN THE NORTHERLY LINE OF SAID LOT 3;

THENCE EASTERLY ALONG SAID NORTHERLY LINE, SOUTH 89° 33' 00" EAST, 283.39 FEET TO THE POINT OF BEGINNING.

PARCEL 2:

A NON-EXCLUSIVE EASEMENT FOR VEHICULAR INGRESS AND EGRESS AND ROAD MAINTENANCE PURPOSES OVER THAT PORTION OF THE NORTHEAST QUARTER OF SECTION 2, TOWNSHIP 1 SOUTH, RANGE 15 WEST, SAN BERNARDINO MERIDIAN, IN THE CITY OF LOS ANGELES, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, INCLUDED WITHIN A STRIP OF LAND 20.00 FEET WIDE, THE CENTERLINE OF SAID 20.00 FOOT WIDE STRIP OF LAND DESCRIBED AS FOLLOWS:

BEGINNING AT THE INTERSECTION OF THE WEST LINE OF THE NORTHEAST QUARTER OF SAID SECTION 2 WITH THE NORTHEASTERLY PROLONGATION OF THE CENTERLINE OF SUMMITRIDGE DRIVE, 41.00 FEET WIDE, AS SAID LAST MENTIONED CENTERLINE IS SHOWN ON THE MAP OF TRACT NO. 20668, RECORDED IN BOOK 671, PAGES 39 THROUGH 42, INCLUSIVE OF MAPS, IN THE OFFICE OF THE RECORDER OF SAID COUNTY, SAI D WEST LINE TO HAVE A BEARING OF NORTH 0° 21' 27" EAST FOR PURPOSES OF THIS DESCRIPTION;

THENCE NORTH 33° 18' 54" EAST, 50.55 FEET TO THE BEGINNING OF A TANGENT CURVE CONCAVE WESTERLY AND HAVING A RADIUS OF 100 FEET;

THENCE NORTHERLY ALONG SAID CURVE THROUGH A CENTRAL ANGLE OF 44° 46' 37", A DISTANCE OF 78.15 FEET;

THENCE TANGENT TO SAID CURVE, NORTH 11° 27' 43" WEST, 55.43 FEET TO THE BEGINNING OF A TANGENT CURVE CONCAVE EASTERLY AND HAVING A RADIUS OF 150 FEET;

THENCE NORTHERLY ALONG SAID LAST MENTIONED CURVE THROUGH A CENTRAL ANGLE OF 28° 35' 38", A DISTANCE OF 74.86 FEET; TANGENT TO SAID LAST MENTIONED CURVE, NORTH 17° 07' 55" EAST, 63.44 FEET TO THE BEGINNING OF A TANGENT CURVE CONCAVE NORTHWESTERLY AND HAVING A RADIUS OF 150 FEET;

THENCE NORTHEASTERLY ALONG SAID LAST MENTIONED CURVE THROUGH A CENTRAL ANGLE OF 2° 4' 23", A DISTANCE OF 5.86 FEET;

THENCE, TANGENT TO SAID LAST MENTIONED CURVE, NORTH 14° 53' 32" EAST, 203.43 FEET TO THE BEGINNING OF A TANGENT CURVE CONCAVE WESTERLY AND HAVING A RADIUS OF 350 FEET;

THENCE NORTHERLY ALONG SAID LAST MENTIONED CURVE THROUGH A CENTRAL ANGLE OF 8° 29' 03", A DISTANCE OF 51.83 FEET;

THENCE TANGENT TO SAID LAST MENTIONED CURVE, NORTH 6° 24' 29" EAST, 229.60 FEET TO THE BEGINNING OF A TANGENT CURVE CONCAVE WESTERLY AND HAVING A RADIUS OF 250 FEET;

THENCE NORTHERLY ALONG SAID LAST MENTIONED CURVE THROUGH A CENTRAL ANGLE OF 10° 58' 55", A DISTANCE OF 47.92 FEET;

THENCE TANGENT TO SAID LAST MENTIONED CURVE, NORTH 4° 34' 26" WEST, 75.24 FEET TO THE BEGINNING OF A TANGENT CURVE CONCAVE SOUTHWESTERLY AND HAVING A RADIUS OF 250 FEET;

THENCE NORTHWESTERLY ALONG SAID LAST MENTIONED CURVE THROUGH A CENTRAL ANGLE OF 25° 09' 18", A DISTANCE OF 109.76 FEET;

THENCE TANGENT TO SAID LAST MENTIONED CURVE, NORTH 29° 43' 44" WEST, 197.42 FEET MORE OR LESS TO SAID WEST LINE OF THE NORTHEAST QUARTER OF SAID SECTION 2.

THE SIDELINES OF SAID 20.00 FOOT STRIP OF LAND ARE TO BE LENGTHENED OR SHORTENED TO TERMINATE SOUTHWESTERLY AND NORTHWESTERLY AT THE SAID WEST LINE OF THE NORTHEAST QUARTER OF SAID SECTION 2.

PARCEL 3:

A NON-EXCLUSIVE EASEMENT FOR VEHICULAR AND PEDESTRIAN INGRESS AND EGRESS, WITH THE RIGHT TO CONSTRUCT AND MAINTAIN A DRIVEWAY AND CURB CUT, AS SET FORTH IN A DOCUMENT RECORDED JUNE 20, 2012, AS INSTRUMENT NO. 20120917645, OFFICIAL RECORDS, UPON THE TERMS, CONDITIONS AND PROVISIONS AS THEREIN SET FORTH, WHICH WAS AMENDED BY THE DOCUMENT RECORDED MAY 10, 2016, AS INSTRUMENT NO. 20160531499 OF OFFICIAL RECORDS, WHICH

STATES SAID EASEMENT SHALL BE LOCATED OVER THE FOLLOWING DESCRIBED LAND:

A VARIABLE WIDTH EASEMENT OVER THAT PORTION OF REAL PROPERTY DESCRIBED IN DEED RECORDED OCTOBER 8, 2008 AS INSTRUMENT NO. 20081801049 OF OFFICIAL RECORDS IN THE CITY OF LOS ANGELES, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, BEING A PORTION OF THE NORTHWEST QUARTER OF LOT 2, SECTION 2, TOWNSHIP 1 SOUTH, RANGE 15 WEST, SAN BERNARDINO MERIDIAN, IN THE CITY OF LOS ANGELES, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, ACCORDING TO THE OFFICIAL PLAT OF SAID LAND, MORE PARTICULARLY DESCRIBED AS FOLLOWS:

BEGINNING AT THE SOUTHWEST CORNER OF LAND DESCRIBED IN DEED RECORDED IN SAID INSTRUMENT NO. 200081801049 OF OFFICIAL RECORDS;

THENCE, NORTHERLY ALONG THE WEST LINE OF LAND DESCRIBED IN SAID INSTRUMENT NO. 20081801049 OF OFFICIAL RECORDS.

1. NORTH 00° 20' 15" EAST, 75.13 FEET TO THE BEGINNING OF A NON-TANGENT CURVE CONCAVE NORTHERLY, HAVING A RADIAL BEARING TO SAID CURVE OF SOUTH 10° 14' 10" WEST AND A RADIUS OF 72.40 FEET; THENCE,

2. EASTERLY ALONG SAID CURVE THROUGH A CENTRAL ANGLE OF 10° 46' 51", AN ARC DISTANCE OF 13.62 FEET TO THE BEGINNING OF A NON-TANGENT COMPOUND CURVE CONCAVE NORTHWESTERLY HAVING A RADIAL BEARING TO SAID CURVE OF SOUTH 02° 54' 57" WEST AND A RADIUS OF 8.27 FEET; THENCE,

3. NORTHEASTERLY ALONG SAID CURVE, THROUGH A CENTRAL ANGLE OF 53° 00' 03", AN ARC DISTANCE OF 7.65 FEET TO A POINT OF NON-TANGENCY; THENCE,

4. SOUTH 65° 18' 03" EAST, 27.55 FEET; THENCE,

5. SOUTH 24° 41' 57" WEST, 1.58 FEET TO THE BEGINNING OF A TANGENT CURVE CONCAVE EASTERLY HAVING A RADIUS OF 130.00 FEET; THENCE,

6. SOUTHERLY ALONG SAID CURVE THROUGH A CENTRAL ANGLE OF 29°00'05", AN ARC DISTANCE OF 65.80 FEET TO THE INTERSECTION WITH THE SOUTH LINE OF LAND DESCRIBED IN SAID INSTRUMENT NO. 20081801049 OF OFFICIAL RECORDS; THENCE WESTERLY ALONG THE SOUTH LINE OF LAND DESCRIBED

IN SAID INSTRUMENT NO. 20081801049 OF OFFICIAL RECORDS.

7. NORTH 89° 50' 48" WEST, 33.64 FEET, TO THE BEGINNING.

APN(s): 4384-005-026

**EXHIBIT A-2**

**LEGAL DESCRIPTION OF REAL PROPERTY**

[*TO BE ATTACHED SUBSEQUENT TO EXECUTION AND PRIOR TO CLOSING*]

## EXHIBIT B

## SITE PLAN OF PROPERTY



EXHIBIT B



EXHIBIT B

## EXHIBIT C

## FORM OF DEED

RECORDING REQUESTED BY
AND WHEN RECORDED RETURN TO:

_____
_____
_____

MAIL TAX STATEMENTS TO:

_____
_____

_____

(Space Above This Line Reserved For Recorder's Use
Only)

The undersigned Grantor(s) Declare(s):

Documentary Transfer Tax is $ _____,

(  )    computed on full value of property conveyed, or

(  )    computed on full value less value of liens and encumbrances.

City of _____
County _____

## GRANT DEED

TREE LANE, LLC, a California limited liability company ("Grantor"), for and in consideration of the sum of TEN AND NO/100 DOLLARS ($10.00) and other good and valuable consideration paid in hand to Grantor by ZACHARY A. VELLA, an individual, as his sole and separate property ("Grantee"), the receipt and sufficiency of which are hereby acknowledged, has GRANTED and CONVEYED, and by these presents does GRANT and CONVEY, that certain parcel of land located in Los Angeles County, California and legally described in **Exhibit A** attached hereto, together with all buildings, improvements and fixtures located thereon and owned by Grantor as of the date hereof and all right, title and interest, if any, that Grantor may have in and to all rights, privileges and appurtenances pertaining thereto (collectively, the "Real Property").

This conveyance is made by Grantor and accepted by Grantee subject to all covenants, conditions, restrictions, and other matters of record in the office of the County Recorder of Los Angeles County, California, all items and title matters of record and all non-delinquent unpaid taxes and assessments.

EXHIBIT C

TO HAVE AND TO HOLD the Real Property together with all improvements located thereon all and singular the rights and appurtenances thereto in anywise belonging, unto Grantee, its legal representatives, successors and assigns forever.

IN WITNESS WHEREOF, Grantor has executed this Grant Deed this _____ day of _____, 2018.

**GRANTOR:**

**TREE LANE, LLC,**
**a California limited liability company**

By: _____
Name: _____
Title: _____

---

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

---

STATE OF _____          )
                                    ) ss.
COUNTY OF _____               )

On _____, 2018 before me, _____, a Notary Public, personally appeared _____ who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of _____ that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _____ (Seal)

EXHIBIT C

## EXHIBIT D

### FORM OF
### BILL OF SALE AND ASSIGNMENT OF CONTRACTS AND INTANGIBLE PROPERTY

This BILL OF SALE AND ASSIGNMENT CONTRACTS AND INTANGIBLE PROPERTY (this "**Assignment**") is executed and delivered as of the _____ day of _____, 2018, pursuant to that certain Purchase and Sale Agreement ("**Purchase Agreement**") dated as of _____ __, 2018, entered into by and ZACHARY A. VELLA, an ("**Buyer**"), and TREE LANE, LLC, a California limited liability company ("**Seller**"), covering the Real Property described in **Exhibit 1** attached hereto ("**Real Property**"). Capitalized terms used in this Agreement but not otherwise defined here shall have the meanings set forth in the Purchase Agreement.

1.      Sale of Personal Property.   For good and valuable consideration, Seller hereby transfers and conveys to Buyer all of Seller's right, title and interest, if any, in and to the following, without representation or warranty as to title or otherwise and in other "AS IS," "WHERE IS" and "WITH ALL FAULTS" condition except as provided in Paragraph 3 below and in the Purchase Agreement (as defined below):

(a)      Personal Property.   All personal property of every nature and description and all replacements thereof which are both now owned by Seller (including any interest in such property that is leased by Seller) and now located in or on the Real Property, without any representations, warranties, guaranties, either expressed or implied, of any kind, nature or type whatsoever, including, without limitation, without any warranty as to merchantability, fitness or fitness for a particular purpose (collectively, the "**Personal Property**"); and

(b)      Intangible Property.   Any and all of the intangible property related to the Real Property, to the extent assignable, including, without limitation, the following (but, in any event, only to the extent assignable by Seller):  warranties; contract rights related to the operation, use or ownership of the Real Property (but excluding Seller's obligations under contracts except those expressly assumed in this instrument); governmental permits, approvals and licenses; files, lists and correspondence.  In the event there is any intangible property which Seller cannot assign without a third party's approval, then Seller will make a good faith attempt to obtain any necessary approvals allowing for such assignment (collectively, the "**Intangible Property**").

2.      Assignment Contracts.   For good and valuable consideration, Seller hereby assigns, transfers, sets over and conveys to Buyer, all of Seller's right, title and interest in and to the service contract(s) described in **Exhibit 2** attached hereto ("**Assumed Contracts**"), and Buyer hereby assumes the obligations of Seller under such Assumed Contracts first arising from and after the Closing Date.

3.      Warranty.   Seller hereby represents and warrants to Buyer that it is the owner of the Personal Property and the Intangible Property, that, to Seller's knowledge, such property is free and clear of all liens, charges and encumbrances, and Seller warrants and defends title to said property unto Buyer against any person or entity lawfully claiming the same or any part thereof by, through or under Seller (but not otherwise).

4.    Successors and Assigns.  This Assignment and the obligations of the parties hereunder shall be binding upon and inure to the benefit of the parties hereto, their respective legal representatives.

5.    Severability.  If any term or provision of this Assignment or the application thereof to any persons or circumstances shall, to any extent, be invalid or unenforceable, the remainder of this Assignment or the application of such term or provision to persons or circumstances other than those as to which it is held invalid or unenforceable shall not be affected thereby, and each term and provision of this Assignment shall be valid and enforced to the fullest extent permitted by law.

6.    Counterparts.  This Assignment may be executed in counterparts, each of which shall be an original and all of which counterparts taken together shall constitute one and the same agreement.

7.    Governing Law.  This Assignment shall be governed by and construed in accordance with the internal laws of the State of California without regard to conflicts of law principles.

*[Remainder of Page Intentionally Blank]*

IN WITNESS WHEREOF, the undersigned have executed this Bill of Sale and Assignment of Contracts and Intangible Property to be effective as of the date first set forth hereinabove.

**SELLER:**

**TREE LANE, LLC,**
a California limited liability company

By: _____
Name: _____
Title: _____

**BUYER:**

[_____,
a [_____]

By: _____
Name: _____
Title: _____

**Exhibit 1 – Description of Real Property [*TO BE ATTACHED PRIOR TO CLOSING*]**
**Exhibit 2 – List of Assumed Contracts  [*TO BE ATTACHED PRIOR TO CLOSING*]**

EXHIBIT D

EXHIBIT D

## EXHIBIT E

### FORM OF
### CERTIFICATE OF NON-FOREIGN STATUS

#### (FIRPTA AFFIDAVIT)

Section 1445 of the Internal Revenue Code provides that a transferee of a U.S. real property interest must withhold tax if the transferor is a foreign person. For U.S. tax purposes (including section 1445), the owner of a disregarded entity (which has legal title to a U.S. real property interest under local law) will be the transferor of the property and not the disregarded entity. To inform the transferee that withholding of tax is not required upon the disposition of a U.S. real property interest by **TREE LANE, LLC**, a California limited liability company ("**Transferor**"), the undersigned hereby certifies the following on behalf of Seller:

　　　1.　　Transferor is not a foreign corporation, foreign partnership, foreign trust, or foreign estate (as those terms are defined in the Internal Revenue Code and Income Tax Regulations);

　　　2.　　Transferor is not a disregarded entity as defined in §1.1445-2(b)(2)(iii);

　　　3.　　Transferor's U.S. employer identification number is: _____; and

　　　4.　　Transferor's office address is [_____].

Transferor understands that this certification may be disclosed to the Internal Revenue Service by transferee and that any false statement contained herein could be punished by fine, imprisonment or both.

Under penalties of perjury I declare that I have examined this certification and to the best of my knowledge and belief it is true, correct and complete, and I further declare that I have authority to sign this document on behalf of Transferor.

Dated: _____, 201__

　　　　　　　　　　**SELLER / TRANSFEROR:**

　　　　　　　　　　**TREE LANE, LLC,**
　　　　　　　　　　a California limited liability company

　　　　　　　　　　By: _____
　　　　　　　　　　Name: _____
　　　　　　　　　　Title: _____

## EXHIBIT F

## FORM OF

## PLEDGE AGREEMENT

[TO BE ATTACHED]

## PLEDGE AGREEMENT

PLEDGE AGREEMENT dated as of September 28, 2018 (this "**Agreement**") made by **MOHAMED HADID**, an individual (the "**Pledgor**"), as pledger, for the benefit of **SKYLARK CAPITAL MANAGEMENT, LLC**, a California limited liability company ("**Skylark**"), as pledgee.

## R E C I T A L S

WHEREAS, Pledgor owns one hundred percent (100%) of the equity membership and/or ownership interests in SUMMITRIDGE DEVELOPMENT II LLC, a California limited liability company ("**Company**");

WHEREAS, the Company owns one hundred percent (100%) of the equity membership and/or ownership interests in TREE LANE LLC, a California limited liability company (the "**Property Owner**");

WHEREAS, Skylark (as purchaser thereunder), Property Owner (as seller thereunder), and Pledgor (together with Property Owner, as seller, the 'Seller Parties' thereunder) have entered into the Purchase and Sale Agreement of even date herewith (the "**Purchase Agreement**") for the purchase and sale of the Property (as defined in the Purchase Agreement); and

WHEREAS, to secure the Obligations (as hereinafter defined) of the Property Owner and the Pledgor (together, as 'Seller Parties' under the Purchase Agreement) under the Purchase Agreement, Pledgor has agreed to execute and deliver this Agreement, and to pledge to Skylark fifty percent (50%) of the equity membership and/or ownership interests in the Company.

NOW, THEREFORE, in consideration of the premises and for other good and valuable consideration, the receipt and legal sufficiency of which are hereby acknowledged, Pledgor, intending to be legally bound, hereby covenants and agrees as follows:

## SECTION 1
## DEFINITIONS

Capitalized terms used in this Agreement and not specifically defined in this Agreement shall have the meaning given to such terms in the Purchase Agreement. For purposes of this Agreement the following terms have the following meanings:

"**Bankruptcy Rights**" shall mean, individually and collectively, all benefits, rights and remedies arising from or as a result of the status of the holders of the Ownership Interests (as defined in **Section 2.1(a)**) as equity security holders in the Company, including receiving all distributions of cash or other property arising out of any Insolvency Proceeding, voting on any plan of reorganization or liquidation, objecting or consenting to or participating in any matter that may be raised in such Insolvency Proceeding, and filing proofs of claim and/or proofs of interest permitted to be filed under Section 501(a) of the Bankruptcy Code in any Insolvency Proceeding, and all Proceeds of any of the foregoing and all increases, substitutions, replacements, additions and accessions to any of the foregoing, together with full power and authority to demand, receive,

enforce, collect or give receipt for any of the foregoing, to file any claims and to take any action which, in the opinion of Skylark, may be necessary or advisable in connection with any of the foregoing.

"**Default**" shall mean the occurrence of any event, circumstance or condition which constitutes a breach or a default under the Purchase Agreement.

"**Equity Distributions**" shall mean collectively, whether now existing or hereafter arising, made or acquired, all payments, dividends, issues, profits and distributions, whether in the form of cash, property or otherwise, and whether derived from operations of the Company or a sale or other disposition of all or any portion of the property of the Company, paid or which are now or may hereafter become payable as a result of, arising out of, on account of, or in connection with the Ownership Interests and/or the Bankruptcy Rights, and the Proceeds of any of the foregoing, including all distributions of cash or property arising out of any of the foregoing, and the Proceeds of any of the foregoing, and all increases, substitutions, replacements, additions and accessions to any of the foregoing, together with full power and authority to demand, receive, enforce, collect or give receipt for any of the foregoing, to file any claims and to take any action which, in the opinion of Skylark, may be necessary or advisable in connection with any of the foregoing.

"**Equity Rights**" shall mean collectively, whether now existing and hereafter arising or acquired, all benefits, rights and remedies of the holders of the Ownership Interests as a result of, arising out of, on account of, or in connection with the Ownership Interests, including the rights to exercise all voting, consensual and other powers of ownership pertaining to the Ownership Interests, and all Proceeds of any of the foregoing and all increases, substitutions, replacements, additions and accessions to any of the foregoing, together with full power and authority to demand, receive, enforce, collect or give receipt for any of the foregoing, to file any claims and to take any action which, in the opinion of Skylark, may be necessary or advisable in connection with any of the foregoing.

"**Insolvency Proceeding**" shall mean any proceeding brought under or pursuant to any bankruptcy, insolvency, receivership or similar law or laws of the United States or any other state or other jurisdiction, including the Bankruptcy Code, and any other law or laws of the United States or any other state or other jurisdiction which affect the rights of debtors and/or creditors generally.

"**Limited Liability Company Agreement**" shall mean the Operating Agreement of the Company dated as of July 23, 2018, as the same may be amended, modified, supplemented, replaced or otherwise modified from time to time in accordance with the terms of this Agreement.

"**Obligations**" shall mean the performance of all obligations under the Purchase Agreement, including, without limitation, (i) the subdivision of the Land being legally subdivided in accordance with the Subdivision Map Act (Section 66410 of the California Government Code), and creation of the Property as a separate legal parcel, and (ii) conveyance and transfer of title to the Property pursuant to and in accordance with the Purchase Agreement, and (iii) payment of Liquidated Damages in the event of a Default under the Purchase Agreement.

2

"**Proceeds**" means all "proceeds" as such term is defined in Section 9-102 of the UCC on the date hereof and, in any event, shall include, without limitation, (i) all dividends, distributions, monies, fees, payments, compensations, proceeds or other income now or hereafter becoming due and payable from, or with respect to, the Ownership Interests, whether payable as profits, distributions, asset distributions, repayment of loans or capital or otherwise, (ii) all contract rights, general intangibles, claims, powers, privileges, benefits and remedies of Pledgor relating to the foregoing; and (iii) all cash or noncash proceeds of any of the foregoing.

## SECTION 2
## PLEDGE

Section 2.1    **Pledge of Security Interest**.   As security for the prompt and complete payment and performance when due of all of the Obligations and to induce Skylark to enter into the Purchase Agreement, Pledgor hereby pledges, assigns and grants to Skylark a continuing first priority security interest in a fifty percent (50%) membership interest in the Company, including a proportionate interest in any and all of the following, whether now existing or hereafter owned, existing or arising (the "**Collateral**"):

(a)    all right, title and interests in, to and under all current and future membership interests and other ownership interests in the Company and all rights, powers and privileges attendant thereto under the Limited Liability Company Agreement or otherwise, including but not limited to the right to manage or control or participate in the management or control of the Company and any and all other rights with respect to the Company that are held or may be held by agreement or operation or law, by Pledgor, including without limitation the right to exercise all voting, consensual and other powers of ownership (collectively, the "**Ownership Interests**");

(b)    all Equity Distributions;

(c)    all Equity Rights;

(d)    all Bankruptcy Rights;

(e)    all documents, certificates and/or instruments representing any of the foregoing and all cash, securities, dividends, rights and other property at any time and from time to time received, receivable or otherwise distributed in respect of or in exchange for any or all of the foregoing; and

(f)    all Proceeds of any of the foregoing and all increases, substitutions, replacements, additions and accessions to any of the foregoing, together with full power and authority to demand, receive, enforce, collect or give receipt for any of the foregoing, to file any claims and to take any action which, in the opinion of Skylark, may be necessary or advisable in connection with any of the foregoing.

Section 2.2    **Certificates Evidencing or Representing Collateral**.   Pledgor will not permit or suffer the Company to take any action at any time which would cause Pledgor's representations and warranties set forth in **Section 3.1(f)** or **(g)** to cease to be true, correct and complete at any time.  If, notwithstanding the foregoing, any of the Collateral ever is evidenced or

represented by any certificate or instrument, Pledgor agrees to deliver to Skylark, promptly upon receipt thereof and in form suitable for transfer (and accompanied by a duly executed instrument of transfer), any and all certificates and/or instruments which evidence or represent any of the Collateral which may at any time or from time to time come into the possession or control of Pledgor.

## SECTION 3
## WARRANTIES AND COVENANTS

Section 3.1 **Warranties**. Pledgor warrants to Skylark that: (a) each of the Recitals in this Agreement is true, correct and complete in all material respects; (b) Pledgor is a valid and subsisting limited liability company and is duly organized and existing under the laws of the State of California, that the Limited Liability Company Agreement is and remains in full force and effect, and that a true and correct copy of the Limited Liability Company Agreement has been delivered to Skylark; (c) Pledgor is (or at the time of any future delivery, pledge, assignment or transfer thereof will be) the legal and equitable owner of the Collateral free and clear of all liens, security interests and encumbrances of every description whatsoever other than the security interest created hereunder; (d) the pledge and delivery of the Collateral pursuant to this Agreement will create a valid first priority, perfected security interest in the Collateral in favor of Skylark and its assigns; (e) neither the execution or the delivery of this Agreement nor compliance with the terms and provisions hereof on the part of Pledgor will violate any statute, license or regulation of any governmental authority or will breach, conflict with or result in a breach of any of the terms, conditions or provisions of any agreement or instrument, other than any agreement with Skylark, to which Pledgor is or may be bound, or constitute a default thereunder, or result in the creation or imposition of any lien, charge or encumbrance of any nature whatsoever upon or give to others any interest or rights, including rights of termination or cancellation, in or with respect to, any of Pledgor's property, assets, contracts, licenses or business; (f) the limited liability company membership interests in the Company are "securities" and "financial assets" within the meaning of Division 8 of the California Uniform Commercial Code (the "**UCC**"); (g) the membership interests in the Company are represented or evidenced by certificates within the meaning of Section 8-102(a)(16) of the UCC; and (h) the Limited Liability Company Agreement of the Company provides, and will provide at all times until the Obligations are satisfied and title to the Property has transferred to Skylark in accordance with the Purchase Agreement, that all membership interest in Company are "securities" within the meaning of Division 8 of the UCC. The representations and warranties set forth in this **Section 3.1** shall survive the execution, delivery and performance of this Agreement.

Section 3.2 **Covenants and Consents**. So long as any of the Obligations shall be outstanding, Pledgor: (a) shall not, without the express prior written consent of Skylark, sell, assign, exchange, pledge or otherwise transfer, encumber, or grant any option, warrant or other right to purchase any Collateral pledged hereunder, or otherwise diminish or impair any of its rights in, to or under any of the Collateral; (b) hereby consents to the filing of such Uniform Commercial Code financing statements and other documents (and pay the costs of filing and recording or re-filing and re-recording the same in all public offices reasonably deemed necessary or appropriate by Skylark) and do such other acts and things, all as Skylark may from time to time reasonably request, to establish and maintain a valid, first priority perfected security interest in the Collateral (free of all other liens, claims and rights of third parties whatsoever) to secure the

4

performance and payment of the Obligations; (c) will execute and deliver to Skylark such allonges, endorsements and similar documents required to perfect Skylark's interest in and to the Collateral, satisfactory in form and substance to Skylark, as Skylark may reasonably request; (d) will furnish Skylark such information concerning the Collateral as Skylark may from time to time reasonably request, and will permit Skylark or any designee of Skylark, from time to time to inspect, audit and make copies of and extracts from all records and all other papers in the possession of Pledgor which pertain to the Collateral, and will, upon request of Skylark at any time when a Default has occurred, deliver to Skylark all of such records and papers; and (e) confirms that the Collateral is classified as, and will be classified as, certificated securities under the terms of Article 8 of the applicable Uniform Commercial Code, and agrees that (1) the Collateral shall be evidenced by an instrument or a certificate, and (2) Pledgor shall or shall cause the Company to promptly deliver any such instrument or certificate, duly endorsed or subscribed by Pledgor or accompanied by appropriate instrument of transfer or assignment duly executed in blank by Pledgor, to Skylark as additional Collateral.

## SECTION 4
## SKYLARK'S ACTIONS UPON DEFAULT

Skylark may from time to time after the occurrence of Default, without notice to Pledgor, take all or any of the following actions: (a) transfer all or any part of the Collateral into the name of Skylark or any nominee or sub-agent for Skylark, with or without disclosing that such Collateral is subject to the lien, pledge and security interest hereunder; (b) appoint one or more sub-agents or nominees for the purpose of retaining physical possession of the Collateral; (c) notify the parties obligated on any of the Collateral to make payment directly to Skylark of any amounts due or to become due thereunder; (d) endorse any checks, drafts or other writings in the name of Pledgor to allow collection of the Collateral; (e) enforce collection of any of the Collateral by suit or otherwise, and surrender, release or exchange all or any part thereof, or compromise or renew for any period (whether or not longer than the original period) any obligations of any nature of any party with respect thereto; and (f) take control of any proceeds of the Collateral.

## SECTION 5
## VOTING RIGHTS AND DIVIDENDS

Section 5.1    **Rights Prior to Default**. Notwithstanding any other provisions contained in this Agreement, so long as any of the Obligations remain unperformed and/or unpaid, and so long as Skylark has not given the notice referred to in **Section 5.2** below:

(a)    Pledgor shall be entitled to exercise any and all voting or consensual rights and powers and purchase or subscription rights (any exercise by Pledgor of such purchase or subscription rights may be made only from funds of Pledgor not comprising the Collateral) relating or pertaining to the Collateral or any part thereof for any purpose; provided, that Pledgor agrees that it will not exercise any such right or power in any manner which would have a material adverse effect on the value of the Collateral or any part thereof or any other material adverse effect in relation to the Collateral or cause a , Default in respect of Pledgor's Obligations under the Purchase Agreement.

(b)     Pledgor shall be entitled to receive, retain and/or distribute to its partners any and all dividends, interest or other cash distributions payable on or in respect of the Collateral which are paid in cash, but all dividends, interest and distributions in respect of the Collateral, whether resulting from a subdivision, combination or reclassification of Collateral or any part thereof or received in exchange for Collateral or any part thereof or as a result of any merger, consolidation, acquisition or other exchange of assets to which any Person may be a party or otherwise or as a result of any exercise of any purchase or subscription rights, shall be and become part of the Collateral hereunder and, if received by Pledgor, shall be forthwith delivered to Skylark in due form for transfer (i.e., endorsed in blank or accompanied by stock or bond powers executed in blank) to be held for the purposes of this Agreement.

Section 5.2   **Rights After Default**.  Upon notice delivered to Pledgor from Skylark given upon the occurrence of a Default, all rights and powers which Pledgor is entitled to exercise and all rights of Pledgor to receive and retain dividends pursuant to **Section 5.1** hereof, shall forthwith cease, and all such rights and powers shall thereupon become vested in Skylark which shall have the sole and exclusive authority to exercise such rights and powers and to receive such dividends, interest or other distributions.  Any and all money and other property paid over to or received by Skylark pursuant to this **Section 5.2** shall be retained by Skylark as additional Collateral hereunder and applied in accordance with the provisions hereof.

## SECTION 6
## REMEDIES

Section 6.1   **UCC Remedies**.  Whenever a Default shall exist, Skylark may exercise from time to time any rights and remedies available to it under the UCC or otherwise available to it under the Purchase Agreement or other applicable law.  Without limiting the foregoing, whenever a Default shall exist, Skylark: (a) may, to the fullest extent permitted by applicable law, without notice, advertisement, hearing or process of law of any kind, (i) sell any or all of the Collateral, free of all rights and claims of Pledgor therein and thereto, at any public or private sale and (ii) bid for and purchase any or all of the Collateral at any such public sale, and (b) shall have the right, for and in the name, place and stead of Pledgor, to execute endorsements, assignments and other instruments of conveyance or transfer with respect to all or any of the Collateral.  Any notification of intended disposition of any of the Collateral shall be deemed reasonably and properly given if given at least ten (10) days before such disposition.  Any proceeds of any of the Collateral may be applied by Skylark to the payment of expenses in connection with the Collateral, including, without limitation, reasonable attorneys' fees and legal expenses, and any balance of such proceeds may be applied by Skylark toward the payment of such of the Obligations, and in such order of application, as Skylark may from time to time elect (and, after payment in full of all Obligations, any excess shall be delivered to Pledgor or as a court of competent jurisdiction shall direct).  If, at the original time or times appointed for the sale of the whole or any part of the Collateral, (1) the highest bid, if there shall be but one sale, shall be inadequate to discharge in full the Obligations, or (2) the highest bid for the lot offered for sale, if the Collateral is offered for sale in lots, would indicate to Skylark in its sole and absolute discretion that the proceeds of the sale or sales of the whole of the Collateral would be unlikely to be sufficient to discharge all of the Obligations, Skylark may, on one or more occasions and in its sole and absolute discretion, postpone any of said sale or sales by public announcement at the time of sale, and no other notice

6

of such postponement or postponements of sale need be given, any other notice hereby waived; provided, however, that any sale or sales made after such postponement shall be after ten (10) days' prior notice to Pledgor. In the event Skylark is subject to any public registration duties promulgated by the Securities and Exchange Commission or any other governing authority in connection with the enforcement of its rights hereunder, Pledgor covenants and agrees to cooperate with Skylark in all respects thereto, including Pledgor being obligated to prepare the applicable registration statement and if requested by Skylark after its review thereof, file the same at Pledgor's sole cost and expense. This foregoing covenant shall survive any foreclosure or transfer in lieu thereof.

Section 6.2    **Manner of Sale.** Skylark is hereby authorized to comply with any limitation or restriction in connection with any sale of Collateral as it may be advised by counsel is necessary in order to: (a) avoid any violation of applicable law (including, without limitation, compliance with such procedures as may restrict the number of prospective bidders or purchasers and/or further restrict such prospective bidders or purchasers to persons or entities who will represent and agree that they are purchasing for their own account for investment and not with a view to the distribution or resale of such Collateral), or (b) obtain any required approval of the sale or of the purchase by any governmental authority or official, and Pledgor agrees that such compliance shall not result in such sale being considered or deemed not to have been made in a commercially reasonable manner and that Skylark shall not be liable or accountable to Pledgor for any discount allowed by reason of the fact that such Collateral is sold in compliance with any such limitation or restriction. Pledgor waives any right it may now or hereafter have to require Skylark to marshal any of the collateral from time to time securing the Obligations. SKYLARK MAY ENFORCE ITS RIGHTS HEREUNDER WITHOUT RESORT TO PRIOR JUDICIAL PROCESS OR JUDICIAL HEARING AND PLEDGOR EXPRESSLY WAIVES, RENOUNCES, AND KNOWINGLY RELINQUISHES ANY LEGAL RIGHT WHICH MIGHT OTHERWISE REQUIRE SKYLARK TO ENFORCE ITS RIGHTS BY JUDICIAL PROCESS. IN SO PROVIDING FOR A NONJUDICIAL REMEDY, PLEDGOR REPRESENTS THAT SUCH A REMEDY IS RESPONSIVE TO COMMERCIAL NECESSITY AND IS THE RESULT OF BARGAIN AT ARM'S LENGTH. NOTHING HEREIN IS INTENDED TO PREVENT SKYLARK FROM RESORTING TO JUDICIAL PROCESS AT SUCH PARTY'S OPTION

## SECTION 7
## WAIVER OF TRANSFER RESTRICTIONS

Section 7.1    Pledgor and Company hereby consent to the terms and conditions contained in this Agreement, to the transactions contemplated thereby and to all future amendments thereto, notwithstanding any limitations or restrictions on such transactions set forth in the governing documents of Company or otherwise with respect to the transfer of any of the Collateral. Without limiting the foregoing, Pledgor and Company agree that any rights of first refusal, options to purchase or other conditions or restrictions affecting the transfer of any of the Collateral shall not be triggered by, or otherwise in any respect be applicable to, the execution and delivery of this Agreement or the exercise of Skylark's rights and remedies under this Agreement, as amended from time to time, and upon Skylark's exercise of its rights and remedies under this Agreement (as amended from time to time), Skylark, a purchaser at a foreclosure sale of the Collateral or any such party's designee shall be immediately and automatically admitted as an owner of Company with

7

all ownership rights accruing to it (including, without limitation, all rights to distributions and voting) without the need to obtain the consent of any owner or the Company or to provide or comply with a right of first refusal or option to purchase with respect to any of the Collateral in favor of any owner, the Company or any other Person, notwithstanding anything in the governing documents of Company, any agreement to which Pledgor is now or hereafter a party with respect to any of the Collateral or otherwise to the contrary or in conflict thereof.

## SECTION 8
## ATTORNEY IN FACT; IRREVOCABLE PROXY

Section 8.1   **Attorney in Fact**.  Pledgor hereby irrevocably appoints Skylark as its attorney-in-fact in accordance with the powers granted in connection with this Agreement (without requiring Skylark to act as such), with full power of substitution, which appointment as attorney-in-fact is irrevocable during the term of this Agreement, to take any action Skylark deems necessary upon the occurrence of a Default to (a) perfect, protect and realize upon its lien and first priority security interest in the Collateral, (b) preserve, protect, direct, utilize and operate any license, permit, contract or other right or obligation of Pledgor, (c) to ask, demand, collect, sue for, recover, compromise, receive and give acquittance and receipts for moneys due and to become due under or in respect of any of the Collateral, (d) to receive, endorse and collect any drafts or other instruments, documents and chattel paper in connection with clause (c) above, and (e) to file any claims or take any action or institute any proceedings that Skylark may deem necessary or desirable for the perfection and/or collection of any of the Collateral or otherwise to enforce the rights of Skylark, with respect to any of the Collateral, including the execution and delivery of any and all documents or instruments related to perfecting Skylark's interest in the Collateral in Pledgor's name, or otherwise to effect fully the purpose, terms and conditions of this Agreement and the Purchase Agreement, and said appointment shall create in Skylark a power coupled with an interest; provided, however, Skylark shall not have any duty to exercise any such rights or to preserve the same, shall not be liable for any failure or delay to do so, and shall be accountable only for amounts that it actually receives as a result of the exercise of such powers hereunder.

**Section 8.2**   **Irrevocable Proxy**.  Pledgor hereby grants to Skylark an irrevocable proxy to vote the Collateral and other equity interests pledged by Pledgor and to exercise all other rights, powers, privileges and remedies to which a holder of the Collateral or other equity interests would be entitled (including without limitation giving or withholding written consents of shareholders, members or partners, as applicable, calling special meetings of shareholders, members or partners, as applicable, and voting at such meetings), which proxy is coupled with an interest and shall be effective, automatically and without the necessity of any action (including any transfer of any Collateral on the record books of the issuer thereof) by any other person (including the issuer of the Collateral or any officer or agent thereof), upon the occurrence of a Default. **THE PROXIES AND POWERS GRANTED BY PLEDGOR PURSUANT TO THIS AGREEMENT ARE COUPLED WITH AN INTEREST AND ARE GIVEN TO SECURE THE PERFORMANCE OF THE PLEDGOR'S OBLIGATIONS UNDER THIS AGREEMENT.**

Section 8.3   Authorization to File UCC Financing Statements.   Pledgor hereby authorizes Skylark to file one or more financing statements, in the form prescribed by the UCC or the uniform commercial code as in effect in any relevant jurisdiction, naming the Pledgor, as

debtor, and covering the Collateral, in the appropriate filing offices in accordance with the UCC or such other uniform commercial code.

## SECTION 9
## MISCELLANEOUS

Section 9.1    **Care of Collateral**.  Skylark shall be deemed to have exercised reasonable care in the custody and preservation of the Collateral if it takes such action for that purpose as Pledgor shall request in writing, but failure of Skylark to comply with any such request shall not of itself be deemed a failure to exercise reasonable care, and no failure of Skylark to preserve or protect any rights with respect to the Collateral against prior parties, or to do any act with respect to preservation of the Collateral not so requested by Pledgor, shall be deemed a failure to exercise reasonable care in the custody or preservation of any Collateral.

Section 9.2    **No Waiver**.  No delay on the part of Skylark in exercising any right, power or remedy shall operate as a waiver thereof, and no single or partial exercise of any such right, power or remedy shall preclude any other or further exercise thereof, or the exercise of any other right, power or remedy. No amendment, modification or waiver of, or consent with respect to, any provision of this Agreement shall be effective unless the same shall be in writing and signed and delivered by Skylark and Pledgor, and then such amendment, modification, waiver or consent shall be effective only in the specific instance and for the specific purpose for which given.

Section 9.3    **Cumulative Rights**.  All obligations of Pledgor and all rights, powers and remedies of Skylark expressed herein are in addition to all other rights, powers and remedies possessed by them, including, without limitation, those provided by applicable law or in any other written instrument or agreement relating to any of the Obligations or any security therefor.

Section 9.4    **Assignment by Skylark**.  Skylark may assign, without Pledgor's consent, its interests in this Agreement and the Purchase Agreement to any other Person, including, without limitation, any of Skylark's affiliates.

Section 9.5    **Successors and Assigns**.  This Agreement shall be binding upon Pledgor and its successors and assigns, and shall inure to the benefit of Skylark and its successors and assigns.

Section 9.6    **Waiver of Jury Trial**.  TO THE FULLEST EXTENT PERMITTED BY LAW, PLEDGOR AND SKYLARK (BY ITS ACCEPTANCE HEREOF) EACH HEREBY (a) EXPRESSLY, KNOWINGLY AND VOLUNTARILY WAIVES ANY RIGHT TO TRIAL BY JURY OF ANY CLAIM OR CAUSE OF ACTION ARISING UNDER THIS AGREEMENT OR IN ANY WAY CONNECTED WITH OR INCIDENTAL TO THE DEALINGS OF THE PARTIES WITH RESPECT TO THE PURCHASE AGREEMENT OR THE TRANSACTIONS CONTEMPLATED THEREBY, WHETHER NOW EXISTING OR HEREAFTER ARISING, AND WHETHER SOUNDING IN CONTRACT, TORT OR OTHERWISE, AND (b) WITHOUT LIMITATION OF SKYLARK'S RIGHT TO EXERCISE ANY REMEDY AFTER DEFAULT SET FORTH HEREIN OR AVAILABLE UNDER APPLICABLE LAW, AGREES AND CONSENTS THAT ANY SUCH CLAIM OR CAUSE OF ACTION SHALL BE DECIDED BY A COURT TRIAL WITHOUT A JURY, AND THAT ANY PARTY TO THIS AGREEMENT

9

MAY FILE AN ORIGINAL COUNTERPART OR A COPY OF THIS SECTION AS WRITTEN EVIDENCE OF THE CONSENTS OF THE PARTIES TO THE WAIVER OF THEIR RESPECTIVE RIGHTS TO TRIAL BY JURY.

Section 9.7    **Governing Law**.    THIS AGREEMENT AND THE PURCHASE AGREEMENT SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH, AND THE RIGHTS OF THE PARTIES SHALL BE GOVERNED BY THE LAW OF THE STATE OF CALIFORNIA, WITHOUT REGARD TO PRINCIPLES OF CONFLICT OF LAW.

Section 9.8    **Jurisdiction and Venue**.

(a)    ANY CLAIM OR ACTION ARISING UNDER THIS AGREEMENT AND THE PURCHASE AGREEMENT MAY, AT SKYLARK'S OPTION, BE INSTITUTED IN ANY FEDERAL OR STATE COURT IN THE COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AND PLEDGOR WAIVES ANY OBJECTIONS WHICH IT MAY NOW OR HEREAFTER HAVE BASED ON VENUE AND/OR FORUM NON CONVENIENS OF ANY SUCH SUIT, ACTION OR PROCEEDING, AND PLEDGOR HEREBY IRREVOCABLY SUBMITS TO THE JURISDICTION OF ANY SUCH COURT IN ANY SUIT, ACTION OR PROCEEDING.

(b)    PLEDGOR AND SKYLARK (BY ITS ACCEPTANCE HEREOF) EACH WAIVES PERSONAL SERVICE OF PROCESS AND IRREVOCABLY CONSENTS TO SERVICE OF PROCESS IN THE MANNER PROVIDED FOR NOTICES IN SECTION 14 OF THE PURCHASE AGREEMENT. NOTHING IN THIS AGREEMENT WILL AFFECT THE RIGHT OF ANY PARTY TO THIS AGREEMENT TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY LAW.

Section 9.9    **Notices**.  All notices required or permitted hereunder shall be given in accordance with **Section 14** of the Purchase Agreement to the address set forth below the Pledgor's signature block on the signature page of this Agreement.

Section 9.10    **Joint and Several**.  If Pledgor consists of more than one Person, then the obligations of Pledgor hereunder shall be joint and several.

Section 9.11    **Counterparts**.  This Agreement may be executed in any number of counterparts, and each duplicate counterpart shall be deemed to be an original.  Receipt of an executed signature page to this Agreement by facsimile, portable document format (.pdf), attachment to an email, or other electronic transmission shall constitute effective delivery thereof.

Section 9.12    **Term of Agreement**.  Upon the full satisfaction of the Obligations and title to the Property being transferred to Skylark in accordance with the Purchase Agreement, this Agreement shall automatically terminate and be of no further force and effect.

*[signature page follows]*

IN WITNESS WHEREOF, this Pledge Agreement has been duly executed and delivered as of the day and year first written above.

**PLEDGOR:**

Mohamed Hadid, an individual

Notice Address:

c/o Summitridge Development II LLC
9454 Wilshire Boulevard, Suite 208
Beverly Hills, California 90212
Attention:  Mohamed Hadid
Email:  hadidaspen@aol.com

SIGNATURE PAGE TO PLEDGE AGREEMENT

## ACKNOWLEDGMENT

The undersigned Company hereby acknowledges receipt of a copy of the foregoing Pledge Agreement, agrees to the terms of, and agrees to be bound by, the Pledge Agreement and to promptly note on its books and records the security interests granted under such Pledge Agreement. The Company further agrees, upon request therefor by Skylark (or its assignee or nominee or other designee) stating (1) that an uncured breach or default has occurred under the Purchase Agreement and (2) that Skylark (or its assignee or nominee or other designee) is entitled under the Pledge Agreement to have the pledged 50% membership interest in the Company re-registered in its name and to be admitted as a substitute member in respect thereof or to exercise voting consent rights with respect thereto, that the Company will act upon and in accordance with such instructions of Skylark, and that it will not require the further consent of, or seek further instruction from, Pledgor at any time.

**COMPANY:**

**SUMMITRIDGE DEVELOPMENT II LLC,**
a California limited liability company

By: _____
Name:  Mohamed Hadid
Title:  Sole Member and Manager

Exhibit 3

FOR REFERENCE ONLY: 20201531690

FIDELITY NATIONAL TITLE COMPANY

RECORDING REQUESTED BY:

Tony Russo
Crest Real Estate
11160 W Olympic Blvd #700
LA, CA 90064

MAIL TAX STATEMENTS AND
WHEN RECORDED MAIL TO:

Zachary Vella
250 Bowery, 2nd Floor
New York, NY 10012

30058359-72

APN: portion of 4384-005-026

SPACE ABOVE THIS LINE IS FOR RECORDER'S USE

# GRANT DEED

THE UNDERSIGNED GRANTOR(S) DECLARE(S):

DOCUMENTARY TRANSFER TAX IS $ 0 ; CITY TRANSFER TAX $ 0
_____ Computed on full value of property conveyed, or
_____ Computed on full value less liens and encumbrances remaining at time of sale.
_____ Unincorporated area   _X_ City of Los Angeles

THE RECORDING IS NOT FOR CONSIDERATION BUT FOR THE PURPOSE OF ADJUSTING THE BOUNDARY
LINES PER LOT LINE ADJUSTMENT CASE NO. AA-2019-3535-PMEX

For no additional consideration, receipt of which is hereby acknowledged,

**Tree Lane, LLC,**
a California limited liability company ("Grantor")

hereby GRANT(S) to

**Zachary Vella,**
a single man ("Grantee")

the following described real property in the
City of Los Angeles, County of Los Angeles,
State of California, more particularly described as follows:

LEGAL DESCRIPTION ATTACHED HERETO AS EXHIBIT "A" AND SHOWN
IN EXHIBIT "B" AND MADE A PART HEREOF BY REFERENCE

"The value of the property in this
conveyance, exclusive of liens and
encumbrances is $100.00 or less, and there
no additional consideration received by the
grantor, R&T 11911."

Exempt from fee per GC27388.1 due to
the maximum fees being paid on documents
in this transaction

DEED APPROVED BY CITY OF
LOS ANGELES PLANNING
DEPARTMENT FOR RECORDING
TO ADJUST LOT LINES PER
LOT LINE ADJUSTMENT CASE NO.
AA-2019-3535-PMEX

Dated: 1/16/2020

TREE LANE LLC, A California Limited
Liability Company

_____
Signature

_____
Name & Title

AKA Mohamed Anwar Hadid

MAIL TAX STATEMENTS AS DIRECTED ABOVE

**This page is part of your document - DO NOT DISCARD**



# 20201531690



**Pages:**
**0007**

Recorded/Filed in Official Records
Recorder's Office, Los Angeles County,
California

**11/30/20 AT 08:00AM**

| | |
|---|---|
| FEES: | 57.00 |
| TAXES: | 0.00 |
| OTHER: | 0.00 |
| PAID: | 57.00 |

## PCOR SURCHARGE $20.00



**LEADSHEET**

202011300230039

**00019402528**

011493355

**SEQ:**
**05**

**SECURE - 8:00AM**



**THIS FORM IS NOT TO BE DUPLICATED**

E08_201125_8...70

FIDELITY NATIONAL TITLE COMPANY

RECORDING REQUESTED BY:

Tony Russo
Crest Real Estate
11150 W Olympic Blvd #700
LA, CA 90064

MAIL TAX STATEMENTS AND
WHEN RECORDED MAIL TO:

Zachary Vella
250 Bowery, 2ⁿᵈ Floor
New York, NY 10012

30058359 - 72

APN: portion of 4384-005-026

SPACE ABOVE THIS LINE IS FOR RECORDER'S USE

## GRANT DEED

THE UNDERSIGNED GRANTOR(S) DECLARE(S):   DOCUMENTARY TRANSFER TAX IS $ 0 ; CITY TRANSFER TAX $ 0

_____ Computed on full value of property conveyed, or

_____ Computed on full value less liens and encumbrances remaining at time of sale.

_____ Unincorporated area   __X__ City of Los Angeles

THE RECORDING IS NOT FOR CONSIDERATION BUT FOR THE PURPOSE OF ADJUSTING THE BOUNDARY
LINES PER LOT LINE ADJUSTMENT CASE NO. AA-2019-3535-PMEX

For no additional consideration, receipt of which is hereby acknowledged,

**Tree Lane, LLC,**
**a California limited liability company** ("Grantor")

hereby GRANT(S) to

**Zachary Vella,**
**a single man** ("Grantee")

"The value of the property in this
conveyance, exclusive of liens and
encumbrances is $100.00 or less, and there
no additional consideration received by the
grantor, R&T 11911."

the following described real property in the
City of Los Angeles, County of Los Angeles,
State of California, more particularly described as follows:

LEGAL DESCRIPTION ATTACHED HERETO AS EXHIBIT "A" AND SHOWN
IN EXHIBIT "B" AND MADE A PART HEREOF BY REFERENCE

Exempt from fee per GC27388.1 due to
the maximum fees being paid on documents
in this transaction

DEED APPROVED BY CITY OF
LOS ANGELES PLANNING
DEPARTMENT FOR RECORDING
TO ADJUST LOT LINES PER
LOT LINE ADJUSTMENT CASE NO.
AA-2019-3535-PMEX

Dated: 1/16/2020

TREE LANE LLC, A California Limited
                   Liability Company

Signature

Mohamed Hadid Manza
Name & Title
AKA Mohamed Anwar Hadid

MAIL TAX STATEMENTS AS DIRECTED ABOVE

A notary public or other officer
completing this certificate verifies
only the identity of the individual
who signed the document to which
this certificate is attached, and not
the truthfulness, accuracy, or
validity of that document.

STATE OF _____ )
                                                     )   ss:
COUNTY OF _____ )

On _____, before me, _____, Notary Public
                                                        (insert name)

personally appeared _____, who
proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are
subscribed to the within instrument and acknowledged to me that he/she/they executed the same
in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the
person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing
paragraph is true and correct.

WITNESS my hand and official seal.


Signature: _____



[Seal]




See attached.

**CALIFORNIA ALL-PURPOSE ACKNOWLEDGMENT**                    CIVIL CODE § 1189

| A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document. |
| --- |

State of California

County of _LOS Angeles_ }

On _January 16, 2020_ before me, _Selena Chavez (Notary Public)_
　　　　　_Date_　　　　　　　　　　　　_Here Insert Name and Title of the Officer_

personally appeared _Mohamed Anwar Hadid_
　　　　　　　　　　　　　　　_Name(s) of Signer(s)_

who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

SELENA CHAVEZ
Notary Public · California
Los Angeles County
Commission # 2267925
My Comm. Expires Nov 20, 2022

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _____
　　　　　　　　_Signature of Notary Public_

_Place Notary Seal and/or Stamp Above_

———————————— **OPTIONAL** ————————————

_Completing this information can deter alteration of the document or fraudulent reattachment of this form to an unintended document._

**Description of Attached Document**

Title or Type of Document: _____

Document Date: _____ Number of Pages: _____

Signer(s) Other Than Named Above: _____

**Capacity(ies) Claimed by Signer(s)**

Signer's Name: _____          Signer's Name: _____
☐ Corporate Officer – Title(s): _____     ☐ Corporate Officer – Title(s): _____
☐ Partner – ☐ Limited ☐ General              ☐ Partner – ☐ Limited ☐ General
☐ Individual　　　☐ Attorney in Fact           ☐ Individual　　　☐ Attorney in Fact
☐ Trustee　　　☐ Guardian of Conservator       ☐ Trustee　　　☐ Guardian of Conservator
☐ Other: _____                      ☐ Other: _____
Signer is Representing: _____           Signer is Representing: _____

©2017 National Notary Association



Exhibit A

## LEGAL DESCRIPTION

That portion of Lot 3 in Section 2, Township 1 South, Range 15 West, San Bernardino Base and Meridian, as per map filed in Book 45, Page 40 of Record of Surveys, in the City of Los Angeles, County of Los Angeles, State of California, described as a whole as follows:

Beginning at the northeast corner of said Lot 3;

Thence westerly along the north line of said Lot 3, North 89° 33' 00" West 283.39 feet to the most northeasterly corner of Lot 7 of said Tract No. 21845;

Thence southeasterly along the northeasterly line of said Lot 7 and Lot 8 of said Tract No. 21845, South 37° 01' 29" East 72.78.00 feet to an angle point on said Lot 8;

Thence continuing southeasterly along the northeasterly line of said Lot 8, South 24° 18' 16: East 63.64 feet;

Thence easterly, North 74° 04' 18" East 16.32 feet;

Thence southeasterly, South 29° 58' 18" East 50.69 feet;

Thence southerly, South 0° 01' 42" West 43.62 feet;

Thence southwesterly, South 60° 01' 42" West 38.68 feet;

Thence southeasterly, South 29° 58' 18" East 71.40 feet;

Thence easterly, South 89° 58' 18" East 3.90 feet to a point of cusp with a curve concave to the south having a radius of 47.31 feet and to which point a radial line bears North 41° 01' 59" West;

Thence easterly 64.83 feet along said curve through a central angle of 78° 31' 33";

Thence southeasterly, South 52° 30' 26" East 10.44 feet to the beginning of a tangent curve concave to the northeast having a radius of 17.94 feet;

Thence continuing southeasterly and easterly 10.21 feet along said curve through a central angle of 32° 35' 49";

Thence continuing easterly, South 85° 06' 16" East 20.03 feet to the beginning of a tangent curve concave to the southwest having a radius of 41.86 feet;

Thence southeasterly and southerly 62.44 feet along said curve through a central angle of 85° 28' 12";

Thence continuing southerly, South 0° 21' 57" West 15.92 feet to the beginning of a tangent curve concave to the northeast having a radius of 12.96 feet;

Thence southerly and southeasterly 15.27 along said curve through a central angle of 67° 31' 21" to the beginning of a non-tangent curve concave to the south having a radius of 30.67 feet and to which point a radial line bears North 28° 17' 34" West;

Thence easterly 21.11 feet along said curve through a central angle of 39° 25' 55" to the east line of said Lot 3;

Thence northerly along said east line, North 0° 21' 54" East 354.79 feet to the Point of Beginning.

Containing 60, 475 S.F. more or less.

Prepared by me or under
my direction and supervision

Atanacio Payan, PLS 7796
Date:  February 5, 2020



# Exhibit 4

FOR REFERENCE ONLY: 20201531688

FIDELITY NATIONAL TITLE COMPANY

RECORDING REQUESTED BY:

Tony Russo
Crest Real Estate
11160 W Olympic Blvd #700
LA, CA 90064

MAIL TAX STATEMENTS AND
WHEN RECORDED MAIL TO:

Zachary Vella
250 Bowery, 2nd Floor
New York, NY 10012

30052959-72

APN: ~~4384-023-014~~, portion of 4384-008-022    SPACE ABOVE THIS LINE IS FOR RECORDER'S USE
portion of

## GRANT DEED

THE UNDERSIGNED GRANTOR(S) DECLARE(S):    DOCUMENTARY TRANSFER TAX IS $ 0 ; CITY TRANSFER TAX $ 0

_____ Computed on full value of property conveyed, or

_____ Computed on full value less liens and encumbrances remaining at time of sale.

_____ Unincorporated area   _X_ City of Los Angeles

THE RECORDING IS NOT FOR CONSIDERATION BUT FOR THE PURPOSE OF ADJUSTING THE BOUNDARY
LINES PER LOT LINE ADJUSTMENT CASE NO. AA-2019-3535-PMEX

"The grantors and the grantees in this conveyance are comprised of the same parties who continue to hold the same
proportionate interest in the property, R & T 11925(d)."

For no additional consideration, receipt of which is hereby acknowledged,

Zachary Vella,
a single man ("Grantor")

hereby GRANT(S) to

Zachary Vella,
a single man ("Grantee")

the following described real property in the
City of Los Angeles, County of Los Angeles,
State of California, more particularly described as follows:

LEGAL DESCRIPTION ATTACHED HERETO AS EXHIBIT "A" AND SHOWN
IN EXHIBIT "B" AND MADE A PART HEREOF BY REFERENCE

DEED APPROVED BY CITY OF
LOS ANGELES PLANNING
DEPARTMENT FOR RECORDING
TO ADJUST LOT LINES PER
LOT LINE ADJUSTMENT CASE NO.
AA-2019-3535-PMEX

Dated: 01/16/2020

Signature

Zachary Vella
Name & Title    /  AKA Zachary Annson Vella

MAIL TAX STATEMENTS AS DIRECTED ABOVE

**This page is part of your document - DO NOT DISCARD**



## 20201531688



**Pages:**
**0007**

**Recorded/Filed in Official Records**
**Recorder's Office, Los Angeles County,**
**California**

**11/30/20 AT 08:00AM**

| | |
|---|---:|
| FEES: | 57.00 |
| TAXES: | 0.00 |
| OTHER: | 0.00 |
| SB2: | 75.00 |
| PAID: | 132.00 |

**PCOR SURCHARGE $20.00**



**LEADSHEET**



202011300230039

00019402526



011493355

**SEQ:**
**03**

**SECURE – 8:00AM**



**THIS FORM IS NOT TO BE DUPLICATED**



E08_201125_8

FIDELITY NATIONAL TITLE COMPANY

RECORDING REQUESTED BY:

Tony Russo
Crest Real Estate
11150 W Olympic Blvd #700
LA, CA 90064

MAIL TAX STATEMENTS AND
WHEN RECORDED MAIL TO:

Zachary Vella
250 Bowery, 2nd Floor
New York, NY 10012

30058359-TL

APN: ~~4384-023-014~~, portion of 4384-023-014, portion of 4384-005-026        SPACE ABOVE THIS LINE IS FOR RECORDER'S USE

# GRANT DEED

THE UNDERSIGNED GRANTOR(S) DECLARE(S):    DOCUMENTARY TRANSFER TAX IS $ 0 ; CITY TRANSFER TAX $ 0

_____ Computed on full value of property conveyed, or

_____ Computed on full value less liens and encumbrances remaining at time of sale.

_____ Unincorporated area   X   City of Los Angeles

THE RECORDING IS NOT FOR CONSIDERATION BUT FOR THE PURPOSE OF ADJUSTING THE BOUNDARY
LINES PER LOT LINE ADJUSTMENT CASE NO. AA-2019-3535-PMEX

"The grantors and the grantees in this conveyance are comprised of the same parties who continue to hold the same
proportionate interest in the property, R & T 11925(d)."

For no additional consideration, receipt of which is hereby acknowledged,

**Zachary Vella,**
**a single man** ("Grantor")

hereby GRANT(S) to

**Zachary Vella,**
**a single man** ("Grantee")

the following described real property in the
City of Los Angeles, County of Los Angeles,
State of California, more particularly described as follows:

LEGAL DESCRIPTION ATTACHED HERETO AS EXHIBIT "A" AND SHOWN
IN EXHIBIT "B" AND MADE A PART HEREOF BY REFERENCE

> DEED APPROVED BY CITY OF
> LOS ANGELES PLANNING
> DEPARTMENT FOR RECORDING
> TO ADJUST LOT LINES PER
> LOT LINE ADJUSTMENT CASE NO.
> AA-2019-3535-PMEX

Dated: 01/16/2020

Signature

Zachary Vella
Name & Title        AKA Zachary Annison Vella

MAIL TAX STATEMENTS AS DIRECTED ABOVE

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

STATE OF

)
)  **ss:**
)

COUNTY OF

On _____, before me, _____, Notary Public

(insert name)

personally appeared _____, who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature: _____

[Seal]

*See attached.*

**CALIFORNIA ALL-PURPOSE ACKNOWLEDGMENT**                    CIVIL CODE § 1189

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California

County of _Los Angeles_

On _January 16, 2020_ before me, _Selena Chavez (Notary Public)_
      _Date_                                _Here Insert Name and Title of the Officer_

personally appeared _Zachary Amson Vella_
                                    _Name(s) of Signer(s)_

who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

SELENA CHAVEZ
Notary Public - California
Los Angeles County
Commission # 2267925
My Comm. Expires Nov 20, 2022

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _____
                          _Signature of Notary Public_

_Place Notary Seal and/or Stamp Above_

———————— OPTIONAL ————————

*Completing this information can deter alteration of the document or fraudulent reattachment of this form to an unintended document.*

**Description of Attached Document**

Title or Type of Document: _____

Document Date: _____ Number of Pages: _____

Signer(s) Other Than Named Above: _____

**Capacity(ies) Claimed by Signer(s)**

Signer's Name: _____          Signer's Name: _____
□ Corporate Officer – Title(s): _____     □ Corporate Officer – Title(s): _____
□ Partner – □ Limited □ General                   □ Partner – □ Limited □ General
□ Individual          □ Attorney in Fact          □ Individual          □ Attorney in Fact
□ Trustee             □ Guardian of Conservator   □ Trustee             □ Guardian of Conservator
□ Other: _____                  □ Other: _____
Signer is Representing: _____           Signer is Representing: _____

©2017 National Notary Association

# EXHIBIT "A"
## LEGAL DESCRIPTION

PROPOSED PARCEL 2

That portion of Lot 3 in Section 2, Township 1 South, Range 15 West, San Bernardino Base and Meridian, as per map filed in Book 45, Page 40 of Record of Surveys and that portion of Lot 8 in Tract No. 21845, as per map filed in Book 619, Pages 83 and 84 of Maps, all in the City of Los Angeles, County of Los Angeles, State of California, described as a whole as follows:

Beginning at the northeast corner of said Lot 3;

Thence westerly along the north line of said Lot 3, North 89° 33' 00" West 283.39 feet to the most northeasterly corner of Lot 7 of said Tract no. 21845;

Thence southeasterly along the northeast line of said Lot 7, South 37° 01' 29" East 25.00 feet to the most easterly corner of said Lot 7;

Thence southwesterly along the line common to Lots 7 and 8, South 39° 57' 15" West 155.73 feet to the most southerly corner of said Lot 7, said southerly corner being on a curve concave to the west having a radius of 38.00 feet, a radial line through said point bears North 39° 57' 15" East;

Thence southeasterly and southerly 22.25 feet along said curve through a central angle of 33° 32' 52";

Thence northeasterly on a non-tangent line, North 39° 57' 15" East 22.31 feet;

Thence easterly, South 89° 58' 18" East 42.79 feet;

Thence easterly, North 74° 04' 18" East 89.25 feet to a point on the northeast line of said Lot 8 having a bearing and distance of North 24° 18' 16" West 102.04 feet;

Thence continuing easterly, North 74° 04' 18" East 16.32 feet;

Thence southeasterly, South 29° 58' 18" East 50.69 feet;

Thence southerly, South 0° 01' 42" West 43.62 feet;

Thence southwesterly, South 60° 01' 42" West 38.68 feet;

Thence southeasterly, South 29° 58' 18" East 71.40 feet;

Thence easterly, South 89° 58' 18" East 3.90 feet to a point of cusp with a curve concave to the south having a radius of 47.31 feet and to which point a radial line bears North 41° 01' 59" West;

Page 1 of 2

Thence easterly 64.83 feet along said curve through a central angle of 78° 31' 33";

Thence southeasterly, South 52° 30' 26" East 10.44 feet to the beginning of a tangent curve concave to the northeast having a radius of 17.94 feet;

Thence continuing southeasterly and easterly 10.21 feet along said curve through a central angle of 32° 35' 49";

Thence continuing easterly, South 85° 06' 16" East 20.03 feet to the beginning of a tangent curve concave to the southwest having a radius of 41.86 feet;

Thence southeasterly and southerly 62.44 feet along said curve through a central angle of 85° 28' 12";

Thence continuing southerly, South 0° 21' 57" West 15.92 feet to the beginning of a tangent curve concave to the northeast having a radius of 12.96 feet;

Thence southerly and southeasterly 15.27 along said curve through a central angle of 67° 31' 21" to the beginning of a non-tangent curve concave to the south having a radius of 30.67 feet and to which point a radial line bears North 28° 17' 34" West;

Thence easterly 21.11 feet along said curve through a central angle of 39° 25' 55" to the east line of said Lot 3;

Thence northerly along said east line, North 0° 21' 54" East 354.79 feet to the Point of Beginning.

Containing 70, 035 S.F. more or less

Exhibit "B" attached hereon and made a part hereof.

Atanacio Payan, PLS 7796

Date: February 5, 2020



LOT LINE ADJUSTMENT
EXHIBIT "B"

Exhibit 5

FOR REFERENCE ONLY: 20201531689

FIDELITY NATIONAL TITLE COMPANY

RECORDING REQUESTED BY:

Tony Russo
Crest Real Estate
11150 W Olympic Blvd #700
LA, CA 90064

MAIL TAX STATEMENTS AND
WHEN RECORDED MAIL TO:

Tree Lane, LLC
11301 W Olympic Bl #537
Los Angeles, CA 90064

30058359-72

APN: 4384-005-026, portion of 4384-025-014
portion of

SPACE ABOVE THIS LINE IS FOR RECORDER'S USE

## GRANT DEED

THE UNDERSIGNED GRANTOR(S) DECLARE(S):

DOCUMENTARY TRANSFER TAX IS $ 0 ; CITY TRANSFER TAX $ 0
_____ Computed on full value of property conveyed, or
_____ Computed on full value less liens and encumbrances remaining at time of sale.
_____ Unincorporated area __X__ City of Los Angeles

THE RECORDING IS NOT FOR CONSIDERATION BUT FOR THE PURPOSE OF ADJUSTING THE BOUNDARY
LINES PER LOT LINE ADJUSTMENT CASE NO. AA-2019-3535-PMEX

"The grantors and the grantees in this conveyance are comprised of the same parties who continue to hold the same
proportionate interest in the property, R & T 11925(d)."

For no additional consideration, receipt of which is hereby acknowledged,

Tree Lane, LLC,
a California limited liability company ("Grantor")

hereby GRANT(S) to

Tree Lane, LLC,
a California limited liability company ("Grantee")

the following described real property in the
City of Los Angeles, County of Los Angeles,
State of California, more particularly described as follows:

LEGAL DESCRIPTION ATTACHED HERETO AS EXHIBIT "A" AND SHOWN
IN EXHIBIT "B" AND MADE A PART HEREOF BY REFERENCE

DEED APPROVED BY CITY OF
LOS ANGELES PLANNING
DEPARTMENT FOR RECORDING
TO ADJUST LOT LINES PER
LOT LINE ADJUSTMENT CASE NO.
AA-2019-3535-PMEX

Exempt from fee per GC27388.1 due to
the maximum fees being paid on documents
in this transaction

Dated: 1/16/2020

TREE LANE, LCC
A CALIFORNIA LIMITED LIAB.
COMPANY.

_____
Signature

Mohamed Hadid Manage.
Name & Title
AKA Mohamed Anwar Hadid

MAIL TAX STATEMENTS AS DIRECTED ABOVE

**This page is part of your document - DO NOT DISCARD**



## 20201531689

**Pages:**
**0008**

**Recorded/Filed in Official Records
Recorder's Office, Los Angeles County,
California**

**11/30/20 AT 08:00AM**

| | | |
|---|---|---|
| FEES: | | 60.00 |
| TAXES: | | 0.00 |
| OTHER: | | 0.00 |
| | | |
| PAID: | | 60.00 |

### PCOR SURCHARGE $20.00



**L E A D S H E E T**



202011300230039

00019402527



011493355

**SEQ:**
**04**

**SECURE - 8:00AM**



**THIS FORM IS NOT TO BE DUPLICATED**

E08_201125_8

FIDELITY NATIONAL TITLE COMPANY

RECORDING REQUESTED BY:

Tony Russo
Crest Real Estate
11150 W Olympic Blvd #700
LA, CA 90064

MAIL TAX STATEMENTS AND
WHEN RECORDED MAIL TO:

Tree Lane, LLC
11301 W Olympic Bl #537
Los Angeles, CA 90064

30058359 - 72

APN: 4384-005-026 , portion of 4384-023-014          SPACE ABOVE THIS LINE IS FOR RECORDER'S USE
portion of

## GRANT DEED

THE UNDERSIGNED GRANTOR(S) DECLARE(S):          DOCUMENTARY TRANSFER TAX IS $ 0 ; CITY TRANSFER TAX $ 0

_____ Computed on full value of property conveyed, or

_____ Computed on full value less liens and encumbrances remaining at time of sale.

_____ Unincorporated area   __X__ City of Los Angeles

THE RECORDING IS NOT FOR CONSIDERATION BUT FOR THE PURPOSE OF ADJUSTING THE BOUNDARY
LINES PER LOT LINE ADJUSTMENT CASE NO. AA-2019-3535-PMEX

"The grantors and the grantees in this conveyance are comprised of the same parties who continue to hold the same
proportionate interest in the property, R & T 11925(d)."

For no additional consideration, receipt of which is hereby acknowledged,

**Tree Lane, LLC,**
**a California limited liability company** ("Grantor")

hereby GRANT(S) to

**Tree Lane, LLC,**
**a California limited liability company** ("Grantee")

the following described real property in the
City of Los Angeles, County of Los Angeles,
State of California, more particularly described as follows:

LEGAL DESCRIPTION ATTACHED HERETO AS EXHIBIT "A" AND SHOWN
IN EXHIBIT "B" AND MADE A PART HEREOF BY REFERENCE

Exempt from fee per GC27388.1 due to
the maximum fees being paid on documents
in this transaction

DEED APPROVED BY CITY OF
LOS ANGELES PLANNING
DEPARTMENT FOR RECORDING
TO ADJUST LOT LINES PER
LOT LINE ADJUSTMENT CASE NO.
AA-2019-3535-PMEX

Dated: 1/16/2020

TREE LANE, LCC
· A CALIFORNIA LIMITED LIABILI
COMPANY.

_____
Signature

Mohamed Hadid Manage.
Name & Title
AKA Mohamed Ahwav Hadid

MAIL TAX STATEMENTS AS DIRECTED ABOVE

A notary public or other officer
completing this certificate verifies
only the identity of the individual
who signed the document to which
this certificate is attached, and not
the truthfulness, accuracy, or
validity of that document.

STATE OF

                          ) ss:

COUNTY OF

On _____, before me, _____, Notary Public

(insert name)

personally appeared _____, who
proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are
subscribed to the within instrument and acknowledged to me that he/she/they executed the same
in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the
person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing
paragraph is true and correct.

WITNESS my hand and official seal.

Signature: _____

[Seal]                    See attached.

14

**CALIFORNIA ALL-PURPOSE ACKNOWLEDGMENT**                    CIVIL CODE § 1189

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document
to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California

County of _Los Angeles_

On _January 16, 2020_ before me, _Selena Chavez (Notary Public)_
       Date                              Here Insert Name and Title of the Officer

personally appeared _Mohamed Anwar Hadid_
                                   Name(s) of Signer(s)

who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed
to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their
authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity
upon behalf of which the person(s) acted, executed the instrument.

> SELENA CHAVEZ
> Notary Public · California
> Los Angeles County
> Commission # 2267925
> My Comm. Expires Nov 20, 2022

I certify under PENALTY OF PERJURY under the
laws of the State of California that the foregoing
paragraph is true and correct.

WITNESS my hand and official seal.

Signature _____

                              Signature of Notary Public

*Place Notary Seal and/or Stamp Above*

———————— **OPTIONAL** ————————

*Completing this information can deter alteration of the document or
fraudulent reattachment of this form to an unintended document.*

**Description of Attached Document**
Title or Type of Document: _____

Document Date: _____ Number of Pages: _____

Signer(s) Other Than Named Above: _____

**Capacity(ies) Claimed by Signer(s)**

Signer's Name: _____ | Signer's Name: _____
☐ Corporate Officer – Title(s): _____ | ☐ Corporate Officer – Title(s): _____
☐ Partner – ☐ Limited ☐ General | ☐ Partner – ☐ Limited ☐ General
☐ Individual    ☐ Attorney in Fact | ☐ Individual    ☐ Attorney in Fact
☐ Trustee    ☐ Guardian of Conservator | ☐ Trustee    ☐ Guardian of Conservator
☐ Other: _____ | ☐ Other: _____
Signer is Representing: _____ | Signer is Representing: _____

©2017 National Notary Association

## EXHIBIT "A"
## LEGAL DESCRIPTION

PROPOSED PARCEL 1

That portion of Lot 3 in Section 2, Township 1 South, Range 15 West, San Bernardino Base and Meridian, as per map filed in Book 45, Page 40 of Record of Surveys, that portion of Lot 1 in Tract No. 32693, as per map filed in Book 918, Pages 13 and 14 of Maps, and that portion of Lot 8 in Tract No. 21845, as per map filed in Book 619, Pages 83 and 84 of Maps, all in the City of Los Angeles, County of Los Angeles, State of California, described as a whole as follows:

Beginning at a point on the east line of said Lot 3, South 0° 21' 54" West 354.79 feet south from the north east corner thereof;

Thence continuing southerly along the east line of said Lot 3, South 0° 21' 54" West 221.33 feet to a point on the south line of the north 576.12 of said Lot 3;

Thence westerly along said south line, North 89° 33' 00" West 352.00 feet to a point on a line having a bearing and distance of North 11° 16' 17" West 169.69 feet as shown on Parcel Map Exemption No. 2880 recorded December 18, 1985 as Instrument No. 85-1494464 Official Records of Los Angeles County;

Thence northerly along said line, North 11° 16' 17" West 169.69 feet to a point on a line parallel with and 20 feet southeasterly from that line having a bearing and distance of North 71° 40' 52" East 155.90 feet as shown on said Tract No. 21845;

Thence westerly along said parallel line, South 71° 40' 52" West 101.21 feet to a point on a line parallel with and 20 feet southerly from that line having a bearing and distance of North 87° 31' 21" East 192.00 feet as shown on said Tract No. 21845;

Thence continuing westerly along said parallel line, South 87° 31' 21" West 209.44 feet to a point on a line parallel with and 20 feet westerly from that line having a bearing and distance of North 20° 00' 00" West 130.15 feet as shown on said Tract No. 21845;

Thence northerly along said parallel line, North 20° 00' 00" West 133.23 feet to a point on the northwesterly line of said Tract No. 32693 having a bearing and distance of North 38° 02' 49" East 50.06 feet;

Thence northeasterly along said line, North 38° 02' 49" East 11.88 feet to the beginning of a tangent curve concave to the southeast having a radius of 83.00 feet;

Thence northeasterly 11.25 feet along said curve through a central angle of 7° 45' 49" to a point on the westerly line of Lot 12 of said Tract No. 21845, a radial line through said point bears North 44° 11' 22" West;

Thence southerly, easterly, and northeasterly along the westerly, southerly, and southeasterly lines of said Tract No. 21845 the following three courses;

1. southerly, South 20° 00' 00" East 130.15 feet;
2. easterly, North 87° 31' 21" East 192.00 feet;

3.  northeasterly, North 71° 40' 52" East 155.90 feet to the most southerly corner of Lot 8 of said Tract No. 21845;

Thence northerly along the west line of said Lot 8, North 14° 22' 23" West 172.21 feet to the most westerly corner of said Lot 8, said westerly corner being on a curve concave to the west having a radius of 38.00 feet, a radial line through said point bears South 14° 22' 23" East;

Thence northeasterly and northerly 61.10 feet along said curve through a central angle of 92° 07' 30";

Thence northeasterly on a non-tangent line, North 39° 57' 15" East 22.31 feet;

Thence easterly, South 89° 58' 18' East 42.79 feet;

Thence easterly, North 74° 04' 18" East 89.25 feet to a point on the northeast line of said Lot 8 having a bearing and distance of North 24° 18' 16" West 102.04 feet;

Thence continuing easterly, North 74° 04' 18" East 16.32 feet;

Thence southeasterly, South 29° 58' 18" East 50.69 feet;

Thence southerly, South 0° 01' 42" West 43.62 feet;

Thence southwesterly, South 60° 01' 42" West 38.68 feet;

Thence southeasterly, South 29° 58' 18" East 71.40 feet;

Thence easterly, South 89° 58' 18" East 3.90 feet to a point of cusp with a curve concave to the south having a radius of 47.31 feet and to which point a radial line bears North 41° 01' 59" West;

Thence easterly 64.83 feet along said curve through a central angle of 78° 31' 33";

Thence southeasterly, South 52° 30' 26" East 10.44 feet to the beginning of a tangent curve concave to the northeast having a radius of 17.94 feet;

Thence continuing southeasterly and easterly 10.21 feet along said curve through a central angle of 32° 35' 49";

Thence continuing easterly, South 85° 06' 16" East 20.03 feet to the beginning of a tangent curve concave to the southwest having a radius of 41.86 feet;

Thence southeasterly and southerly 62.44 feet along said curve through a central angle of 85° 28' 12";

Thence continuing southerly, South 0° 21' 57" West 15.92 feet to the beginning of a tangent curve concave to the northeast having a radius of 12.96 feet;

Thence southerly and southeasterly 15.27 along said curve through a central angle of 67° 31' 21" to the beginning of a non-tangent curve concave to the south having a radius of 30.67 feet and to which point a radial line bears North 28° 17' 34" West;

Thence easterly 21.11 feet along said curve through a central angle of 39° 25' 55" to the Point of Beginning.

Containing 141, 444 S.F. more or less

Exhibit "B" attached hereon and made a part hereof.

Atanacio Payan, PLS 7796

Date:  February 5, 2020



## LOT LINE ADJUSTMENT
### EXHIBIT "B"

# Exhibit 6

FOR REFERENCE ONLY: 20201531691

## FIDELITY NATIONAL TITLE COMPANY

**RECORDING REQUESTED BY:**

Tony Russo
Crest Real Estate
11150 W Olympic Blvd #700
LA, CA 90064

MAIL TAX STATEMENTS AND
WHEN RECORDED MAIL TO:

Tree Lane, LLC
11301 W Olympic Bl #537
Los Angeles, CA 90064

30058359-TL

APN: portion of 4284-023-014

SPACE ABOVE THIS LINE IS FOR RECORDER'S USE

# GRANT DEED

THE UNDERSIGNED GRANTOR(S) DECLARE(S):

DOCUMENTARY TRANSFER TAX IS $ 0 ; CITY TRANSFER TAX $ 0

\_\_\_\_\_ Computed on full value of property conveyed, or

\_\_\_\_\_ Computed on full value less liens and encumbrances remaining at time of sale.

\_\_\_\_\_ Unincorporated area   \_X\_ City of Los Angeles

THE RECORDING IS NOT FOR CONSIDERATION BUT FOR THE PURPOSE OF ADJUSTING THE BOUNDARY
LINES PER LOT LINE ADJUSTMENT CASE NO. AA-2019-3535-PMEX

For no additional consideration, receipt of which is hereby acknowledged,

**Zachary Vella,**
**a single man ("Grantor")**

hereby GRANT(S) to

**Tree Lane, LLC,**
**a California limited liability company ("Grantee")**

the following described real property in the
City of Los Angeles, County of Los Angeles,
State of California, more particularly described as follows:

"The value of the property in this
conveyance, exclusive of liens and
encumbrances is $100.00 or less, and there
no additional consideration received by the
grantor, R&T 11911."

LEGAL DESCRIPTION ATTACHED HERETO AS EXHIBIT "A" AND SHOWN
IN EXHIBIT "B" AND MADE A PART HEREOF BY REFERENCE

DEED APPROVED BY CITY OF
LOS ANGELES PLANNING
DEPARTMENT FOR RECORDING
TO ADJUST LOT LINES PER
LOT LINE ADJUSTMENT CASE NO.
AA-2019-3535-PMEX

Exempt from fee per GC27388.1 due to
the maximum fees being paid on documents
in this transaction

Dated: 01/16/2020

Signature

Zachary Vella
Name & Title

AKA  Zachary Annson Vella

MAIL TAX STATEMENTS AS DIRECTED ABOVE



**This page is part of your document - DO NOT DISCARD**





## 20201531691

**Pages:**
**0003**

**Recorded/Filed in Official Records
Recorder's Office, Los Angeles County,
California**

**11/30/20 AT 08:00AM**

|  |  |
|---|---|
| FEES : | 54.00 |
| TAXES : | 0.00 |
| OTHER : | 0.00 |
| **PAID :** | **54.00** |

### PCOR SURCHARGE $20.00



**L E A D S H E E T**

202011300230039

00019402529

011493355

**SEQ:
06**

**SECURE - 8:00AM**



**THIS FORM IS NOT TO BE DUPLICATED**

E08_201125_8

FIDELITY NATIONAL TITLE COMPANY

RECORDING REQUESTED BY:

Tony Russo
Crest Real Estate
11150 W Olympic Blvd #700
LA, CA 90064

MAIL TAX STATEMENTS AND
WHEN RECORDED MAIL TO:

Tree Lane, LLC
11301 W Olympic Bl #537
Los Angeles, CA 90064

30058359-72

APN: portion of 4384-023-014                    SPACE ABOVE THIS LINE IS FOR RECORDER'S USE

## GRANT DEED

THE UNDERSIGNED GRANTOR(S) DECLARE(S):

DOCUMENTARY TRANSFER TAX IS $ 0 ; CITY TRANSFER TAX $ 0
_____ Computed on full value of property conveyed, or
_____ Computed on full value less liens and encumbrances remaining at time of sale.
_____ Unincorporated area   _X_ City of Los Angeles

THE RECORDING IS NOT FOR CONSIDERATION BUT FOR THE PURPOSE OF ADJUSTING THE BOUNDARY
LINES PER LOT LINE ADJUSTMENT CASE NO. AA-2019-3535-PMEX

For no additional consideration, receipt of which is hereby acknowledged,

**Zachary Vella,**
**a single man** ("Grantor")

hereby GRANT(S) to

**Tree Lane, LLC,**
**a California limited liability company** ("Grantee")

"The value of the property in this
conveyance, exclusive of liens and
encumbrances is $100.00 or less, and there
no additional consideration received by the
grantor, R&T 11911."

the following described real property in the
City of Los Angeles, County of Los Angeles,
State of California, more particularly described as follows:

LEGAL DESCRIPTION ATTACHED HERETO AS EXHIBIT "A" AND SHOWN
IN EXHIBIT "B" AND MADE A PART HEREOF BY REFERENCE

DEED APPROVED BY CITY OF
LOS ANGELES PLANNING
DEPARTMENT FOR RECORDING
TO ADJUST LOT LINES PER
LOT LINE ADJUSTMENT CASE NO.
AA-2019-3535-PMEX

Exempt from fee per GC27388.1 due to
the maximum fees being paid on documents
in this transaction

Dated: 01/16/2020

Signature

Zachary Vella
Name & Title
AKA  Zachary Annson Vella

MAIL TAX STATEMENTS AS DIRECTED ABOVE

A notary public or other officer
completing this certificate verifies
only the identity of the individual
who signed the document to which
this certificate is attached, and not
the truthfulness, accuracy, or
validity of that document.

STATE OF _____ )
                              )  ss:
COUNTY OF _____   )

On _____, before me, _____, Notary Public
                                        (insert name)

personally appeared _____, who
proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are
subscribed to the within instrument and acknowledged to me that he/she/they executed the same
in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the
person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing
paragraph is true and correct.

WITNESS my hand and official seal.

Signature: _____

[Seal]

See attached.

**CALIFORNIA ALL-PURPOSE ACKNOWLEDGMENT**                    CIVIL CODE § 1189

---

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

---

State of California

County of _Los Angeles_

On _January 16, 2020_ before me, _Selena Chavez (Notary Public)_
Date                                   Here Insert Name and Title of the Officer

personally appeared _Zachary Annson Vella_
Name(s) of Signer(s)

who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

SELENA CHAVEZ
Notary Public · California
Los Angeles County
Commission # 2267925
My Comm. Expires Nov 20, 2022

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _____

*Place Notary Seal and/or Stamp Above*                    *Signature of Notary Public*

---

**OPTIONAL**

*Completing this information can deter alteration of the document or fraudulent reattachment of this form to an unintended document.*

**Description of Attached Document**

Title or Type of Document: _____

Document Date: _____ Number of Pages: _____

Signer(s) Other Than Named Above: _____

**Capacity(ies) Claimed by Signer(s)**

Signer's Name: _____    Signer's Name: _____
☐ Corporate Officer – Title(s): _____    ☐ Corporate Officer – Title(s): _____
☐ Partner – ☐ Limited ☐ General          ☐ Partner – ☐ Limited ☐ General
☐ Individual        ☐ Attorney in Fact     ☐ Individual        ☐ Attorney in Fact
☐ Trustee           ☐ Guardian of Conservator  ☐ Trustee        ☐ Guardian of Conservator
☐ Other: _____          ☐ Other: _____
Signer is Representing: _____    Signer is Representing: _____

---

©2017 National Notary Association



Exhibit A

## LEGAL DESCRIPTION

That portion of Lot 8 in Tract No. 21845, as per map filed in Book 619, Pages 83 and 84 of Maps, in the City of Los Angeles, County of Los Angeles, State of California, described as a whole as follows:

Beginning at the most southerly corner of said Lot 8;

Thence northerly along the west line of said Lot 8, North 14° 22' 23" West 172.21 feet to the most westerly corner of said Lot 8, said westerly corner being on a curve concave to the west having a radius of 38.00 feet, a radial line through said point bears South 14° 22' 23" East;

Thence northeasterly and northerly 61.10 feet along said curve through a central angle of 92° 07' 30";

Thence northeasterly on a non-tangent line, North 39° 57' 15" East 22.31 feet;

Thence easterly, South 89° 58' 18' East 42.79 feet;

Thence easterly, North 74° 04' 18" East 89.25 feet to a point on the northeast line of said Lot 8 having a bearing and distance of North 24° 18' 16" West 102.04 feet;

Thence southeasterly along the northeasterly line of said Lot 8, South 24° 18' 16" East 38.40 feet to the most easterly corner thereof;

Thence southwesterly along the southeast line of said Lot 8, South 24° 03' 26" West 183.98 feet;

Thence continuing southwesterly along the southeast line of said Lot 8, South 52° 04' 00" West 86.21 feet to the Point of Beginning.

Containing 26, 855 S.F. more or less

Prepared by me or under
my direction and supervision

Atanacio Payan, PLS 7796
Date:  February 5, 2020



LOT LINE ADJUSTMENT
EXHIBIT "B"

B1040 (FORM 1040) (12/15)

| ADVERSARY PROCEEDING COVER SHEET<br>(Instructions on Reverse) | ADVERSARY PROCEEDING NUMBER<br>(Court Use Only) |
|---|---|

**PLAINTIFFS**

Tree Lane LLC

**DEFENDANTS**

Zachary Vella

**ATTORNEYS** (Firm Name, Address, and Telephone No.)
Sandford L. Frey and Robyn B. Sokol
Leech Tishman Fuscaldo & Lampl, Inc.
1100 Glendon Avenue, 15th Floor
Los Angeles, CA 90024 - Tel: 424.738.4400

**ATTORNEYS** (If Known)

**PARTY** (Check One Box Only)
⊠ Debtor      □ U.S. Trustee/Bankruptcy Admin
□ Creditor    □ Other
□ Trustee

**PARTY** (Check One Box Only)
□ Debtor      □ U.S. Trustee/Bankruptcy Admin
□ Creditor    □ Other
□ Trustee

**CAUSE OF ACTION** (WRITE A BRIEF STATEMENT OF CAUSE OF ACTION, INCLUDING ALL U.S. STATUTES INVOLVED)
(1) Avoidance of Fraudulent Transfer Pursuant to 11 U.S.C. Section 544 and Cal. Civ. Code Sections 3439.04(a), 3439.04(a)(2), and 3439.05; (2) Recovery of Avoided Transfer for Benefit of Estate Pursuant to 11 U.S.C. Sections 550(a)(1) and 551 and Cal. Civ. Code Section 3439.07(a)(1); (3) Cancellation of Instruments; (4) Tortious Interference with Prospective Economic Advantage; and (5) Unjust Enrichment/Quantum Meruit/Restitution

**NATURE OF SUIT**

(Number up to five (5) boxes starting with lead cause of action as 1, first alternative cause as 2, second alternative cause as 3, etc.)

**FRBP 7001(1) – Recovery of Money/Property**
□ 11-Recovery of money/property – §542 turnover of property
□ 12-Recovery of money/property – §547 preference
☑ 13-Recovery of money/property – §548 fraudulent transfer
☑ 14-Recovery of money/property - other

**FRBP 7001(2) – Validity, Priority or Extent of Lien**
□ 21-Validity, priority or extent of lien or other interest in property

**FRBP 7001(3) – Approval of Sale of Property**
□ 31-Approval of sale of property of estate and of a co-owner - §363(h)

**FRBP 7001(4) – Objection/Revocation of Discharge**
□ 41-Objection / revocation of discharge – §727(c),(d),(e)

**FRBP 7001(5) – Revocation of Confirmation**
□ 51-Revocation of confirmation

**FRBP 7001(6) – Dischargeability**
□ 66-Dischargeability - §523(a)(1),(14),(14A) priority tax claims
□ 62-Dischargeability - §523(a)(2), false pretenses, false representation, actual fraud
□ 67-Dischargeability - §523(a)(4), fraud as fiduciary, embezzlement, larceny

**(continued next column)**

**FRBP 7001(6) – Dischargeability (continued)**
□ 61-Dischargeability - §523(a)(5), domestic support
□ 68-Dischargeability - §523(a)(6), willful and malicious injury
□ 63-Dischargeability - §523(a)(8), student loan
□ 64-Dischargeability - §523(a)(15), divorce or separation obligation (other than domestic support)
□ 65-Dischargeability - other

**FRBP 7001(7) – Injunctive Relief**
□ 71-Injunctive relief – imposition of stay
□ 72-Injunctive relief – other

**FRBP 7001(8) Subordination of Claim or Interest**
□ 81-Subordination of claim or interest

**FRBP 7001(9) Declaratory Judgment**
□ 91-Declaratory judgment

**FRBP 7001(10) Determination of Removed Action**
□ 01-Determination of removed claim or cause

**Other**
□ SS-SIPA Case – 15 U.S.C. §§78aaa et.seq.
☑ 02-Other (e.g. other actions that would have been brought in state court if unrelated to bankruptcy case)

| □ Check if this case involves a substantive issue of state law | □ Check if this is asserted to be a class action under FRCP 23 |
|---|---|
| □ Check if a jury trial is demanded in complaint | Demand  $ 10,000,000 |

Other Relief Sought
Avoidance of fraudulent transfers; Cancellation of Instruments; Tortious Interference; Unjust Enrichment

B1040 (FORM 1040) (12/15)

| BANKRUPTCY CASE IN WHICH THIS ADVERSARY PROCEEDING ARISES | | |
|---|---|---|
| NAME OF DEBTOR<br>Tree Lane LLC | BANKRUPTCY CASE NO.<br>2:24-bk-13201-BB | |
| DISTRICT IN WHICH CASE IS PENDING<br>Central District of California | DIVISION OFFICE<br>Los Angeles Division | NAME OF JUDGE<br>Sheri Bluebond |
| **RELATED ADVERSARY PROCEEDING (IF ANY)** | | |
| PLAINTIFF | DEFENDANT | ADVERSARY<br>PROCEEDING NO. |
| DISTRICT IN WHICH ADVERSARY IS PENDING | DIVISION OFFICE | NAME OF JUDGE |
| SIGNATURE OF ATTORNEY (OR PLAINTIFF)<br><br>*/s/ Robyn B. Sokol* | | |
| DATE<br><br>November 8, 2024 | PRINT NAME OF ATTORNEY (OR PLAINTIFF)<br><br>Robyn B. Sokol | |

## INSTRUCTIONS

The filing of a bankruptcy case creates an "estate" under the jurisdiction of the bankruptcy court which consists of all of the property of the debtor, wherever that property is located. Because the bankruptcy estate is so extensive and the jurisdiction of the court so broad, there may be lawsuits over the property or property rights of the estate. There also may be lawsuits concerning the debtor's discharge. If such a lawsuit is filed in a bankruptcy court, it is called an adversary proceeding.

A party filing an adversary proceeding must also must complete and file Form 1040, the Adversary Proceeding Cover Sheet, unless the party files the adversary proceeding electronically through the court's Case Management/Electronic Case Filing system (CM/ECF). (CM/ECF captures the information on Form 1040 as part of the filing process.) When completed, the cover sheet summarizes basic information on the adversary proceeding. The clerk of court needs the information to process the adversary proceeding and prepare required statistical reports on court activity.

The cover sheet and the information contained on it do not replace or supplement the filing and service of pleadings or other papers as required by law, the Bankruptcy Rules, or the local rules of court. The cover sheet, which is largely self-explanatory, must be completed by the plaintiff's attorney (or by the plaintiff if the plaintiff is not represented by an attorney). A separate cover sheet must be submitted to the clerk for each complaint filed.

**Plaintiffs** and **Defendants.** Give the names of the plaintiffs and defendants exactly as they appear on the complaint.

**Attorneys.** Give the names and addresses of the attorneys, if known.

**Party**. Check the most appropriate box in the first column for the plaintiffs and the second column for the defendants.

**Demand.** Enter the dollar amount being demanded in the complaint.

**Signature.** This cover sheet must be signed by the attorney of record in the box on the second page of the form. If the plaintiff is represented by a law firm, a member of the firm must sign. If the plaintiff is pro se, that is, not represented by an attorney, the plaintiff must sign.