Sandford L. Frey (State Bar No. 117058)
Robyn B. Sokol (State Bar No. 159506)
**LEECH TISHMAN NELSON HARDIMAN, INC.**
1100 Glendon Avenue, 15th Floor
Los Angeles California 90024
Telephone: (424) 738-4400; Facsimile: (424) 738-5080
E-mail: *sfrey@leechtishman.com*
        *rsokol@leechtishman.com*

Attorneys for Tree Lane, LLC
Debtor and Debtor-in-Possession

## UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

## LOS ANGELES DIVISION

| | |
|---|---|
| In re | **Case No. 2:24-bk-13201-BB** |
| TREE LANE LLC, | **Adv. Case No. 2:24-ap-01259-BB** |
| Debtor. | **Chapter 11** |
| | **FIRST AMENDED COMPLAINT FOR:** |
| TREE LANE LLC, | **(1) AVOIDANCE OF FRAUDULENT TRANSFER PURSUANT TO 11 U.S.C. § 544 AND CAL. CIV. CODE §§ 3439.04(a)(1), 3439.04(a)(2), AND, 3439.05;** |
| Plaintiff, | |
| v. | |
| ZACHARY VELLA, an individual, | **(2) RECOVERY OF AVOIDED TRANSFER FOR BENEFIT OF ESTATE PURSUANT TO 11 U.S.C. §§ 550(a)(1) AND 551 AND CAL. CIV. CODE § 3439.07(a)(1);** |
| Defendant | |
| | **(3) CANCELLATION OF INSTRUMENT;** |
| | **(4) TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE;** |
| | **(5) UNJUST ENRICHMENT/QUANTUM MERUIT/RESTITUTION;** |
| | **(6) FRAUD;** |

1

**(7) FRAUDULENT MISREPRESENTATION; AND**

**(8) CONVERSION**

**TO THE HONORABLE SHERI BLUEBOND, UNITED STATES BANKRUPTCY JUDGE, AND DEFENDANT:**

Plaintiff, Tree Lane LLC, debtor and debtor in possession ("**Plaintiff**" or "**Debtor**") hereby files this *First Amended Complaint for (1) Avoidance of Fraudulent Transfer Pursuant to 11 U.S.C. § 544(b) and Cal. Civ. Code §§ 3439.04(a)(1), 3439.04(a)(2) and 3439.05; (2) Recovery of Avoided Transfer for Benefit of Estate Pursuant to 11 U.S.C. §§ 550(a)(1) and 551 and Cal. Civ. Code § 3439.07; (3) Cancellation of Instrument; (4) Tortious Interference With Prospective Economic Advantage; (5) Unjust Enrichment/Quantum Meruit/Restitution; (6) Fraud; (7) Fraudulent Misrepresentation; and, (8) Conversion* ("**Complaint**") against Zachary Vella ("**Vella**") alleging as follows:

## STATEMENT OF JURISDICTION AND VENUE

1. On April 25, 2024 ("**Petition Date**"), the Debtor filed a Voluntary Petition under Chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.*

2. The Bankruptcy Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. § 1334 and 11 U.S.C. §§ 544, 550, and 551. This adversary proceeding is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (H) and (O).

3. The Bankruptcy Court has constitutional jurisdiction to enter a final judgment in this adversary proceeding. To the extent the Court does not have constitutional jurisdiction to enter a final judgment, the Debtor consents to the Court entering a final judgment in this proceeding.

4. Venue lies properly in this judicial district in that the civil proceeding arises under title 11 of the United States Code as provided in 28 U.S.C. § 1409.

5. This adversary proceeding arises out of the case entitled *In re Tree Lane LLC*, Case No. 2:24-bk-13201-BB, filed on April 25, 2024, and currently pending in the United States Bankruptcy Court, Central District of California, Los Angeles Division.

**PARTIES**

6.      Plaintiff is presently, and at all times relevant to the allegations of this Complaint was, a California limited liability company located and doing business in the County of Los Angeles, State of California, including in particular its business activities relating to the facts, as alleged herein and the 4.2 acres of a developable real property located at 2451 Summitridge Drive, Beverly Hills, California 90210 which it acquired in 2013 ("**Property**").

7.      Defendant Vella is an individual who on information and belief, (a) is residing in the State of Florida, (b) resided at the time of most of the events alleged herein in the County of Los Angeles, State of California, (c) is the co-founder and managing director of Skylark Capital Management, LLC, a California limited liability company, (d) is the signatory for agreements and loan documents identified herein, and (e) has been and is doing business in the County of Los Angeles, State of California, including in particular his activities relating to the Debtor and real property described and as alleged herein.

**FACTUAL ALLEGATIONS**

**A.      Summary of Factual Allegations and Claims**

8.      Prior to the transfers of real property and unauthorized line adjustments described herein, the Debtor held title to 100% of the Property. The Debtor completed development plans and had permits for the development of the Property as a one-of-a-kind, luxurious, state-of-the-art single-family residential home with approximately 30,000 square feet of living space, a private pool and spa, a home theater, and an eight (8) car garage with a car lift ("**Project**").

9.      Vella is the co-founder and managing director of Skylark Capital Management, LLC, a California limited liability company ("**Lender**"), the entity that provided the Debtor with a construction loan to complete the Project in 2018.  Without the Debtor's knowledge or consent, Vella transferred 1.39 acres of the Property owned by the Debtor to Vella in his personal capacity, made lot line adjustments to the Property and transferred certain real property consisting of .63 acres of hillside owned by Vella to the Debtor without the Debtor's knowledge.  These lot line adjustments and transfers were made without the knowledge or consent of the lien holders secured by properly perfected liens on each of the parcels that were transferred.

10.    Vella failed to provide any notice to the lien holders of the transfers and lot line adjustments.

11.    Vella's unauthorized and improper lot line adjustments and transfers (described more fully below) resulted in the Property being changed from a single parcel of 4.01 acres comprised of APN 4384-023-23 (2.62 Acres) ("**APN 23**") and APN 4384-023-022 (1.39 Acres) ("**APN 22**") in which the Debtor held legal title to the following two parcels of real property:

  a.    3.24 acre parcel comprised of APN 23 (2.62 acres) and APN 4384-023-020 (.62 acres) ("**APN 20**") in which the Debtor holds legal title ("**Tree Lane Parcel**")

  b.    1.61 acre parcel comprised of APN 22 (1.39 acres) and APN 4384-023-021 (.22 acres) ("**APN 21**") in which Vella holds legal title  ("**Vella Parcel**")

12.    By and through this Complaint, the Debtor seeks to avoid the fraudulent transfer of APN 22 by the Debtor to Vella and seeks damages resulting from fraud, fraudulent misrepresentation, conversion, tortious interference, unjust enrichment and slander of title perpetrated by Vella. The transfer by the Debtor of APN 22 was a transfer of the Debtor's property that was made without the knowledge or consent of the Debtor for no consideration or less than reasonable value.

13.    The transfer by the Debtor of APN 22 was made without the knowledge or consent of the lien holder whose claim is secured by APN 22.  In fact, no notice of the improper and fraudulent transfers from the Debtor to Vella was provided to the properly perfected lien holder.

14.     The Debtor also seeks damages resulting from Vella's unauthorized and unlawful acts which interfered with and continue to interfere with the Debtor's economic benefits relating to the Property.

15.    The transfer of APN 20 to the Debtor without the Debtor's knowledge or consent was made subject to the lien of Boston Private Bank and Trust Company in the original amount of approximately $2,437,500. The transfer of APN 20 to the Debtor by Vella was made without the knowledge or consent of Boston Private Bank and Trust Company or the then lien holder of APN 20.

**B.    Altered Lot Lines and Ownership Caused by Vella**

16.    The unauthorized and improper actions of Vella resulted in the altering of the

Property dramatically to the detriment of the Debtor and its creditors as set forth in the Los Angeles

tax records and summarized as follows:

| Lot # | Owner | Address | APN | Acres |
|-------|-------|---------|-----|-------|
| **1** | Tree Lane | 2451 Summitridge Dr | 4384-023-023 (**"APN 23"**) | 2.62 |
| **2** | Tree Lane | 9702 Hensal Rd | 4384-023-020 (**"APN 20"**) | 0.62 |
| **3** | **Zachary Vella** | **SUBJECT PARCEL** | **4384-023-022** (**"APN 22"**) | **1.39** |
| **4** | Zachary Vella | Hensal Rd.  (**"Vella Lot"**) | 4384-023-021 (**"APN 21"**) | 0.22 |
| **5** | Zachary Vella | 9703 Hensal Rd | 4384-023-013 (**"APN 13"**) | 0.27 |



**C.      Loans to the Debtor, Unauthorized Lot Line Adjustments and Improper Transfers**

17.      In or around September 28, 2018, Lender agreed to lend the Debtor $31,300,000.00 to complete the Project ("**Loan**").  The Loan was evidenced by certain prepetition loan documents ("**Loan Documents**"), including a *Loan Agreement* dated September 28, 2018 ("**Loan Agreement**") and secured by, among other things, a *Construction Deed of Trust, Assignment of Leases and Rents, Security Agreement and Fixture Filing dated October 4, 2018* recorded against the Property ("**Deed of Trust**") and the Debtor's personal property.

18.      Prior to the Loan, the Debtor had no prior interactions or business dealings with Lender or Vella.  Instead, Vella, on behalf of Lender, sought out Mohamad Hadid ("**Hadid**"), the Debtor's principal, in mid-2018 and offered to lend the Debtor $31,300,000.00 to fund a pay-off of the then current secured debt on the Property and for development of the Property.

19.      Unbeknownst to the Debtor, at around the time the Loan was made, Vella, the Lender's manager and co-founder, purchased from a third-party real property abutting the Debtor's Property.  Attached hereto as **Exhibit 1** and incorporated herein by this reference is a Los Angeles County parcel map (**Parcel Map**") for the area where the Property is located which shows the Property and neighboring parcels.  APN 20, APN 21, and APN 4384-023-013 ("**APN 13**") on the Parcel Map are the real property which Vella held title prior to the recordation of grant deeds on November 30, 2020.  **Exhibit 1** also includes a summary of the current ownership of the APN 20 APN 21, APN 22, and APN 23.

20.      APN 20 is the real property transferred by Vella to the Debtor by and through the Grant Deed recorded on November 30, 2020 with the Los Angeles County Recorder's Office as instrument no. 20201531691 ("**APN 20 Grant Deed**"). APN 20 is a steep hillside .62-acre parcel.

21.      Vella currently retains title to APN 21 and APN 13.

22.      APN 21 has been combined with APN 22 through Vella's undisclosed and unauthorized actions to create a single parcel of real property − the Vella Parcel.

23.      At the time of the transfer of APN 20 to the Debtor by Vella it was encumbered by the lien of Boston Private Bank and Trust Company or its predecessor ("**Boston**"), in the original

amount of $2,437,500 ("**Boston Loan**") by a deed of trust recorded on January 10, 2019 ("**Boston Lien**"). Attached hereto as **Exhibit 2** and incorporated herein by this reference is the title report prepared by Equity Title Company on November 3, 2023 for APN 20, APN 21, APN 22 and APN 23.

24.    Vella is the beneficiary of the Boston Loan, incurred the obligation to Boston, placed the lien on APN 20 and received the proceeds from the Boston Loan. The Debtor received none of the proceeds from the Boston Loan.[1] *Id.*  Additionally, none of the proceeds from the Boston Loan were used by Vella to improve the Tree Lane Parcel or APN 20 which is now part of the Tree Lane Parcel.

25.    Before the maturity date of the Loan, Vella began the process of obtaining certain documents signed by the Debtor's principal so that he could seize control of 1.39 acres of the Property which abuts APN 22.

26.    At the same time that the Loan Documents were executed, while not referenced in the Loan Documents, the Lender and/or Vella required the Debtor to enter into the Purchase and Sale Agreement wherein the Debtor would sell the Lender "a 50,000-60,000 square foot lot sufficient to construct the Improvements" of the Property for $1,000,000 ("**PSA**").  The real property referenced in the PSA is APN 22.  At the time the PSA was executed, APN 22 had a value of approximately $9,000,000.  Attached hereto as **Exhibit 3** and incorporated herein by this reference is the PSA.

27.    The PSA was executed the same day as the Loan Documents and was presented to the Debtor by Vella as a precondition to and part of the Loan.

28.    The Debtor is informed and believes and, on that basis, alleges that the PSA requirement was planned by the Lender under the control of Vella in anticipation of Vella's purchase of the abutting real property comprised of APN 20, APN 21 and APN 13 ("**Original Vella Properties**") shortly after the Loan closed.

29.    By grant deed recorded in Los Angeles County on January 2019, with instrument

---

[1] The proceeds from the Boston Loan may have been used by Vella to purchase APN 20, APN 21 and APN 13.

number 2019007890, Vella received title to real properties located on Hensel Road, APN 20, APN 21 and APN 13 − the Original Vella Properties.

30.    APN 22 abuts APN 21 of the Original Vella Properties which are now owned 100% by Vella as a single lot, the Vella Parcel.

31.    The PSA required: (i) that the Property be subdivided first before APN 22 would be transferred to the Lender (**Exhibit 2**, PSA,¶1(a)) [in other words dividing the Property into lots that could be separately developed but would still be fully owned by the Debtor (the "**Subdivision**")]; and (ii) that the Lender would pay the Debtor $1,000,000.00 (**Exhibit 3**, PSA, ¶ 2) (the "**1.39 Acre Lot Conditions**").

32.    The Debtor relied on Vella and the Lender to comply with the terms of the PSA, as well as the oral promise by Vella for a reduction in the amount owed on the Loan to compensate the Debtor for the significantly reduced purchase price provided by the PSA, before APN 22 was transferred to Lender.

33.    The Debtor was not paid the $1,000,000.00 required pursuant to the PSA, nor did the Lender reduce the Loan principal balance or fees.  Instead, APN 22 was transferred to Vella, in his individual capacity without the Debtor's knowledge or consent and without the Debtor receiving any consideration for the transfer.

34.    In or around January 16, 2020 and thereafter, Vella engaged in various improper acts and title recordings including but not limited to recording numerous grant deeds and purported lot line adjustments involving the Original Vella Properties and the Property.

35.    These unauthorized lot line adjustments and transfers resulted in the 1.39 acres of APN 22 being transferred from the Debtor to Vella for no consideration and APN 20 being transferred to the Debtor by Vella without the knowledge or consent of the Debtor and subject to the liens of secured creditors that also did not provide their consent.

36.    APN 20 consists of a steep hillside located adjacent to 2451 Summitridge Drive, APN 23.  APN 20 requires costly erosion control work and remediation work. But for the transfer of APN 22 to the Debtor, the Debtor would not be saddled with these costs.

37.    On or about November 30, 2020, Vella caused the grant deed in which the Debtor

1  granted to Vella APN 22 to be recorded in the Los Angeles County Recorder's Office as instrument

2  number of 20201531690 ("**1.39 Acre Grant Deed**").  The 1.39 Acre Grant Deed contains a legal

3  description for APN 22.  Attached hereto as **Exhibit 4** and incorporated herein by this reference is a

4  true and correct copy of the 1.39 Acre Grant Deed.  With the recording of the 1.39 Acre Grant Deed

5  on November 30, 2020, the Debtor's interest in APN 22 that was originally part of the Property was

6  transferred to Vella for no consideration ("**1.39 Acre Lot Transfer**").  *Id.*

7      38.     The Debtor is informed and believes, and on that basis alleges, that the end result of

8  the unauthorized transfers and lot line adjustments is that Vella: (1) obtained title to 1.39 acres of the

9  Property (APN 22) for no consideration; and (2) accomplished the Lot Line Adjustments which

10  divided the Debtor's Property into two separate lots, the Tree Lane Parcel comprised of APN 20 and

11  APN 23 and the Vella Parcel comprised of APN 22 and APN 21.

12      39.     The unauthorized Vella transfers ("**Unauthorized Transfers**") consist of the

13  following:

14      a.     The grant deed recorded on November 30, 2020, with an instrument number of

15  20201531688 in which Vella grants himself an increase in Parcel 2 from 36,415.29 square

16  feet to 70,035.06 square feet ("**Parcel 2 Grant Deed**", attached as **Exhibit 5).**

17      b.     The grant deed recorded thereafter on November 30, 2020, with an instrument

18  number of 20201531689 reduces the Debtor's interest in Parcel 1 from 175,063.88 square

19  feet to 141,444.11 square feet.  ("**Parcel 1 Grant Deed**", attached hereto as **Exhibit 6**). The

20  Parcel 2 Grant Deed appears to increase some portion of Vella's Property by 33,619 square

21  feet and Parcel 1 Grant Deed appears to decrease some portion of the Debtor's Property by

22  the exact same 33,619 square feet.

23      c.     The recording of the 1.39 Acre Grant Deed on November 30, 2020 which

24  resulted in APN 22 being transferred from the Debtor to Vella – the 1.39 Acre Lot Transfer.

25  **Exhibit 4.**

26      d.     The recording of the grant deed with the Los Angeles County Recorder's Office

27  as instrument no. 20201531691 on November 30, 2020 ("**APN 20 Grant Deed**") in which

28  Vella transferred APN 20 to the Debtor without the Debtor's knowledge or consent and

---

9

without the knowledge or consent of Boston or its predecessor.  Attached hereto as **Exhibit 7** is a true and correct copy to the APN 20 Grant Deed.

40.     As a result of the recording of the APN 20 Grant Deed, the 1.39 Grant Deed, and the lot line adjustments Los Angeles County records shows that the 4 parcels that existed before the recording of these documents resulted in the Tree Lane Parcel and the Vella Parcel.  *See* **Exhibit 1**.

41.     The Debtor is informed and believes and, on that basis, alleges that the documents that were brought to Hadid for signature in or around January 16, 2020 were later falsified by Vella as the grant deeds presented to Hadid for signature did not contain or attach the description of the real property being transferred.  At the time of execution, it was misrepresented to Hadid that the grant deeds were for the subdivision of the Property and not to change ownership of the Property.

42.     The documents that were presented to Hadid, the principal of the Debtor at the time, for execution did not include legal descriptions and were essentially blank grant deeds with no attachments for the property descriptions. The blank grant deeds executed by Hadid were subsequently altered to add legal descriptions that resulted in the transfer of APN 22 to Vella when the 1.39 Acre Grant Deed was recorded in Los Angeles County on November 30, 2020, the transfer of APN 20 to the Debtor that occurred when the APN 20 Grant Deed was record in Los Angeles County on November 30, 2020, and the Lot Line Adjustments all without the Debtor's knowledge or consent.

43.     Additionally, no notice of the lot line adjustments or the transfers were provided to anyone including those parties holding properly perfected security interests in APN 20, APN 22, and APN 23.

44.     With the recording of the 1.39 Acre Grant Deed, the Debtor transferred 1.39 acres that it owned to Vella for no consideration.

45.     At the time of the 1.39 Acre Lot Transfer the Debtor was insolvent.  *See* **Exhibit 3**.

46.     At the time of the 1.39 Acre Lot Transfer, the Loan was in default and the Debtor owed its vendors substantial sums for work that had been completed, but for which the Debtor had no funds to pay. At the time of the 1.39 Acre Lot Transfer the Debtor had no revenue or funding and it was unable to pay its bills as they became due.

---

10

47.    At the time of the 1.39 Acre Lot Transfer, the Debtor's creditors included but were not limited to the Lender.  After the 1.39 Acre Lot Transfer, the Debtor had many creditors.  A list of the Debtor's creditors as of the Petition Date is in the Debtor's Schedules filed on April 25, 2024. Dkt. No. 2.

48.    The 1.39 Acre Lot Transfer resulted from misrepresentations, false statements, improper notarizations, and the improper recordation of grant deeds by Vella.

49.    The improper transfer and unauthorized lot line adjustments made by Vella directly reduced the value of the Debtor's assets and has made it exceedingly difficult to develop the Debtor's primary asset let alone market and sell the real property of the Debtor.  *See* **Exhibit 1**.

50.    On or about January 2025, Debtor learned that as a result of the unauthorized lot line adjustments Vella had created two separate lots – the Tree Lane Parcel consisting of APN 20 and APN 23 and the Vella Parcel consisting of APN 22 and APN 21.

51.    As a result, Skylark (UK) Servicing, LLC ("**Skylark Servicer**") could not foreclose on APN 22 because it does not hold a security interest in APN 21 and one cannot foreclose against a portion of a lot.

52.    Skylark Servicer was unable to foreclose against its collateral as agreed upon in the *Settlement Agreement and Release* by and among the Debtor, on the one hand, and Skylark (UK), LLC and Skylark Services, on the other hand, approved by Court order entered on October 1, 2024. Bankr. Dkt. No. 216.

## FIRST CLAIM FOR RELIEF

### Avoidance of Fraudulent Transfer

### 11 U.S.C. § 544 and Cal. Civ. Code §§ 3439.04(a)(2) and 3439.05

53.    Plaintiff realleges and incorporates by reference each and every allegation set forth in the foregoing paragraphs of this Complaint as though fully set forth herein.

54.    Within four years of the Petition Date, the Debtor transferred the 1.39 Acre Parcel to Vella – the 1.39 Acre Lot Transfer.   The 1.39 Acre Lot Transfer occurred with the recording of the 1.39 Acre Grant Deed on November 30, 2020.

55.     The Debtor received no consideration from Vella in exchange for the 1.39 Acre Lot Transfer.

56.     The Debtor received less than reasonably equivalent value in exchange for the 1.39 Acre Lot Transfer.

57.     At the time of the 1.39 Acre Lot Transfer, the Debtor (i) was engaged or was about to be engaged in a business or transaction for which its remaining assets were unreasonably small in relation to the business or transaction, or (ii) intended to incur, or reasonably should have believed that it would incur debts beyond its ability to pay as they came due.

58.     At the time of the 1.39 Acre Lot Transfer, the Lender and others were creditors of the Debtor.

59.     By reason of the foregoing, the 1.39 Acre Lot Transfer is avoidable pursuant to 11 U.S.C. § 544 and Cal. Civ. Code §§ 3439.04(a)(2) and 3439.05.

## SECOND CLAIM FOR RELIEF

### Avoidance of Fraudulent Transfer

### 11 U.S.C. § 544(b) and Cal. Civ. Code § 3439.04(a)(1)

60.     Plaintiff realleges and incorporates by reference each and every allegation set forth in the foregoing paragraphs of this Complaint as though fully set forth herein.

61.     Within four years of the Petition Date, the Debtor transferred the 1.39 Acre Parcel to Vella – the 1.39 Acre Lot Transfer.   The 1.39 Acre Lot Transfer occurred with the recording of the 1.39 Acre Grant Deed on November 30, 2020.

62.      The Debtor received no consideration from Vella in exchange for the 1.39 Acre Lot Transfer. *See* **Exhibit 4**.

63.     The Debtor received less than reasonably equivalent value in exchange for the 1.39 Acre Lot Transfer. *Id.*

64.     The 1.39 Acre Lot Transfer was made with the actual intent to hinder, delay, or defraud creditors of the Debtor.

65.     By reason of the foregoing, the 1.39 Acre Lot Transfer is avoidable as a fraudulent transfer pursuant to 11 U.S.C. § 544(b) and Cal. Civ. Code § 3439.04(a)(1).

4896-9861-1784, v. 5

**THIRD CLAIM FOR RELIEF**

**Recovery of Avoided Transfer for Benefit of Estate**

**11 U.S.C. § 550(a)(1) and 551 and Cal. Civil Code § 3439.07**

66.     Plaintiff realleges and incorporates by reference each and every allegation set forth in the foregoing paragraphs of this Complaint as though fully set forth herein.

67.     Plaintiff is informed and believes and thereon alleges that Vella took APN 22 not in good faith for less than reasonably equivalent value, and with knowledge of the voidability of APN 22.

68.     By reason of the foregoing, Plaintiff is entitled to recover from Vella and preserve for the benefit of the Estate APN 22 or the value thereof pursuant to 11 U.S.C. §§ 550(a)(1) and 551, Cal. Civil Code § 3439.07.

**FOURTH CLAIM FOR RELIEF**

**Cancellation of Instruments**

**11 U.S.C. § 544(b) and Cal. Civ. Code § 3412**

69.     Plaintiff realleges and incorporates by reference each and every allegation set forth in the foregoing paragraphs of this Complaint as though fully set forth herein.

70.     Code of Civil Procedure section 3412 provides that "[a] written instrument in respect to which there is a reasonable apprehension that if left outstanding it may cause serious injury to a person against whom it is void or voidable, may, upon his application, be so adjudged, and order to be delivered up or canceled."

71.     The Lender required the Debtor to sell to Lender APN 22 from the 4.02-acre Property owned by the Debtor for the highly discounted amount of $1,000,000.00, when APN 22 was valued at approximately $10,000,000.00.  The PSA was executed the same day as the Loan Documents on September 28, 2018 but, while not mentioned in the Loan Documents, was a precondition to, and part and parcel of, the Loan itself.  This was planned by Vella in anticipation of Vella's purchase of the Original Vella Properties on or about January 10, 2019.

72.     The 1.39 Acre Lot Conditions were not met by the Lender or Vella.

73.     Vella caused the Unauthorized Transfers to be recorded without the knowledge or

1   consent of the Debtor. Vella caused the Unauthorized Transfers to be recorded without the

2   knowledge or consent of those creditors holding properly perfected secured claims secured by the

3   real property transferred – APN 20 and APN 22.

4        74.    The 1.39 Acre Grant Deed is void or voidable, due to, including but not limited to,

5   fraud, slander of title, unconscionability, and breach of contract.

6        75.    The Debtor has been harmed by the improper and untrue recordings on public title

7   that have diminished the Debtor's ownership and right to maintain and own the Property and/or all

8   portions thereof as described herein.

9        76.    To be effective, an instrument conveying real property must be written and must

10   name a grantor and a grantee, and it must be subscribed by the grantor or the grantor's agent, and it

11   must be delivered to and accepted by the grantee, and these are the minimum requirements for a

12   valid deed.  If one of the essential elements is missing, the deed is ineffective to transfer title.  *In re*

13   *Marriage of Wozniak*, 59 Cal. App. 5th 120, 273 Cal. Rptr. 3d 421 (4th Dist. 2020).  Acceptance by

14   the grantee is necessary to make a delivery effective and the deed operative. *Luna v. Brownell*, 185

15   Cal. App. 4th 668, 110 Cal. Rptr. 3d 573 (2d Dist. 2010).

16        77.    The Debtor was unaware of the transfer of APN 22 to Vella by the Debtor because

17   the grant deeds executed by Hadid were incomplete and did not include any attachments describing

18   the property to be transferred, and the Debtor did not consent to the transfer of APN 22 to Vella.

19        78.    Therefore, the Debtor hereby applies to this Court for an Order determining that the

20   1.39 Acre Grant Deed is void and canceled.

21   **FIFTH CLAIM FOR RELIEF**

22   **Tortious Interference with Prospective Economic Advantage**

23        79.    Plaintiff realleges and incorporates by reference each and every allegation set forth in

24   the foregoing paragraphs of this Complaint as though fully set forth herein.

25        80.    The Property is Plaintiff's most valuable asset and is the sole source of its future

26   economic benefit.  The Debtor intended to develop the Project and then sell the Property to a third-

27   party buyer.

28        81.    Vella is, and at all times relevant hereto, aware of the fact that the Property was

Debtor's most valuable asset and the source of its future economic benefit.

82.     The Debtor is informed and believes and, on that basis, alleges, that Vella intentionally perpetrated a scheme to transfer a 1.39-acre portion of the Property, APN 22, to Vella in his individual capacity.

83.     Vella represented to Hadid that the Lender wanted him to sign certain documents that were intended to perform the Subdivision and which would not entail any transfer of the Property. Instead, the blank grant deeds presented to Hadid to sign were missing and/or had blanks for the description of the property being transferred, and Vella mispresented to Hadid that the documents he was signing, the Parcel 1 Grant Deed, the Parcel 2 Grant Deed, and the 1.39 Acre Grant Deed were for the Subdivision.  It was not until later that these grant deeds were falsified by or at the direction of Vella by adding legal descriptions to effectuate a transfer of APN 22 to Vella, personally, without any compensation to the Debtor for APN 22.

84.     The result of Vella's intentional wrongful acts was the transfer of APN 22 to Vella personally, thus significantly reducing the size and value of the Property.  Further, Vella's transfer of APN 20 to the Debtor by the APN 20 Grant Deed without the Debtor's knowledge or consent, while it increased the acreage of the Debtor's real property, is not land originally utilized by the Debtor in its development plans and permits for the Project.  APN 20 is a hillside lot which requires costly erosion control and remediation work.  This interference with the Debtor's Property by Vella has proximately caused economic harm to the Debtor.

85.     All of these acts and the consequences therefrom have damaged the Debtor in an amount to be determined at trial.

## SIXTH CLAIM FOR RELIEF

### Unjust Enrichment/Quantum Meruit/Restitution

86.     Plaintiff realleges and incorporates by reference each and every allegation set forth in the foregoing paragraphs of this Complaint as though fully set forth herein.

87.     Through the transfer of APN 22 to Vella by the Debtor for no consideration, the 1.39 Acre Lot Transfer, Vella was unjustly enriched by gaining title to APN 22.

88.     Vella received the benefit of his individual ownership of APN 22 through the

recording of the 1.39 Acre Grant Deed through fraud and misrepresentations to the Debtor.

89.    As such, this Court may Order Vella to pay restitution to the Debtor in the form of cancellation of the 1.39 Acre Grant Deed, and or an award against Vella and in favor of the Debtor for the fair market value of the 1.39 Acre Lot, in an amount to be proven at trial.

### SEVENTH CLAIM FOR RELIEF

### Fraud

### Cal. Civ. Code §§ 1572, 1709, 1710

90.    Plaintiff realleges and incorporates by reference each and every allegation set forth in the foregoing paragraphs of this Complaint as though fully set forth herein.

91.    Vella defrauded the Debtor by making numerous false and misleading representations, statements, and/or omissions upon which the Debtor reasonably relied to its detriment and damage as outlined herein.

92.    Vella, individually and as agent of the Lender, knowingly misrepresented the contents, purpose, and legal effect of documents requiring Hadid's signature. Specifically, Vella falsely stated that the documents were necessary to process a subdivision required under the PSA and were not to convey ownership of any portion of the Property.

93.    Vella knowingly made false statements of fact and concealed his actual intent regarding the Property which was to facilitate unauthorized lot line adjustments and transfer APN 22 to himself to be used to create the Vella Parcel which is comprised of APN 21 and APN 22.

94.    Vella knowingly made false statements to the Debtor and Hadid to gain the appropriate signatures on the Parcel 1 Grant Deed, the Parcel 2 Grant Deed, and the 1.39 Acre Grant Deed by providing Hadid with grant deeds that did not attach the property descriptions and telling Hadid, the Debtor's representative that these grant deeds were to facilitate the subdivisions set forth in the PSA.

95.    Vella also misrepresented to the Debtor that the Loan would be reduced in an amount equal to the fair market value of APN 22 at the time of the transfer.  This never occurred and Vella knew that the Loan was not going to be reduced by the value of APN 22.

96.    Vella concealed the true facts of the transaction and the transfers from Hadid and the Debtor.

97.   Vella knew that the representations he made were false when they were made.

98.   Vella made the false statements and took the fraudulent actions with the intent to defraud the Debtor.

99.   The Debtor justifiably relied on these misrepresentations made by Vella.

100.   As a direct and proximate result of Vella's fraudulent actions and misrepresentations, the Debtor has suffered damages, including the unlawful loss of valuable real property and impaired ability to complete the Project as originally contemplated.  Additionally, the Debtor has lost 1.39 acres of its Property, APN 22, which has significant value for which the Debtor must be compensated.

101.   The Debtor is entitled to rescission of the fraudulent instruments and monetary damages in an amount to be proven at trial.

102.   Vella made a misrepresentation (false representation, concealment, or nondisclosure) of which he had knowledge of its falsity (or 'scienter'), with the intent to defraud (induce reliance), and the Debtor justifiably relied on such misrepresentation and this reliance resulted in significant damages to the Debtor.

103.   Vella's conduct constitutes actual fraud and deceit as defined in California Civil Code §1572 and §§ 1709-1710. As a direct and proximate result of Vella's fraud, the Debtor suffered substantial damage, including but not limited to the loss of the APN 22 and diminution in value of its primary asset, the Property.

104.   Accordingly, the Debtor is entitled to damages according to proof at trial and punitive damages under Cal. Civ. Code § 3294.

## EIGHTH CLAIM FOR RELIEF

### Fraudulent or Intentional Misrepresentation

### Cal. Civ. Code §§ 1709-1710

105.   Plaintiff realleges and incorporates by reference each and every allegation set forth in the foregoing paragraphs of this Complaint as though fully set forth herein.

106.   Vella made false representations and material omissions to the Debtor and Hadid, the Debtor's principal, regarding the nature and purpose of documents presented for his signature,

including blank or incomplete grant deeds and the PSA. Specifically, Vella falsely stated that the documents were intended solely for subdivision purposes and not to transfer title or ownership of any portion of the Property.  Vella also falsely represented that the Loan would be reduced by the fair market value of APN 22 and that title to APN 22 would be in the name of the Lender not Vella. *See* PSA, **Exhibit 3**.

107.    Vella knew the representations were false at the time they were made and intended that Hadid and the Debtor rely on these false representations. The Debtor, in reliance on these representations, executed the grant deeds without knowing that they would be used to transfer title to valuable real property owned by the Debtor to Vella individually and without consideration.

108.    Vella's conduct constitutes actual fraud and deceit as defined in California Civil Code.

109.    Vella suggested as fact information that he knew was not true to Hadid and the Debtor.

110.    Vella suppressed the facts from Hadid and the Debtor even though he was bound to disclose the true facts which were that the transfers of the execution of the documents would result in the transfer of APN 22 to from the Debtor to Vella for no consideration and that Vella owned or planned to purchase the Original Vella Properties.

111.    As a direct and proximate result of Vella's fraud, the Debtor suffered substantial damage, including but not limited to the loss of APN 22, the diminution in value of its primary asset and an inability to develop the Project as planned and permitted.

112.    Accordingly, the Debtor is entitled to damages according to proof at trial and punitive damages under Cal. Civ. Code § 3294.

## NINTH CLAIM FOR RELIEF

### Conversion

113.    Plaintiff realleges and incorporates by reference each and every allegation set forth in the foregoing paragraphs of this Complaint as though fully set forth herein.

114.  The Debtor had a right to possess and control the entire 4.01-acre Property, including APN 22. Vella wrongfully exercised dominion and control over APN 22 by recording the 1.39 Acre

Grant Deed and transferring ownership to himself without the Debtor's knowledge or consent and without any lawful justification or consideration.

115. The Debtor never consented to the conveyance of APN 22. Vella's retention and exercise of control over APN 22 was wrongful, intentional, and constitutes conversion of the Debtor's property.

116. As a direct and proximate result of Vella's conversion, the Debtor has suffered damages in an amount to be proven at trial, including but not limited to the fair market value of APN 22. The Debtor also seeks punitive damages under Cal. Civ. Code § 3294.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for a judgment as follows:

1.      On the First and Second Claims for Relief, avoidance of the 1.39 Acre Lot Transfer pursuant to 11 U.S.C. § 544(b)(1), California Civil Code §§ 3439.04(a)(1), 3439.04(a)(2) and 3439.05;

2.      On the Third Claim for Relief, a judgment that the Debtor recover the APN 22 or the value of the avoided 1.39 Acre Lot Transfer from Vella or any immediate or mediate transferee of the Debtor for the benefit of the Debtor's bankruptcy estate under 11 U.S.C. §§ 550 and 551 and Cal. Civ. Code § 3439.07;

3.      On the Fourth Claim for Relief, for an Order determining that the 1.39 Acre Grant Deed is void and canceled;

4.      On the Fifth Claim for Relief, for judgment in favor of the Debtor and against Vella in an amount to be determined at the time of trial of the damages suffered by the Debtor as a result of Vella's tortious interference with the Debtor's prospective business advantage;

5.      On the Sixth Claim for Relief, for judgment in favor of the Debtor and against Vella cancelling the 1.39 Acre Lot Grant Deed, or alternatively, damages in an amount to be determined at the time of trial representing a monetary determination of the amount Vella benefited from the unauthorized transfer of APN 22 to him;

6.      On the Seventh Claim for Relief, for judgment in favor of the Debtor and against Vella for damages in and amount to be proven at trial for the fraud perpetrated on the Debtor by

Vella and punitive damages under Cal. Civ. Code §3294.

      7.     On the Eighth Claim for Relief, for judgment in favor of the Debtor and against Vella for damages in and amount to be proven at trial for the fraud perpetrated on the Debtor by Vella and punitive damages under Cal. Civ. Code §3294.

      117.  On the Ninth Claim for Relief, for judgment in favor of the Debtor and against Vella and damages in an amount to be proven at trial, including but not limited to the fair market value of APN 22 and punitive damages under Cal. Civ. Code § 3294.

      8.     For costs of suit; and

      9.     For such other and further relief as the Court may deem appropriate.

DATED:  August 21, 2025           LEECH TISHMAN NELSON HARDIMAN, INC.

                                 By: /s/ Robyn B. Sokol
                                    Robyn B. Sokol
                                    Attorneys for Tree Lane, LLC
                                    Debtor and Debtor-in Possession

4896-9861-1784, v. 5

Exhibit 1



## CURRENT PROPERTY OWNERSHIP SUMMARY

Zachary Vella's unauthorized and improper lot line adjustments and transfers resulted in the Property being changed from a single parcel of 4.01 acres in which the Debtor held title to the following two parcels of real property:

1.    3.24 acre parcel comprised of APN 4384-023-23 (2.62 Acres) and APN 4384-023-020 (.62 Acres) in which the Debtor holds legal title – the Tree Lane Parcel [Lots 1 and 2 below]

2.    1.61 acre parcel comprised of APN 4384-023-022 (the 1.39 acre parcel that the Debtor seeks to avoid) and APN 4384-023-021 (.22 acres) in which Vella holds legal title – the Vella Parcel [Lots 3 and 4 below]

Below is a summary and picture of the lots at issue.

| Lot # | Owner | Address | APN | Acres |
|-------|-------|---------|-----|-------|
| 1 | Tree Lane | 2451 Summitridge Dr | 4384-023-023 (**"APN 23"**) | 2.62 |
| 2 | Tree Lane | 9702 Hensal Rd | 4384-023-020 (**"APN 20"**) | 0.62 |
| 3 | **Zachary Vella** | **SUBJECT PARCEL** | **4384-023-022 ("APN 22")** | **1.39** |
| 4 | Zachary Vella | Hensal Rd.  (**"Vella Lot"**) | 4384-023-021 (**"APN 21"**) | 0.22 |
| 5 | Zachary Vella | 9703 Hensal Rd | 4384-023-013 (**"APN 13"**) | 0.27 |



Exhibit 2



POR. LOT 3
SEC. 2 , T. 1 S., R. 15 W.

8

TRACT No. 21845

HENSAL ROAD

POR. LOT 1
TRACT No. 32693

PARCEL 1   (FEE)
PARCEL 2   (ESMT)
PARCEL 3   (ESMT)
PARCEL 4   (FEE)
2' ESMT FOR PUBLIC UTILITIES REC. IN
  BK 16580 PG 352 O.R.
ESMT FOR PUBLIC UTILITIES AS SHOWN OR
  DEDICATED ON TRACT MAP
ESMT FOR ACCESS WALLS & UTILITIES REC. 01-17-84
  AS INS. No. 84-68769
ESMT FOR PILLAR ENCROACHMENT REC. 06-20-2012
  AS INS. No. 20120917645
ESMT FOR INGRESS EGRESS, GUARD HOUSE,
  SECURITY GATES REC. 07-18-2016
  AS INS. No. 20160834793

EQUITY TITLE®
COMPANY
Part of the TRG Family of Companies

DETAIL
06-20-12 #20120917645

POR.
TRACT No. 20668

Exhibit 2, Page 23

This plat is not a part of a preliminary title report or policy of title insurance.
Equity title Company does not guarantee the square footage or lot size as shown on this plat.
Easements and other matters depicted hereon are provided as a courtesy only and no representation is made as to
The accuracy or completeness thereof. The Company assumes no liability for any loss occurring by reason of reliance thereon.

# EQUITY TITLE COMPANY

801 N. BRAND BOULEVARD, SUITE 400
GLENDALE, CA 91203
PHONE: (818) 291-4400
FAX: (818) 291-4460

DATED AS OF NOVEMBER 3, 2023 AT 7:30 A.M.

| | |
|---|---|
| **ETC - GLENDALE**<br>**801 N. BRAND BLVD., SUITE 400**<br>**GLENDALE, CA 91203** | **YOUR NO.:**<br>**PROPERTY ADDRESS: 2451 NORTH**<br>**SUMMITRIDGE DRIVE, LOS ANGELES, CA 90210** |
| **ATTENTION:  KEVIN VANDERSCHANS** | **ORDER NO.: 3910123-07021**<br>**TITLE OFFICER: ANNE M WANG**<br>**EMAIL: unit60@equitytitle.com** |

## "PRELIMINARY REPORT"

IN RESPONSE TO THE ABOVE REFERENCED APPLICATION FOR A POLICY OF TITLE INSURANCE, **EQUITY TITLE COMPANY** HEREBY REPORTS THAT IT IS PREPARED TO ISSUE, OR CAUSE TO BE ISSUED, AS OF THE DATE HEREOF, A POLICY OR POLICIES OF TITLE INSURANCE DESCRIBING THE LAND AND THE ESTATE OR INTEREST THEREIN HEREINAFTER SET FORTH, INSURING AGAINST LOSS WHICH MAY BE SUSTAINED BY REASON OF ANY DEFECT, LIEN OR ENCUMBRANCE NOT SHOWN OR REFERRED TO AS AN EXCEPTION BELOW OR NOT EXCLUDED FROM COVERAGE PURSUANT TO THE PRINTED SCHEDULES, CONDITIONS AND STIPULATIONS OF SAID POLICY FORMS.

THE PRINTED EXCEPTIONS AND EXCLUSIONS FROM THE COVERAGE OF SAID POLICY OR POLICIES ARE SET FORTH IN EXHIBIT B ATTACHED. THE POLICY TO BE ISSUED MAY CONTAIN AN ARBITRATION CLAUSE. WHEN THE AMOUNT OF INSURANCE IS LESS THAN THAT SET FORTH IN THE ARBITRATION CLAUSE, ALL ARBITRABLE MATTERS SHALL BE ARBITRATED AT THE OPTION OF EITHER THE COMPANY OR THE INSURED AS THE EXCLUSIVE REMEDY OF THE PARTIES.  LIMITATIONS ON COVERED RISKS APPLICABLE TO THE CLTA AND ALTA HOMEOWNER'S POLICIES OF TITLE INSURANCE WHICH ESTABLISH A DEDUCTIBLE AMOUNT AND A MAXIMUM DOLLAR LIMIT OF LIABILITY FOR CERTAIN COVERAGES ARE SET FORTH IN THE POLICY. COPIES OF THE POLICY FORMS SHOULD BE READ.  THEY ARE AVAILABLE FROM THE OFFICE THAT ISSUED THIS REPORT.

**PLEASE READ THE EXCEPTIONS SHOWN OR REFERRED TO BELOW AND THE EXCEPTIONS AND EXCLUSIONS SET FORTH IN EXHIBIT B OF THIS REPORT CAREFULLY.  THE EXCEPTIONS AND EXCLUSIONS ARE MEANT TO PROVIDE YOU WITH NOTICE OF MATTERS WHICH ARE NOT COVERED UNDER THE TERMS OF THE TITLE INSURANCE POLICY AND SHOULD BE CAREFULLY CONSIDERED.**

**IT IS IMPORTANT TO NOTE THAT THIS PRELIMINARY REPORT IS NOT A WRITTEN REPRESENTATION AS TO THE CONDITION OF TITLE AND MAY NOT LIST ALL LIENS, DEFECTS AND ENCUMBRANCES AFFECTING TITLE TO THE LAND.**

THIS REPORT (AND ANY SUPPLEMENTS OR AMENDMENTS HERETO) IS ISSUED SOLELY FOR THE PURPOSE OF FACILITATING THE ISSUANCE OF A POLICY OF TITLE INSURANCE AND NO LIABILITY IS ASSUMED HEREBY.  IF IT IS DESIRED THAT LIABILITY BE ASSUMED PRIOR TO THE ISSUANCE OF A POLICY OF TITLE INSURANCE, A BINDER OR COMMITMENT SHOULD BE REQUESTED.

THE FORM OF POLICY OF TITLE INSURANCE CONTEMPLATED BY THIS REPORT IS:

ALTA/CLTA HOMEOWNER'S POLICY OF TITLE INSURANCE, IF APPLICABLE, OR

CLTA/ALTA STANDARD OWNER'S POLICY; AND/OR

ALTA LOAN POLICY, IF APPLICABLE, OR CLTA STANDARD LOAN POLICY

**A SPECIFIC REQUEST SHOULD BE MADE IF ANOTHER FORM OR ADDITIONAL COVERAGE IS DESIRED**.

ORDER NO. 3910123-07021

## SCHEDULE A

THE ESTATE OR INTEREST IN THE LAND HEREINAFTER DESCRIBED OR REFERRED TO COVERED BY THIS REPORT IS:

**A FEE AS TO PARCELS 1 AND 4, AN EASEMENT AS TO PARCELS 2 AND 3.**

TITLE TO SAID ESTATE OR INTEREST AT THE DATE HEREOF IS VESTED IN:

**TREE LANE, LLC, A CALIFORNIA LIMITED LIABILITY COMPANY**

THE LAND REFERRED TO IN THIS REPORT IS SITUATED IN THE COUNTY OF LOS ANGELES, STATE OF CALIFORNIA AND IS DESCRIBED AS FOLLOWS:

**SEE EXHIBIT "A" ATTACHED HERETO**

ORDER NO. 3910123-07021

# EXHIBIT "A"

**PARCEL 1:**

**THAT CERTAIN REAL PROPERTY SITUATED IN THE CITY OF LOS ANGELES, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, BEING PORTIONS OF LOT 3, IN SECTION 2, TOWNSHIP 1 SOUTH, RANGE 15 WEST, S.B.B.M., AS PER MAP FILED IN** <u>BOOK 45, PAGE 40</u> **OF RECORD OF SURVEYS AND LOT 1 OF TRACT 32693 AS PER MAP RECORDED IN** <u>BOOK 918, PAGES 13</u> **AND 14 OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY, DESCRIBED AS FOLLOWS:**

**THAT PORTION OF LOT 3 OF SAID RECORD OF SURVEY AND THAT PORTION OF LOT 1 OF SAID TRACT 32693 MORE PARTICULARLY DESCRIBED AS FOLLOWS:**

**BEGINNING AT THE NORTHEAST CORNER OF SAID LOT 3; THENCE ALONG THE EASTERLY LINE OF SAID LOT 3, SOUTH 0° 21' 54" WEST, 576.12 FEET; THENCE PARALLEL WITH THE NORTH LINE OF SAID LOT 3, NORTH 89° 33' 00" WEST, 352.00 FEET; THENCE NORTH 11° 16' 17" WEST 169.69 FEET TO A POINT DISTANT 20.00 FEET, MEASURED AT RIGHT ANGLES, FROM THE SOUTHEASTERLY LINE OF TRACT 21845, AS PER MAP FILED IN** <u>BOOK 619, PAGES 83</u> **AND 84 OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY; THENCE PARALLEL WITH THE SOUTHEASTERLY, SOUTHERLY AND SOUTHWESTERLY LINES OF SAID TRACT 21845 AND DISTANT 20.00 FEET THEREFROM, MEASURED AT RIGHT ANGLES ALONG THE FOLLOWING COURSES AND DISTANCES, SOUTH 71° 40' 52" WEST 101.21 FEET; THENCE SOUTH 87° 31' 21" WEST 209.42 FEET; NORTH 20° 03' 46" WEST, 133.22 FEET TO THE POINT IN THE SOUTHERLY SIDE LINE OF HENSAL ROAD, 34.00 FEET WIDE, AS PER SAID TRACT 32693; THENCE NORTHEASTERLY ALONG SAID SOUTHERLY LINE, NORTH 38° 02' 06" EAST, 11.95 FEET TO THE BEGINNING OF A TANGENT CURVE CONCAVE SOUTHEASTERLY HAVING A RADIUS OF 83.00 FEET, THROUGH A CENTRAL ANGLE OF 07° 42' 52" A DISTANCE OF 11.18 FEET TO THE NORTHWESTERLY CORNER OF LOT 12 OF SAID TRACT 21845, SAID CORNER ALSO BEING THE NORTHEASTERLY CORNER OF LOT 1 OF SAID TRACT 32693; THENCE SOUTHEASTERLY ALONG THE SOUTHWESTERLY LINE OF SAID LOT 12, SAID LINE ALSO BEING A PORTION OF THE NORTHEASTERLY LINE OF LOT 12, SAID LINE ALSO BEING A PORTION OF THE NORTHEASTERLY LINE OF SAID LOT 1, SOUTH 20° 03' 46" EAST 130.14 FEET; THENCE CONTINUING ALONG THE SOUTHERLY, SOUTHEASTERLY AND NORTHEASTERLY LINE OF SAID TRACT 21845, THE FOLLOWING COURSES AND DISTANCES NORTH 87° 31' 21" EAST 192.00 FEET; NORTH 71° 40' 52" EAST 155.90 FEET; THENCE NORTH 52° 04' 00" EAST 86.21 FEET; NORTH 24° 03' 26" EAST 183.98 FEET; THENCE NORTH 24° 18' 16" WEST, 102.04 FEET; THENCE NORTH 37° 01' 29" WEST 72.98 FEET TO A POINT IN THE NORTHERLY LINE OF SAID LOT 3; THENCE EASTERLY ALONG SAID NORTHERLY LINE, SOUTH 89° 33' 00" EAST, 283.39 FEET TO THE POINT OF BEGINNING.**

**PARCEL 2:**

**A NON-EXCLUSIVE EASEMENT FOR VEHICULAR INGRESS AND EGRESS AND ROAD MAINTENANCE PURPOSES OVER THAT PORTION OF THE NORTHEAST QUARTER OF SECTION 2, TOWNSHIP 1 SOUTH, RANGE 15 WEST, S.B.M., IN THE CITY OF LOS ANGELES, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, INCLUDED WITHIN A STRIP OF LAND 20.00 FEET WIDE, THE CENTERLINE OF SAID 20.00 FOOT WIDE STRIP OF LAND DESCRIBED AS FOLLOWS:**

**BEGINNING AT THE INTERSECTION OF THE WEST LINE OF THE NORTHEAST QUARTER OF SAID SECTION 2 WITH THE NORTHEASTERLY PROLONGATION OF THE CENTERLINE OF SUMMITRIDGE DRIVE, 41.00 FEET WIDE, AS SAID LAST MENTIONED CENTERLINE IS SHOWN ON THE MAP OF TRACT NO. 20668, RECORDED IN** <u>BOOK 671, PAGES 39</u> **TO 42, INCLUSIVE OF MAPS, IN THE OFFICE OF THE RECORDER OF SAID COUNTY, SAID WEST LINE TO HAVE A BEARING OF NORTH 0 DEGREES 21' 27" EAST FOR PURPOSES OF THIS DESCRIPTION;**

ORDER NO. 3910123-07021

THENCE NORTH 33 DEGREES 18' 54" EAST, 50.55 FEET TO THE BEGINNING OF A TANGENT CURVE CONCAVE WESTERLY AND HAVING A RADIUS OF 100 FEET; THENCE NORTHERLY ALONG SAID CURVE THROUGH A CENTRAL ANGLE OF 44 DEGREES 46' 37", A DISTANCE OF 78.15 FEET; THENCE, TANGENT TO SAID CURVE, NORTH 11 DEGREES 27' 43" WEST, 55.43 FEET TO THE BEGINNING OF A TANGENT CURVE CONCAVE EASTERLY AND HAVING A RADIUS OF 150 FEET; THENCE NORTHERLY ALONG SAID LAST MENTIONED CURVE THROUGH A CENTRAL ANGLE OF 28 DEGREES 35' 38", A DISTANCE OF 74.86 FEET; TANGENT TO SAID LAST MENTIONED CURVE, NORTH 17 DEGREES 07' 55" EAST, 63.44 FEET TO THE BEGINNING OF A TANGENT CURVE CONCAVE NORTHWESTERLY AND HAVING A RADIUS OF 150 FEET; THENCE NORTHEASTERLY ALONG SAID LAST MENTIONED CURVE THROUGH A CENTRAL ANGLE OF 2 DEGREES 14' 23", A DISTANCE OF 5.86 FEET; THENCE, TANGENT TO SAID LAST MENTIONED CURVE, NORTH 14 DEGREES 53' 32" EAST, 203.43 FEET TO THE BEGINNING OF A TANGENT CURVE CONCAVE WESTERLY AND HAVING A RADIUS OF 350 FEET; THENCE NORTHERLY ALONG SAID LAST MENTIONED CURVE THROUGH A CENTRAL ANGLE OF 8 DEGREES 29' 03", A DISTANCE OF 51.83 FEET; THENCE, TANGENT TO SAID LAST MENTIONED CURVE, NORTH 6 DEGREES 24' 29" EAST, 229.60 FEET TO THE BEGINNING OF A TANGENT CURVE CONCAVE WESTERLY AND HAVING A RADIUS OF 250 FEET; THENCE NORTHERLY ALONG SAID LAST MENTIONED CURVE THROUGH A CENTRAL ANGLE OF 10 DEGREES 58' 55", A DISTANCE OF 47.92 FEET; THENCE, TANGENT TO SAID LAST MENTIONED CURVE, NORTH 4 DEGREES, 34' 26" WEST, 75.24 FEET TO THE BEGINNING OF A TANGENT CURVE CONCAVE SOUTHWESTERLY AND HAVING A RADIUS OF 250 FEET; THENCE NORTHWESTERLY ALONG SAID LAST MENTIONED CURVE THROUGH A CENTRAL ANGLE OF 25 DEGREES 09' 18", A DISTANCE OF 109.76 FEET; THENCE, TANGENT TO SAID LAST MENTIONED CURVE, NORTH 29 DEGREES 43' 44" WEST, 197.42 FEET MORE OR LESS TO SAID WEST LINE OF THE NORTHEAST QUARTER OF SAID SECTION 2.

THE SIDELINES OF SAID 20.00 FOOT STRIP OF LAND ARE TO BE LENGTHENED OR SHORTENED TO TERMINATE SOUTHWESTERLY AND NORTHWESTERLY AT THE SAID WEST LINE OF THE NORTHEAST QUARTER OF SAID SECTION 2.

PARCEL 3:

A NON-EXCLUSIVE EASEMENT FOR VEHICULAR AND PEDESTRIAN INGRESS AND EGRESS, WITH THE RIGHT TO CONSTRUCT AND MAINTAIN A DRIVEWAY AND CURB CUT, AS SET FORTH IN A DOCUMENT RECORDED JUNE 20, 2012, AS INSTRUMENT NO. 20120917645, OF OFFICIAL RECORDS, UPON THE TERMS, CONDITIONS AND PROVISIONS AS THEREIN SET FORTH, WHICH WAS AMENDED BY THE DOCUMENT RECORDED MAY 10, 2016, AS INSTRUMENT NO. 20160531499, OF OFFICIAL RECORDS, WHICH STATES SAID EASEMENT SHALL BE LOCATED OVER THE FOLLOWING DESCRIBED LAND:

A VARIABLE WIDTH EASEMENT OVER THAT PORTION OF REAL PROPERTY DESCRIBED IN DEED RECORDED OCTOBER 8, 2008 AS DOCUMENT NO. 20081801049, OF OFFICIAL RECORDS IN THE CITY OF LOS ANGELES, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, BEING A PORTION OF THE NORTHWEST QUARTER OF LOT 2, SECTION 2, TOWNSHIP 1 SOUTH, RANGE 15 WEST, SAN BERNARDINO MERIDIAN, IN THE CITY OF LOS ANGELES, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, ACCORDING TO THE OFFICIAL PLAT OF SAID LAND, MORE PARTICULARLY DESCRIBED AS FOLLOWS:

BEGINNING AT THE SOUTHWEST CORNER OF LAND DESCRIBED IN DEED RECORDED IN SAID DOCUMENT NO. 20081801049, OF OFFICIAL RECORDS; THENCE, NORTHERLY ALONG THE WEST LINE OF LAND DESCRIBED IN SAID DOCUMENT NO. 20081801049, OF OFFICIAL RECORDS.

1. NORTH 00° 20' 15" EAST, 75.13 FEET TO THE BEGINNING OF A NON-TANGENT CURVE CONCAVE NORTHERLY, HAVING A RADIAL BEARING TO SAID CURVE OF SOUTH 10° 14' 10" WEST AND A RADIUS OF 72.40 FEET; THENCE,

ORDER NO. 3910123-07021

**2. EASTERLY ALONG SAID CURVE THROUGH A CENTRAL ANGLE OF 10° 46' 51", AN ARC DISTANCE OF 13.62 FEET TO THE BEGINNING OF A NON-TANGENT COMPOUND CURVE CONCAVE NORTHWESTERLY HAVING A RADIAL BEARING TO SAID CURVE OF SOUTH 02° 54' 57" WEST AND A RADIUS OF 8.27 FEET; THENCE,**

**3. NORTHEASTERLY ALONG SAID CURVE, THROUGH A CENTRAL ANGLE OF 53° 00' 03", AN ARC DISTANCE OF 7.65 FEET TO A POINT OF NON-TANGENCY; THENCE,**

**4. SOUTH 65° 18' 03" EAST, 27.55 FEET; THENCE,**

**5. SOUTH 24° 41' 57" WEST, 1.58 FEET TO THE BEGINNING OF A TANGENT CURVE CONCAVE EASTERLY HAVING A RADIUS OF 130.00 FEET; THENCE,**

**6. SOUTHERLY ALONG SAID CURVE THROUGH A CENTRAL ANGLE OF 29° 00' 05", AN ARC DISTANCE OF 65.80 FEET TO THE INTERSECTION WITH THE SOUTH LINE OF LAND DESCRIBED IN SAID DOCUMENT NO. 20081801049; THENCE, WESTERLY ALONG THE SOUTH LINE OF LAND DESCRIBED IN SAID DOCUMENT NO. 20081801049, OF OFFICIAL RECORDS.**

**7. NORTH 89° 50' 48" WEST, 33.64 FEET, TO THE BEGINNING.**

**PARCEL 4:**

**THAT PORTION OF LOT 8 IN TRACT NO. 21845, AS PER MAP FILED IN <u>BOOK 619, PAGES 83</u> AND 84 OF MAPS, IN THE CITY OF LOS ANGELES, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, DESCRIBED AS A WHOLE AS FOLLOWS:**

**BEGINNING AT THE MOST SOUTHERLY CORNER OF SAID LOT 8;**

**THENCE NORTHERLY ALONG THE WEST LINE OF SAID LOT 8, NORTH 14° 22' 23" WEST 172.21 FEET TO THE MOST WESTERLY CORNER OF SAID LOT 8, SAID WESTERLY CORNER BEING ON A CURVE CONCAVE TO THE WEST HAVING A RADIUS OF 38.00 FEET, A RADIAL LINE THROUGH SAID POINT BEARS SOUTH 14° 22' 23" EAST;**

**THENCE NORTHEASTERLY AND NORTHERLY 61.10 FEET ALONG SAID CURVE THROUGH A CENTRAL ANGLE OF 92° 07' 30";**

**THENCE NORTHEASTERLY ON A NON-TANGENT LINE, NORTH 39° 57' 15" EAST 22.31 FEET;**

**THENCE EASTERLY, SOUTH 89° 58' 18" EAST 42.79 FEET;**

**THENCE EASTERLY, NORTH 74° 04' 18" EAST 89.25 FEET TO A POINT ON THE NORTHEAST LINE OF SAID LOT 8 HAVING A BEARING AND DISTANCE OF NORTH 24° 18' 16" WEST 102.04 FEET;**

**THENCE SOUTHEASTERLY ALONG THE NORTHEASTERLY LINE OF SAID LOT 8, SOUTH 24° 18' 16" EAST 38.40 FEET TO THE MOST EASTERLY CORNER THEREOF;**

**THENCE SOUTHWESTERLY ALONG THE SOUTHEAST LINE OF SAID LOT 8, SOUTH 24° 03' 26" WEST 183.98 FEET;**

**THENCE CONTINUING SOUTHWESTERLY ALONG THE SOUTHEAST LINE OF SAID LOT 8, SOUTH 52° 04' 00" WEST 86.21 FEET TO THE POINT OF BEGINNING.**

**APN'S: 4384-023-021, 4384-023-020, 4384-023-023 & 4384-023-022**

**\*\*\*END OF LEGAL DESCRIPTION\*\*\***

ORDER NO. 3910123-07021

**SCHEDULE B**

AT THE DATE HEREOF EXCEPTIONS TO COVERAGE IN ADDITION TO THE PRINTED EXCEPTIONS AND EXCLUSIONS IN SAID POLICY FORM DESIGNATED ON THE FACE PAGE OF THIS REPORT WOULD BE AS FOLLOWS:

**A.   GENERAL AND SPECIAL TAXES FOR THE FISCAL YEAR 2023-2024**

| | | |
|---|---|---|
| **TOTAL:** | **$3,411.01** | |
| **FIRST INSTALLMENT:** | **$1,705.51** | **OPEN** |
| **PENALTY:** | **$0.00** | |
| **SECOND INSTALLMENT:** | **$1,705.50** | **OPEN** |
| **PENALTY:** | **$0.00** | |

| | |
|---|---|
| **ASSESSED VALUATION:** | |
| **LAND VALUE:** | **$281,478.00** |
| **IMPROVEMENTS:** | **$0.00** |
| **EXEMPTION:** | **$0.00** |

| | |
|---|---|
| **CODE AREA:** | **00067** |
| **A. P. NO.:** | **4384-023-021** |

**B.   THE LIEN OF DEFAULTED TAXES FOR THE FISCAL YEAR 2018-2019 AND SUBSEQUENT DELINQUENCIES.**

| | |
|---|---|
| **AMOUNT TO REDEEM:** | **$84,161.34** |
| **VALID THROUGH:** | **NOVEMBER 30, 2023** |

| | |
|---|---|
| **CODE AREA:** | **00067** |
| **A. P. NO.:** | **4384-023-021** |

**C.   GENERAL AND SPECIAL TAXES FOR THE FISCAL YEAR 2023-2024**

| | | |
|---|---|---|
| **TOTAL:** | **$9,537.23** | |
| **FIRST INSTALLMENT:** | **$4,768.62** | **OPEN** |
| **PENALTY:** | **$0.00** | |
| **SECOND INSTALLMENT:** | **$4,768.61** | **OPEN** |
| **PENALTY:** | **$0.00** | |

| | |
|---|---|
| **ASSESSED VALUATION:** | |
| **LAND VALUE:** | **$790,704.00** |
| **IMPROVEMENTS:** | **$0.00** |
| **EXEMPTION:** | **$0.00** |

| | |
|---|---|
| **CODE AREA:** | **00067** |
| **A. P. NO.:** | **4384-023-020** |

ORDER NO. 3910123-07021

**D. THE LIEN OF DEFAULTED TAXES FOR THE FISCAL YEAR 2018-2019 AND SUBSEQUENT DELINQUENCIES.**

| | |
|---|---|
| **AMOUNT TO REDEEM:** | **$84,161.34** |
| **VALID THROUGH:** | **NOVEMBER 30, 2023** |

| | |
|---|---|
| **CODE AREA:** | **00067** |
| **A. P. NO.:** | **4384-023-020** |

**E. GENERAL AND SPECIAL TAXES FOR THE FISCAL YEAR 2023-2024**

| | | |
|---|---|---|
| **TOTAL:** | **$31,002.16** | |
| **FIRST INSTALLMENT:** | **$15,501.08** | **OPEN** |
| **PENALTY:** | **$0.00** | |
| **SECOND INSTALLMENT:** | **$15,501.08** | **OPEN** |
| **PENALTY:** | **$0.00** | |

| | |
|---|---|
| **ASSESSED VALUATION:** | |
| **LAND VALUE:** | **$2,566,928.00** |
| **IMPROVEMENTS:** | **$0.00** |
| **EXEMPTION:** | **$0.00** |

| | |
|---|---|
| **CODE AREA:** | **00067** |
| **A. P. NO.:** | **4384-023-023** |

**F. THE LIEN OF DEFAULTED TAXES FOR THE FISCAL YEAR 2018-2019 AND SUBSEQUENT DELINQUENCIES.**

| | |
|---|---|
| **AMOUNT TO REDEEM:** | **$277,200.90** |
| **VALID THROUGH:** | **NOVEMBER 30, 2023** |

| | |
|---|---|
| **CODE AREA:** | **00067** |
| **A. P. NO.:** | **4384-023-023** |

**G. GENERAL AND SPECIAL TAXES FOR THE FISCAL YEAR 2023-2024**

| | | |
|---|---|---|
| **TOTAL:** | **$22,898.49** | |
| **FIRST INSTALLMENT:** | **$11,449.25** | **OPEN** |
| **PENALTY:** | **$0.00** | |
| **SECOND INSTALLMENT:** | **$11,449.24** | **OPEN** |
| **PENALTY:** | **$0.00** | |

| | |
|---|---|
| **ASSESSED VALUATION:** | |
| **LAND VALUE:** | **$1,893,528.00** |
| **IMPROVEMENTS:** | **$0.00** |
| **EXEMPTION:** | **$0.00** |

| | |
|---|---|
| **CODE AREA:** | **00067** |
| **A. P. NO.:** | **4384-023-022** |

ORDER NO. 3910123-07021

**H.  THE LIEN OF DEFAULTED TAXES FOR THE FISCAL YEAR 2018-2019 AND SUBSEQUENT DELINQUENCIES.**

|   |   |
|---|---|
| **AMOUNT TO REDEEM:** | **$277,200.90** |
| **VALID THROUGH:** | **NOVEMBER 30, 2023** |

|   |   |
|---|---|
| **CODE AREA:** | **00067** |
| **A. P. NO.:** | **4384-023-022** |

I.   THE LIEN OF SUPPLEMENTAL TAXES ASSESSED PURSUANT TO CHAPTER 3.5 COMMENCING WITH SECTION 75 OF THE CALIFORNIA REVENUE AND TAXATION CODE.

1.   WATER RIGHTS, CLAIMS OR TITLE TO WATER, WHETHER OR NOT SHOWN BY THE PUBLIC RECORDS.

2.   ANY EASEMENTS, RECITALS, SETBACKS, NOTATIONS AND OTHER MATTERS AFFECTING SAID LAND FOR THE PURPOSES STATED THEREON, AND INCIDENTAL PURPOSES THEREIN, AS SHOWN ON THE RECORDED MAP REFERENCED IN THE LEGAL DESCRIPTION.

3.   AN EASEMENT FOR PUBLIC UTILITIES AND INCIDENTAL PURPOSES.

|   |   |
|---|---|
| RECORDED: | IN BOOK 16580, PAGE 352, OF OFFICIAL RECORDS. |
| AFFECTS: | AS MORE PARTICULARLY DESCRIBED THEREIN |

4.   A COVENANT AND AGREEMENT WHEREIN THE OWNERS OF SAID LAND AGREE WITH AND PROMISE TO A GOVERNMENTAL AGENCY TO PERFORM AS SET FORTH THEREIN

|   |   |
|---|---|
| RECORDED: | OCTOBER 20, 1964 AS INSTRUMENT NO. 4898, OF OFFICIAL RECORDS. |

5.   AN EASEMENT AS SHOWN ON THE MAP OF TRACT NO. 32693.

|   |   |
|---|---|
| FOR: | PUBLIC UTILITIES AND INCIDENTAL PURPOSES. |
| AFFECTS: | THAT PORTION OF SAID LAND AS SHOWN ON THE MAP OF SAID TRACT. |

6.   A COVENANT AND AGREEMENT WHEREIN THE OWNERS OF SAID LAND AGREE WITH AND PROMISE TO A GOVERNMENTAL AGENCY TO PERFORM AS SET FORTH THEREIN

|   |   |
|---|---|
| RECORDED: | AUGUST 6, 1980 AS INSTRUMENT NO. 80-752601, OF OFFICIAL RECORDS. |

7.   THE TERMS AND PROVISIONS CONTAINED IN THE DOCUMENT ENTITLED "NOTICE OF CONSENT TO USE OF LAND" RECORDED MARCH 5, 1981 AS INSTRUMENT NO. 81-231829, OF OFFICIAL RECORDS.

8.   AN EASEMENT FOR PURPOSES STATED AND INCIDENTAL RIGHTS.

|   |   |
|---|---|
| FOR: | ACCESS, WALLS AND PUBLIC UTILITIES AND INCIDENTAL PURPOSES |
| RECORDED: | JANUARY 17, 1984 AS INSTRUMENT NO. 84-68769, OF OFFICIAL RECORDS. |
| AFFECTS: | AS MORE PARTICULARLY DESCRIBED THEREIN |

ORDER NO. 3910123-07021

9.   COVENANTS, CONDITIONS AND RESTRICTIONS IN THE DOCUMENT ABOVE MENTIONED, WHICH
PROVIDE THAT A VIOLATION THEREOF SHALL NOT DEFEAT OR RENDER INVALID THE LIEN OF
ANY FIRST MORTGAGE OR DEED OF TRUST MADE IN GOOD FAITH AND FOR VALUE, BUT
DELETING ANY COVENANT, CONDITION OR RESTRICTION INDICATING A PREFERENCE,
LIMITATION OR DISCRIMINATION BASED ON RACE, COLOR, RELIGION, SEX, HANDICAP, FAMILIAL
STATUS, OR NATIONAL ORIGIN, TO THE EXTENT SUCH COVENANTS, CONDITIONS OR
RESTRICTIONS VIOLATE TITLE 42, SECTION 3604(C), OF THE UNITED STATES CODES.

10.   A COVENANT AND AGREEMENT WHEREIN THE OWNERS OF SAID LAND AGREE WITH AND
PROMISE TO A GOVERNMENTAL AGENCY TO PERFORM AS SET FORTH THEREIN

RECORDED:          JANUARY 29, 1985 AS INSTRUMENT NO. 85-107063, OF OFFICIAL
RECORDS.

11.   THE TERMS AND PROVISIONS CONTAINED IN THE DOCUMENT ENTITLED "WAIVER OF DAMAGES
INDEMNIFICATION AGREEMENT AND RIGHT OF INGRESS AND EGRESS COVENANT TO RUN WITH
THE LAND" RECORDED FEBRUARY 21, 1985 AS INSTRUMENT NO. 85-199102, OF OFFICIAL
RECORDS.

12.   A COVENANT AND AGREEMENT WHEREIN THE OWNERS OF SAID LAND AGREE WITH AND
PROMISE TO A GOVERNMENTAL AGENCY TO PERFORM AS SET FORTH THEREIN

RECORDED:          OCTOBER 21, 1985 AS INSTRUMENT NO. 85-1240675, OF OFFICIAL
RECORDS.

13.   A COVENANT AND AGREEMENT WHEREIN THE OWNERS OF SAID LAND AGREE WITH AND
PROMISE TO A GOVERNMENTAL AGENCY TO PERFORM AS SET FORTH THEREIN

RECORDED:          DECEMBER 18, 1985 AS INSTRUMENT NO. 85-1494484, OF OFFICIAL
RECORDS.

14.   A COVENANT AND AGREEMENT WHEREIN THE OWNERS OF SAID LAND AGREE WITH AND
PROMISE TO A GOVERNMENTAL AGENCY TO PERFORM AS SET FORTH THEREIN

RECORDED:          NOVEMBER 12, 1986 AS INSTRUMENT NO. 86-1549153, OF OFFICIAL
RECORDS.

15.   A COVENANT AND AGREEMENT WHEREIN THE OWNERS OF SAID LAND AGREE WITH AND
PROMISE TO A GOVERNMENTAL AGENCY TO PERFORM AS SET FORTH THEREIN

RECORDED:          FEBRUARY 19, 1987 AS INSTRUMENT NO. 87-251540, OF OFFICIAL
RECORDS.

16.   A COVENANT AND AGREEMENT WHEREIN THE OWNERS OF SAID LAND AGREE WITH AND
PROMISE TO A GOVERNMENTAL AGENCY TO PERFORM AS SET FORTH THEREIN

RECORDED:          FEBRUARY 19, 1987 AS INSTRUMENT NO. 87-251541, OF OFFICIAL
RECORDS.

17.   A COVENANT AND AGREEMENT WHEREIN THE OWNERS OF SAID LAND AGREE WITH AND
PROMISE TO A GOVERNMENTAL AGENCY TO PERFORM AS SET FORTH THEREIN

RECORDED:          FEBRUARY 19, 1987 AS INSTRUMENT NO. 87-251542, OF OFFICIAL
RECORDS.

ORDER NO. 3910123-07021

18.  A COVENANT AND AGREEMENT WHEREIN THE OWNERS OF SAID LAND AGREE WITH AND
     PROMISE TO A GOVERNMENTAL AGENCY TO PERFORM AS SET FORTH THEREIN

     RECORDED:              MAY 2, 1995 AS INSTRUMENT NO. 95-716532, OF OFFICIAL RECORDS.

19.  AN EASEMENT FOR PURPOSES STATED AND INCIDENTAL RIGHTS.

     FOR:                   PILLAR ENCROACHMENT
     RECORDED:              JUNE 20, 2012 AS INSTRUMENT NO. 20120917645, OF OFFICIAL
                            RECORDS.

     AFFECTS:               AS MORE PARTICULARLY DESCRIBED THEREIN

     A DOCUMENT DECLARING MODIFICATIONS THEREOF RECORDED MAY 10, 2016 AS
     INSTRUMENT NO. 2016-531499, OF OFFICIAL RECORDS.

20.  THE TERMS AND PROVISIONS CONTAINED IN THE DOCUMENT ENTITLED "AN UNRECORDED
     SETTLEMENT AGREEMENT" RECORDED MARCH 15, 2013 AS INSTRUMENT NO. 20130392277, OF
     OFFICIAL RECORDS.

21.  AN EASEMENT FOR PURPOSES STATED AND INCIDENTAL RIGHTS.

     FOR:                   INGRESS AND EGRESS PURPOSES, AND TO MAINTAIN AND OPERATE
                            THE GUARD HOUSE, SECURITY GATES, AND ADJACENT LANDSCAPING
     RECORDED:              JULY 18, 2016 AS INSTRUMENT NO. 20160834793, OF OFFICIAL
                            RECORDS.

     AFFECTS:               AS MORE PARTICULARLY DESCRIBED THEREIN

22.  COVENANTS, CONDITIONS, RESTRICTIONS, EASEMENTS, ASSESSMENTS, LIENS, CHARGES,
     TERMS AND PROVISIONS, WHICH PROVIDE THAT A VIOLATION THEREOF SHALL NOT DEFEAT OR
     RENDER INVALID THE LIEN OF ANY FIRST MORTGAGE OR DEED OF TRUST MADE IN GOOD FAITH
     AND FOR VALUE, BUT DELETING ANY COVENANT, CONDITION OR RESTRICTION INDICATING A
     PREFERENCE, LIMITATION OR DISCRIMINATION BASED ON RACE, COLOR, RELIGION, SEX,
     HANDICAP, FAMILIAL STATUS, OR NATIONAL ORIGIN, SEXUAL ORIENTATION, MARITAL STATUS,
     ANCESTRY, SOURCE OF INCOME OR DISABILITY, TO THE EXTENT SUCH COVENANTS,
     CONDITIONS OR RESTRICTIONS VIOLATE TITLE 42, SECTION 3604(C), OF THE UNITED STATES
     CODES OR SECTION 12955 OF THE CALIFORNIA GOVERNMENT CODE.  LAWFUL RESTRICTIONS
     UNDER STATE AND FEDERAL LAW ON THE AGE OF OCCUPANTS IN SENIOR HOUSING OR
     HOUSING FOR OLDER PERSONS SHALL NOT BE CONSTRUED AS RESTRICTIONS BASED ON
     FAMILIAL STATUS.

     RECORDED:              SEPTEMBER 9, 2016 AS INSTRUMENT NO. 2016-1064931, OF OFFICIAL
                            RECORDS.

23.  A COVENANT AND AGREEMENT WHEREIN THE OWNERS OF SAID LAND AGREE WITH AND
     PROMISE TO A GOVERNMENTAL AGENCY TO PERFORM AS SET FORTH THEREIN

     RECORDED:              DECEMBER 12, 2017 AS INSTRUMENT NO. 20171441705, OF OFFICIAL
                            RECORDS.

     A DOCUMENT DECLARING MODIFICATIONS THEREOF RECORDED SEPTEMBER 16, 2019 AS
     INSTRUMENT NO. 20190959953, OF OFFICIAL RECORDS.

ORDER NO. 3910123-07021

24. **A DEED OF TRUST TO SECURE AN ORIGINAL INDEBTEDNESS AND ANY OTHER AMOUNTS OR OBLIGATIONS SECURED THEREBY**

| | |
|---|---|
| **AMOUNT:** | **$31,300,000.00** |
| **DATED:** | **SEPTEMBER 28, 2018** |
| **TRUSTOR:** | **TREE LANE LLC, A CALIFORNIA LIMITED LIABILITY COMPANY** |
| **TRUSTEE:** | **FCI LENDER SERVICES, INC., A CALIFORNIA CORPORATION** |
| **BENEFICIARY:** | **SKYLARK CAPITAL MANAGEMENT, LLC, A CALIFORNIA LIMITED LIABILITY COMPANY** |
| **RECORDED:** | **OCTOBER 4, 2018 AS INSTRUMENT NO. 20181013436, OF OFFICIAL RECORDS.** |
| **LOAN NO.:** | **NONE SHOWN** |

**IN REGARDS TO THE ABOVE MENTIONED DEED OF TRUST THIS COMPANY WILL REQUIRE A WRITTEN DEMAND SIGNED BY THE BENEFICIARY**

**AND**

**THE ORIGINAL NOTE AND A SUBSTITUTION OF TRUSTEE AND FULL RECONVEYANCE EXECUTED BY THE BENEFICIARY.**

**IF YOU CANNOT OBTAIN THESE DOCUMENTS PLEASE CONTACT US AS SOON AS POSSIBLE.**

**IN ADDITION, IN ACCORDANCE WITH CALIFORNIA CIVIL CODE 51.27 AND 511.6, AS IT AFFECTS BENEFICIAL INTEREST ACQUIRED AFTER DECEMBER 31, 1974, THE SPOUSE, IF ANY,  OF THE BENEFICIARY WILL NEED TO JOIN IN THE EXECUTION OF THE SUBSTITUTION OF TRUSTEE AND FULL RECONVEYANCE. IF THE BENEFICIARY HAS SINCE BECOME A WIDOW(ER), A COPY OF THE SPOUSE'S DEATH CERTIFICATE WILL BE REQUIRED.**

**ACCORDING TO THE PUBLIC RECORDS, THE BENEFICIAL INTEREST UNDER THE DEED OF TRUST WAS ASSIGNED TO SKYLARK MAN I, LLC, A DELAWARE LIMITED LIABILITY COMPANY BY ASSIGNMENT RECORDED JANUARY 28, 2022 AS INSTRUMENT NO. 20220112340, OF OFFICIAL RECORDS.**

**A DOCUMENT RECORDED JANUARY 28, 2022 AS INSTRUMENT NO. 20220112341, OF OFFICIAL RECORDS, PURPORTEDLY SUBSTITUTES CALIFORNIA TD SPECIALISTS AS TRUSTEE UNDER THE DEED OF TRUST.**

**A NOTICE OF DEFAULT RECORDED JANUARY 28, 2022 AS INSTRUMENT NO. 20220112342, OF OFFICIAL RECORDS.**

25. **A FINANCING STATEMENT**

| | |
|---|---|
| **DEBTOR:** | **TREE LANE LLC** |
| **SECURED PARTY:** | **SKYLARK CAPITAL MANAGEMENT, LLC** |
| **RECORDED:** | **OCTOBER 4, 2018 AS INSTRUMENT NO. 20181013437, OF OFFICIAL RECORDS.** |

ORDER NO. 3910123-07021

26. **A DEED OF TRUST TO SECURE AN ORIGINAL INDEBTEDNESS AND ANY OTHER AMOUNTS OR OBLIGATIONS SECURED THEREBY**

|  |  |
|---|---|
| **AMOUNT:** | **$2,437,500.00** |
| **DATED:** | **JANUARY 4, 2019** |
| **TRUSTOR:** | **ZACHARY VELLA, A SINGLE MAN** |
| **TRUSTEE:** | **FIDELITY NATIONAL TITLE COMPANY** |
| **BENEFICIARY:** | **BOSTON PRIVATE BANK AND TRUST COMPANY** |
| **RECORDED:** | **JANUARY 10, 2019 AS INSTRUMENT NO. 20190027891, OF OFFICIAL RECORDS.** |
| **LOAN NO.:** | **NONE SHOWN** |

**AFFECTS: THE LAND AND OTHER PROPERTY.**

27. **A CLAIM OF LIEN**

|  |  |
|---|---|
| **LIEN CLAIMANT:** | **HEIDI CORPORATION DBA DONALD J. SCHEFFLER'S CONSTRUCTION** |
| **AMOUNT:** | **$1,924,573.00** |
| **RECORDED:** | **JULY 1, 2019 AS INSTRUMENT NO. 20190633823, OF OFFICIAL RECORDS.** |

**NOTICE OF PENDENCY OF ACTION**

|  |  |
|---|---|
| **COURT:** | **SUPERIOR COURT OF THE STATE OF CALIFORNIA COUNTY OF LOS ANGELES** |
| **CASE NO.:** | **19SMCV01694** |
| **PLAINTIFF:** | **HEIDI CORPORATION DBA DONALD J. SCHEFFLER'S CONCRETE CONSTRUCTION** |
| **DEFENDANT:** | **TREE LANE LLC; TREETOP DEVELOPMENT LLC; AND DOES 1 THROUGH 10 INCLUSIVE** |
| **PURPOSE:** | **FORECLOSURE OF A MECHANICS' LIEN** |
| **RECORDED:** | **OCTOBER 4, 2019 AS INSTRUMENT NO. 20191053023, OF OFFICIAL RECORDS.** |

28. **A CLAIM OF LIEN**

|  |  |
|---|---|
| **LIEN CLAIMANT:** | **ASSOCIATED READY MIX CONCRETE INC.** |
| **AMOUNT:** | **$87,772.93** |
| **RECORDED:** | **SEPTEMBER 18, 2019 AS INSTRUMENT NO. 20190973230, OF OFFICIAL RECORDS.** |

ORDER NO. 3910123-07021

NOTICE OF PENDENCY OF ACTION

COURT:           SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES
                      WEST DISTRICT-SANTA MONICA COURTHOUSE
CASE NO.:       19SMCV01688
PLAINTIFF:      ASSOCIATED READY MIXED CONCRETE, INC., A CORPORATION
DEFENDANT:   TREE LANE, LLC, A LIMITED LIABILITY COMPANY; AND JOHN
                      DOES 1 TO 100, INCLUSIVE
PURPOSE:       FORECLOSURE OF A MECHANICS' LIEN
RECORDED:    OCTOBER 1, 2019 AS INSTRUMENT NO. 20191035102, OF OFFICIAL
                      RECORDS.

29.  A DEED OF TRUST TO SECURE AN ORIGINAL INDEBTEDNESS AND ANY OTHER
     AMOUNTS OR OBLIGATIONS SECURED THEREBY

AMOUNT:        $6,000,000.00
DATED:          NOVEMBER 5, 2019
TRUSTOR:       TREE LLC, A CALIFORNIA LIMITED LIABILITY COMPANY
TRUSTEE:       FIDELITY NATIONAL TITLE COMPANY
BENEFICIARY:   LYDDA LUD LENDER TREE, LLC, A CALIFORNIA LIMITED
                      LIABILITY COMPANY
RECORDED:    DECEMBER 26, 2019 AS INSTRUMENT NO. 20191443165, OF
                      OFFICIAL RECORDS.
LOAN NO.:      NONE SHOWN

IN REGARDS TO THE ABOVE MENTIONED DEED OF TRUST THIS COMPANY WILL
REQUIRE A WRITTEN DEMAND SIGNED BY THE BENEFICIARY

AND

THE ORIGINAL NOTE AND A SUBSTITUTION OF TRUSTEE AND FULL RECONVEYANCE
EXECUTED BY THE BENEFICIARY.

IF YOU CANNOT OBTAIN THESE DOCUMENTS PLEASE CONTACT US AS SOON AS
POSSIBLE.

IN ADDITION, IN ACCORDANCE WITH CALIFORNIA CIVIL CODE 51.27 AND 511.6, AS IT
AFFECTS BENEFICIAL INTEREST ACQUIRED AFTER DECEMBER 31, 1974, THE
SPOUSE, IF ANY,  OF THE BENEFICIARY WILL NEED TO JOIN IN THE EXECUTION OF
THE SUBSTITUTION OF TRUSTEE AND FULL RECONVEYANCE. IF THE BENEFICIARY
HAS SINCE BECOME A WIDOW(ER), A COPY OF THE SPOUSE'S DEATH CERTIFICATE
WILL BE REQUIRED.

30.  A FINANCING STATEMENT

DEBTOR:          TREE LANE LLC
SECURED PARTY: LYDDA LUD LENDER TREE, LLC, A CALIFORNIA LIMITED
                      LIABILITY COMPANY
RECORDED:    JANUARY 16, 2020 AS INSTRUMENT NO. 20200062809, OF
                      OFFICIAL RECORDS.

ORDER NO. 3910123-07021

31. **A CLAIM OF LIEN**

| | |
|---|---|
| **LIEN CLAIMANT:** | **HD SUPPLY CONSTRUCTION SUPPLY, LTD., DBA HD SUPPLY WHITE CAP CONSTRUCTION SUPPLY** |
| **AMOUNT:** | **$238,960.63** |
| **RECORDED:** | **OCTOBER 27, 2020 AS INSTRUMENT NO. 20201340731, OF OFFICIAL RECORDS.** |

**NOTICE OF PENDENCY OF ACTION**

| | |
|---|---|
| **COURT:** | **SUPERIOR COURT OF THE STATE OF CALIFORNIA COUNTY OF LOS ANGELES, SANTA MONICA COURTHOUSE** |
| **CASE NO.:** | **21SMCV00002** |
| **PLAINTIFF:** | **HD SUPPLY CONSTRUCTION SUPPLY, LTD. D/B/A HD SUPPLY WHITE CAP CONSTRUCTION SUPPLY, A FLORIDA LIMITED PARTNERSHIP** |
| **DEFENDANT:** | **CRUZ CONCRETE AND STONE INC., A CALIFORNIA CORPORATION; MARTIN CRUZ, AN INDIVIDUAL; TREETOP DEVELOPMENT LLC, A CALIFORNIA LIMITED LIABILITY COMPANY; MOHAMED HADID, AN INDIVIDUAL; TREE LANE LLC, A CALIFORNIA LIMITED LIABILITY COMPANY; SKYLARK CAPITAL MANAGEMENT, LLC, A CALIFORNIA LIMITED LIABILITY COMPANY AND DOES 1 THROUGH 130;** |
| **PURPOSE:** | **FORECLOSURE OF A MECHANICS' LIEN** |
| **RECORDED:** | **JANUARY 25, 2021 AS INSTRUMENT NO. 20210126442, OF OFFICIAL RECORDS.** |

32. **A CLAIM OF LIEN**

| | |
|---|---|
| **LIEN CLAIMANT:** | **HD SUPPLY CONSTRUCTION SUPPLY, LTD., DBA HD SUPPLY WHITE CAP CONSTRUCTION SUPPLY** |
| **AMOUNT:** | **$103,608.06** |
| **RECORDED:** | **OCTOBER 27, 2020 AS INSTRUMENT NO. 20201342199, OF OFFICIAL RECORDS.** |

ORDER NO. 3910123-07021

**NOTICE OF PENDENCY OF ACTION**

| | |
|---|---|
| **COURT:** | **SUPERIOR COURT OF THE STATE OF CALIFORNIA COUNTY OF LOS ANGELES, SANTA MONICA COURTHOUSE** |
| **CASE NO.:** | **21SMCV00002** |
| **PLAINTIFF:** | **HD SUPPLY CONSTRUCTION SUPPLY, LTD. D/B/A HD SUPPLY WHITE CAP CONSTRUCTION SUPPLY, A FLORIDA LIMITED PARTNERSHIP** |
| **DEFENDANT:** | **CRUZ CONCRETE AND STONE INC., A CALIFORNIA CORPORATION; MARTIN CRUZ, AN INDIVIDUAL; TREETOP DEVELOPMENT LLC, A CALIFORNIA LIMITED LIABILITY COMPANY; MOHAMED HADID, AN INDIVIDUAL; TREE LANE LLC, A CALIFORNIA LIMITED LIABILITY COMPANY; SKYLARK CAPITAL MANAGEMENT, LLC, A CALIFORNIA LIMITED LIABILITY COMPANY AND DOES 1 THROUGH 130;** |
| **PURPOSE:** | **FORECLOSURE OF A MECHANICS' LIEN** |
| **RECORDED:** | **JANUARY 25, 2021 AS INSTRUMENT NO. 20210126441, OF OFFICIAL RECORDS.** |

33. A CERTIFICATE OF COMPLIANCE, DATED OCTOBER 13, 2020 EXECUTED BY THE LOS ANGELES DEPARTMENT OF CITY PLANNING RECORDED NOVEMBER 30, 2020 AS INSTRUMENT NO. 20201531686, OF OFFICIAL RECORDS.

    AFFECTS:           NONE SHOWN

34. A CERTIFICATE OF COMPLIANCE, DATED OCTOBER 13, 2020 EXECUTED BY THE LOS ANGELES DEPARTMENT OF CITY PLANNING RECORDED NOVEMBER 30, 2020 AS INSTRUMENT NO. 20201531687, OF OFFICIAL RECORDS.

    AFFECTS:           NONE SHOWN

**35. A CLAIM OF LIEN**

| | |
|---|---|
| **LIEN CLAIMANT:** | **CRUZ CONCRETE AND STONE INC.,** |
| **AMOUNT:** | **$1,819,140.86** |
| **RECORDED:** | **DECEMBER 21, 2020 AS INSTRUMENT NO. 20201700777, OF OFFICIAL RECORDS.** |

**NOTICE OF PENDENCY OF ACTION**

| | |
|---|---|
| **COURT:** | **SUPERIOR COURT OF THE STATE OF CALIFORNIA COUNTY OF LOS ANGELES-UNLIMITED JURISDICTION** |
| **CASE NO.:** | **21SMCV00502** |
| **PLAINTIFF:** | **CRUZ CONCRETE AND STONE INC.,** |
| **DEFENDANT:** | **GOLDEN BLUE BUILDERS GROUP, INC., A CORPORATION; JUSTIN KUNKLE, INDIVIDUALLY AND DOING BUSINESS AS GOLDEN BLUE BUILDERS GROUP; TREE LANE, LLC, A LIMITED LIABILITY COMPANY; AND DOES 1 THROUGH 100 INCLUSIVE,** |
| **PURPOSE:** | **FORECLOSURE OF A MECHANICS' LIEN** |
| **RECORDED:** | **APRIL 30, 2021 AS INSTRUMENT NO. 20210689509, OF OFFICIAL RECORDS.** |

ORDER NO. 3910123-07021

36.  **THE EFFECT OF A NOTICE OF SPECIAL TAX LIEN IN FAVOR OF THE MOUNTAINS RECREATION AND CONSERVATION AUTHORITY COMMUNITY FACILITIES DISTRICT NO. 2016-1 (FIRE PREVENTION, WILDLIFE CORRIDOR AND OPEN SPACE PROTECTION), AS DISCLOSED BY A DOCUMENT RECORDED FEBRUARY 10, 2021 AS INSTRUMENT NO. 20210235371, OF OFFICIAL RECORDS.**

    **FOR FURTHER INFORMATION CONCERNING THE CURRENT AND ESTIMATED FUTURE TAX LIABILITY OF OWNERS OR PURCHASERS OF REAL PROPERTY SUBJECT TO THIS SPECIAL TAX LIEN, INTERESTED PERSONS SHOULD CONTACT:**

    **SCI CONSULTING GROUP
4745 MANGELS BLVD.
FAIRFIELD, CA 94534
(800) 273-5167**

    **PLEASE NOTE THAT THIS DOCUMENT CONSISTS OF 408 PAGES, ONLY THE FIRST SIX PAGES HAVE BEEN HYPERLINKED. PLEASE CONTACT THIS OFFICE IF MORE PAGES ARE NEEDED.**

37.  **A NOTICE OF HOMEOWNERS ASSOCIATION ASSESSMENT LIEN**

| | |
|---|---|
| **ASSOCIATION:** | **BELLA VISTA ESTATES OWNERS' ASSOCIATION** |
| **AMOUNT:** | **$26,535.25, AND ANY OTHER AMOUNTS DUE THEREUNDER.** |
| **RECORDED:** | **MARCH 19, 2021 AS INSTRUMENT NO. 20210447083, OF OFFICIAL RECORDS.** |

38.  **AN ABSTRACT OF JUDGMENT**

| | |
|---|---|
| **COURT:** | **SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES** |
| **CASE NO.:** | **22STCV36932** |
| **DEBTOR:** | **TREE LANE LLC, A CALIFORNIA LIMITED LIABILITY COMPANY** |
| **CREDITOR:** | **PNC EQUIPMENT FINANCE, LLC, A DELAWARE LIMITED LIABILITY COMPANY C/O HEMAR ROUSSO & HEALD, LLC** |
| **AMOUNT:** | **$7,638.75, AND ANY OTHER AMOUNTS DUE THEREUNDER.** |
| **RECORDED:** | **MAY 30, 2023 AS INSTRUMENT NO. 20230349060, OF OFFICIAL RECORDS.** |

39.  **A NOTICE OF HOMEOWNERS ASSOCIATION ASSESSMENT LIEN**

| | |
|---|---|
| **ASSOCIATION:** | **BELLA VISTA ESTATES OWNERS' ASSOCIATION** |
| **AMOUNT:** | **$48,893.36, AND ANY OTHER AMOUNTS DUE THEREUNDER.** |
| **RECORDED:** | **SEPTEMBER 1, 2023 AS INSTRUMENT NO. 20230585355, OF OFFICIAL RECORDS.** |

    **A NOTICE OF DEFAULT RECORDED NOVEMBER 1, 2023 AS INSTRUMENT NO. 20230747490, OF OFFICIAL RECORDS.**

**40.  ANY ADDITIONAL CLAIMS OF STATUTORY LIEN FOR LABOR OR MATERIAL ARISING BY REASON OF A WORK OF IMPROVEMENT DISCLOSED BY THE ABOVE CLAIM OF LIEN.**

**41.  ANY FACTS ABOUT THE LAND THAT AN INSPECTION OR INQUIRY OF PARTIES IN POSSESSION SATISFACTORY TO THE COMPANY WOULD DISCLOSE AND THAT ARE NOT SHOWN BY THE PUBLIC RECORDS.**

42.  ANY FACTS, RIGHTS, INTERESTS OR CLAIMS WHICH WOULD BE DISCLOSED BY A CORRECT ALTA/NSPS SURVEY.

ORDER NO. 3910123-07021

## REQUIREMENTS:

**43. PRIOR TO THE ISSUANCE OF ANY POLICY OF TITLE INSURANCE, THE COMPANY WILL REQUIRE:**

**A. THE RECEIPT AND REVIEW OF THE COMPLETED OWNER'S PROPERTY STATEMENT SUBJECT TO FURTHER REQUIREMENTS OF THIS COMPANY.**

**B. THIS TRANSACTION MAY BE SUBJECT TO A CONFIDENTIAL ORDER ISSUED PURSUANT TO THE BANK SECRECY ACT. THE POLICY ISSUING AGENT MUST BE PROVIDED WITH CERTAIN INFORMATION NECESSARY TO COMPLY WITH THE CONFIDENTIAL ORDER PRIOR TO THE CLOSING. THIS TRANSACTION WILL NOT BE INSURED AND THIS ISSUING AGENT AND/OR ITS UNDERWRITER WILL NOT BE INVOLVED IN THE CLOSING AND SETTLEMENT UNTIL THIS INFORMATION IS SUBMITTED, REVIEWED AND FOUND TO BE COMPLETE.**

**C. WITH RESPECT TO TREE LANE, LLC, A CALIFORNIA LIMITED LIABILITY COMPANY:**

**A. A COPY OF ITS OPERATING AGREEMENT AND ANY AMENDMENTS THERETO;**

**B. IF IT IS A CALIFORNIA LIMITED LIABILITY COMPANY, THAT A CERTIFIED COPY OF ITS ARTICLES OF ORGANIZATION (LLC-1) AND ANY CERTIFICATE OF CORRECTION (LLC-11), CERTIFICATE OF AMENDMENT (LLC-2), OR RESTATEMENT OF ARTICLES OF ORGANIZATION (LLC-10) BE RECORDED IN THE PUBLIC RECORDS;**

**C. IF IT IS A FOREIGN LIMITED LIABILITY COMPANY, THAT A CERTIFIED COPY OF ITS APPLICATION FOR REGISTRATION (LLC-5) BE RECORDED IN THE PUBLIC RECORDS;**

**D. WITH RESPECT TO ANY DEED, DEED OF TRUST, LEASE, SUBORDINATION AGREEMENT OR OTHER DOCUMENT OR INSTRUMENT EXECUTED BY SUCH LIMITED LIABILITY COMPANY AND PRESENTED FOR RECORDATION BY THE COMPANY OR UPON WHICH THE COMPANY IS ASKED TO RELY, THAT SUCH DOCUMENT OR INSTRUMENT BE EXECUTED IN ACCORDANCE WITH ONE OF THE FOLLOWING, AS APPROPRIATE:**

**(I) IF THE LIMITED LIABILITY COMPANY PROPERLY OPERATES THROUGH OFFICERS APPOINTED OR ELECTED PURSUANT TO THE TERMS OF A WRITTEN OPERATING AGREEMENT, SUCH DOCUMENT MUST BE EXECUTED BY AT LEAST TWO DULY ELECTED OR APPOINTED OFFICERS, AS FOLLOWS: THE CHAIRMAN OF THE BOARD, THE PRESIDENT OR ANY VICE PRESIDENT, AND ANY SECRETARY, ASSISTANT SECRETARY, THE CHIEF FINANCIAL OFFICER OR ANY ASSISTANT TREASURER;**

**(II) IF THE LIMITED LIABILITY COMPANY PROPERLY OPERATES THROUGH A MANAGER OR MANAGERS IDENTIFIED IN THE ARTICLES OF ORGANIZATION AND/OR DULY ELECTED PURSUANT TO THE TERMS OF A WRITTEN OPERATING AGREEMENT, SUCH DOCUMENT MUST BE EXECUTED BY AT LEAST TWO SUCH MANAGERS OR BY ONE MANAGER IF THE LIMITED LIABILITY COMPANY PROPERLY OPERATES WITH THE EXISTENCE OF ONLY ONE MANAGER.**

**E. OTHER REQUIREMENTS WHICH THE COMPANY MAY IMPOSE FOLLOWING ITS REVIEW OF THE MATERIAL REQUIRED HEREIN AND OTHER INFORMATION WHICH THE COMPANY MAY REQUIRE.**

**\*\*\*END OF SCHEDULE B\*\*\***

## Statement of Information

Equity Title Company maintains procedural safeguards that comply with federal standards to protect the confidentiality and security of non-public personal information. This statement will serve to establish identity, eliminate matters affecting persons of similar name, protect you against forgeries, and speed the completion of your title and escrow services. **PLEASE BE SURE YOU HAVE FILLED THIS FORM OUT COMPLETELY; INCLUDING SIGNATURES AND DATE. NOT PROVIDING REQUESTED INFORMATION MAY CAUSE A DELAY IN THE CLOSE OF YOUR TRANSACTION. - THANK YOU -**

ESCROW NO._____    TITLE ORDER:  3910123-07021

NAME_____    SOC.SEC. NUMBER_____
      FIRST        FULL MIDDLE NAME        LAST      DRIVER'S LICENSE NUMBER_____

DATE OF BIRTH_____BIRTHPLACE_____HOME PHONE_____

YOUR BUSINESS PHONE_____YOUR CELL PHONE_____YOUR FAX_____

YOUR E-MAIL_____SPOUSE/DOMESTIC PARTNER E-MAIL_____

LIVED IN USA SINCE_____    LIVED IN CALIFORNIA SINCE_____

(CIRCLE ONE)  NAME OF SPOUSE/ DOMESTIC PARTNER_____    SOC. SEC. NUMBER_____
      FIRST      FULL MIDDLE NAME      LAST    DRIVER'S LICENSE NUMBER_____

DATE OF BIRTH_____BIRTHPLACE_____PREVIOUS NAME_____

SPOUSE/DOMESTIC PARTNER BUSINESS PHONE_____CELL PHONE_____FAX_____

LIVED IN USA SINCE_____    LIVED IN CALIFORNIA SINCE_____

**IF MARRIED, OR IN A DOMESTIC PARTNERSHIP,  DATE:** _____AT_____
                      CITY AND STATE

**PREVIOUS MARRIAGE(S) OR DOMESTIC PARTNERSHIP(S) (if no previous marriage or domestic partnership, write "NONE"):**

(CIRCLE ONE)  NAME OF FORMER           DECEASED     DATE_____
SPOUSE/DOMESTIC PARTNER_____DIVORCED    WHERE_____

(CIRCLE ONE)  NAME OF FORMER           DECEASED     DATE_____
SPOUSE/DOMESTIC PARTNER_____DIVORCED    WHERE_____

(ATTACH ADDITIONAL PAGE, IF NECESSARY)

**CHILDREN:**

NAME _____ DATE OF BIRTH _____ NAME _____ DATE OF BIRTH _____

NAME _____ DATE OF BIRTH _____ NAME _____ DATE OF BIRTH _____

(ATTACH ADDITIONAL PAGE, IF NECESSARY)

**INFORMATION COVERING PAST 10 YEARS.**

**Residence:**

| | NUMBER AND STREET | CITY | ZIP CODE | FROM | TO |
|---|---|---|---|---|---|
| | | | | | |
| **Your Employment:** | NUMBER AND STREET | CITY | ZIP CODE | FROM | TO |
| | FIRM NAME AND ADDRESS | CITY | ZIP CODE | FROM | TO |
| | FIRM NAME AND ADDRESS | CITY | ZIP CODE | FROM | TO |
| **Spouse/Domestic Partner Employment:** | FIRM NAME AND ADDRESS | CITY | ZIP CODE | FROM | TO |
| | FIRM NAME AND ADDRESS | CITY | ZIP CODE | FROM | TO |
| | FIRM NAME AND ADDRESS | CITY | ZIP CODE | FROM | TO |
| | FIRM NAME AND ADDRESS | CITY | ZIP CODE | FROM | TO |

**HAVE YOU OR YOUR SPOUSE/DOMESTIC PARTNER OWNED OR OPERATED A BUSINESS?**

☐ YES    ☐ NO    IF SO, PLEASE LIST NAMES_____

I HAVE NEVER BEEN ADJUDGED BANKRUPT, NOR ARE THERE ANY UNSATISFIED JUDGMENTS OR OTHER MATTERS PENDING AGAINST ME WHICH MIGHT AFFECT MY TITLE TO THIS PROPERTY EXCEPT AS FOLLOWS:

_____

THE STREET ADDRESS OF THE PROPERTY IN THIS TRANSACTION IS: 2451 SUMMITRIDGE
**The undersigned declare, under penalty of perjury, that the foregoing is true and correct.**

Date:_____    X_____
                  (SIGNATURE)

Date:_____    X_____
                  (SPOUSE/DOMESTIC PARTNER SIGNATURE)

# Owners Property Statement

In connection with the property located at: 2451 SUMMITRIDGE,Beverly Hills, CA

**Instructions**: Please initial after reading each statement below. If one does not apply, leave it blank and provide further explanation at the bottom of this form.

THE UNDERSIGNED OWNER(S) OF THE ABOVE DESCRIBED PROPERTY MAKE(S) THE FOLLOWING STATEMENTS AND REPRESENTATIONS TO THE TITLE COMPANY AND ITS UNDERWRITER:

[ ___ ] 1. Owner warrants and represents that they are the owner of the above described Property and that they have no pending proceedings in State or Federal Court which resulted in or may result in judgments against Owner or liens against the Property.

[ ___ ] 2. Owner represents that, in the last twelve (12) months, they have not contracted for, ordered, or agreed to the supplying of any labor, materials or construction-related service for remodeling, renovation, repair or construction of any improvements located on the Property.

[ ___ ] 3. Owner represents that they know of no claims, encroachments, rights, interests, easements, rights of way,  liens, agreements, notices, options, contracts, Homeowners Association ("HOA") violations, HOA charges, fees assessed, or liens, or other matters affecting the Property, whether verbal, written, unrecorded, or appearing in the public records.

[ ___ ] 4. Owner represents that they are currently not leasing, permitting or granting to any other person or entity, verbally, in writing or otherwise, any right to use, possess, occupy or live in the Property or any part thereof for any purpose, and no other person has or claims any present right to use or possess the Property, including rights of first refusal, or contracts to sell the Property.

[____] 5. Owner represents that there are currently no new or existing loans or obligations for energy efficiency
improvements affecting the Property. Such improvements include, but not limited to, those made with the State of California's HERO ("Home Energy Renovation Opportunity") or PACE ("Property Assessed Clean Energy") program.

Owner understands that Title Company and Underwriter will rely on the statements, declarations, representations and warranties herein to close the transaction and to issue a title insurance policy or policies. Owner has completed the Property Statement to the best of Owner's ability and understanding.  Owner agrees to indemnify and hold Title Company and/or Underwriter harmless from and against any loss or damage either or both may sustain, including, but not limited to, reasonable attorney's fees and court costs should any of the statements, declarations, representations and warranties herein be incorrect.

EXCEPTIONS:   [ ___ ] I initialed all of the above statements and there are no exceptions to the best of
my knowledge.
[ ___ ] The only exceptions to the above statements are:
_____
_____
_____
_____
_____
_____

Date:   _____

_____          _____
(SIGNATURE)                                          (SIGNATURE)

## NOTES:

**WE DEPOSIT FUNDS RECEIVED ON YOUR BEHALF IN STATE OR FEDERALLY-CHARTERED BANKS THAT ARE INSURED BY THE FEDERAL DEPOSIT INSURANCE CORPORATION ("FDIC").  THE ACCOUNT IS CURRENTLY HELD AT COMERICA BANK.**

**FDIC DEPOSIT INSURANCE COVERAGE APPLIES TO A MAXIMUM AMOUNT OF $250,000 PER DEPOSITOR FOR DEPOSITS HELD IN THE SAME LEGAL OWNERSHIP CATEGORY AT EACH BANK.  FOR EXAMPLE, FUNDS HELD ON YOUR BEHALF IN AN ACCOUNT MAINTAINED BY US WILL BE COMBINED WITH ANY INDIVIDUAL ACCOUNTS HELD DIRECTLY BY YOU AT THE SAME BANK.  YOU ARE RESPONSIBLE FOR MONITORING THE TOTAL AMOUNT OF DEPOSITS THAT ARE OWNED DIRECTLY OR INDIRECTLY BY YOU IN ANY ONE BANK.**

**IF YOU HAVE QUESTIONS ABOUT FDIC DEPOSIT INSURANCE, CONTACT YOUR FINANCIAL OR LEGAL ADVISORS OR GO TO HTTP://WWW.FDIC.GOV/DEPOSIT/DEPOSITS/INDEX.HTML.  WE DO NOT GUARANTEE THE SOLVENCY OF ANY BANK INTO WHICH FUNDS ARE DEPOSITED AND WE ASSUME NO LIABILITY FOR ANY LOSS YOU INCUR DUE TO THE FAILURE, INSOLVENCY OR SUSPENSION OF OPERATIONS OF ANY BANK OR THE $250,000 FDIC DEPOSIT INSURANCE LIMIT.**

**UNLESS OTHERWISE AGREED IN WRITING, EACH OF THE PRINCIPALS AGREES, UNDERSTANDS AND ACKNOWLEDGES THAT:  THE ESCROW ACCOUNT IS NON-INTEREST-BEARING; NO FINANCIAL OR OTHER BENEFITS WILL BE EARNED BY OR PROVIDED TO ANY OF THE PRINCIPALS WITH RESPECT TO SUCH FUNDS' AND Equity Title Company AND ITS AFFILIATES MAY INSTEAD RECEIVE DIRECT AND INDIRECT FINANCIAL AND OTHER BENEFITS FROM THE DEPOSITORY WITH RESPECT TO SUCH FUNDS THESE BENEFITS SHALL BE TREATED AS ADDITIONAL COMPENSATION TO Equity Title Company FOR ITS SERVICES AS AN ESCROW HOLDER IN THIS TRANSACTION.**

**NOTE:** IF APPLICABLE, AND UNLESS OTHERWISE DIRECTED IN WRITING, Equity Title Company ISSUES THE **ALTA HOME OWNER'S POLICY** ON RESIDENTIAL PROPERTY SALE TRANSACTIONS.

**NOTE:** THIS COMPANY REQUIRES CURRENT BENEFICIARY DEMANDS PRIOR TO CLOSING. NO PAYOFFS WILL BE MADE USING "VERBAL" FIGURES

**NOTE:** EFFECTIVE JANUARY 1, 1990, ASSEMBLY BILL 512, ENACTED AS CHAPTER 598, WILL ADD SECTION 12413.1 TO THE CALIFORNIA INSURANCE CODE DEALING WITH THE "GOOD FUNDS" ISSUE.  FUNDS DEPOSITED BY:

- ❑ CASH AND BY ELECTRONIC TRANSFER (WIRED FUNDS) WILL BE AVAILABLE FOR SAME DAY DISBURSEMENTS.
- ❑ CASHIER'S CHECKS, CERTIFIED CHECKS AND TELLER'S CHECKS WILL BE AVAILABLE FOR NEXT DAY DISBURSEMENTS.
- ❑ ALL OTHER TYPES OF CHECKS WILL NOT BE AVAILABLE FOR DISBURSEMENT UNTIL THE DAY PROVIDED IN REGULATION CC ADOPTED BY THE FEDERAL RESERVE BOARD OF GOVERNORS.
- ❑ A DRAFT WILL NOT BE AVAILABLE FOR DISBURSEMENT UNTIL THE DRAFT HAS BEEN SUBMITTED FOR COLLECTION AND PAYMENT RECEIVED BY OUR BANK.

**PLEASE NOTE:**  THIS COMPANY WILL MAKE DISBURSEMENTS ONLY IN THE SAME MANNER AS WHICH FUNDS ARE RECEIVED.  SHOULD THIS COMPANY BE REQUESTED TO MAKE ANY DISBURSEMENTS BY ELECTRONIC TRANSFER (WIRED FUNDS), THIS COMPANY WILL REQUIRE FUNDS TO BE DEPOSITED TO OUR ACCOUNT BY ELECTRONIC TRANSFER.

ORDER NO. 3910123-07021

Branch :ETQ,User :PCAD          Order: 3910122-05292   Title Officer: 60   Comment:                    Station Id :OKEO



This plat is for your aid in locating your land with reference to streets and other parcels. While this plat is believed to be correct, the company assumes no liability for any loss occurring by reason of reliance thereon.

LOS ANGELES,CA
Document: ASSESSOR_MAP 4384.005

Page 1 of 1

Printed on 6/23/2022 7:00:22 AM

ORDER NO. 3910123-07021



Description: Los Angeles,CA Assessor Map - Book.Page 4384.23 Page: 1 of 1
Order: 1 Comment:

ORDER NO. 3910123-07021

# EQUITY TITLE COMPANY
# PRIVACY POLICY

**Rev. 5/10/2023**

| FACTS | WHAT DOES EQUITY TITLE COMPANY DO WITH YOUR PERSONAL INFORMATION? | |
|---|---|---|
| **Why?** | Financial companies choose how they share your personal information. Federal law gives consumers the right to limit some but not all sharing. Federal law also requires us to tell you how we collect, share, and protect your personal information. Please read this notice carefully to understand what we do. | |
| **What?** | The types of personal information we collect and share depend on the product or service you have with us. This information can include:<br>• Social Security number and account balances<br>• Payment history and credit card or other debt<br>• Checking account information and wire transfer instructions<br>When you are *no longer* our customer, we continue to share your information as described in this notice. | |
| **How?** | All financial companies need to share customers' personal information to run their everyday business. In the section below, we list the reasons financial companies can share their customers' personal information; the reasons Equity Title Company chooses to share; and whether you can limit this sharing. | |
| **Reasons we can share your personal information** | **Does Equity Title Company share?** | **Can you limit this sharing?** |
| **For our everyday business purposes—** such as to process your transactions, maintain your account(s), respond to court orders and legal investigations, or report to credit bureaus | Yes | No |
| **For our marketing purposes—** to offer our products and services to you | No | We don't share |
| **For joint marketing with other financial companies** | No | We don't share |
| **For our affiliates' everyday business purposes—** information about your transactions and experiences | Yes | No |
| **For our affiliates' everyday business purposes—** information about your creditworthiness | No | We don't share |
| **For our affiliates to market to you** | No | We don't share |
| **For nonaffiliates to market to you** | No | We don't share |
| **Questions?** | Go to https://www.anywhere.re/privacypolicy | |

*[PAGE 1-2]*

| Who we are | |
| --- | --- |
| **Who is providing this notice?** | Equity Title Company |

| What we do | |
| --- | --- |
| **How does Equity Title Company protect my personal information?** | To protect your personal information from unauthorized access and use, we use security measures that comply with federal law. These measures include computer safeguards and secured files and buildings. |
| **How does Equity Title Company collect my personal information?** | We collect your personal information, for example, when you<br>• Apply for insurance or pay insurance premiums<br>• Provide your mortgage information or show your driver's license<br>• Give us your contact information<br>We also collect your personal information from others, such as credit bureaus, affiliates, or other companies. |
| **Why can't I limit all sharing?** | Federal law gives you the right to limit only<br>• Sharing for affiliates' everyday business purposes—information about your creditworthiness<br>• Affiliates from using your information to market to you<br>• Sharing for nonaffiliates to market to you<br>State laws and individual companies may give you additional rights to limit sharing. |

| Definitions | |
| --- | --- |
| **Affiliates** | Companies related by common ownership or control. They can be financial and nonfinancial companies.<br>• *Our affiliates include companies that are owned in whole or in part by Anywhere Real Estate Inc., such as Better Homes and Gardens® Real Estate, CENTURY 21®, Coldwell Banker®, Coldwell Banker Commercial®, The Corcoran Group®, ERA®, Sotheby's International Realty®, Anywhere Advisors LLC, Cartus, Anywhere Leads Inc. and Anywhere Integrated Services LLC.* |
| **Nonaffiliates** | Companies not related by common ownership or control. They can be financial and nonfinancial companies.<br>• *Equity Title Company does not share with nonaffiliates so they can market to you* |
| **Joint marketing** | A formal agreement between nonaffiliated financial companies that together market financial products or services to you.<br>• *Equity Title Company does not share with nonaffiliated financial companies for joint marketing purposes* |

| Other Important Information | |
| --- | --- |
| **For European Union Customers** | Please see our Privacy Policy located at<br>https://www.anywhere.re/privacypolicy |
| **For our California Customers** | Please see our notice about the California Consumer Protection Act located at https://www.anywhere.re/privacypolicy |

*[PAGE 2-2]*

## Equity Title Company
### Available Discounts

Equity Title Company is pleased to inform you that upon proper qualification, there are premium discounts available upon the purchase of title insurance covering improved property with a one to four family residential dwelling.

Such discounts could apply to:

- Property located within an area proclaimed a state or federal disaster area
- Property purchased from a foreclosing beneficiary or successful bidder at a foreclosure sale
- Property being refinanced

Please talk with your title officer to determine your qualification for any of these discounts.

## EXHIBIT B (Revised 11-09-2018)
## LIST OF PRINTED EXCEPTIONS AND EXCLUSIONS  (By Policy Type)

**1.  CALIFORNIA LAND TITLE ASSOCIATION STANDARD COVERAGE POLICY – 1990 (Revised 11/09/2018)**

**EXCLUSIONS FROM COVERAGE**

The following matters are expressly excluded from the coverage of this policy and the Company will not pay loss or damage, costs, attorneys' fees or expenses which arise by reason of:

1. (a)  Any law, ordinance or governmental regulation (including but not limited to building and zoning laws, ordinances, or regulations) restricting, regulating, prohibiting or relating to (i) the occupancy, use or enjoyment of the land; (ii) the character, dimensions or location of any improvement now or hereafter erected on the land; (iii) a separation in ownership or a change in the dimensions or area of the land or any parcel of which the land is or was a part; or (iv) environmental protection, or the effect of any violation of these laws, ordinances or governmental regulations, except to the extent that a notice of enforcement thereof or a notice of a defect, lien or encumbrance resulting from a violation or alleged violation affecting the land has been recorded in the public records at Date of Policy.

   (b)  Any governmental police power not excluded by (a) above, except to the extent that a notice of the exercise thereof or a notice of a defect, lien or encumbrance resulting from a violation or alleged violation affecting the land has been recorded in the public records at Date of Policy.

2. Rights of eminent domain unless notice of the exercise thereof has been recorded in the public records at Date of Policy, but not excluding from coverage any taking which has occurred prior to Date of Policy which would be binding on the rights of a purchaser for value without knowledge.

3. Defects, liens, encumbrances, adverse claims, or other matters:
   (a)  whether or not recorded in the public records at Date of Policy, but created, suffered, assumed or agreed to by the insured claimant;
   (b)  not known to the Company, not recorded in the public records at Date of Policy, but known to the insured claimant and not disclosed in writing to the Company by the insured claimant prior to the date the insured claimant became an insured under this policy;
   (c)  resulting in no loss or damage to the insured claimant;
   (d)  attaching or created subsequent to Date of Policy; or
   (e)  resulting in loss or damage which would not have been sustained if the insured claimant had paid value for the insured mortgage or for the estate or interest insured by this policy.

4. Unenforceability of the lien of the insured mortgage because of the inability or failure of the insured at Date of Policy, or the inability or failure of any subsequent owner of the indebtedness, to comply with the applicable "doing business" laws of the state in which the land is situated.

5. Invalidity or unenforceability of the lien of the insured mortgage, or claim thereof, which arises out of the transaction evidenced by the insured mortgage and is based upon usury or any consumer credit protection or truth in lending law.

6. Any claim, which arises out of the transaction vesting in the named insured the estate or interest insured by their policy or the transaction creating the interest of the insured lender, by reason of the operation of federal bankruptcy, state insolvency or similar creditors' rights laws.

**EXCEPTIONS FROM COVERAGE - SCHEDULE B PART 1**

This policy does not insure against loss or damage (and the Company will not pay costs, attorneys' fees or expenses) which arise by reason of:

1. Taxes or assessments which are not shown as existing liens by the records of any taxing authority that levies taxes or assessments on real property or by the public records.  Proceedings by a public agency which may result in taxes or assessments, or notice of such proceedings, whether or not shown by the records of such agency or by the public records.

2. Any facts, rights, interests or claims which are not shown by the public records but which could be ascertained by an inspection of the land or which may be asserted by persons in possession thereof.

3. Easements, liens or encumbrances, or claims thereof, which are not shown by the public records.

4. Discrepancies, conflicts in boundary lines, shortage in area, encroachments, or any other facts which a correct survey would disclose, and which are not shown by the public records.

5. (a) Unpatented mining claims; (b) reservations or exceptions in patents or in Acts authorizing the issuance thereof; (c) water rights, claims or title to water, whether or not the matters excepted under (a), (b), or (c) are shown by the public records.

6. Any lien, or right to a lien, for services, labor or material unless such lien is shown by the public records at Date of Policy.

**2.  CLTA HOMEOWNER'S POLICY OF TITLE INSURANCE 2013 / ALTA HOMEOWNER'S POLICY OF TITLE INSURANCE 2013 (Revised 12/02/13)**

Covered Risks 16 (Subdivision Law Violation), 18 (Building Permit), 19 (Zoning) and 21 (Encroachment of boundary walls or fences) are subject to Deductible Amounts and Maximum Dollar Limits of Liability

**EXCLUSIONS FROM COVERAGE**

In addition to the exceptions in Schedule B, you are not insured against loss, costs, attorneys' fees, and expenses resulting  from:

1. Governmental police power, and the existence or violation of any law or government regulation.  This includes building and zoning ordinances and also laws and regulations  concerning:
   (a) building
   (b) zoning
   (c) land use;
   (d) improvements on the land
   (e) land division
   (f)  environmental protection.
      This exclusion does not limit the coverage described in Covered Risk 8a, 14, 15, 16, 18, 19, 20, 23, or 27.

2. The failure of Your existing structures, or any part of them, to be constructed in accordance with applicable building codes. This Exclusion does not limit coverage described in Covered Risk 14 or 15.

3. The right to take the land by condemning it This Exclusion does not limit the coverage described in Covered Risk 17.

4. Risks:
   (a)  that are created, allowed, or agreed to by You, whether  or not they appear in the Public Records;
   (b)  that are Known to You at the Policy Date, but not to Us, unless they appear in the Public Records at the Policy Date;
   (c)  that result in no loss to You; or
   (d)  that first occur after the Policy Date -- this does not limit the coverage described in Covered Risk 7, 8.e, 25, 26, 27, or 28.

5. Failure to pay value for Your Title.

6. Lack of a right:
   (a)  to any Land outside the area specifically described and referred to in paragraph 3 of Schedule A; and
   (b)  in streets, alleys, or waterways that touch the Land.
   This Exclusion does not limit the coverage described in Covered Risk 11 or 21.

7. The transfer of the Title to You is invalid as a preferential transfer or as a fraudulent transfer or conveyance under federal bankruptcy, state insolvency, or similar creditor's rights laws.

8. Contamination, explosion, fire, flooding, vibration, fracturing, earthquake, or subsidence.

9. Negligence by a person or an Entity exercising a right to extract or develop minerals, water, or any other substances.

**3. ALTA EXPANDED COVERAGE RESIDENTIAL LOAN POLICY  (12/02/13)**

**EXCLUSIONS FROM COVERAGE**

The following matters are expressly excluded from the coverage of this policy and the Company will not pay loss or damage, costs, attorney's fees or expenses which arise by reason of:

1. (a)  Any law, ordinance, permit, or governmental regulation (including those relating to building and zoning) restricting, regulating, prohibiting, or relating to
      (i)  the occupancy, use, or enjoyment of the Land;
      (ii) the character, dimensions, or location of any improvement erected on the Land;
      (iii)      the subdivision of land; or
      (iv)      environmental protection;
   or the effect of any violation of these laws, ordinances, or governmental regulations.
   This Exclusion 1(a) does not modify or limit the coverage provided under Covered Risk  5, 6, 13(c), 13(d), 14 or 16.
   (b)  Any governmental police power.  This Exclusion 1(b) does not modify or limit the coverage provided under Covered Risk 5, 6, 13(c), 13(d), 14 or 16.

2. Rights of eminent domain. This Exclusion does not modify or limit the coverage provided under Covered Risk 7 or 8.

3. Defects, liens, encumbrances, adverse claims, or other matters
   (a)  created, suffered, assumed, or agreed to by the Insured Claimant;
   (b)  not Known to the Company, not recorded in the Public Records at Date of Policy, but Known to the Insured Claimant and not disclosed in writing to the Insured Claimant prior to the date the Insured Claimant became an Insured under this policy;
   (c)  resulting in no loss or damage to the Insured Claimant;
   (d)  attaching or created subsequent to Date of Policy (however, this does not modify or limit the coverage provided under Covered Risk 11, 16, 17, 18, 19, 20, 21, 22, 23, 24, 27 or 28); or

(e)  resulting in loss or damage that would not have been sustained if the Insured Claimant had paid value for the Insured Mortgage.
4.  Unenforceability of the lien of the Insured Mortgage because of the inability or failure of an Insured to comply with applicable doing-business laws of the state where the Land is situated.
5.  Invalidity or unenforceability in whole or in part of the lien of the Insured Mortgage that arises out of the transaction evidenced by the Insured Mortgage and is based upon usury, or any consumer credit protection or truth-in-lending law.  This Exclusion does not modify or limit the coverage provided in Covered Risk 26.
6.  Any claim of invalidity, unenforceability or lack of priority of the lien of the Insured Mortgage as to Advances or modifications made after the Insured has Knowledge that the vestee shown in Schedule A is no longer the owner of the estate or interest covered by this policy. This Exclusion does not modify or limit the coverage provided in Covered Risk 11.
7.  Any lien on the Title for real estate taxes or assessments imposed by governmental authority and created or attaching subsequent to Date of Policy. This Exclusion does not modify or limit the coverage provided in Covered Risk 11(b) or 25.
8.  The failure of the residential structure, or any portion of it, to have been constructed before, on or after Date of Policy in accordance with applicable building codes.  This Exclusion does not modify or limit the coverage provided in Covered Risk 5 or 6.
9.  Any claim, by reason of the operation of federal bankruptcy, state insolvency, or similar creditors' rights laws, that the transaction creating the lien of the Insured Mortgage, is
    (a)  a fraudulent conveyance or fraudulent transfer, or
    (b)  a preferential transfer for any reason not stated in Covered Risk 27(b) of this policy.
10.  Contamination, explosion, fire, flooding, vibration, fracturing, earthquake, or subsidence.
11.  Negligence by a person or an Entity exercising a right to extract or develop minerals, water, or any  other substances.

### 4. 2006 ALTA LOAN POLICY (06-17-06)

#### EXCLUSIONS FROM COVERAGE

The following matters are expressly excluded from the coverage of this policy, and the Company will not pay loss or damage, costs, attorneys' fees, or expenses that arise by reason of:
1.  (a) Any law, ordinance, permit, or governmental regulation (including those relating to building and zoning) restricting, regulating, prohibiting, or relating to
        (i)       the occupancy, use, or enjoyment of the Land;
        (ii)      the character, dimensions, or location of any improvement erected on the Land;
        (iii)     the subdivision of land; or environmental protection;
    or the effect of any violation of these laws, ordinances, or governmental regulations. This Exclusion 1(a) does not modify or limit the coverage provided under Covered Risk 5.
    (b) Any governmental police power. This Exclusion 1(b) does not modify or limit the coverage provided under Covered Risk 6.
2.  Rights of eminent domain.  This Exclusion does not modify or limit the coverage provided under Covered Risk 7 or 8.
3.  Defects, liens, encumbrances, adverse claims, or other matters
    (a) created, suffered, assumed, or agreed to by the Insured Claimant;
    (b) not Known to the Company, not recorded in the Public Records at Date of Policy, but Known to the Insured Claimant and not disclosed in writing to the Company by the Insured Claimant prior to the date the Insured Claimant became an Insured under this policy;
    (c) resulting in no loss or damage to the Insured Claimant;
    (d) attaching or created subsequent to Date of Policy (however, this does not modify or limit the coverage provided under Covered Risk 11, 13, or 14); or
    (e) resulting in loss or damage that would not have been sustained if the Insured Claimant had paid value for the Insured Mortgage.
4.  Unenforceability of the lien of the Insured Mortgage because of the inability or failure of an Insured to comply with applicable doing-business laws of the state where the Land is situated.
5.  Invalidity or unenforceability in whole or in part of the lien of the Insured Mortgage that arises out of the transaction evidenced by the Insured Mortgage and is based upon usury or any consumer credit protection or truth-in-lending law.
6.  Any claim, by reason of the operation of federal bankruptcy, state insolvency, or similar creditors' rights laws, that the transaction creating the lien of the Insured Mortgage, is
    (a) a fraudulent conveyance or fraudulent transfer, or
    (b) a preferential transfer for any reason not stated in Covered Risk 13(b) of this policy.
7.  Any lien on the Title for real estate taxes or assessments imposed by governmental authority and created or attaching between Date of Policy and the date of recording of the Insured Mortgage in the Public Records. This Exclusion does not modify or limit the coverage provided under Covered Risk 11(b).

The above policy form may be issued to afford either Standard Coverage or Extended Coverage.  In addition to the above Exclusions from Coverage, the Exceptions from Coverage in a Standard Coverage policy will also include the following Exceptions from Coverage:

#### EXCEPTIONS FROM COVERAGE

This policy does not insure against loss or damage (and the Company will not pay costs, attorneys' fees or expenses) that arise by reason of:
1.  Taxes or assessments which are not shown as existing liens by the records of any taxing authority that levies taxes or assessments on real property or by the public records.  Proceedings by a public agency which may result in taxes or assessments, or notice of such proceedings, whether or not shown by the records of such agency or by the public records.
2.  Any facts, rights, interests or claims which are not shown by the public records but which could be ascertained by an inspection of the land or which may be asserted by persons in possession thereof.
3.  Easements, liens or encumbrances, or claims thereof, which are not shown by the public records.
4.  Discrepancies, conflicts in boundary lines, shortage in area, encroachments, or any other facts which a correct survey would disclose, and which are not shown by the public records.
5.  (a) Unpatented mining claims; (b) reservations or exceptions in patents or in Acts authorizing the issuance thereof; (c) water rights, claims or title to water, whether or not the matters excepted under (a), (b), or (c) are shown by the public records.
6.  Any lien, or right to a lien, for services, labor or material unless such lien is shown by the Public Records at Date of Policy.

### 5. 2006 ALTA OWNER'S POLICY (06-17-06)

#### EXCLUSIONS FROM COVERAGE

The following matters are expressly excluded from the coverage of this policy, and the Company will not pay loss or damage, costs, attorneys' fees or expenses that arise by reason of:
1.  (a) Any law, ordinance, permit, or governmental regulation (including those relating to building and zoning) restricting, regulating, prohibiting, or relating to
        (i) the occupancy, use, or enjoyment of the Land;
        (ii) the character, dimensions, or location of any improvement erected on the Land;
        (iii) the subdivision of land; or
        (iv) environmental protection;
    or the effect of any violation of these laws, ordinances, or governmental regulations. This Exclusion 1(a) does not modify or limit the coverage provided under Covered Risk 5.
    (b) Any governmental police power.  This Exclusion 1(b) does not modify or limit the coverage provided under Covered Risk 6.
2.  Rights of eminent domain.  This Exclusion does not modify or limit the coverage provided under Covered Risk 7 or 8.
3.  Defects, liens, encumbrances, adverse claims, or other matters
    (a) created, suffered, assumed, or agreed to by the Insured Claimant;
    (b) not Known to the Company, not recorded in the Public Records at Date of Policy, but Known to the Insured Claimant and not disclosed in writing to the Company by the Insured Claimant prior to the date the Insured Claimant became an Insured under this policy;
    (c) resulting in no loss or damage to the Insured Claimant;
    (d) attaching or created subsequent to Date of Policy (however, this does not modify or limit the coverage provided under Covered Risk 9 and 10); or
    (e) resulting in loss or damage that would not have been sustained if the Insured Claimant had paid value for the Title.
4.  Any claim, by reason of the operation of federal bankruptcy, state insolvency, or similar creditors' rights laws, that the transaction vesting the Title as shown in Schedule A, is
    (a) a fraudulent conveyance or fraudulent transfer, or
    (b) a preferential transfer for any reason not stated in Covered Risk 9 of this policy.
5.  Any lien on the Title for real estate taxes or assessments imposed by governmental authority and created or attaching between Date of Policy and the date of recording of the deed or other instrument of transfer in the Public Records that vests Title as shown in Schedule A.

The above policy form may be issued to afford either Standard Coverage or Extended Coverage.  In addition to the above Exclusions from Coverage, the Exceptions from Coverage in a Standard Coverage policy will also include the following Exceptions from Coverage:

#### EXCEPTIONS FROM COVERAGE

This policy does not insure against loss or damage (and the Company will not pay costs, attorneys' fees or expenses) that arise by reason of:
1.  Taxes or assessments which are not shown as existing liens by the records of any taxing authority that levies taxes or assessments on real property or by the public records.  Proceedings by a public agency which may result in taxes or assessments, or notice of such proceedings, whether or not shown by the records of such agency or by the public records.
2.  Any facts, rights, interests or claims which are not shown by the public records but which could be ascertained by an inspection of the land or which may be asserted by persons in possession thereof.
3.  Easements, liens or encumbrances, or claims thereof, which are not shown by the public records.
4.  Discrepancies, conflicts in boundary lines, shortage in area, encroachments, or any other facts which a correct survey would disclose, and which are not shown by the public records.
5.  (a) Unpatented mining claims; (b) reservations or exceptions in patents or in Acts authorizing the issuance thereof; (c) water rights, claims or title to water, whether or not the matters excepted under (a), (b), or (c) are shown by the public records.
6.  Any lien, or right to a lien, for services, labor or material unless such lien is shown by the Public Records at Date of Policy.

Exhibit 3

### PURCHASE AND SALE AGREEMENT

PURCHASE AND SALE AGREEMENT dated as of September 28, 2018 (this "**Agreement**", and such date, the "**Effective Date**") among **SKYLARK CAPITAL MANAGEMENT, LLC**, a California limited liability company (together with any assignee of its rights hereunder, "**Buyer**"), **TREE LANE, LLC**, a California limited liability company ("**Seller**"), and Mohamed Hadid, an individual who, directly or indirectly owns all of the equity interests in Seller ("**Mr. Hadid**", or, together with Seller, sometimes the "**Seller Parties**"). Buyer, Seller and Mr. Hadid are referred to collectively herein as the "**Parties**" and each of them individually as a "**Party**".

### RECITALS

A.      Seller owns certain undeveloped real property consisting of approximately 4.02 acres located in the City of Los Angeles, County of Los Angeles, California more particularly described (via metes and bounds) on **Exhibit A-1** attached hereto (the "**Land**").

B.      Buyer desires to purchase, and Seller desires to sell, the Property (defined below) on the terms and conditions set forth below.

### AGREEMENT

NOW, THEREFORE, in consideration of mutual covenants set forth herein and for other consideration the receipt and sufficiency of which is hereby acknowledged, Seller Parties and Buyer hereby agree as follows:

1.      **Purchase and Sale**. Upon the terms and conditions set forth herein, Buyer agrees to buy from Seller, and Seller agrees to sell to Buyer, the Property (as hereinafter defined), which constitutes the portion of the Land designated in the site plan attached hereto as **Exhibit B**, which shall be a 50,000-60,000 square foot lot sufficient to construct the Improvements (as defined in **Section 5(d)**) and shall be more particularly described on **Exhibit A-2** attached hereto and made a part hereof, together with all rights, privileges, easements, tenements, hereditaments, rights-of-way and other appurtenances thereon or in any way pertaining thereto, development rights, air and water rights to the extent owned by the Seller (collectively, the "**Real Property**"). The "**Property**" shall include the Real Property and does not include any equipment or other personal property but shall expressly include all intangible personal property, if any, owned by Seller and related to the Property that can be assigned, including, without limitation: any warranties, surveys, engineering reports and other material technical information relating to the Real Property and/or the improvements (if any); any Contracts (as defined in **Section 9(a)** below) and other contract rights related to the Property (but only to the extent Seller's obligations thereunder are expressly assumed by Buyer); and any governmental permits, approvals and licenses (including any pending applications) (collectively, the "**Intangible Property**"), all to be assigned to Buyer at Closing. If the assignment of any such Intangible Property requires the approval of a third party, Seller Parties will use best efforts to obtain any necessary approvals allowing for such assignment.

a.      Land Division. It is understood and agreed by and between or among Buyer and Seller Parties that, in order to accomplish the sale of the Property to Buyer, Seller must complete a subdivision of the Land (the "**Land Division**"). The Land Division shall be at Seller Parties' sole cost and expense, and in furtherance hereof Seller Parties shall cause the Land to be subdivided into

Exhibit 3, Page 51

two (2) separate legal parcels, one of which shall be the Real Property, in compliance with the California Subdivision Map Act. Seller Parties' acknowledge the existence of that certain Covenant and Agreement to Hold Property as One Parcel dated December 17, 1985 and recorded on December 18, 1995 as document number 85-1494484 (the "**Covenant and Agreement**") restricting the subdivision of the Land; Seller Parties shall cause the Covenant and Agreement to be released removed by the City of Los Angeles ("**City**") prior to Closing so that the Land Division can be accomplished in strict accordance with this Agreement. The Land Division shall be deemed complete upon the recordation by Seller of a parcel map, a tract map or another instrument, approved by the City or applicable governing body, such that the Real Property constitutes a separate legal parcel / lot that is legally identifiable as separate and distinct from the remainder of the Land, which remainder shall continue to be Seller's property (Seller's "**Hadid Parcel**"). Seller Parties shall complete the Land Division prior to Closing, which shall occur not later than the Outside Closing Date (as hereinafter defined). As part of the Land Division, Seller Parties shall also cause, at Seller Parties' sole cost and expense, an updated survey ("**Survey**") of the Real Property to be made and certified by a reputable and competent registered land surveyor and such Survey shall be delivered to Buyer and Seller. The Land Division is a non-waivable condition to closing for the benefit of Buyer. Once the Land Division is completed, **Exhibit A-2** of this Agreement shall be automatically amended to include the updated legal description of the Real Property being purchased by Buyer at Closing. In the event that Seller fails, though no fault of Buyer, to cause the Land Division to actually occur prior to March 31, 2020 (the "**Outside Subdivision Date**"), then Buyer shall be entitled to terminate this Agreement, the Earnest Money (*less* the Independent Consideration) shall be returned by Seller Parties to Buyer, and Buyer may elect its choice of remedies pursuant to **Section 16(b)** of this Agreement.

       <u>Power of Attorney</u>. Seller hereby irrevocably makes, constitutes and appoints Buyer or any of Buyer's designees as Seller's true and lawful attorney-in-fact with full power, to take any action available to Seller to effect or in furtherance of the Land Division, and execute any document or instrument in the name and on behalf of Seller which is necessary or desirable in connection therewith, and record any document or instrument in the official records of the City of Los Angeles or County of Los Angeles, as applicable, and to do any and all other acts necessary or proper to carry out the intent of this Agreement and effect the Land Division, in any such case if Seller fails so to do not later than eighteen months after the Effective Date, *provided* that prior to the first exercise of this power of attorney, Buyer shall make written demand upon Seller Parties for full performance of their obligations under this **Section 1(a)** at least 30 days prior to such first exercise (which demand shall be made no earlier than 30 days prior to the end of such eighteen month period after the Effective Date). Each Seller Party hereby ratifies and confirms all that Buyer or its designee as such attorney-in-fact shall properly do by virtue of this power of attorney.

       b.    <u>Construction of Driveway Across the Hadid Parcel</u>. In connection with the Land Division, Seller Parties shall cause, at Seller Parties' sole cost and expense, the creation, grading and construction of a driveway at the access way to the Hadid Parcel from Summitridge Drive depicted on the site plan attached hereto as **Exhibit B**, and running across and over the Hadid Parcel to and through the Real Property ("**Driveway**") for the purpose of granting the owner of the Real Property unrestricted ingress / egress rights to the Real Property, all as to be more particularly set forth on the parcel map prepared in connection with the Land Division. The Parties acknowledge that, after the Land Division is completed, the two subdivided parcels which comprise the Land will share a common gated access way from Summitridge Drive, which would be a shared driveway subject to the REA (as hereinafter defined); *provided*, that Buyer may acquire (if available), at its election and at its own expense, an easement in the parcel adjacent to the Land for ingress / egress

rights to the Real Property, in which event, the 'Driveway' shall be direct access from Summitridge Drive to the Real Property across such easement, and shall be private to the Real Property, as depicted in **Exhibit B**.

      c.    Easement / Shared Access Agreement. Prior to the expiration of the Feasibility Period, Buyer and Seller Parties shall cooperate and use good faith efforts to agree upon the final form of an easement / shared access agreement ("**REA**") to be executed and notarized by the Parties and recorded at Closing.   The REA shall contain Seller Parties' obligations respecting the construction of the Driveway and customary provisions for granting perpetual shared access to each Party's respective parcel / lot (*i.e.*, Buyer shall have access to the Real Property and Seller shall have access to the Hadid Parcel). In addition, the REA shall contain such other provisions and restrictions as Buyer and Seller may reasonably deem appropriate including: (a) utility access rights of Buyer to construct utilities from Summitridge Drive to the Real Property; (b) the shared obligations of each party to maintain and repair the Driveway (subsequent to the initial construction by Seller), (c) any landscaping or building restrictions respecting walls or fences along any shared property line deemed mutually agreeable to the parties.  For avoidance of doubt, the rights and obligations set forth in the REA shall be perpetual and shall "run with the land" for the benefit of each of the Real Property and the Remainder Property as applicable. If the Parties cannot agree on the final form of the REA prior to the initially determined expiration of the Feasibility Period, the same shall be extended for such additional time as reasonably deemed necessary by Buyer to finalize the REA; *provided*, that, in the event such extension of the Feasibility Period exceeds the Outside Closing Date, then Buyer may elect to terminate this Agreement, in which case this Agreement shall automatically terminate, the Earnest Money shall be returned by Seller Parties to Buyer, and the Parties shall have no further obligation hereunder except for those duties that expressly survive the termination of this Agreement.

    **2.**    **Purchase Price**:  The Purchase Price shall be One Million And No/100 Dollars ($1,000,000.00) payable in cash through escrow at Close of Escrow (as hereinafter defined) except as otherwise provided herein.

    **3.**    **Escrow**:  This Agreement shall be consummated through Fidelity National Title Insurance Company, as escrow holder (attention: Bobbie Purdy, email: BobbiePurdyTeam@fnf.com) (in such capacity, "**Escrow Holder**") and issuer of the Title Policy (as hereinafter defined) (attention: Michael Brinkman, email: mike.brinkman@fnf.com) (in such capacity, "**Title Company**").  Buyer and Seller shall deliver a signed copy of this Agreement to Escrow Holder within one (1) business day following Buyer and Seller Parties' mutual acceptance and execution of this Agreement and escrow shall be deemed opened when Escrow Holder delivers a countersigned copy of this Agreement to all parties hereto ("**Opening of Escrow**").   Additionally, within three (3) business days following Opening of Escrow, or as soon as possible thereafter, Escrow Holder is instructed to deliver a current commitment for title insurance ("**Title Commitment**"), including legible copies of all referenced documents, to Buyer.

    **4.**    **Earnest Money**:

      a.    Within thirty (30) days after the Effective Date, Buyer shall deliver to Seller a deposit in the amount of Five Hundred Thousand and No/100 Dollars ($500,000.00) (the "**Earnest Money**").  The Earnest Money shall be fully refundable by Seller Parties to Buyer until such time as Buyer has waived all contingency items to Buyer's full satisfaction by delivering an "**Approval Notice**" (as defined in **Section 5(f)** below) to Seller on or before the expiration of the Feasibility

Period. At Closing, to the extent the same occurs, the Earnest Money shall be retained by Seller in partial payment of the Purchase Price at Close of Escrow.

        b.        Contemporaneously with the execution and delivery of this Agreement, Buyer shall deliver to Seller as further consideration for this Agreement, in cash, the sum of One Hundred And No/100 Dollars ($100.00) (the "**Independent Consideration**"), in addition to the Purchase Price and independent of any other consideration provided hereunder, which Independent Consideration is consideration for Seller entering into this Agreement, fully earned by Seller upon delivery and is non-refundable under any circumstances. At Closing, to the extent the same occurs, the Independent Consideration shall be applied as a credit against the Purchase Price.

       **5.**        **Buyer's Feasibility Period and Title Review**.

        a.        Delivery of Materials.  Within five (5) days following the Effective Date, Seller shall provide Buyer with copies of all reports, studies, legal documents and correspondence ("**Seller's Due-Diligence Information**") affecting the Property for which Seller has actual knowledge of and are in Seller's possession or control, including, but not limited to, the following items: (i) surveys, (ii) soils density reports, (iii) environmental reports, (iv) plans and specifications for improvements, (v) any option or use agreements (all of which shall be terminated prior to the Close of Escrow), and (vi) correspondence with the City and/or other governmental agencies exercising authority over the Property, (vii) any third party contracts or agreements that encumber or affect the property in any manner, and (viii) any other information relevant to the Property.

        b.        Feasibility Period.  In addition to any other contingency expressly set forth in this Agreement, Buyer shall initially have until September 30, 2019 (following the Effective Date, the "**Feasibility Period**"), to conduct Buyer's due diligence and to complete a feasibility study for its proposed development of the Property, including evaluating title and the environmental condition of the Property (together with the Governmental Approvals below, "**Buyer's Contingencies**"). Buyer and its affiliates, employees, attorneys, lenders (including prospective lenders), agents, contractors, consultants, investors, and representatives (collectively, "**Buyer's Agents**") may enter the Property and undertake any and all necessary studies, tests and assessments as Buyer deems necessary to evaluate the condition of the Property, at Buyer's sole cost.  Buyer shall be responsible for curing any liens that may attach to the Property arising out of Buyer's testing or inspections and Buyer's Pre-Closing construction of the Improvements (defined below), and shall hold harmless, defend and indemnify Seller Parties from any actual costs, claims or liabilities arising out of work done by or on behalf of Buyer (or Buyer's Agents) on or about the Property except for those costs, claims or liabilities caused by the negligence of the Seller Parties or Seller's breach of this Agreement. Additionally, during the Feasibility Period, Buyer or Buyer's Agents may apply for or request, at Buyer's expense, any and all Government Approvals (defined below) or other approvals or permits from all applicable governing agencies, with conditions of approval acceptable to Buyer, in Buyer's sole and absolute discretion, necessary to permit the development of the Improvements (defined below) and Seller shall cooperate, in good faith, and assist Buyer or Buyer's Agents with all aspects of the procurement of such Government Approvals at all times prior to Closing. Each of Buyer's, Seller's and Seller Parties' respective obligations herein shall survive the termination of this Agreement or Closing.

        c.        Feasibility Studies.  At all times prior to Closing (or, at Buyer's election, the earlier terminating of this Agreement), Buyer or Buyer's Agents shall be permitted to perform any environmental tests or studies on the Property. In connection with such studies, Buyer agrees to

provide (or cause Buyer's Agents to provide) reasonable liability insurance, which shall name Seller as an additional insured or loss payee. All information derived from Buyer's tests and test results shall, to the extent permissible under existing law, remain confidential and not be disclosed to any party other than as is necessary to consummate the transaction contemplated hereby or to exercise Buyer's rights hereunder, including, without limitation, Buyer's Agents, Buyer's counsel and any other consultants. The foregoing confidentiality provision shall survive the termination of this Agreement, but not the consummation of the purchase and sale contemplated hereby. Buyer shall furnish a copy to Seller of any reports or analyses (without warranty as to accuracy, completeness or reliability) at the time Buyer receives any such report or analysis, which are prepared by third parties as part of Buyer's feasibility study of the Property. Buyer shall bear the costs and expenses with respect to its feasibility studies hereunder, including, without limitation, all environmental matters and investigations.

      d.    <u>Pre-Closing Construction of the Improvements</u>.  Seller hereby acknowledges and agrees that at all times from and after the Effective Date and prior to Closing, Buyer shall be permitted to construct the Improvements on the Real Property in accordance with this **Section 5(d)**. The term "**Improvements**" includes all improvements necessary or desirable for the construction of a not less than 20,000 square feet above-grade single family residence on the Real Property substantially as depicted in **Schedule B**.

      i.    The Parties acknowledge and agree that all architect drawings, plans and specifications required for Buyer's development of the Real Property and construction of the Improvements shall be prepared and implemented in general conformance with the site plan attached hereto as **Exhibit "B"** ("**Site Plan**"), provided that such final drawings, plans and specifications (and expressly including the Site Plan) shall be subject to Buyer's final review and approval and may be revised by Buyer, in Buyer's sole and absolute discretion, as deemed necessary by Buyer in order to Complete the Improvements. Seller Parties shall reasonably cooperate, in good faith, as required by Buyer respecting the construction of the Improvements, including, without limitation, timely execution and delivery of contraction documents, contracts and supplementary documents as may be deemed necessary by Buyer to enable Buyer to complete the Improvements as planned. Contracts, documents and any other materials prepared (or deemed necessary by Buyer) in connection with the proposed construction of the Improvements shall be referred to herein collectively as the "**Proposed Plans**" or singly as a "**Proposed Plan**".

      ii.    Within three (3) business days of the submission of any Proposed Plan by Buyer to Seller which requires the approval or cooperation of Seller Parties, Seller Parties shall provide such approval or (to the extent applicable) written notice of Seller Parties' approval. Buyer acknowledges and agrees that all final plans shall remain subject to approval by the applicable governing body. In addition, Seller shall cooperate and use good faith efforts to assist Buyer in the revision of any approved plans to resolve differences between version of the approved plans and the requirements of the City.

      iii.    Buyer, without cost or expense to Seller, shall undertake to obtain all necessary governmental approvals, licenses and permits from each and every authority having jurisdiction thereof for the construction of the Improvements, including, but not limited to, conditional use permits, excavation, building and use permits, architectural approvals and environmental permits and approvals (collectively, the "**Government Approvals**"). Seller shall cooperate, in good faith, and assist Buyer or Buyer's Agents with all aspects of the procurement of such Government Approvals at all times prior to Closing. Government Approvals shall specifically

include the actual building permit that authorizes the contractor to commence construction of the Improvements prior to Closing.

        iv.     Buyer shall, at Buyer's sole cost and in its sole discretion, select a contractor or contractors for the construction of the Improvements ("**Contractor**") and shall enter into a contract or contracts for such construction (collectively, the "**Construction Contract**"). Seller shall cooperate, in good faith, and assist Buyer or Buyer's Agents with all aspects of the procurement of such Construction Contract at all times prior to Closing.

        v.     Buyer and Seller agree to cooperate and use commercially reasonable good faith efforts to cause any shared expenses (i.e., "hook-up" or "connection" fees or deposits required to be paid to providers of utility services as a condition to the mutual benefit of the Real Property and the Hadid Parcel receiving such service) (collectively, "**Shared Construction Expenses**") to be split equally (50/50) between Buyer and Seller. Seller shall pay its share of the Shared Construction Expenses within ten (10) days after receipt of any such request. The obligations pursuant to this **Section 5(d)** shall expressly survive Closing.

        e.     Title Objections. Prior to the expiration of the Feasibility Period, Buyer shall have the right to object in writing to any title matters that appear on the Title Commitment, and/or the Survey, (collectively, the "**Title Objections**"). After the expiration of the Feasibility Period and at any time prior to Closing, Buyer shall have the right to object in writing to any title matters which adversely affect Buyer's title to the Real Property (as reasonably determined by Buyer in good faith) if (i) such matters first appear on any update to the Title Commitment issued after the expiration of the Feasibility Period or in an Updated Survey (which is a survey delivered to Buyer after the end of the Feasibility Period that is based on information not known to Buyer prior to the end of the Feasibility Period), and (ii) such new title or survey exception was not caused by Buyer (collectively, the "**New Title Matters**").

        f.     Seller's Cure Option. Prior to the expiration of the Feasibility Period, Seller may elect to remove any such Title Objections of Buyer and Seller may notify Buyer in writing within five (5) days after receipt of Buyer's notice of Buyer's applicable Title Objections. Within three (3) business days after Seller's election or deemed election (but, in any event, prior to the expiration of the Closing Date), Buyer may elect in in its sole and absolute discretion in writing to either (i) terminate this Agreement, in which event the Earnest Money (*less* the Independent Consideration) shall be automatically returned to Buyer by Seller Parties, this Agreement shall automatically terminate and the parties shall have no further rights or obligations hereunder except for obligations which expressly survive the termination of this Agreement, or (ii) waive such Title Objections and proceed to Closing.

        g.     Buyer's Approval Notice. Except as expressly set forth herein, if the Property shall be unsatisfactory to the Buyer for any reason or no reason in the Buyer's sole and absolute discretion, then Buyer shall have the right to terminate this Agreement at any time prior to the expiration of the Feasibility Period by delivering written notice to Seller, in which event the Earnest Money (*less* the Independent Consideration) immediately shall be refunded by Seller Parties to Buyer and neither Party shall have any further rights or obligations hereunder, except for those that expressly survive such termination. In the event that the Buyer fails to terminate this Agreement prior to the end of the Feasibility Period, Buyer shall be deemed to have disapproved the condition of the Property, the Earnest Money (*less* the Independent Consideration) immediately shall be returned by Seller Parties to Buyer, this Agreement shall automatically terminate, and neither Party shall have

any further rights or obligations hereunder, except for those that expressly survive such termination. Conversely, at any time prior to the expiration of the Feasibility Period, Buyer, in its sole and absolute discretion, may approve the condition of the Property and elect to proceed to Closing in accordance with this Agreement by delivering a written notice of such approval (an "**Approval Notice**"), in which event the Earnest Money shall be nonrefundable to the Buyer, except as otherwise expressly provided in this Agreement.

      h.    <u>Seller's Cure Responsibility</u>.  After the delivery of Buyer's Approval Notice (if at all) and prior to Closing, Seller Parties shall be affirmatively obligated to remove any and all New Title Matters and all Required Removal Items (defined below).  At any time prior to Closing, Buyer shall notify Seller of any New Title Matters that require Seller Parties' cure.  Seller shall be affirmatively obligated to cause such New Title Matters to be cured prior to Closing.  If Seller elects or is deemed to have elected not to remove one or more of Buyer's Title Objections or New Title Matters, then, within three (3) business days after Seller's election or deemed election (but, in any event, prior to the Closing Date), Buyer may elect in its sole and absolute discretion in writing to either (i) exercise Buyer's rights and/or remedies under **Section 16(b)**, or (ii) waive such New Title Matters and proceed to Closing.

      i.    <u>Required Removal Exceptions</u>.  Notwithstanding anything contained herein to the contrary, Buyer shall not be required to object to and Seller Parties shall be affirmatively obligated to remove the following title defects prior to the Closing Date, collectively referred to as the "**Required Removal Items**" (i) judgment liens, mechanic's liens, materialman's liens, real estate tax liens, or any other liens evidencing monetary encumbrances (other than liens for non-delinquent real estate taxes) created as a result of the acts or omissions of either Seller Party, its or his agents or affiliates, including any mortgage, deed of trust or other financing instrument securing indebtedness of either Seller Party or any of its or his affiliates, (ii) title matters created by either Seller Party, its or his agents or affiliates in violation of the terms of this Agreement; and (iii) any exception to title that Seller has specifically agreed in writing to remove pursuant to the terms of **Section 5(d)**.  **For avoidance of doubt, Seller Parties shall also be affirmatively required to cause the Covenant and Agreement to be released and removed or amended so as to permit the Land Division.**  If this Agreement is not terminated by Buyer in accordance with the provisions hereof, Seller Parties shall, at or prior to Closing, be obligated to remove all Required Removal Exceptions.  If Seller is unable to remove any Required Removal Exceptions prior to the Closing Date, Buyer may at Closing elect to either (A) exercise all of Buyer's rights and/or remedies under **Section 16(b)**, or (B) accept in writing such exceptions to title and solely in the event of such written waiver, the Closing shall occur as herein provided without any reduction of or credit against the Purchase Price.

      **6.**    <u>**Representations and Warranties of Seller Parties and Buyer**</u>.

      **a.**    <u>Seller Parties' Representations and Warranties</u>.  Seller Parties, jointly and severally, represents and warrants to Buyer, both as of the date hereof and as of the Closing Date, as follows (collectively, "**Seller's Warranties**"):

      i.    <u>Seller's Authorization</u>.  (a) Seller is duly or formed, validly existing and in good standing under the laws of the State of California, (b) the person(s) executing this Agreement and the Pledge Agreement (defined below) on behalf of Seller has the consent and authority to execute this Agreement and the Pledge Agreement and consummate the transaction and fulfill all of Seller's obligations hereunder and under all closing documents to be executed by Seller, and (c) such instruments, obligations and actions are valid and legally binding upon Seller,

enforceable in accordance with their respective terms. The execution and delivery of this Agreement and the Pledge Agreement and all closing documents to be executed by Seller and the performance of the obligations of Seller hereunder or thereunder will not (i) result in the violation of any law or any provision of Seller's organizational documents, (ii) conflict with any order of any court or governmental instrumentality binding upon Seller, or (iii) conflict or be inconsistent with, or result in any default under, any contract, agreement or commitment to which Seller is bound.

ii.    Title to Property.  Seller has good and marketable title to the Land, free and clear of all liens and encumbrances, except as shown on the Title Commitment.

iii.    Due Diligence Materials.  Seller Parties have delivered or otherwise made available to Buyer all books, records, and other writings in either Seller Party's, and/or any of their respective agent's, representative's or employee's possession, related in any material way to the use, ownership, development or operation of the Property.  To each Seller Party's knowledge, the documents heretofore or hereafter delivered or otherwise made available to Buyer prior to closing are true, correct and complete in all material respects.

iv.    Hazardous Materials.  Each Seller Party has no knowledge of the existence of any hazardous materials or toxic substances on the Property and has not received any notice of (i) any violation of any hazardous materials laws or (ii) any potential studies or investigations into the existence of any such environmental hazards on the Property.

v.    No Third-Party Rights.  Each Seller Party has not entered into any agreements currently in effect pursuant to which either Seller Party has granted any rights of first refusal to purchase all or any part of the Property, options to purchase all or any part of the Property or other rights whereby any individual or entity has the right to purchase all or any part of the Property.

vi.    Litigation.  To each Seller Party's knowledge, there is no action, suit, arbitration, unsatisfied order or judgment pending, or action, suit, arbitration, governmental investigation or proceeding threatened, against the Property or transaction contemplated by the Agreement, wherein either Seller Party or any of its or his affiliates is/are a plaintiff, defendant or other named party, which could individually or in the aggregate affect the Property, adversely or otherwise, or the operation thereof.

vii.    Zoning.  Each Seller Party has not received any written notice that the Property is currently in violation of any applicable zoning, building, fire or other safety laws or regulations and each Seller Party has not received any written notice of any violation, default, intended or threatened non-renewal, suspension or revocation of any licenses and permits, the loss of which would materially adversely affect the value of the Property.

viii.    Delivery of Property at Closing.  Seller shall deliver the Property at Closing free and clear of any rights of any parties claiming a possessory interest in any portion of the Property.

ix.    Compliance with Applicable Law; No Seller Party Defaults.    (i) Seller has not received any notice of a violation of any applicable law with respect to the Property which has not been cured or dismissed, (ii) no administrative proceeding, investigation or inquiry is pending or,

to either Seller Party's knowledge, threatened with respect to any violation of applicable law with respect to the Property, and (iii) to each Seller Party's knowledge, there is no violation of any applicable law with respect to the Property which has not been cured or dismissed. In addition, each Seller Party has not received nor sent any written notice of default by either Seller Party under the terms of any of any leases, service contracts, CC&Rs, restrictions running with the Land, or other contracts to which either Seller Party is a party.

        x.      <u>Bankruptcy</u>. No petition has been filed by Seller, nor has Seller received written notice of any petition filed against or by Seller under the Federal Bankruptcy Code or any similar laws and Seller has not caused, suffered or consented to the appointment of a receiver, trustee, administrator, conservator, liquidator or similar official in any federal, state or foreign judicial or non-judicial proceedings, to hold, administer and/or liquidate all or substantially all of its respective property, or made an assignment for the benefit of creditors.

        xi.      <u>Taxes / Special Assessments</u>. (a) All taxes that are due and owing by Seller with respect to the Property have been timely paid (or will be timely paid prior to the Closing Date); (b) Seller has duly and timely filed all federal, state, local and foreign tax returns with respect to the Property as required by applicable law, and such tax returns are true, correct and complete in all material respects; (c) each Seller Party has not received any written notice for an audit or examination of any taxes with respect to the Property which has not been resolved or completed; (d) no deficiency, assessment or proposed adjustment concerning any tax liability with respect to the Property has been claimed or raised by any governmental authority; and e) there is no currently pending appeal or abatement proceeding with respect to the real estate taxes assessed on the Real Property.

        xii.      <u>Exclusivity of Contract</u>. Seller has not contracted with and shall not enter into negotiations for the sale of the Property with any parties other than Buyer during the term of this Agreement.

        xiii.      <u>Employees</u>. Seller has not, nor has ever, had any employees or employment agreements or collective bargaining agreements at the Property for which Buyer will be responsible after the Closing.

        xiv.      <u>No Leases</u>.  Seller warrants that there are no Leases leasing any portion of the Property.

        xv.      <u>Condemnation</u>. Seller has received no written notice of any pending condemnation proceeding or other proceeding in eminent domain, and to Seller's knowledge, no condemnation proceeding or eminent domain proceeding is threatened affecting the Property or any portion thereof.

        xvi.      <u>Assets</u>. Seller represents and warrants that it will maintain reasonable reserves as required by law to satisfy its post-closing obligations under this Agreement.

        xvii.      <u>Good Faith</u>. Each Seller has negotiated and hereby covenants to continue to negotiate in good faith with Buyer, and Seller shall complete the Land Division and finalize the Improvements all as more particularly set forth herein.

      Seller Parties' Warranties set forth in this Agreement shall survive the Closing and not be merged therein for a period of twelve (12) months after the Closing Date (the "**Survival Period**").

     **b.**    <u>**Buyer's Representations and Warranties**</u>.  Buyer represents and warrants to Seller Parties, both as of the date hereof and as of the Closing Date, as follows (collectively, "**Buyer's Warranties**"):

        i.    <u>Buyer's Authorization</u>.  (a) Buyer is duly organized (or formed), validly existing and in good standing under the laws of the State of California, (b) the person executing this Agreement on behalf of Buyer has the consent and authority to execute this Agreement and consummate the transaction and fulfill all of Buyer's obligations hereunder and under all closing documents to be executed by Buyer, and (c) such instruments, obligations and actions are valid and legally binding upon Buyer, enforceable in accordance with their respective terms.  The execution and delivery of this Agreement and all closing documents to be executed by Buyer and the performance of the obligations of Buyer hereunder or thereunder will not (i) result in the violation of any law or any provision of Buyer's organizational documents, (ii) conflict with any order of any court or governmental instrumentality binding upon Buyer, or (iii) conflict or be inconsistent with, or result in any default under, any contract, agreement or commitment to which Buyer is bound.

        ii.    <u>Buyer's Solvency</u>.  Buyer is not bankrupt or insolvent under any applicable federal or state standard, has not filed nor intends to file at this time for protection or relief under any applicable bankruptcy or creditor protection statute, and has not been threatened by creditors with an involuntary application of any applicable bankruptcy or creditor protection statute.

        iii.    <u>Experienced Buyer</u>.  Buyer is an experienced purchaser of property similar to the size and/or function of the Property, and is familiar with matters that typically impact the future use of such property and, without limiting any representations, warranties and covenants of Seller set forth in this Agreement or any document to be delivered in connection herewith, will conduct its own investigation and inspection of the Property in reliance upon the aid and advice of Buyer's independent experts in purchasing the Property.

        iv.    <u>As-Is Condition</u>.  Except as expressly set forth in this Agreement, Seller Parties make no representations about the condition of the Property, and Buyer is relying solely on its own investigations, tests, analyses and advice of its consultants. Except in the event of fraud on the part of Seller or otherwise expressly set forth herein, including the representations, warranties and covenants of Seller, (A) Buyer is purchasing the Property in its "AS IS, WITH ALL FAULTS" condition, and (B) as of Closing, Buyer releases Seller Parties from any and all claims, demands, causes of action, obligations, damages and liabilities of any nature, known or unknown, relating to the physical condition of the Property.

        v.    <u>Release of Claims</u>.  Except as expressly set forth in this Agreement, Seller Parties have no obligation to repair, correct or compensate Buyer for any conditions of the Property, and upon Closing, Buyer shall be deemed to have waived any and all objections to the condition of the Property, whether or not known to Buyer or its officers, directors, partners, employees, agents, trustees, representatives, contractors, attorneys, successors or assigns (with Buyer, collectively, "**Buyer Parties**").  Except as otherwise provided in the Agreement, including Seller Parties' representations, warranties and covenants in the Agreement, from and after the Closing, and except with respect to any agreements which survive the Closing, Buyer hereby completely releases and forever discharges the Seller Parties and Brokers from and against all claims, liabilities, demands, judgments, damages, losses and costs (collectively, "**Claims**"), including, without limitation, those arising from or related to:  (a) any condition of the Property, whether known

or unknown by either of the parties as of Closing; (b) any claim for indemnity or contribution arising under any federal, state or local laws, statutes or regulations relating to liability of property owners for hazardous substances (as that term is defined under federal and state laws); (c) any use, handling, treatment, storage, transportation or disposal of hazardous substances at or from the Property after Closing; and (d) any latent or patent defect affecting the Property (collectively, the "**Released Matters**").  Buyer's release obligations under this **Section 6(b)(v)** shall survive the termination of the Agreement or Closing.

7.    <u>**Closing**</u>.  The closing hereunder ("**Closing**") shall be held and delivery of all items to be made at the Closing under the terms of this Agreement shall be made through escrow at Escrow Holder's office on the date that is the later to occur of (a) fifteen (15) days after the completion of the Land Division or (b) such other date and time as Buyer and Seller may mutually agree upon in writing (the "**Closing Date**" or "**Close of Escrow**"); provided that, the Closing Date shall occur no later than the date that occurs fifteen (15) days after the expiration of the Outside Subdivision Date (the "**Outside Closing Date**"), unless such extension of the Closing Date is approved by Buyer in writing.  Except as otherwise provided in this Agreement, the Outside Closing Date may not be extended without the prior written approval of both Seller Parties and Buyer.

8.    <u>**Conditions Precedent**</u>.  In addition to the documents and funds that must be placed into escrow prior to or on the Closing Date, the following are conditions precedent to Buyer's obligation to proceed with the Close of Escrow:

a.    Seller Parties' Warranties set forth herein will be true and correct in all material respects on the Closing Date;

b.    Title Company's irrevocable commitment to issue to Buyer an Owner's ALTA Extended Coverage Policy of Title Insurance in the amount of the Purchase Price showing title to the Real Property vested in Buyer (or Buyer's designee), subject only to the title exceptions approved by Buyer and otherwise in accordance with the provisions of this Agreement ("<u>**Title Policy**</u>");

c.    As of the Close of Escrow, no suit, action or other proceeding will be pending that seeks, nor will there exist any judgment the effect of which is, to restrain the purchase and sale of the Property, or otherwise prohibit Buyer's proposed ownership and use of the Property, or affect title or the condition of the Property, provided, however, that any such suit, action, proceeding, judgment, restraint, prohibition, or effect on title or Property conditions shall not have been due to any acts of the Buyer Parties or any of them;

d.    No petition has been filed by or against either Seller Party under the Federal Bankruptcy Code or any similar State or Federal Law, whether now or hereafter existing.

e.    The REA is recorded at Closing.

In the event that any condition set forth in this **Section 8** does not occur, Buyer may terminate this transaction upon written notice to Seller and Escrow Holder and the Earnest Money (less the Independent Consideration) shall be promptly returned by Seller Parties to Buyer and Buyer shall be entitled to exercise any and all remedies pursuant to **Section 16(b)** below.  In the event that Buyer does not terminate this Agreement prior to the Close of Escrow, Buyer will be deemed to have

waived the condition herein.  The foregoing, however, shall not negate or limit remedies for a breach hereof by Seller Parties, the remedies for which are set forth in **Section 16**.

9.    **Seller Parties' Covenants.**

a.    Covenants of Performance and Good Faith. On or before the Closing, Seller Parties shall cause the Land Division and the construction of the Shared Driveway to occur and shall use commercially reasonable good faith efforts to negotiate the REA and otherwise comply with the other obligations of Seller Parties under this Agreement.

b.    Maintenance of Property.  Seller Parties shall operate and maintain the Property in a manner consistent with Seller Parties' past practices with respect to the Property. Between the Effective Date and the Closing, Seller Parties will advise Buyer of any written notice either Seller Party receives after the Effective Date from any governmental authority respecting taxation, zoning, environmental notices, condemnation, Land Division, the construction of the Shared Driveway, or the violation of any laws regulating the condition or use of the Property.

10.    **Casualty and Condemnation.**

a.    Condemnation.  Prior to Closing, the risk of loss by condemnation shall remain with Seller.  In the event of the actual or threatened condemnation of all or any portion of the Property prior to the Close of Escrow or access to the Property is materially impaired, Buyer has the right to either (i) cancel this Agreement by written notice to Seller, in which event, notwithstanding anything to the contrary contained in this Agreement, all Earnest Money (*less* the Independent Consideration) will be promptly refunded by Seller Parties to Buyer, or (ii) elect to close escrow in accordance with its terms notwithstanding such actual or threatened taking, in which event all awards or payments made or to be made by the condemning authority to either Seller Party with respect to the Property will be paid over and assigned to Buyer at Close of Escrow.

b.    Casualty.  Prior to Closing, Seller Parties shall maintain adequate insurance respecting the Land and the risk of loss for any improvements affecting the Real Property other than the Improvements to be constructed by Buyer shall remain with Seller; provided that Buyer shall obtain (or if required by Buyer's insurer, the parties shall cooperate to obtain mutually agreeable) insurance coverage respecting the Improvements, at Buyer's sole cost and expense.   In the event of the actual damage or destruction of all or any portion of the Property prior to the Close of Escrow or access to the Property is materially impaired, Buyer has the right to either (i) cancel this Agreement by written notice to Seller, in which event, notwithstanding anything to the contrary contained in this Agreement, all Earnest Money (*less* the Independent Consideration) will be promptly refunded by Seller Parties to Buyer, or (ii) elect to close escrow in accordance with its terms notwithstanding such damage or destruction taking, in which event all insurance proceeds or claims paid or payable to Seller with respect to the Property will be paid over and assigned to Buyer at Close of Escrow and Buyer shall receive a credit at Closing for the amount of any deductible respecting Seller's insurance and incurred or to be incurred by Buyer and for the amount of any uninsured loss with respect to the Property.  Seller acknowledges and agrees that any such credit respecting such insurance claims may exceed the Purchase Price. Seller Parties shall cooperate with Buyer in the processing of any insurance claims.

11.    **Fees and Costs**.  Closing costs shall be allocated between Buyer and Seller in accordance with local custom except as expressly set forth below:

a.      Buyer's Responsibility. Buyer shall pay the following closing costs: (i) the premiums charged by the Title Company for the extended coverage portion of the Owner's Title Policy (including endorsements), (ii) the cost of the Updated Survey, (iii) one-half (1/2) of all recording and filing charges in connection with the instrument by which Seller conveys the Property, (iv) one-half of all escrow or closing charges, and (v) all fees due its attorneys and all costs of Buyer's due diligence, including fees due its consultants).

b.      Seller's Responsibility. Seller shall pay the following closing costs: (i) all fees due its attorneys, (ii) the premium charged by the Title Company for the CLTA (or "base") coverage portion of the Owner's Title Policy, as well as all costs incurred in connection with causing the Title Company to remove any Required Removal Exceptions, (iii) one-half (1/2) of all recording and filing charges in connection with the instrument by which Seller conveys the Property, (iv) one-half of all escrow or closing charges and (v) all City and County transfer taxes and other transfer or sales taxes applicable to the transfer and sale of the Property to Buyer.

The obligations of the Parties under this **Section 11** shall survive the Closing (and not be merged therein) or any earlier termination of this Agreement.

12.      **Prorations**.

a.      If any income or expenses associated with the Property (excluding the items listed in **Section 12(b)** below) are to be assumed by Buyer, a preliminary estimate of the closing prorations of income and expenses set forth above shall be reflected on a preliminary closing statement to be prepared by Seller and submitted to Buyer for Buyer's approval not later than five (5) business days prior to the Closing Date (the "**Preliminary Closing Statement**"). The Preliminary Closing Statement shall be subject to Buyer's review, comment and reasonable approval. Each of Buyer and Seller shall act reasonably and in good faith in finalizing the Preliminary Closing Statement, and Seller shall provide the backup for the items in the Preliminary Closing Statement. The final Closing Statement, once agreed upon, shall be signed by Buyer and Seller and delivered to the Escrow Holder for purposes of making the proration of income and expenses at Closing, subject to the final adjustment / re-proration between Buyer and Seller as more particularly set forth below.

b.      All real property taxes, personal property taxes, assessments, governmental licenses or permit fees, utility costs, and all other items of income and expense normally apportioned in sales of property in similar situations in the county in which the Property is located shall be apportioned on a *per diem* basis at the Closing as of the close of business on the day immediately preceding the Closing Date.

13.      **Closing Documents**. At least one (1) business day prior to the Closing Date (other than the funds, which may be deposited by Buyer or Seller on the scheduled Closing Date if permitted by the Escrow Holder), the Parties must deposit into escrow the funds and documents described below.

a.      Seller Deliveries. Seller will deposit the following:

(i)      An original duly executed and acknowledged Grant Deed respecting the Real Property, in the form attached hereto as **Exhibit C**;

(ii)      Two (2) original counterparts of a bill of sale and assignment and assumption of the Contracts and Intangible Property, in the form of **Exhibit D** attached hereto ("**Bill of Sale and Assignment Agreement**"), executed by Seller;

(iii)      Such affidavits and agreements concerning parties in possession, mechanics' liens, gap coverage and other title matters as may be reasonably required by Title Company in order to issue the Title Policy in accordance with the provisions of **Section 5** of this Agreement;

(iv)      A closing statement respecting the Property prepared in writing by Escrow Holder and approved in writing and duly executed by Seller;

(v)      An affidavit pursuant to Section 1445 of the Code with respect to Seller, duly executed, as applicable, by Seller, and upon which Buyer is entitled to rely, that each Seller is not a "foreign person" within the meaning of Section 1445, in the form of **Exhibit E** attached hereto and any similar certificates required by the State of California in respect of such matters (such as the Form 593-C); and

(vi)      Such other documents and funds, including without limitation, escrow instructions, as may be reasonably required of Seller to close the transaction in accordance with applicable laws and this Agreement.

b.      <u>Buyer Deliveries</u>. Buyer will deposit the following:

(i)      The Purchase Price, *less* the Earnest Money, *plus* or *minus* Buyer's portion the Closing costs and prorations pursuant to this Agreement;

(ii)      A closing statement respecting the Property prepared in writing by Escrow Holder and approved in writing and each duly executed by Buyer;

(iii)      Two (2) original counterparts of the Bill of Sale and Assignment Agreement, executed by Buyer;

(iv)      duly executed affidavits, disclosures and reports as are required of Buyer by applicable state or local law in connection with the conveyance of the Property; and

(v)      Such other documents and funds, including without limitation, escrow instructions, as may be reasonably required of Buyer to close the transaction in accordance with this Agreement.

**14.**      **Notices**.  All notices related to this Agreement are to be delivered, in writing, to the following respective addresses:

| **SELLER:** | Tree Lane, LLC<br>9454 Wilshire Boulevard, Suite 208<br>Beverly Hills, California 90212<br>Attention: Mohamed Hadid<br>email: hadidaspen@aol.com | **BUYER:** | Skylark Capital Management, LLC<br>8445 Santa Monica Boulevard<br>West Hollywood, California 90069<br>Attention: Zachary A. Vella<br>email: zach@vellagroup.com: |
|---|---|---|---|

Exhibit 3, Page 64

| COPY TO: | Abdulaziz, Grossbart & Rudman<br>6454 Coldwater Canyon Ave.<br>North Hollywood, CA 91606<br>Attention: Bruce D. Rudman<br>Telephone: (818) 760-2000<br>email:  bdr@agrlaw.com | COPY TO: | Eisner, P.C.<br>9601 Wilshire Blvd., 7th Floor<br>Beverly Hills, California 90210<br>Attention: Brian D. Kilb<br>Telephone: (310) 855-3249<br>email:  bkilb@eisnerlaw.com |
|---|---|---|---|

**15.    Brokerage:**  The parties represent and warrant to each other that no broker or finder was instrumental in arranging or bringing about this transaction.  If any person brings a claim for a commission or finder's fee based upon any contact, dealings or communication with Buyer or Seller, then the party through whom such person makes his claim shall defend the other party (the "**Indemnified Party**") from such claim, and shall indemnify the Indemnified Party and hold the Indemnified Party harmless for, from, and against any and all costs, damages, claims, liabilities or expenses (including without limitation, court costs and reasonable attorneys' fees and disbursements) incurred by the Indemnified Party in defending against the claim.  The provisions of this Section 15 shall survive the Closing or, if the purchase and sale is not consummated, any termination of this Agreement.

**16.    Seller's and Buyer's Remedies.**

a.    If Buyer fails to pay or materially perform when due any act or obligation required by this Agreement, which material failure continues uncured after five (5) business days' written notice from Seller to Buyer, Buyer shall be in default, in which event Seller's sole and exclusive remedy is to cancel this Agreement and retain the Earnest Money then on deposit as Seller's liquidated damages.

b.    (i)    If either Seller Party fails to pay or perform when due any act or obligation required by this Agreement, which failure continues uncured after five (5) business days' written notice from Buyer to Seller Parties, Seller shall be in default, in which event, at the election of Buyer made at any time thereafter in its sole discretion, Buyer may immediately cancel this Agreement, and be entitled to pursue any or all remedies at law or in equity, including, without limitation, specific performance, suit for damages, and/or other alternative relief.

(ii)    The Parties agree that damage to Buyer caused by any breach of Seller Parties' obligations under this Agreement would be difficult or impossible to ascertain because, among other things, of the unique characteristics of the Real Property.  The Parties further agree that a reasonable estimate of such damage is an amount (the "**Liquidated Damages Amount**") equal to the sum of (x) $5,000,000 *plus* (y) the Earnest Money therefore delivered by Buyer to Seller Parties (or either of them) *plus* (z) the sum of (A) all amounts expended by Buyer after the Effective Date to obtain Government Approvals, (B) all Shared Construction Expenses paid by Buyer, (C) all amounts expended by Buyer in conducting due diligence during the Feasibility Period pursuant to **Section 5**, including surveys, environmental reports soils reports, and engineering analyses and reports, and (D) all amounts expended by Buyer after the Effective Date for the design and construction of the Improvements (*provided* that the sum of the amounts described in clauses (A), (B), (C) and (D) shall not exceed $300,000.00 unless Seller Parties have consented in writing in advance to expenditure thereof).

Exhibit 3, Page 65

(iii)    If, upon termination of this Agreement by Buyer after breach hereof or default hereunder by Seller Parties, (A) Seller Parties execute a confession of judgment in a form acceptable to Buyer it in sole discretion, pursuant to which Seller Parties confess judgment in favor of Buyer in an amount equal to the Liquidated Damages Amount, and (B) Seller Parties pay to Buyer, within ten (10) business days after such termination, an amount equal to the aggregate amounts described in **clauses (y)** and **(z)** in the definition of the term "Liquidated Damages Amount" in **Section 16(b)(ii)**, Buyer agrees that it will not seek to collect payment in respect of such judgment or otherwise seek to enforce such judgment in respect of the remaining Liquidated Damages Amount until the earlier of (A) the "Maturity Date" (as defined in the Loan Agreement dated as of September 28, 2018 (the "Loan Agreement") between Seller, as borrower thereunder, and Buyer, as lender thereunder), as such Maturity Date may be extended in accordance with the Loan Agreement, or (B) the date upon which the loan made to Seller by Buyer pursuant to the Loan Agreement is repaid in full (including by any refinancing thereof).  If indefeasible payment of the Liquidated Damages Amount is not made in full on or prior to such earlier date, then Buyer may exercise each and every right and remedy available to it at law or in equity to enforce payment thereof and the judgment confessed by Seller Parties with respect thereto, including, without limitation, by exercising its rights and remedies under the Pledge Agreement (as hereinafter defined).  Nothing in this **Section 16(b)(iii)** shall prohibit, impair or impede in any respect Buyer from maintaining an action for specific enforcement of Seller Parties' obligations hereunder, to which Seller Parties stipulate Buyer shall be entitled after breach hereof or default hereunder by Seller Parties

With respect to the liquidated damages available to each of Buyer and Seller herein the Parties hereby acknowledge and agree as follows:

IT IS IMPRACTICABLE OR EXTREMELY DIFFICULT TO FIX, PRIOR TO THE EFFECTIVE DATE, THE ACTUAL DAMAGES THAT SELLER WOULD INCUR IN THE EVENT OF BUYER'S FAILURE TO PURCHASE THE PROPERTY AS REQUIRED IN THIS AGREEMENT AND IT IS IMPRACTICABLE OR EXTREMELY DIFFICULT TO FIX, PRIOR TO THE EFFECTIVE DATE, THE ACTUAL DAMAGES THAT BUYER WOULD INCUR IN THE EVENT OF SELLER PARTIES' FAILURE TO FULFILL THEIR RESPECTIVE OBLIGATIONS AS REQUIRED IN THIS AGREEMENT. THEREFORE, UPON SELLER'S CANCELLATION OF THIS AGREEMENT RESULTING FROM BUYER'S FAILURE TO PURCHASE THE PROPERTY AS REQUIRED IN THIS AGREEMENT, SELLER IS ENTITLED TO ALL EARNEST MONEY AS CONSIDERATION FOR TAKING THE PROPERTY OFF THE MARKET AND NOT AS A PENALTY AND UPON BUYER'S CANCELLATION OF THIS AGREEMENT RESULTING FROM SELLER PARTIES' FAILURE TO SATISFY EACH OF SELLER PARTIES' OBLIGATIONS AS REQUIRED IN THIS AGREEMENT, BUYER IS ENTITLED TO AN AMOUNT EQUAL TO THE LIQUIDATED DAMAGES APPRAISAL AS CONSIDERATION FOR INDUCING BUYER TO ENTER INTO THIS AGREEMENT, INVEST IN THE REAL PROPERTY AND CONSTRUCT THE IMPROVEMENTS, AND NOT AS A PENALTY.   SUCH SUMS ARE A REASONABLE ESTIMATE OF SELLER'S DAMAGES FOR BUYER'S DEFAULT AND BUYER'S DAMAGES FOR SELLER PARTIES' DEFAULT (AS APPLICABLE).

WITH RESPECT TO SELLER ONLY, THE FOREGOING LIQUIDATED DAMAGES REMEDY IS SELLER'S SOLE REMEDY FOR BUYER'S FAILURE TO PURCHASE THE PROPERTY AS REQUIRED IN THIS AGREEMENT AND IS IN LIEU OF ANY OTHER REMEDY AT LAW OR IN EQUITY. UPON SELLER'S RECEIPT OF THE EARNEST MONEY, BUYER IS RELEASED FROM ANY FURTHER LIABILITY TO SELLER EXCEPT FOR ANY OBLIGATIONS TO REPAIR THE PROPERTY OR TO INDEMNIFY SELLER AS EXPRESSLY PROVIDED HEREIN. IN SUCH EVENT, ANY ESCROW CANCELLATION FEES AND TITLE COMPANY CHARGES ARE BUYER'S RESPONSIBILITY.

WITH RESPECT TO BUYER ONLY, THE FOREGOING LIQUIDATED DAMAGES REMEDY IS BUYER'S SOLE REMEDY FOR SELLER'S FAILURE TO COMPLETE THE LAND DIVISION OR OTHERWISE COMPLY WITH THE OBLIGATIONS OF SELLER REQUIRED UNDER THIS AGREEMENT AND IS IN LIEU OF ANY OTHER REMEDY AT LAW OR IN EQUITY. UPON BUYER'S RECEIPT OF THE LIQUIDATED DAMAGES AMOUNT, EACH SELLER PARTY IS RELEASED FROM ANY FURTHER LIABILITY TO BUYER EXCEPT FOR ANY OBLIGATIONS TO INDEMNIFY BUYER AS EXPRESSLY PROVIDED HEREIN. IN SUCH EVENT, ANY ESCROW CANCELLATION FEES AND TITLE COMPANY CHARGES ARE SELLER'S RESPONSIBILITY.

BY INITIALING BELOW, EACH OF BUYER AND EACH SELLER PARTY ACKNOWLEDGE THAT THEY HAVE READ AND UNDERSTAND THE PROVISIONS OF THESE LIQUIDATED DAMAGES PARAGRAPHS.

MR. HADID'S INITIALS _____    SELLER'S INITIALS _____    BUYER'S INITIALS _JS_

**17.    Escrow Instructions**. Buyer and Seller Parties shall engage Escrow Holder to act as their Escrow Holder in connection with this transaction. This Agreement shall serve as the Escrow Instructions. Escrow Holder, as the person responsible for closing the escrow, must file all necessary information regarding this transaction required by the Code, and provide copies to the parties. If this Agreement is canceled in accordance with its terms for any reason whatsoever (other than a Party's default, in which event the "Seller's and Buyer's Remedies" provision shall apply), Buyer and Seller agree to promptly execute any escrow cancellation instructions required by Escrow Holder, however in the event Buyer or Seller fail to execute the escrow cancellation instructions within ten (10) days following Escrow Holder's delivery of said cancellation instructions, Escrow Holder shall proceed with the cancellation of the escrow as if said party had signed the cancellation instructions. In the absence of a default, Seller shall pay any customary escrow cancellation charges; otherwise, such charges are paid by the defaulting party.

**18.    Collateral Security**. The Seller Parties' obligations under this Agreement are secured by a security interest in favor of Buyer arising under the Pledge Agreement of even date herewith (the "**Pledge Agreement**") between Mr. Hadid, as pledger, and Buyer, pursuant to which Mr. Hadid pledged, as security for Seller Parties' performance of all of their obligations under this Agreement, a fifty percent (50%) membership interest in Summitridge Development II, LLC, a California limited liability company and the sole member of Seller.

**19.    Standard Provisions**.

a.    Assignment. At any time prior to the Closing, Buyer may nominate and/or assign its rights and obligations under this Agreement.

b.    Time is of the Essence. Time is of the essence of this agreement.

c.    Notices. All notices under this Agreement must be in writing and are deemed received (i) upon receipt or refusal of delivery, if personally delivered; (ii) on the next business day, if deposited for next day delivery with a nationwide overnight courier; (iii) upon delivery if emailed to email address designated in the notice addresses above (a written confirmation of successful transmission from the transmitting computer is sufficient evidence of such receipt) (if email is sent after business hours or on a non-business day then receipt shall be deemed to occur on the next business day); or (iv) on the third day following the date of mailing, if mailed by certified mail, postage prepaid, return receipt requested. Notice received by a party's legal counsel is notice to such party for all purposes.

WITH RESPECT TO BUYER ONLY, THE FOREGOING LIQUIDATED DAMAGES REMEDY IS BUYER'S SOLE REMEDY FOR SELLER'S FAILURE TO COMPLETE THE LAND DIVISION OR OTHERWISE COMPLY WITH THE OBLIGATIONS OF SELLER REQUIRED UNDER THIS AGREEMENT AND IS IN LIEU OF ANY OTHER REMEDY AT LAW OR IN EQUITY.  UPON BUYER'S RECEIPT OF THE LIQUIDATED DAMAGES AMOUNT, EACH SELLER PARTY IS RELEASED FROM ANY FURTHER LIABILITY TO BUYER EXCEPT FOR ANY OBLIGATIONS TO INDEMNIFY BUYER AS EXPRESSLY PROVIDED HEREIN.  IN SUCH EVENT, ANY ESCROW CANCELLATION FEES AND TITLE COMPANY CHARGES ARE SELLER'S RESPONSIBILITY.

BY INITIALING BELOW, EACH OF BUYER AND EACH SELLER PARTY ACKNOWLEDGE THAT THEY HAVE READ AND UNDERSTAND THE PROVISIONS OF THESE LIQUIDATED DAMAGES PARAGRAPHS.

MR. HADID'S INITIALS ⟨ ⟩     SELLER'S INITIALS ⟨ ⟩     BUYER'S INITIALS _____

17.    **Escrow Instructions**.  Buyer and Seller Parties shall engage Escrow Holder to act as their Escrow Holder in connection with this transaction.  This Agreement shall serve as the Escrow Instructions.  Escrow Holder, as the person responsible for closing the escrow, must file all necessary information regarding this transaction required by the Code, and provide copies to the parties.  If this Agreement is canceled in accordance with its terms for any reason whatsoever (other than a Party's default, in which event the "Seller's and Buyer's Remedies" provision shall apply), Buyer and Seller agree to promptly execute any escrow cancellation instructions required by Escrow Holder, however in the event Buyer or Seller fail to execute the escrow cancellation instructions within ten (10) days following Escrow Holder's delivery of said cancellation instructions, Escrow Holder shall proceed with the cancellation of the escrow as if said party had signed the cancellation instructions.  In the absence of a default, Seller shall pay any customary escrow cancellation charges; otherwise, such charges are paid by the defaulting party.

18.    **Collateral Security**.  The Seller Parties' obligations under this Agreement are secured by a security interest in favor of Buyer arising under the Pledge Agreement of even date herewith (the "**Pledge Agreement**") between Mr. Hadid, as pledger, and Buyer, pursuant to which Mr. Hadid pledged, as security for Seller Parties' performance of all of their obligations under this Agreement, a fifty percent (50%) membership interest in Summitridge Development II, LLC, a California limited liability company and the sole member of Seller.

19.    **Standard Provisions**.

a.    Assignment.  At any time prior to the Closing, Buyer may nominate and/or assign its rights and obligations under this Agreement.

b.    Time is of the Essence.  Time is of the essence of this agreement.

c.    Notices.  All notices under this Agreement must be in writing and are deemed received (i) upon receipt or refusal of delivery, if personally delivered; (ii) on the next business day, if deposited for next day delivery with a nationwide overnight courier; (iii) upon delivery if emailed to email address designated in the notice addresses above (a written confirmation of successful transmission from the transmitting computer is sufficient evidence of such receipt) (if email is sent after business hours or on a non-business day then receipt shall be deemed to occur on the next business day); or (iv) on the third day following the date of mailing, if mailed by certified mail, postage prepaid, return receipt requested.  Notice received by a party's legal counsel is notice to such party for all purposes.

    d.    <u>Authorization / Binding Effect</u>.  Buyer warrants and Seller warrants that each has the authority to enter into the Agreement.  This Agreement is binding upon the respective heirs, personal representatives, successors and assigns of the parties.

    e.    <u>Integration; Waiver</u>.  This Agreement embodies and constitutes the entire understanding between the parties with respect to the transaction and all prior agreements, understandings, representations and statements, oral or written, are merged into this Agreement.  Neither this Agreement nor any provision hereof may be waived, modified, amended, discharged or terminated except by an instrument signed by the parties hereto.  No waiver by either party hereto of any failure or refusal by the other party to comply with its obligations hereunder shall be deemed a waiver of any other or subsequent failure or refusal to so comply.

    f.    <u>Captions Not Binding; Exhibits</u>.  The captions in this Agreement are inserted for reference only and in no way limit the scope or intent of this Agreement or of any of the provisions hereof.  All Exhibits attached hereto shall be incorporated by reference as if set out herein in full..

    g.    <u>Severability</u>.  If any term or provision of this Agreement or the application thereof shall, to any extent, be invalid or unenforceable, the remainder of this Agreement or the application of such term or provision to persons or circumstances other than those as to which it is held invalid or unenforceable shall not be affected thereby, and each term and provision of this Agreement shall be valid and enforced to the fullest extent permitted by law.

    h.    <u>Counterparts; Electronic Signatures</u>.  This Agreement may be executed in counterparts, each of which shall be an original and all of which counterparts taken together shall constitute one and the same agreement.  Signatures to this Agreement transmitted by electronic means shall be valid and effective to bind the party so signing.

    i.    <u>Governing Law</u>.  This Agreement is governed by the laws of the State of California.

    k.    <u>Attorney's Fees</u>.  If any claim or legal proceeding is made or commenced between the parties hereto concerning the Property, this Agreement, or the rights and duties of either in relation thereto, the prevailing Party in such matter shall be entitled, in addition to such other relief as may be granted, to receive from the losing Party a reasonable sum as and for its costs and attorneys' fees incurred both at and in preparation for arbitration, trial and any appeal or review, such sum to be set by the arbitrator(s) or court(s) before which the matter is heard.

    l.    <u>Survival</u>.  All representations and warranties by Seller and warranties by Buyer, and the right to enforce or assert a breach of the same, shall survive Closing (subject to any express limitations herein) and shall not be merged into any document delivered by Seller and/or Buyer at Closing.

m.    <u>No Joint Venture</u>.  Seller and Buyer do not intend to form a partnership or joint venture by executing this Agreement and neither party may bind the other to a third party.

n.    <u>Binding on Successors</u>.  This Agreement shall be binding upon, and inure to the benefit of, the successors, heirs, and permitted assigns and transferees of the parties.

*[Remainder of Page Intentionally Blank]*

Exhibit 3, Page 70

IN WITNESS WHEREOF, Buyer and each Seller Party have executed this Agreement, to be effective as of the Effective Date.


**SELLER:**

**TREE LANE, LLC,**
a California limited liability company

By: _____
Name:  Mohamed Hadid
Title:  Member

**BUYER:**

**SKYLARK CAPITAL MANAGEMENT, LLC**


By: _____
Name:
Title:


MR. HADID

_____
Mohamed Hadid

IN WITNESS WHEREOF, Buyer and each Seller Party have executed this Agreement, to be effective as of the Effective Date.

**SELLER:**

**TREE LANE, LLC,**
a California limited liability company

By:_____
Name:
Title:

**BUYER:**

**SKYLARK CAPITAL MANAGEMENT, LLC**

By:_____ _Jon Shapiro_
Name: Jon Shapiro
Title: Managing Director.

MR. HADID

_____
Mohamed Hadid

SIGNATURE PAGE TO PURCHASE AND SALE AGREEMENT

## LIST OF EXHIBITS

Exhibit "A-1"   Legal Description of Land

Exhibit "A-2"   Legal Description of Real Property

Exhibit "B"    Site Plan of Property

Exhibit "C"    Form of Deed

Exhibit "D"    Form of Bill of Sale and Assignment and Assumption of Contracts and Intangible
               Property

Exhibit "E"    Non-Foreign Affidavit

Exhibit "F"    Pledge Agreement

**EXHIBIT A-1**

**LEGAL DESCRIPTION OF LAND**

THE LAND REFERRED TO HEREIN BELOW IS SITUATED IN THE CITY OF LOS ANGELES (BEVERLY HILLS AREA) IN THE COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AND IS DESCRIBED AS FOLLOWS:

PARCEL 1:

THAT CERTAIN REAL PROPERTY SITUATED IN THE CITY OF LOS ANGELES, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, BEING PORTIONS OF LOT 3, IN SECTION 2, TOWNSHIP 1 SOUTH, RANGE 15 WEST, SAN BERNARDINO BASE AND MERIDIAN, AS PER MAP FILED IN BOOK 45, PAGE 40 OF RECORD OF SURVEYS AND LOT 1 OF TRACT 32693 AS PER MAP RECORDED IN BOOK 918, PAGES 13 AND 14 OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY, DESCRIBED AS FOLLOWS:

THAT PORTION OF LOT 3 OF SAID RECORD OF SURVEY AND THAT PORTION OF LOT 1 OF SAID TRACT 32693 MORE PARTICULARLY DESCRIBED AS FOLLOWS:

BEGINNING AT THE NORTHEAST CORNER OF SAID LOT 3;

THENCE ALONG THE EASTERLY LINE OF SAID LOT 3, SOUTH 0° 21' 54" WEST, 576.12 FEET;

THENCE PARALLEL WITH THE NORTH LINE OF SAID LOT 3, NORTH 89° 33' 00" WEST, 352.00 FEET;

THENCE NORTH 11° 16' 17" WEST 169.69 FEET TO A POINT DISTANT 20.00 FEET, MEASURED AT RIGHT ANGLES, FROM THE SOUTHEASTERLY LINE OF TRACT 21845, AS PER MAP FILED IN BOOK 619, PAGES 83 AND 84 OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY;

THENCE PARALLEL WITH THE SOUTHEASTERLY, SOUTHERLY AND SOUTHWESTERLY LINES OF SAID TRACT 21845 AND DISTANT 20.00 FEET THEREFROM, MEASURED AT RIGHT ANGLES ALONG THE FOLLOWING COURSES AND DISTANCES

SOUTH 71° 40' 52" WEST 101.21 FEET;

THENCE SOUTH 87° 31' 21" WEST 209.42 FEET; NORTH 20° 03' 46" WEST, 133.22 FEET TO THE POINT IN THE SOUTHERLY SIDE LINE OF HENSAL ROAD, 34.00 FEET WIDE, AS PER SAID TRACT 32693;

THENCE NORTHEASTERLY ALONG SAID SOUTHERLY LINE, NORTH 38° 02' 06" EAST, 11.95 FEET TO THE BEGINNING OF A TANGENT CURVE CONCAVE SOUTHEASTERLY HAVING A RADIUS OF 83.00 FEET,

THROUGH A CENTRAL ANGLE OF 07° 42' 52" A DISTANCE OF 11.18 FEET TO THE NORTHWESTERLY CORNER OF LOT 12 OF SAID TRACT 21845, SAID CORNER ALSO BEING THE NORTHEASTERLY CORNER OF LOT 1 OF SAID TRACT 32693;

THENCE SOUTHEASTERLY ALONG THE SOUTHWESTERLY LINE OF SAID LOT 12, SAID LINE ALSO BEING A PORTION OF THE NORTHEASTERLY LINE OF LOT 12, SAID LINE ALSO BEING A PORTION OF THE NORTHEASTERLY LINE OF SAID LOT 1, SOUTH 20° 03' 46" EAST 130.14 FEET;

THENCE CONTINUING ALONG THE SOUTHERLY, SOUTHEASTERLY AND NORTHEASTERLY LINE OF SAID TRACT 21845, THE FOLLOWING COURSES AND DISTANCES:

NORTH 87° 31' 21" EAST 192.00 FEET; NORTH 71° 40' 52" EAST 155.90 FEET;

THENCE NORTH 52° 04' 00" EAST 86.21 FEET; NORTH 24° 03' 26" EAST 183.98 FEET;

THENCE NORTH 24° 18' 16" WEST, 102.04 FEET;

THENCE NORTH 37° 01' 29" WEST 72.98 FEET TO A POINT IN THE NORTHERLY LINE OF SAID LOT 3;

THENCE EASTERLY ALONG SAID NORTHERLY LINE, SOUTH 89° 33' 00" EAST, 283.39 FEET TO THE POINT OF BEGINNING.

PARCEL 2:

A NON-EXCLUSIVE EASEMENT FOR VEHICULAR INGRESS AND EGRESS AND ROAD MAINTENANCE PURPOSES OVER THAT PORTION OF THE NORTHEAST QUARTER OF SECTION 2, TOWNSHIP 1 SOUTH, RANGE 15 WEST, SAN BERNARDINO MERIDIAN, IN THE CITY OF LOS ANGELES, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, INCLUDED WITHIN A STRIP OF LAND 20.00 FEET WIDE, THE CENTERLINE OF SAID 20.00 FOOT WIDE STRIP OF LAND DESCRIBED AS FOLLOWS:

BEGINNING AT THE INTERSECTION OF THE WEST LINE OF THE NORTHEAST QUARTER OF SAID SECTION 2 WITH THE NORTHEASTERLY PROLONGATION OF THE CENTERLINE OF SUMMITRIDGE DRIVE, 41.00 FEET WIDE, AS SAID LAST MENTIONED CENTERLINE IS SHOWN ON THE MAP OF TRACT NO. 20668, RECORDED IN BOOK 671, PAGES 39 THROUGH 42, INCLUSIVE OF MAPS, IN THE OFFICE OF THE RECORDER OF SAID COUNTY, SAI D WEST LINE TO HAVE A BEARING OF NORTH 0° 21' 27" EAST FOR PURPOSES OF THIS DESCRIPTION;

THENCE NORTH 33° 18' 54" EAST, 50.55 FEET TO THE BEGINNING OF A TANGENT CURVE CONCAVE WESTERLY AND HAVING A RADIUS OF 100 FEET;

THENCE NORTHERLY ALONG SAID CURVE THROUGH A CENTRAL ANGLE OF 44° 46' 37", A DISTANCE OF 78.15 FEET;

EXHIBIT A-1

THENCE TANGENT TO SAID CURVE, NORTH 11° 27' 43" WEST, 55.43 FEET TO THE BEGINNING OF A TANGENT CURVE CONCAVE EASTERLY AND HAVING A RADIUS OF 150 FEET;

THENCE NORTHERLY ALONG SAID LAST MENTIONED CURVE THROUGH A CENTRAL ANGLE OF 28° 35' 38", A DISTANCE OF 74.86 FEET; TANGENT TO SAID LAST MENTIONED CURVE, NORTH 17° 07' 55" EAST, 63.44 FEET TO THE BEGINNING OF A TANGENT CURVE CONCAVE NORTHWESTERLY AND HAVING A RADIUS OF 150 FEET;

THENCE NORTHEASTERLY ALONG SAID LAST MENTIONED CURVE THROUGH A CENTRAL ANGLE OF 2° 4' 23", A DISTANCE OF 5.86 FEET;

THENCE, TANGENT TO SAID LAST MENTIONED CURVE, NORTH 14° 53' 32" EAST, 203.43 FEET TO THE BEGINNING OF A TANGENT CURVE CONCAVE WESTERLY AND HAVING A RADIUS OF 350 FEET;

THENCE NORTHERLY ALONG SAID LAST MENTIONED CURVE THROUGH A CENTRAL ANGLE OF 8° 29' 03", A DISTANCE OF 51.83 FEET;

THENCE TANGENT TO SAID LAST MENTIONED CURVE, NORTH 6° 24' 29" EAST, 229.60 FEET TO THE BEGINNING OF A TANGENT CURVE CONCAVE WESTERLY AND HAVING A RADIUS OF 250 FEET;

THENCE NORTHERLY ALONG SAID LAST MENTIONED CURVE THROUGH A CENTRAL ANGLE OF 10° 58' 55", A DISTANCE OF 47.92 FEET;

THENCE TANGENT TO SAID LAST MENTIONED CURVE, NORTH 4° 34' 26" WEST, 75.24 FEET TO THE BEGINNING OF A TANGENT CURVE CONCAVE SOUTHWESTERLY AND HAVING A RADIUS OF 250 FEET;

THENCE NORTHWESTERLY ALONG SAID LAST MENTIONED CURVE THROUGH A CENTRAL ANGLE OF 25° 09' 18", A DISTANCE OF 109.76 FEET;

THENCE TANGENT TO SAID LAST MENTIONED CURVE, NORTH 29° 43' 44" WEST, 197.42 FEET MORE OR LESS TO SAID WEST LINE OF THE NORTHEAST QUARTER OF SAID SECTION 2.

THE SIDELINES OF SAID 20.00 FOOT STRIP OF LAND ARE TO BE LENGTHENED OR SHORTENED TO TERMINATE SOUTHWESTERLY AND NORTHWESTERLY AT THE SAID WEST LINE OF THE NORTHEAST QUARTER OF SAID SECTION 2.

PARCEL 3:

A NON-EXCLUSIVE EASEMENT FOR VEHICULAR AND PEDESTRIAN INGRESS AND EGRESS, WITH THE RIGHT TO CONSTRUCT AND MAINTAIN A DRIVEWAY AND CURB CUT, AS SET FORTH IN A DOCUMENT RECORDED JUNE 20, 2012, AS INSTRUMENT NO. 20120917645, OFFICIAL RECORDS, UPON THE TERMS, CONDITIONS AND PROVISIONS AS THEREIN SET FORTH, WHICH WAS AMENDED BY THE DOCUMENT RECORDED MAY 10, 2016, AS INSTRUMENT NO. 20160531499 OF OFFICIAL RECORDS, WHICH

EXHIBIT A-1

STATES SAID EASEMENT SHALL BE LOCATED OVER THE FOLLOWING DESCRIBED LAND:

A VARIABLE WIDTH EASEMENT OVER THAT PORTION OF REAL PROPERTY DESCRIBED IN DEED RECORDED OCTOBER 8, 2008 AS INSTRUMENT NO. 20081801049 OF OFFICIAL RECORDS IN THE CITY OF LOS ANGELES, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, BEING A PORTION OF THE NORTHWEST QUARTER OF LOT 2, SECTION 2, TOWNSHIP 1 SOUTH, RANGE 15 WEST, SAN BERNARDINO MERIDIAN, IN THE CITY OF LOS ANGELES, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, ACCORDING TO THE OFFICIAL PLAT OF SAID LAND, MORE PARTICULARLY DESCRIBED AS FOLLOWS:

BEGINNING AT THE SOUTHWEST CORNER OF LAND DESCRIBED IN DEED RECORDED IN SAID INSTRUMENT NO. 200081801049 OF OFFICIAL RECORDS;

THENCE, NORTHERLY ALONG THE WEST LINE OF LAND DESCRIBED IN SAID INSTRUMENT NO. 20081801049 OF OFFICIAL RECORDS.

1. NORTH 00° 20' 15" EAST, 75.13 FEET TO THE BEGINNING OF A NON-TANGENT CURVE CONCAVE NORTHERLY, HAVING A RADIAL BEARING TO SAID CURVE OF SOUTH 10° 14' 10" WEST AND A RADIUS OF 72.40 FEET; THENCE,

2. EASTERLY ALONG SAID CURVE THROUGH A CENTRAL ANGLE OF 10° 46' 51", AN ARC DISTANCE OF 13.62 FEET TO THE BEGINNING OF A NON-TANGENT COMPOUND CURVE CONCAVE NORTHWESTERLY HAVING A RADIAL BEARING TO SAID CURVE OF SOUTH 02° 54' 57" WEST AND A RADIUS OF 8.27 FEET; THENCE,

3. NORTHEASTERLY ALONG SAID CURVE, THROUGH A CENTRAL ANGLE OF 53° 00' 03", AN ARC DISTANCE OF 7.65 FEET TO A POINT OF NON-TANGENCY; THENCE,

4. SOUTH 65° 18' 03" EAST, 27.55 FEET; THENCE,

5. SOUTH 24° 41' 57" WEST, 1.58 FEET TO THE BEGINNING OF A TANGENT CURVE CONCAVE EASTERLY HAVING A RADIUS OF 130.00 FEET; THENCE,

6. SOUTHERLY ALONG SAID CURVE THROUGH A CENTRAL ANGLE OF 29°00'05", AN ARC DISTANCE OF 65.80 FEET TO THE INTERSECTION WITH THE SOUTH LINE OF LAND DESCRIBED IN SAID INSTRUMENT NO. 20081801049 OF OFFICIAL RECORDS; THENCE WESTERLY ALONG THE SOUTH LINE OF LAND DESCRIBED

IN SAID INSTRUMENT NO. 20081801049 OF OFFICIAL RECORDS.

7. NORTH 89° 50' 48" WEST, 33.64 FEET, TO THE BEGINNING.

APN(s): 4384-005-026

EXHIBIT A-1

**EXHIBIT A-2**

**LEGAL DESCRIPTION OF REAL PROPERTY**

[*TO BE ATTACHED SUBSEQUENT TO EXECUTION AND PRIOR TO CLOSING*]

EXHIBIT A-2

## EXHIBIT B

## SITE PLAN OF PROPERTY



EXHIBIT B



EXHIBIT B

## EXHIBIT C

## FORM OF DEED

RECORDING REQUESTED BY
AND WHEN RECORDED RETURN TO:

_____
_____
_____

MAIL TAX STATEMENTS TO:

_____
_____

_____

(Space Above This Line Reserved For Recorder's Use Only)

The undersigned Grantor(s) Declare(s):

Documentary Transfer Tax is $_____.

( )  computed on full value of property conveyed, or

( )  computed on full value less value of liens and encumbrances.

City of _____
County _____

## GRANT DEED

TREE LANE, LLC, a California limited liability company ("Grantor"), for and in consideration of the sum of TEN AND NO/100 DOLLARS ($10.00) and other good and valuable consideration paid in hand to Grantor by ZACHARY A. VELLA, an individual, as his sole and separate property ("Grantee"), the receipt and sufficiency of which are hereby acknowledged, has GRANTED and CONVEYED, and by these presents does GRANT and CONVEY, that certain parcel of land located in Los Angeles County, California and legally described in **Exhibit A** attached hereto, together with all buildings, improvements and fixtures located thereon and owned by Grantor as of the date hereof and all right, title and interest, if any, that Grantor may have in and to all rights, privileges and appurtenances pertaining thereto (collectively, the "Real Property").

This conveyance is made by Grantor and accepted by Grantee subject to all covenants, conditions, restrictions, and other matters of record in the office of the County Recorder of Los Angeles County, California, all items and title matters of record and all non-delinquent unpaid taxes and assessments.

EXHIBIT C

TO HAVE AND TO HOLD the Real Property together with all improvements located thereon all and singular the rights and appurtenances thereto in anywise belonging, unto Grantee, its legal representatives, successors and assigns forever.

IN WITNESS WHEREOF, Grantor has executed this Grant Deed this ____ day of _____, 2018.

**GRANTOR:**

**TREE LANE, LLC,**
**a California limited liability company**

By: _____
Name: _____
Title: _____

> A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

STATE OF _____        )
                                 ) ss.
COUNTY OF _____             )

On _____, 2018 before me, _____, a Notary Public, personally appeared _____ who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of _____ that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _____ (Seal)

EXHIBIT C

## EXHIBIT D

### FORM OF
### BILL OF SALE AND ASSIGNMENT OF CONTRACTS AND INTANGIBLE PROPERTY

    This BILL OF SALE AND ASSIGNMENT CONTRACTS AND INTANGIBLE PROPERTY (this "**Assignment**") is executed and delivered as of the _____ day of _____, 2018, pursuant to that certain Purchase and Sale Agreement ("**Purchase Agreement**") dated as of _____, 2018, entered into by and ZACHARY A. VELLA, an ("**Buyer**"), and TREE LANE, LLC, a California limited liability company ("**Seller**"), covering the Real Property described in **Exhibit 1** attached hereto ("**Real Property**"). Capitalized terms used in this Agreement but not otherwise defined here shall have the meanings set forth in the Purchase Agreement.

    1.    Sale of Personal Property.  For good and valuable consideration, Seller hereby transfers and conveys to Buyer all of Seller's right, title and interest, if any, in and to the following, without representation or warranty as to title or otherwise and in other "AS IS," "WHERE IS" and "WITH ALL FAULTS" condition except as provided in Paragraph 3 below and in the Purchase Agreement (as defined below):

    (a)    Personal Property.  All personal property of every nature and description and all replacements thereof which are both now owned by Seller (including any interest in such property that is leased by Seller) and now located in or on the Real Property, without any representations, warranties, guaranties, either expressed or implied, of any kind, nature or type whatsoever, including, without limitation, without any warranty as to merchantability, fitness or fitness for a particular purpose (collectively, the "**Personal Property**"); and

    (b)    Intangible Property.  Any and all of the intangible property related to the Real Property, to the extent assignable, including, without limitation, the following (but, in any event, only to the extent assignable by Seller):  warranties; contract rights related to the operation, use or ownership of the Real Property (but excluding Seller's obligations under contracts except those expressly assumed in this instrument); governmental permits, approvals and licenses; files, lists and correspondence.  In the event there is any intangible property which Seller cannot assign without a third party's approval, then Seller will make a good faith attempt to obtain any necessary approvals allowing for such assignment (collectively, the "**Intangible Property**").

    2.    Assignment Contracts.  For good and valuable consideration, Seller hereby assigns, transfers, sets over and conveys to Buyer, all of Seller's right, title and interest in and to the service contract(s) described in **Exhibit 2** attached hereto ("**Assumed Contracts**"), and Buyer hereby assumes the obligations of Seller under such Assumed Contracts first arising from and after the Closing Date.

    3.    Warranty.  Seller hereby represents and warrants to Buyer that it is the owner of the Personal Property and the Intangible Property, that, to Seller's knowledge, such property is free and clear of all liens, charges and encumbrances, and Seller warrants and defends title to said property unto Buyer against any person or entity lawfully claiming the same or any part thereof by, through or under Seller (but not otherwise).

EXHIBIT D

4.    <u>Successors and Assigns</u>.  This Assignment and the obligations of the parties hereunder shall be binding upon and inure to the benefit of the parties hereto, their respective legal representatives.

5.    <u>Severability</u>.  If any term or provision of this Assignment or the application thereof to any persons or circumstances shall, to any extent, be invalid or unenforceable, the remainder of this Assignment or the application of such term or provision to persons or circumstances other than those as to which it is held invalid or unenforceable shall not be affected thereby, and each term and provision of this Assignment shall be valid and enforced to the fullest extent permitted by law.

6.    <u>Counterparts</u>.  This Assignment may be executed in counterparts, each of which shall be an original and all of which counterparts taken together shall constitute one and the same agreement.

7.    <u>Governing Law</u>.  This Assignment shall be governed by and construed in accordance with the internal laws of the State of California without regard to conflicts of law principles.

*[Remainder of Page Intentionally Blank]*

IN WITNESS WHEREOF, the undersigned have executed this Bill of Sale and Assignment of Contracts and Intangible Property to be effective as of the date first set forth hereinabove.

**SELLER:**

**TREE LANE, LLC,**
a California limited liability company

By: _____
Name: _____
Title: _____

**BUYER:**

[_____,
a [_____]

By: _____
Name: _____
Title: _____

**Exhibit 1 – Description of Real Property [*TO BE ATTACHED PRIOR TO CLOSING*]**
**Exhibit 2 – List of Assumed Contracts  [*TO BE ATTACHED PRIOR TO CLOSING*]**

EXHIBIT D

EXHIBIT D

**EXHIBIT E**

**FORM OF**
**CERTIFICATE OF NON-FOREIGN STATUS**

(FIRPTA AFFIDAVIT)

Section 1445 of the Internal Revenue Code provides that a transferee of a U.S. real property interest must withhold tax if the transferor is a foreign person. For U.S. tax purposes (including section 1445), the owner of a disregarded entity (which has legal title to a U.S. real property interest under local law) will be the transferor of the property and not the disregarded entity. To inform the transferee that withholding of tax is not required upon the disposition of a U.S. real property interest by **TREE LANE, LLC**, a California limited liability company ("**Transferor**"), the undersigned hereby certifies the following on behalf of Seller:

1.      Transferor is not a foreign corporation, foreign partnership, foreign trust, or foreign estate (as those terms are defined in the Internal Revenue Code and Income Tax Regulations);

2.      Transferor is not a disregarded entity as defined in §1.1445-2(b)(2)(iii);

3.      Transferor's U.S. employer identification number is: _____; and

4.      Transferor's office address is [_____].

Transferor understands that this certification may be disclosed to the Internal Revenue Service by transferee and that any false statement contained herein could be punished by fine, imprisonment or both.

Under penalties of perjury I declare that I have examined this certification and to the best of my knowledge and belief it is true, correct and complete, and I further declare that I have authority to sign this document on behalf of Transferor.

Dated: _____, 201__

**SELLER / TRANSFEROR:**

**TREE LANE, LLC,**
a California limited liability company

By: _____
Name: _____
Title: _____

EXHIBIT E

## EXHIBIT F

## FORM OF

## PLEDGE AGREEMENT

[TO BE ATTACHED]

EXHIBIT F

## PLEDGE AGREEMENT

PLEDGE AGREEMENT dated as of September 28, 2018 (this "**Agreement**") made by **MOHAMED HADID**, an individual (the "**Pledgor**"), as pledger, for the benefit of **SKYLARK CAPITAL MANAGEMENT, LLC**, a California limited liability company ("**Skylark**"), as pledgee.

## R E C I T A L S

WHEREAS, Pledgor owns one hundred percent (100%) of the equity membership and/or ownership interests in SUMMITRIDGE DEVELOPMENT II LLC, a California limited liability company ("**Company**");

WHEREAS, the Company owns one hundred percent (100%) of the equity membership and/or ownership interests in TREE LANE LLC, a California limited liability company (the "**Property Owner**");

WHEREAS, Skylark (as purchaser thereunder), Property Owner (as seller thereunder), and Pledgor (together with Property Owner, as seller, the 'Seller Parties' thereunder) have entered into the Purchase and Sale Agreement of even date herewith (the "**Purchase Agreement**") for the purchase and sale of the Property (as defined in the Purchase Agreement); and

WHEREAS, to secure the Obligations (as hereinafter defined) of the Property Owner and the Pledgor (together, as 'Seller Parties' under the Purchase Agreement) under the Purchase Agreement, Pledgor has agreed to execute and deliver this Agreement, and to pledge to Skylark fifty percent (50%) of the equity membership and/or ownership interests in the Company.

NOW, THEREFORE, in consideration of the premises and for other good and valuable consideration, the receipt and legal sufficiency of which are hereby acknowledged, Pledgor, intending to be legally bound, hereby covenants and agrees as follows:

## SECTION 1
## DEFINITIONS

Capitalized terms used in this Agreement and not specifically defined in this Agreement shall have the meaning given to such terms in the Purchase Agreement. For purposes of this Agreement the following terms have the following meanings:

"**Bankruptcy Rights**" shall mean, individually and collectively, all benefits, rights and remedies arising from or as a result of the status of the holders of the Ownership Interests (as defined in **Section 2.1(a)**) as equity security holders in the Company, including receiving all distributions of cash or other property arising out of any Insolvency Proceeding, voting on any plan of reorganization or liquidation, objecting or consenting to or participating in any matter that may be raised in such Insolvency Proceeding, and filing proofs of claim and/or proofs of interest permitted to be filed under Section 501(a) of the Bankruptcy Code in any Insolvency Proceeding, and all Proceeds of any of the foregoing and all increases, substitutions, replacements, additions and accessions to any of the foregoing, together with full power and authority to demand, receive,

enforce, collect or give receipt for any of the foregoing, to file any claims and to take any action which, in the opinion of Skylark, may be necessary or advisable in connection with any of the foregoing.

"**Default**" shall mean the occurrence of any event, circumstance or condition which constitutes a breach or a default under the Purchase Agreement.

"**Equity Distributions**" shall mean collectively, whether now existing or hereafter arising, made or acquired, all payments, dividends, issues, profits and distributions, whether in the form of cash, property or otherwise, and whether derived from operations of the Company or a sale or other disposition of all or any portion of the property of the Company, paid or which are now or may hereafter become payable as a result of, arising out of, on account of, or in connection with the Ownership Interests and/or the Bankruptcy Rights, and the Proceeds of any of the foregoing, including all distributions of cash or property arising out of any of the foregoing, and the Proceeds of any of the foregoing, and all increases, substitutions, replacements, additions and accessions to any of the foregoing, together with full power and authority to demand, receive, enforce, collect or give receipt for any of the foregoing, to file any claims and to take any action which, in the opinion of Skylark, may be necessary or advisable in connection with any of the foregoing.

"**Equity Rights**" shall mean collectively, whether now existing and hereafter arising or acquired, all benefits, rights and remedies of the holders of the Ownership Interests as a result of, arising out of, on account of, or in connection with the Ownership Interests, including the rights to exercise all voting, consensual and other powers of ownership pertaining to the Ownership Interests, and all Proceeds of any of the foregoing and all increases, substitutions, replacements, additions and accessions to any of the foregoing, together with full power and authority to demand, receive, enforce, collect or give receipt for any of the foregoing, to file any claims and to take any action which, in the opinion of Skylark, may be necessary or advisable in connection with any of the foregoing.

"**Insolvency Proceeding**" shall mean any proceeding brought under or pursuant to any bankruptcy, insolvency, receivership or similar law or laws of the United States or any other state or other jurisdiction, including the Bankruptcy Code, and any other law or laws of the United States or any other state or other jurisdiction which affect the rights of debtors and/or creditors generally.

"**Limited Liability Company Agreement**" shall mean the Operating Agreement of the Company dated as of July 23, 2018, as the same may be amended, modified, supplemented, replaced or otherwise modified from time to time in accordance with the terms of this Agreement.

"**Obligations**" shall mean the performance of all obligations under the Purchase Agreement, including, without limitation, (i) the subdivision of the Land being legally subdivided in accordance with the Subdivision Map Act (Section 66410 of the California Government Code), and creation of the Property as a separate legal parcel, and (ii) conveyance and transfer of title to the Property pursuant to and in accordance with the Purchase Agreement, and (iii) payment of Liquidated Damages in the event of a Default under the Purchase Agreement.

2

"**Proceeds**" means all "proceeds" as such term is defined in Section 9-102 of the UCC on the date hereof and, in any event, shall include, without limitation, (i) all dividends, distributions, monies, fees, payments, compensations, proceeds or other income now or hereafter becoming due and payable from, or with respect to, the Ownership Interests, whether payable as profits, distributions, asset distributions, repayment of loans or capital or otherwise, (ii) all contract rights, general intangibles, claims, powers, privileges, benefits and remedies of Pledgor relating to the foregoing; and (iii) all cash or noncash proceeds of any of the foregoing.

## SECTION 2
## PLEDGE

Section 2.1    **Pledge of Security Interest**.  As security for the prompt and complete payment and performance when due of all of the Obligations and to induce Skylark to enter into the Purchase Agreement, Pledgor hereby pledges, assigns and grants to Skylark a continuing first priority security interest in a fifty percent (50%) membership interest in the Company, including a proportionate interest in any and all of the following, whether now existing or hereafter owned, existing or arising (the "**Collateral**"):

(a)    all right, title and interests in, to and under all current and future membership interests and other ownership interests in the Company and all rights, powers and privileges attendant thereto under the Limited Liability Company Agreement or otherwise, including but not limited to the right to manage or control or participate in the management or control of the Company and any and all other rights with respect to the Company that are held or may be held by agreement or operation or law, by Pledgor, including without limitation the right to exercise all voting, consensual and other powers of ownership (collectively, the "**Ownership Interests**");

(b)    all Equity Distributions;

(c)    all Equity Rights;

(d)    all Bankruptcy Rights;

(e)    all documents, certificates and/or instruments representing any of the foregoing and all cash, securities, dividends, rights and other property at any time and from time to time received, receivable or otherwise distributed in respect of or in exchange for any or all of the foregoing; and

(f)    all Proceeds of any of the foregoing and all increases, substitutions, replacements, additions and accessions to any of the foregoing, together with full power and authority to demand, receive, enforce, collect or give receipt for any of the foregoing, to file any claims and to take any action which, in the opinion of Skylark, may be necessary or advisable in connection with any of the foregoing.

Section 2.2    **Certificates Evidencing or Representing Collateral**.  Pledgor will not permit or suffer the Company to take any action at any time which would cause Pledgor's representations and warranties set forth in **Section 3.1(f)** or **(g)** to cease to be true, correct and complete at any time.  If, notwithstanding the foregoing, any of the Collateral ever is evidenced or

3

represented by any certificate or instrument, Pledgor agrees to deliver to Skylark, promptly upon receipt thereof and in form suitable for transfer (and accompanied by a duly executed instrument of transfer), any and all certificates and/or instruments which evidence or represent any of the Collateral which may at any time or from time to time come into the possession or control of Pledgor.

**SECTION 3**
**WARRANTIES AND COVENANTS**

Section 3.1    **Warranties**. Pledgor warrants to Skylark that: (a) each of the Recitals in this Agreement is true, correct and complete in all material respects; (b) Pledgor is a valid and subsisting limited liability company and is duly organized and existing under the laws of the State of California, that the Limited Liability Company Agreement is and remains in full force and effect, and that a true and correct copy of the Limited Liability Company Agreement has been delivered to Skylark; (c) Pledgor is (or at the time of any future delivery, pledge, assignment or transfer thereof will be) the legal and equitable owner of the Collateral free and clear of all liens, security interests and encumbrances of every description whatsoever other than the security interest created hereunder; (d) the pledge and delivery of the Collateral pursuant to this Agreement will create a valid first priority, perfected security interest in the Collateral in favor of Skylark and its assigns; (e) neither the execution or the delivery of this Agreement nor compliance with the terms and provisions hereof on the part of Pledgor will violate any statute, license or regulation of any governmental authority or will breach, conflict with or result in a breach of any of the terms, conditions or provisions of any agreement or instrument, other than any agreement with Skylark, to which Pledgor is or may be bound, or constitute a default thereunder, or result in the creation or imposition of any lien, charge or encumbrance of any nature whatsoever upon or give to others any interest or rights, including rights of termination or cancellation, in or with respect to, any of Pledgor's property, assets, contracts, licenses or business; (f) the limited liability company membership interests in the Company are "securities" and "financial assets" within the meaning of Division 8 of the California Uniform Commercial Code (the "UCC"); (g) the membership interests in the Company are represented or evidenced by certificates within the meaning of Section 8-102(a)(16) of the UCC; and (h) the Limited Liability Company Agreement of the Company provides, and will provide as at all times until the Obligations are satisfied and title to the Property has transferred to Skylark in accordance with the Purchase Agreement, that all membership interest in Company are "securities" within the meaning of Division 8 of the UCC. The representations and warranties set forth in this **Section 3.1** shall survive the execution, delivery and performance of this Agreement.

Section 3.2    **Covenants and Consents**. So long as any of the Obligations shall be outstanding, Pledgor:  (a) shall not, without the express prior written consent of Skylark, sell, assign, exchange, pledge or otherwise transfer, encumber, or grant any option, warrant or other right to purchase any Collateral pledged hereunder, or otherwise diminish or impair any of its rights in, to or under any of the Collateral; (b) hereby consents to the filing of such Uniform Commercial Code financing statements and other documents (and pay the costs of filing and recording or re-filing and re-recording the same in all public offices reasonably deemed necessary or appropriate by Skylark) and do such other acts and things, all as Skylark may from time to time reasonably request, to establish and maintain a valid, first priority perfected security interest in the Collateral (free of all other liens, claims and rights of third parties whatsoever) to secure the

4

performance and payment of the Obligations; (c) will execute and deliver to Skylark such allonges, endorsements and similar documents required to perfect Skylark's interest in and to the Collateral, satisfactory in form and substance to Skylark, as Skylark may reasonably request; (d) will furnish Skylark such information concerning the Collateral as Skylark may from time to time reasonably request, and will permit Skylark or any designee of Skylark, from time to time to inspect, audit and make copies of and extracts from all records and all other papers in the possession of Pledgor which pertain to the Collateral, and will, upon request of Skylark at any time when a Default has occurred, deliver to Skylark all of such records and papers; and (e) confirms that the Collateral is classified as, and will be classified as, certificated securities under the terms of Article 8 of the applicable Uniform Commercial Code, and agrees that (1) the Collateral shall be evidenced by an instrument or a certificate, and (2) Pledgor shall or shall cause the Company to promptly deliver any such instrument or certificate, duly endorsed or subscribed by Pledgor or accompanied by appropriate instrument of transfer or assignment duly executed in blank by Pledgor, to Skylark as additional Collateral.

## SECTION 4
## SKYLARK'S ACTIONS UPON DEFAULT

Skylark may from time to time after the occurrence of Default, without notice to Pledgor, take all or any of the following actions: (a) transfer all or any part of the Collateral into the name of Skylark or any nominee or sub-agent for Skylark, with or without disclosing that such Collateral is subject to the lien, pledge and security interest hereunder; (b) appoint one or more sub-agents or nominees for the purpose of retaining physical possession of the Collateral; (c) notify the parties obligated on any of the Collateral to make payment directly to Skylark of any amounts due or to become due thereunder; (d) endorse any checks, drafts or other writings in the name of Pledgor to allow collection of the Collateral; (e) enforce collection of any of the Collateral by suit or otherwise, and surrender, release or exchange all or any part thereof, or compromise or renew for any period (whether or not longer than the original period) any obligations of any nature of any party with respect thereto; and (f) take control of any proceeds of the Collateral.

## SECTION 5
## VOTING RIGHTS AND DIVIDENDS

Section 5.1    **Rights Prior to Default**.  Notwithstanding any other provisions contained in this Agreement, so long as any of the Obligations remain unperformed and/or unpaid, and so long as Skylark has not given the notice referred to in **Section 5.2** below:

(a)    Pledgor shall be entitled to exercise any and all voting or consensual rights and powers and purchase or subscription rights (any exercise by Pledgor of such purchase or subscription rights may be made only from funds of Pledgor not comprising the Collateral) relating or pertaining to the Collateral or any part thereof for any purpose; provided, that Pledgor agrees that it will not exercise any such right or power in any manner which would have a material adverse effect on the value of the Collateral or any part thereof or any other material adverse effect in relation to the Collateral or cause a , Default in respect of Pledgor's Obligations under the Purchase Agreement.

5

(b)    Pledgor shall be entitled to receive, retain and/or distribute to its partners any and all dividends, interest or other cash distributions payable on or in respect of the Collateral which are paid in cash, but all dividends, interest and distributions in respect of the Collateral, whether resulting from a subdivision, combination or reclassification of Collateral or any part thereof or received in exchange for Collateral or any part thereof or as a result of any merger, consolidation, acquisition or other exchange of assets to which any Person may be a party or otherwise or as a result of any exercise of any purchase or subscription rights, shall be and become part of the Collateral hereunder and, if received by Pledgor, shall be forthwith delivered to Skylark in due form for transfer (i.e., endorsed in blank or accompanied by stock or bond powers executed in blank) to be held for the purposes of this Agreement.

Section 5.2    **Rights After Default**.  Upon notice delivered to Pledgor from Skylark given upon the occurrence of a Default, all rights and powers which Pledgor is entitled to exercise and all rights of Pledgor to receive and retain dividends pursuant to **Section 5.1** hereof, shall forthwith cease, and all such rights and powers shall thereupon become vested in Skylark which shall have the sole and exclusive authority to exercise such rights and powers and to receive such dividends, interest or other distributions.  Any and all money and other property paid over to or received by Skylark pursuant to this **Section 5.2** shall be retained by Skylark as additional Collateral hereunder and applied in accordance with the provisions hereof.

**SECTION 6**
**REMEDIES**

Section 6.1    **UCC Remedies**.  Whenever a Default shall exist, Skylark may exercise from time to time any rights and remedies available to it under the UCC or otherwise available to it under the Purchase Agreement or other applicable law.  Without limiting the foregoing, whenever a Default shall exist, Skylark:  (a) may, to the fullest extent permitted by applicable law, without notice, advertisement, hearing or process of law of any kind, (i) sell any or all of the Collateral, free of all rights and claims of Pledgor therein and thereto, at any public or private sale and (ii) bid for and purchase any or all of the Collateral at any such public sale, and (b) shall have the right, for and in the name, place and stead of Pledgor, to execute endorsements, assignments and other instruments of conveyance or transfer with respect to all or any of the Collateral.   Any notification of intended disposition of any of the Collateral shall be deemed reasonably and properly given if given at least ten (10) days before such disposition.  Any proceeds of any of the Collateral may be applied by Skylark to the payment of expenses in connection with the Collateral, including, without limitation, reasonable attorneys' fees and legal expenses, and any balance of such proceeds may be applied by Skylark toward the payment of such of the Obligations, and in such order of application, as Skylark may from time to time elect (and, after payment in full of all Obligations, any excess shall be delivered to Pledgor or as a court of competent jurisdiction shall direct).  If, at the original time or times appointed for the sale of the whole or any part of the Collateral, (1) the highest bid, if there shall be but one sale, shall be inadequate to discharge in full the Obligations, or (2) the highest bid for the lot offered for sale, if the Collateral is offered for sale in lots, would indicate to Skylark in its sole and absolute discretion that the proceeds of the sale or sales of the whole of the Collateral would be unlikely to be sufficient to discharge all of the Obligations, Skylark may, on one or more occasions and in its sole and absolute discretion, postpone any of said sale or sales by public announcement at the time of sale, and no other notice

6

of such postponement or postponements of sale need be given, any other notice hereby waived; provided, however, that any sale or sales made after such postponement shall be after ten (10) days' prior notice to Pledgor. In the event Skylark is subject to any public registration duties promulgated by the Securities and Exchange Commission or any other governing authority in connection with the enforcement of its rights hereunder, Pledgor covenants and agrees to cooperate with Skylark in all respects thereto, including Pledgor being obligated to prepare the applicable registration statement and if requested by Skylark after its review thereof, file the same at Pledgor's sole cost and expense. This foregoing covenant shall survive any foreclosure or transfer in lieu thereof.

Section 6.2  **Manner of Sale**.  Skylark is hereby authorized to comply with any limitation or restriction in connection with any sale of Collateral as it may be advised by counsel is necessary in order to: (a) avoid any violation of applicable law (including, without limitation, compliance with such procedures as may restrict the number of prospective bidders or purchasers and/or further restrict such prospective bidders or purchasers to persons or entities who will represent and agree that they are purchasing for their own account for investment and not with a view to the distribution or resale of such Collateral), or (b) obtain any required approval of the sale or of the purchase by any governmental authority or official, and Pledgor agrees that such compliance shall not result in such sale being considered or deemed not to have been made in a commercially reasonable manner and that Skylark shall not be liable or accountable to Pledgor for any discount allowed by reason of the fact that such Collateral is sold in compliance with any such limitation or restriction. Pledgor waives any right it may now or hereafter have to require Skylark to marshal any of the collateral from time to time securing the Obligations. SKYLARK MAY ENFORCE ITS RIGHTS HEREUNDER WITHOUT RESORT TO PRIOR JUDICIAL PROCESS OR JUDICIAL HEARING AND PLEDGOR EXPRESSLY WAIVES, RENOUNCES, AND KNOWINGLY RELINQUISHES ANY LEGAL RIGHT WHICH MIGHT OTHERWISE REQUIRE SKYLARK TO ENFORCE ITS RIGHTS BY JUDICIAL PROCESS. IN SO PROVIDING FOR A NONJUDICIAL REMEDY, PLEDGOR REPRESENTS THAT SUCH A REMEDY IS RESPONSIVE TO COMMERCIAL NECESSITY AND IS THE RESULT OF BARGAIN AT ARM'S LENGTH. NOTHING HEREIN IS INTENDED TO PREVENT SKYLARK FROM RESORTING TO JUDICIAL PROCESS AT SUCH PARTY'S OPTION

## SECTION 7
## WAIVER OF TRANSFER RESTRICTIONS

Section 7.1  Pledgor and Company hereby consent to the terms and conditions contained in this Agreement, to the transactions contemplated thereby and to all future amendments thereto, notwithstanding any limitations or restrictions on such transactions set forth in the governing documents of Company or otherwise with respect to the transfer of any of the Collateral. Without limiting the foregoing, Pledgor and Company agree that any rights of first refusal, options to purchase or other conditions or restrictions affecting the transfer of any of the Collateral shall not be triggered by, or otherwise in any respect be applicable to, the execution and delivery of this Agreement or the exercise of Skylark's rights and remedies under this Agreement, as amended from time to time, and upon Skylark's exercise of its rights and remedies under this Agreement (as amended from time to time), Skylark, a purchaser at a foreclosure sale of the Collateral or any such party's designee shall be immediately and automatically admitted as an owner of Company with

7

all ownership rights accruing to it (including, without limitation, all rights to distributions and voting) without the need to obtain the consent of any owner or the Company or to provide or comply with a right of first refusal or option to purchase with respect to any of the Collateral in favor of any owner, the Company or any other Person, notwithstanding anything in the governing documents of Company, any agreement to which Pledgor is now or hereafter a party with respect to any of the Collateral or otherwise to the contrary or in conflict thereof.

## SECTION 8
## ATTORNEY IN FACT; IRREVOCABLE PROXY

Section 8.1    **Attorney in Fact**.  Pledgor hereby irrevocably appoints Skylark as its attorney-in-fact in accordance with the powers granted in connection with this Agreement (without requiring Skylark to act as such), with full power of substitution, which appointment as attorney-in-fact is irrevocable during the term of this Agreement, to take any action Skylark deems necessary upon the occurrence of a Default to (a) perfect, protect and realize upon its lien and first priority security interest in the Collateral, (b) preserve, protect, direct, utilize and operate any license, permit, contract or other right or obligation of Pledgor, (c) to ask, demand, collect, sue for, recover, compromise, receive and give acquittance and receipts for moneys due and to become due under or in respect of any of the Collateral, (d) to receive, endorse and collect any drafts or other instruments, documents and chattel paper in connection with clause (c) above, and (e) to file any claims or take any action or institute any proceedings that Skylark may deem necessary or desirable for the perfection and/or collection of any of the Collateral or otherwise to enforce the rights of Skylark, with respect to any of the Collateral, including the execution and delivery of any and all documents or instruments related to perfecting Skylark's interest in the Collateral in Pledgor's name, or otherwise to effect fully the purpose, terms and conditions of this Agreement and the Purchase Agreement, and said appointment shall create in Skylark a power coupled with an interest; provided, however, Skylark shall not have any duty to exercise any such rights or to preserve the same, shall not be liable for any failure or delay to do so, and shall be accountable only for amounts that it actually receives as a result of the exercise of such powers hereunder.

Section 8.2    **Irrevocable Proxy**.  Pledgor hereby grants to Skylark an irrevocable proxy to vote the Collateral and other equity interests pledged by Pledgor and to exercise all other rights, powers, privileges and remedies to which a holder of the Collateral or other equity interests would be entitled (including without limitation giving or withholding written consents of shareholders, members or partners, as applicable, calling special meetings of shareholders, members or partners, as applicable, and voting at such meetings), which proxy is coupled with an interest and shall be effective, automatically and without the necessity of any action (including any transfer of any Collateral on the record books of the issuer thereof) by any other person (including the issuer of the Collateral or any officer or agent thereof), upon the occurrence of a Default. **THE PROXIES AND POWERS GRANTED BY PLEDGOR PURSUANT TO THIS AGREEMENT ARE COUPLED WITH AN INTEREST AND ARE GIVEN TO SECURE THE PERFORMANCE OF THE PLEDGOR'S OBLIGATIONS UNDER THIS AGREEMENT.**

Section 8.3    Authorization to File UCC Financing Statements.    Pledgor hereby authorizes Skylark to file one or more financing statements, in the form prescribed by the UCC or the uniform commercial code as in effect in any relevant jurisdiction, naming the Pledgor, as

8

debtor, and covering the Collateral, in the appropriate filing offices in accordance with the UCC or such other uniform commercial code.

### SECTION 9
### MISCELLANEOUS

Section 9.1    **Care of Collateral**. Skylark shall be deemed to have exercised reasonable care in the custody and preservation of the Collateral if it takes such action for that purpose as Pledgor shall request in writing, but failure of Skylark to comply with any such request shall not of itself be deemed a failure to exercise reasonable care, and no failure of Skylark to preserve or protect any rights with respect to the Collateral against prior parties, or to do any act with respect to preservation of the Collateral not so requested by Pledgor, shall be deemed a failure to exercise reasonable care in the custody or preservation of any Collateral.

Section 9.2    **No Waiver**. No delay on the part of Skylark in exercising any right, power or remedy shall operate as a waiver thereof, and no single or partial exercise of any such right, power or remedy shall preclude any other or further exercise thereof, or the exercise of any other right, power or remedy. No amendment, modification or waiver of, or consent with respect to, any provision of this Agreement shall be effective unless the same shall be in writing and signed and delivered by Skylark and Pledgor, and then such amendment, modification, waiver or consent shall be effective only in the specific instance and for the specific purpose for which given.

Section 9.3    **Cumulative Rights**. All obligations of Pledgor and all rights, powers and remedies of Skylark expressed herein are in addition to all other rights, powers and remedies possessed by them, including, without limitation, those provided by applicable law or in any other written instrument or agreement relating to any of the Obligations or any security therefor.

Section 9.4    **Assignment by Skylark**. Skylark may assign, without Pledgor's consent, its interests in this Agreement and the Purchase Agreement to any other Person, including, without limitation, any of Skylark's affiliates.

Section 9.5    **Successors and Assigns**. This Agreement shall be binding upon Pledgor and its successors and assigns, and shall inure to the benefit of Skylark and its successors and assigns.

Section 9.6    **Waiver of Jury Trial**. TO THE FULLEST EXTENT PERMITTED BY LAW, PLEDGOR AND SKYLARK (BY ITS ACCEPTANCE HEREOF) EACH HEREBY (a) EXPRESSLY, KNOWINGLY AND VOLUNTARILY WAIVES ANY RIGHT TO TRIAL BY JURY OF ANY CLAIM OR CAUSE OF ACTION ARISING UNDER THIS AGREEMENT OR IN ANY WAY CONNECTED WITH OR INCIDENTAL TO THE DEALINGS OF THE PARTIES WITH RESPECT TO THE PURCHASE AGREEMENT OR THE TRANSACTIONS CONTEMPLATED THEREBY, WHETHER NOW EXISTING OR HEREAFTER ARISING, AND WHETHER SOUNDING IN CONTRACT, TORT OR OTHERWISE, AND (b) WITHOUT LIMITATION OF SKYLARK'S RIGHT TO EXERCISE ANY REMEDY AFTER DEFAULT SET FORTH HEREIN OR AVAILABLE UNDER APPLICABLE LAW, AGREES AND CONSENTS THAT ANY SUCH CLAIM OR CAUSE OF ACTION SHALL BE DECIDED BY A COURT TRIAL WITHOUT A JURY, AND THAT ANY PARTY TO THIS AGREEMENT

9

MAY FILE AN ORIGINAL COUNTERPART OR A COPY OF THIS SECTION AS WRITTEN EVIDENCE OF THE CONSENTS OF THE PARTIES TO THE WAIVER OF THEIR RESPECTIVE RIGHTS TO TRIAL BY JURY.

Section 9.7     **Governing Law**.     THIS AGREEMENT AND THE PURCHASE AGREEMENT SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH, AND THE RIGHTS OF THE PARTIES SHALL BE GOVERNED BY THE LAW OF THE STATE OF CALIFORNIA, WITHOUT REGARD TO PRINCIPLES OF CONFLICT OF LAW.

Section 9.8     **Jurisdiction and Venue**.

(a)     ANY CLAIM OR ACTION ARISING UNDER THIS AGREEMENT AND THE PURCHASE AGREEMENT MAY, AT SKYLARK'S OPTION, BE INSTITUTED IN ANY FEDERAL OR STATE COURT IN THE COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AND PLEDGOR WAIVES ANY OBJECTIONS WHICH IT MAY NOW OR HEREAFTER HAVE BASED ON VENUE AND/OR FORUM NON CONVENIENS OF ANY SUCH SUIT, ACTION OR PROCEEDING, AND PLEDGOR HEREBY IRREVOCABLY SUBMITS TO THE JURISDICTION OF ANY SUCH COURT IN ANY SUIT, ACTION OR PROCEEDING.

(b)     PLEDGOR AND SKYLARK (BY ITS ACCEPTANCE HEREOF) EACH WAIVES PERSONAL SERVICE OF PROCESS AND IRREVOCABLY CONSENTS TO SERVICE OF PROCESS IN THE MANNER PROVIDED FOR NOTICES IN SECTION 14 OF THE PURCHASE AGREEMENT. NOTHING IN THIS AGREEMENT WILL AFFECT THE RIGHT OF ANY PARTY TO THIS AGREEMENT TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY LAW.

Section 9.9     **Notices**.  All notices required or permitted hereunder shall be given in accordance with **Section 14** of the Purchase Agreement to the address set forth below the Pledgor's signature block on the signature page of this Agreement.

Section 9.10     **Joint and Several**.  If Pledgor consists of more than one Person, then the obligations of Pledgor hereunder shall be joint and several.

Section 9.11     **Counterparts**.  This Agreement may be executed in any number of counterparts, and each duplicate counterpart shall be deemed to be an original.  Receipt of an executed signature page to this Agreement by facsimile, portable document format (.pdf), attachment to an email, or other electronic transmission shall constitute effective delivery thereof.

Section 9.12     **Term of Agreement**.  Upon the full satisfaction of the Obligations and title to the Property being transferred to Skylark in accordance with the Purchase Agreement, this Agreement shall automatically terminate and be of no further force and effect.

*[signature page follows]*

10

IN WITNESS WHEREOF, this Pledge Agreement has been duly executed and delivered as of the day and year first written above.

**PLEDGOR:**

_____
Mohamed Hadid, an individual

Notice Address:

c/o Summitridge Development II LLC
9454 Wilshire Boulevard, Suite 208
Beverly Hills, California 90212
Attention:  Mohamed Hadid
Email:  hadidaspen@aol.com

SIGNATURE PAGE TO PLEDGE AGREEMENT

## ACKNOWLEDGMENT

The undersigned Company hereby acknowledges receipt of a copy of the foregoing Pledge Agreement, agrees to the terms of, and agrees to be bound by, the Pledge Agreement and to promptly note on its books and records the security interests granted under such Pledge Agreement.  The Company further agrees, upon request therefor by Skylark (or its assignee or nominee or other designee) stating (1) that an uncured breach or default has occurred under the Purchase Agreement and (2) that Skylark (or its assignee or nominee or other designee) is entitled under the Pledge Agreement to have the pledged 50% membership interest in the Company re-registered in its name and to be admitted as a substitute member in respect thereof or to exercise voting consent rights with respect thereto, that the Company will act upon and in accordance with such instructions of Skylark, and that it will not require the further consent of, or seek further instruction from, Pledgor at any time.

**COMPANY:**

**SUMMITRIDGE DEVELOPMENT II LLC,**
a California limited liability company

By: _____
Name:  Mohamed Hadid
Title:  Sole Member and Manager

Exhibit 4

FOR REFERENCE ONLY: 20201531690

FIDELITY NATIONAL TITLE COMPANY

RECORDING REQUESTED BY:

Tony Russo
Crest Real Estate
11150 W Olympic Blvd #700
LA, CA 90064

MAIL TAX STATEMENTS AND
WHEN RECORDED MAIL TO:

Zachary Vella
250 Bowery, 2nd Floor
New York, NY 10012

30058359-72

APN: portion of 4384-005-026                    SPACE ABOVE THIS LINE IS FOR RECORDER'S USE

## GRANT DEED

THE UNDERSIGNED GRANTOR(S) DECLARE(S):    DOCUMENTARY TRANSFER TAX IS $ 0 ; CITY TRANSFER TAX $ 0
_____ Computed on full value of property conveyed, or
_____ Computed on full value less liens and encumbrances remaining at time of sale.
_____ Unincorporated area    X    City of Los Angeles

THE RECORDING IS NOT FOR CONSIDERATION BUT FOR THE PURPOSE OF ADJUSTING THE BOUNDARY
LINES PER LOT LINE ADJUSTMENT CASE NO. AA-2019-3535-PMEX

For no additional consideration, receipt of which is hereby acknowledged,

**Tree Lane, LLC,**
**a California limited liability company ("Grantor")**

hereby GRANT(S) to

**Zachary Vella,**
**a single man ("Grantee")**

the following described real property in the
City of Los Angeles, County of Los Angeles,
State of California, more particularly described as follows:

LEGAL DESCRIPTION ATTACHED HERETO AS EXHIBIT "A" AND SHOWN
IN EXHIBIT "B" AND MADE A PART HEREOF BY REFERENCE

"The value of the property in this
conveyance,exclusive of liens and
encumbrances is $100.00 or less,and there
no additional consideration received by the
grantor, R&T 11911."

Exempt from fee per GC27388.1 due to
the maximum fees being paid on documents
in this transaction

DEED APPROVED BY CITY OF
LOS ANGELES PLANNING
DEPARTMENT FOR RECORDING
TO ADJUST LOT LINES PER
LOT LINE ADJUSTMENT CASE NO.
AA-2019-3535-PMEX

Dated: 1/16/2020

TREE LANE LLC, A California Limited
LiABILITY Company

_____
Signature

Mohamed Hadid Manyn
Name & Title

AKA Mohamed Anwar Hadid

MAIL TAX STATEMENTS AS DIRECTED ABOVE

Exhibit 4, Page 100



**This page is part of your document - DO NOT DISCARD**



## 20201531690



Pages:
0007

Recorded/Filed in Official Records
Recorder's Office, Los Angeles County,
California

**11/30/20 AT 08:00AM**

| | |
|---|---|
| FEES: | 57.00 |
| TAXES: | 0.00 |
| OTHER: | 0.00 |
| PAID: | 57.00 |

**PCOR SURCHARGE $20.00**



**L E A D S H E E T**



202011300230039

00019402528



011493355

**SEQ:**
**05**

**SECURE - 8:00AM**



**THIS FORM IS NOT TO BE DUPLICATED**

E08_201125_8012070

E825M3

FIDELITY NATIONAL TITLE COMPANY

RECORDING REQUESTED BY:

Tony Russo
Crest Real Estate
11150 W Olympic Blvd #700
LA, CA 90064

MAIL TAX STATEMENTS AND
WHEN RECORDED MAIL TO:

Zachary Vella
250 Bowery, 2nd Floor
New York, NY 10012

30058359-72

APN: portion of 4384-005-026

SPACE ABOVE THIS LINE IS FOR RECORDER'S USE

# GRANT DEED

THE UNDERSIGNED GRANTOR(S) DECLARE(S):

DOCUMENTARY TRANSFER TAX IS $ 0 ; CITY TRANSFER TAX $ 0
_____ Computed on full value of property conveyed, or
_____ Computed on full value less liens and encumbrances remaining at time of sale.
_____ Unincorporated area   X   City of Los Angeles

THE RECORDING IS NOT FOR CONSIDERATION BUT FOR THE PURPOSE OF ADJUSTING THE BOUNDARY
LINES PER LOT LINE ADJUSTMENT CASE NO. AA-2019-3535-PMEX

For no additional consideration, receipt of which is hereby acknowledged,

**Tree Lane, LLC,**
**a California limited liability company** ("Grantor")

hereby GRANT(S) to

**Zachary Vella,**
**a single man** ("Grantee")

the following described real property in the
City of Los Angeles, County of Los Angeles,
State of California, more particularly described as follows:

"The value of the property in this
conveyance, exclusive of liens and
encumbrances is $100.00 or less, and there
no additional consideration received by the
grantor, R&T 11911."

LEGAL DESCRIPTION ATTACHED HERETO AS EXHIBIT "A" AND SHOWN
IN EXHIBIT "B" AND MADE A PART HEREOF BY REFERENCE

DEED APPROVED BY CITY OF
LOS ANGELES PLANNING
DEPARTMENT FOR RECORDING
TO ADJUST LOT LINES PER
LOT LINE ADJUSTMENT CASE NO.
AA-2019-3535-PMEX

Exempt from fee per GC27388.1 due to
the maximum fees being paid on documents
in this transaction

Dated: 1/16/2020

TREE LANE LLC, A California Limited
Liability Company

_____
Signature

_____
Name & Title

AKA Mohamed Anwar Hadid

MAIL TAX STATEMENTS AS DIRECTED ABOVE

Exhibit 4, Page 102

> A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

STATE OF _____ )
                          )  ss:
COUNTY OF _____ )

On _____, before me, _____, Notary Public
                                        (insert name)

personally appeared _____, who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature: _____

[Seal]

See attached.

**CALIFORNIA ALL-PURPOSE ACKNOWLEDGMENT**                    CIVIL CODE § 1189

> A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California

County of _LOS Angeles_

On _January 16, 2020_ before me, _Selena Chavez (Notary Public)_
     *Date*                 *Here Insert Name and Title of the Officer*

personally appeared _Mohamed Anwar Hadid_
                                   *Name(s) of Signer(s)*

who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

> SELENA CHAVEZ
> Notary Public · California
> Los Angeles County
> Commission # 2267925
> My Comm. Expires Nov 20, 2022

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _____

*Place Notary Seal and/or Stamp Above*        *Signature of Notary Public*

─────────────────── **OPTIONAL** ───────────────────

*Completing this information can deter alteration of the document or fraudulent reattachment of this form to an unintended document.*

**Description of Attached Document**

Title or Type of Document: _____

Document Date: _____ Number of Pages: _____

Signer(s) Other Than Named Above: _____

**Capacity(ies) Claimed by Signer(s)**

Signer's Name: _____    Signer's Name: _____
☐ Corporate Officer – Title(s): _____    ☐ Corporate Officer – Title(s): _____
☐ Partner – ☐ Limited ☐ General    ☐ Partner – ☐ Limited ☐ General
☐ Individual    ☐ Attorney in Fact    ☐ Individual    ☐ Attorney in Fact
☐ Trustee    ☐ Guardian of Conservator    ☐ Trustee    ☐ Guardian of Conservator
☐ Other: _____    ☐ Other: _____
Signer is Representing: _____    Signer is Representing: _____

©2017 National Notary Association



Exhibit A

## LEGAL DESCRIPTION

That portion of Lot 3 in Section 2, Township 1 South, Range 15 West, San Bernardino Base and Meridian, as per map filed in Book 45, Page 40 of Record of Surveys, in the City of Los Angeles, County of Los Angeles, State of California, described as a whole as follows:

Beginning at the northeast corner of said Lot 3;

Thence westerly along the north line of said Lot 3, North 89° 33' 00" West 283.39 feet to the most northeasterly corner of Lot 7 of said Tract No. 21845;

Thence southeasterly along the northeasterly line of said Lot 7 and Lot 8 of said Tract No. 21845, South 37° 01' 29" East 72.78.00 feet to an angle point on said Lot 8;

Thence continuing southeasterly along the northeasterly line of said Lot 8, South 24° 18' 16: East 63.64 feet;

Thence easterly, North 74° 04' 18" East 16.32 feet;

Thence southeasterly, South 29° 58' 18" East 50.69 feet;

Thence southerly, South 0° 01' 42" West 43.62 feet;

Thence southwesterly, South 60° 01' 42" West 38.68 feet;

Thence southeasterly, South 29° 58' 18" East 71.40 feet;

Thence easterly, South 89° 58' 18" East 3.90 feet to a point of cusp with a curve concave to the south having a radius of 47.31 feet and to which point a radial line bears North 41° 01' 59" West;

Thence easterly 64.83 feet along said curve through a central angle of 78° 31' 33";

Thence southeasterly, South 52° 30' 26" East 10.44 feet to the beginning of a tangent curve concave to the northeast having a radius of 17.94 feet;

Thence continuing southeasterly and easterly 10.21 feet along said curve through a central angle of 32° 35' 49";

Thence continuing easterly, South 85° 06' 16" East 20.03 feet to the beginning of a tangent curve concave to the southwest having a radius of 41.86 feet;

Thence southeasterly and southerly 62.44 feet along said curve through a central angle of 85° 28' 12";

Page 1 of 2

Thence continuing southerly, South 0° 21' 57" West 15.92 feet to the beginning of a tangent curve concave to the northeast having a radius of 12.96 feet;

Thence southerly and southeasterly 15.27 along said curve through a central angle of 67° 31' 21" to the beginning of a non-tangent curve concave to the south having a radius of 30.67 feet and to which point a radial line bears North 28° 17' 34" West;

Thence easterly 21.11 feet along said curve through a central angle of 39° 25' 55" to the east line of said Lot 3;

Thence northerly along said east line, North 0° 21' 54" East 354.79 feet to the Point of Beginning.

Containing 60, 475 S.F. more or less.

Prepared by me or under
my direction and supervision

Atanacio Payan, PLS 7796
Date: February 5, 2020



Exhibit 5

FOR REFERENCE ONLY: 20201531688

FIDELITY NATIONAL TITLE COMPANY

RECORDING REQUESTED BY:

Tony Russo
Crest Real Estate
11160 W Olympic Blvd #700
LA, CA 90064

MAIL TAX STATEMENTS AND
WHEN RECORDED MAIL TO:

Zachary Vella
250 Bowery, 2nd Floor
New York, NY 10012

30052359-TL

APN: 4384-023-014, portion of 4384-008-026        SPACE ABOVE THIS LINE IS FOR RECORDER'S USE
portion of

# GRANT DEED

THE UNDERSIGNED GRANTOR(S) DECLARE(S):        DOCUMENTARY TRANSFER TAX IS $ 0 ; CITY TRANSFER TAX $ 0

_____ Computed on full value of property conveyed, or
_____ Computed on full value less liens and encumbrances remaining at time of sale.
_____ Unincorporated area   X  City of Los Angeles

THE RECORDING IS NOT FOR CONSIDERATION BUT FOR THE PURPOSE OF ADJUSTING THE BOUNDARY
LINES PER LOT LINE ADJUSTMENT CASE NO. AA-2019-3535-PMEX

"The grantors and the grantees in this conveyance are comprised of the same parties who continue to hold the same
proportionate interest in the property, R & T 11925(d)."

For no additional consideration, receipt of which is hereby acknowledged,

**Zachary Vella,**
**a single man ("Grantor")**

hereby GRANT(S) to

**Zachary Vella,**
**a single man ("Grantee")**

the following described real property in the
City of Los Angeles, County of Los Angeles,
State of California, more particularly described as follows:

LEGAL DESCRIPTION ATTACHED HERETO AS EXHIBIT "A" AND SHOWN
IN EXHIBIT "B" AND MADE A PART HEREOF BY REFERENCE

> DEED APPROVED BY CITY OF
> LOS ANGELES PLANNING
> DEPARTMENT FOR RECORDING
> TO ADJUST LOT LINES PER
> LOT LINE ADJUSTMENT CASE NO.
> AA-2019-3535-PMEX

Dated:  01/16/2020

Signature

Zachary Vella
Name & Title  /  AKA Zachary Annison Vella

MAIL TAX STATEMENTS AS DIRECTED ABOVE



**This page is part of your document - DO NOT DISCARD**



## 20201531688



Pages:
0007

**Recorded/Filed in Official Records
Recorder's Office, Los Angeles County,
California**

**11/30/20 AT 08:00AM**

| | |
|---|---|
| FEES: | 57.00 |
| TAXES: | 0.00 |
| OTHER: | 0.00 |
| SB2: | 75.00 |
| PAID: | 132.00 |

**PCOR SURCHARGE $20.00**



LEADSHEET

202011300230039

00019402526

011493355

SEQ:
03

SECURE - 8:00AM



**THIS FORM IS NOT TO BE DUPLICATED**

E08_201125_8_____0

E833385

FIDELITY NATIONAL TITLE COMPANY

RECORDING REQUESTED BY:

Tony Russo
Crest Real Estate
11150 W Olympic Blvd #700
LA, CA 90064

MAIL TAX STATEMENTS AND
WHEN RECORDED MAIL TO:

Zachary Vella
250 Bowery, 2nd Floor
New York, NY 10012

30058359-TL

APN: ~~4384-023~~ 4384-023-014, portion of   4384-005-026                SPACE ABOVE THIS LINE IS FOR RECORDER'S USE
portion of

# GRANT DEED

THE UNDERSIGNED GRANTOR(S) DECLARE(S):        DOCUMENTARY TRANSFER TAX IS $ 0 ; CITY TRANSFER TAX $ 0

_____ Computed on full value of property conveyed, or
_____ Computed on full value less liens and encumbrances remaining at time of sale.
_____ Unincorporated area   _X_ City of Los Angeles

THE RECORDING IS NOT FOR CONSIDERATION BUT FOR THE PURPOSE OF ADJUSTING THE BOUNDARY
LINES PER LOT LINE ADJUSTMENT CASE NO. AA-2019-3535-PMEX

"The grantors and the grantees in this conveyance are comprised of the same parties who continue to hold the same
proportionate interest in the property, R & T 11925(d)."

For no additional consideration, receipt of which is hereby acknowledged,

**Zachary Vella,**
**a single man** ("Grantor")

hereby GRANT(S) to

**Zachary Vella,**
**a single man** ("Grantee")

the following described real property in the
City of Los Angeles, County of Los Angeles,
State of California, more particularly described as follows:

LEGAL DESCRIPTION ATTACHED HERETO AS EXHIBIT "A" AND SHOWN
IN EXHIBIT "B" AND MADE A PART HEREOF BY REFERENCE

DEED APPROVED BY CITY OF
LOS ANGELES PLANNING
DEPARTMENT FOR RECORDING
TO ADJUST LOT LINES PER
LOT LINE ADJUSTMENT CASE NO.
AA-2019-3535-PMEX

Dated: 01/16/2020

Signature

Zachary Vella
Name & Title   AKA Zachary Annson Vella

MAIL TAX STATEMENTS AS DIRECTED ABOVE

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

STATE OF _____ )
                        ) ss:
COUNTY OF _____ )

On _____, before me, _____, Notary Public
                                        (insert name)

personally appeared _____, who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature: _____

[Seal]                      See attached.

**CALIFORNIA ALL-PURPOSE ACKNOWLEDGMENT**                           CIVIL CODE § 1189

> A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California

County of _Los Angeles_ }

On _January 16, 2020_ before me, _Selena Chavez (Notary Public)_
      *Date*                    *Here Insert Name and Title of the Officer*

personally appeared _Zachary Annson Vellq_ 
                              *Name(s) of Signer(s)*

who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

---

SELENA CHAVEZ
Notary Public - California
Los Angeles County
Commission # 2267925
My Comm. Expires Nov 20, 2022

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _____
                    *Signature of Notary Public*

*Place Notary Seal and/or Stamp Above*

--- **OPTIONAL** ---

*Completing this information can deter alteration of the document or fraudulent reattachment of this form to an unintended document.*

**Description of Attached Document**

Title or Type of Document: _____

Document Date: _____ Number of Pages: _____

Signer(s) Other Than Named Above: _____

**Capacity(ies) Claimed by Signer(s)**

| Signer's Name: _____ | Signer's Name: _____ |
|---|---|
| ☐ Corporate Officer – Title(s): _____ | ☐ Corporate Officer – Title(s): _____ |
| ☐ Partner – ☐ Limited ☐ General | ☐ Partner – ☐ Limited ☐ General |
| ☐ Individual ☐ Attorney in Fact | ☐ Individual ☐ Attorney in Fact |
| ☐ Trustee ☐ Guardian of Conservator | ☐ Trustee ☐ Guardian of Conservator |
| ☐ Other: _____ | ☐ Other: _____ |
| Signer is Representing: _____ | Signer is Representing: _____ |

©2017 National Notary Association

## EXHIBIT "A"
## LEGAL DESCRIPTION

PROPOSED PARCEL 2

That portion of Lot 3 in Section 2, Township 1 South, Range 15 West, San Bernardino Base and Meridian, as per map filed in Book 45, Page 40 of Record of Surveys and that portion of Lot 8 in Tract No. 21845, as per map filed in Book 619, Pages 83 and 84 of Maps, all in the City of Los Angeles, County of Los Angeles, State of California, described as a whole as follows:

Beginning at the northeast corner of said Lot 3;

Thence westerly along the north line of said Lot 3, North 89° 33' 00" West 283.39 feet to the most northeasterly corner of Lot 7 of said Tract no. 21845;

Thence southeasterly along the northeast line of said Lot 7, South 37° 01' 29" East 25.00 feet to the most easterly corner of said Lot 7;

Thence southwesterly along the line common to Lots 7 and 8, South 39° 57' 15" West 155.73 feet to the most southerly corner of said Lot 7, said southerly corner being on a curve concave to the west having a radius of 38.00 feet, a radial line through said point bears North 39° 57' 15" East;

Thence southeasterly and southerly 22.25 feet along said curve through a central angle of 33° 32' 52";

Thence northeasterly on a non-tangent line, North 39° 57' 15" East 22.31 feet;

Thence easterly, South 89° 58' 18' East 42.79 feet;

Thence easterly, North 74° 04' 18" East 89.25 feet to a point on the northeast line of said Lot 8 having a bearing and distance of North 24° 18' 16" West 102.04 feet;

Thence continuing easterly, North 74° 04' 18" East 16.32 feet;

Thence southeasterly, South 29° 58' 18" East 50.69 feet;

Thence southerly, South 0° 01' 42" West 43.62 feet;

Thence southwesterly, South 60° 01' 42" West 38.68 feet;

Thence southeasterly, South 29° 58' 18" East 71.40 feet;

Thence easterly, South 89° 58' 18" East 3.90 feet to a point of cusp with a curve concave to the south having a radius of 47.31 feet and to which point a radial line bears North 41° 01' 59" West;

Page 1 of 2

Thence easterly 64.83 feet along said curve through a central angle of 78° 31' 33";

Thence southeasterly, South 52° 30' 26" East 10.44 feet to the beginning of a tangent curve concave to the northeast having a radius of 17.94 feet;

Thence continuing southeasterly and easterly 10.21 feet along said curve through a central angle of 32° 35' 49";

Thence continuing easterly, South 85° 06' 16" East 20.03 feet to the beginning of a tangent curve concave to the southwest having a radius of 41.86 feet;

Thence southeasterly and southerly 62.44 feet along said curve through a central angle of 85° 28' 12";

Thence continuing southerly, South 0° 21' 57" West 15.92 feet to the beginning of a tangent curve concave to the northeast having a radius of 12.96 feet;

Thence southerly and southeasterly 15.27 along said curve through a central angle of 67° 31' 21" to the beginning of a non-tangent curve concave to the south having a radius of 30.67 feet and to which point a radial line bears North 28° 17' 34" West;

Thence easterly 21.11 feet along said curve through a central angle of 39° 25' 55" to the east line of said Lot 3;

Thence northerly along said east line, North 0° 21' 54" East 354.79 feet to the Point of Beginning.

Containing 70, 035 S.F. more or less

Exhibit "B" attached hereon and made a part hereof.

Atanacio Payan, PLS 7796

Date:  February 5, 2020



Exhibit 5, Page 117

Exhibit 6

FOR REFERENCE ONLY: 20201531689

FIDELITY NATIONAL TITLE COMPANY

RECORDING REQUESTED BY:

Tony Russo
Crest Real Estate
11150 W Olympic Blvd #700
LA, CA 90064

MAIL TAX STATEMENTS AND
WHEN RECORDED MAIL TO:

Tree Lane, LLC
11301 W Olympic Bl #537
Los Angeles, CA 90064

30058359-TL

APN: 4384-005-026, portion of 4384-023-014          SPACE ABOVE THIS LINE IS FOR RECORDER'S USE
portion of

## GRANT DEED

THE UNDERSIGNED GRANTOR(S) DECLARE(S):          DOCUMENTARY TRANSFER TAX IS $ 0 ; CITY TRANSFER TAX $ 0

_____ Computed on full value of property conveyed, or
_____ Computed on full value less liens and encumbrances remaining at time of sale.
_____ Unincorporated area   _X_  City of Los Angeles

THE RECORDING IS NOT FOR CONSIDERATION BUT FOR THE PURPOSE OF ADJUSTING THE BOUNDARY
LINES PER LOT LINE ADJUSTMENT CASE NO. AA-2019-3535-PMEX

"The grantors and the grantees in this conveyance are comprised of the same parties who continue to hold the same
proportionate interest in the property, R & T 11925(d)."

For no additional consideration, receipt of which is hereby acknowledged,

Tree Lane, LLC,
a California limited liability company ("Grantor")

hereby GRANT(S) to

Tree Lane, LLC,
a California limited liability company ("Grantee")

the following described real property in the
City of Los Angeles, County of Los Angeles,
State of California, more particularly described as follows:

LEGAL DESCRIPTION ATTACHED HERETO AS EXHIBIT "A" AND SHOWN
IN EXHIBIT "B" AND MADE A PART HEREOF BY REFERENCE

Exempt from fee per GC27388.1 due to
the maximum fees being paid on documents
in this transaction

DEED APPROVED BY CITY OF
LOS ANGELES PLANNING
DEPARTMENT FOR RECORDING
TO ADJUST LOT LINES PER
LOT LINE ADJUSTMENT CASE NO.
AA-2019-3535-PMEX

Dated: 1/16/2020

TREE LANE, LCC
A CALIFORNIA LIMITED LIABIL
COMPANY ..

_____
Signature

Mohamed Hadid Manage.
Name & Title
AKA Mohamed Anwar Hadid

MAIL TAX STATEMENTS AS DIRECTED ABOVE



**This page is part of your document - DO NOT DISCARD**



## 20201531689

**Pages:**
**0008**

Recorded/Filed in Official Records
Recorder's Office, Los Angeles County,
California

**11/30/20 AT 08:00AM**

| | |
|---|---|
| FEES: | 60.00 |
| TAXES: | 0.00 |
| OTHER: | 0.00 |
| PAID: | 60.00 |

**PCOR SURCHARGE $20.00**



L E A D S H E E T



202011300230039

**00019402527**



011493355

**SEQ:**
**04**

SECURE – 8:00AM



**THIS FORM IS NOT TO BE DUPLICATED**

E08_201125_8

E6253A5

Exhibit 6, Page 119

FIDELITY NATIONAL TITLE COMPANY

RECORDING REQUESTED BY:

Tony Russo
Crest Real Estate
11150 W Olympic Blvd #700
LA, CA 90064

MAIL TAX STATEMENTS AND
WHEN RECORDED MAIL TO:

Tree Lane, LLC
11301 W Olympic Bl #537
Los Angeles, CA 90064

30058359-TL

APN: 4384-005-026, portion of 4384-023-014
portion of

SPACE ABOVE THIS LINE IS FOR RECORDER'S USE

# GRANT DEED

THE UNDERSIGNED GRANTOR(S) DECLARE(S):

DOCUMENTARY TRANSFER TAX IS $ 0 ; CITY TRANSFER TAX $ 0

_____ Computed on full value of property conveyed, or

_____ Computed on full value less liens and encumbrances remaining at time of sale.

_____ Unincorporated area    _X_   City of Los Angeles

THE RECORDING IS NOT FOR CONSIDERATION BUT FOR THE PURPOSE OF ADJUSTING THE BOUNDARY
LINES PER LOT LINE ADJUSTMENT CASE NO. AA-2019-3535-PMEX

"The grantors and the grantees in this conveyance are comprised of the same parties who continue to hold the same
proportionate interest in the property, R & T 11925(d)."

For no additional consideration, receipt of which is hereby acknowledged,

**Tree Lane, LLC,**
**a California limited liability company** ("Grantor")

hereby GRANT(S) to

**Tree Lane, LLC,**
**a California limited liability company** ("Grantee")

the following described real property in the
City of Los Angeles, County of Los Angeles,
State of California, more particularly described as follows:

LEGAL DESCRIPTION ATTACHED HERETO AS EXHIBIT "A" AND SHOWN
IN EXHIBIT "B" AND MADE A PART HEREOF BY REFERENCE

Exempt from fee per GC27388.1 due to
the maximum fees being paid on documents
in this transaction

DEED APPROVED BY CITY OF
LOS ANGELES PLANNING
DEPARTMENT FOR RECORDING
TO ADJUST LOT LINES PER
LOT LINE ADJUSTMENT CASE NO.
AA-2019-3535-PMEX

Dated: 1/16/2020

TREE LANE, LCC
A CALIFORNIA Limited Liabili.
Company.

Signature

Mohamed Hadid Manage.
Name & Title
AKA Mohamed Anwar Hadid

MAIL TAX STATEMENTS AS DIRECTED ABOVE

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

STATE OF _____ )
                               )  ss:
COUNTY OF _____ )

On _____, before me, _____, Notary Public
                                        (insert name)

personally appeared _____, who
proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are
subscribed to the within instrument and acknowledged to me that he/she/they executed the same
in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the
person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing
paragraph is true and correct.

WITNESS my hand and official seal.


Signature: _____

[Seal]                    *See attached.*

14

**CALIFORNIA ALL-PURPOSE ACKNOWLEDGMENT**                                           CIVIL CODE § 1189

> A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document
> to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California

County of _Los Angeles_ }

On _January 16, 2020_ before me, _Selena Chavez (Notary Public)_
　　　　　*Date*　　　　　　　　　　　　　　*Here Insert Name and Title of the Officer*

personally appeared _Mohamed Anwar Hadid_
　　　　　　　　　　　　　　　　　*Name(s) of Signer(s)*

who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed
to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their
authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity
upon behalf of which the person(s) acted, executed the instrument.

> **SELENA CHAVEZ**
> Notary Public · California
> Los Angeles County
> Commission # 2267925
> My Comm. Expires Nov 20, 2022

I certify under PENALTY OF PERJURY under the
laws of the State of California that the foregoing
paragraph is true and correct.

WITNESS my hand and official seal.

Signature _____

*Place Notary Seal and/or Stamp Above*          *Signature of Notary Public*

───────────────────── **OPTIONAL** ─────────────────────
*Completing this information can deter alteration of the document or
fraudulent reattachment of this form to an unintended document.*

**Description of Attached Document**

Title or Type of Document: _____

Document Date: _____ Number of Pages: _____

Signer(s) Other Than Named Above: _____

**Capacity(ies) Claimed by Signer(s)**

Signer's Name: _____          Signer's Name: _____
☐ Corporate Officer – Title(s): _____         ☐ Corporate Officer – Title(s): _____
☐ Partner – ☐ Limited ☐ General              ☐ Partner – ☐ Limited ☐ General
☐ Individual          ☐ Attorney in Fact          ☐ Individual          ☐ Attorney in Fact
☐ Trustee          ☐ Guardian of Conservator        ☐ Trustee          ☐ Guardian of Conservator
☐ Other: _____              ☐ Other: _____
Signer is Representing: _____          Signer is Representing: _____

©2017 National Notary Association

## EXHIBIT "A"
## LEGAL DESCRIPTION

PROPOSED PARCEL 1

That portion of Lot 3 in Section 2, Township 1 South, Range 15 West, San Bernardino Base and Meridian, as per map filed in Book 45, Page 40 of Record of Surveys, that portion of Lot 1 in Tract No. 32693, as per map filed in Book 918, Pages 13 and 14 of Maps, and that portion of Lot 8 in Tract No. 21845, as per map filed in Book 619, Pages 83 and 84 of Maps, all in the City of Los Angeles, County of Los Angeles, State of California, described as a whole as follows:

Beginning at a point on the east line of said Lot 3, South 0° 21' 54" West 354.79 feet south from the north east corner thereof;

Thence continuing southerly along the east line of said Lot 3, South 0° 21' 54" West 221.33 feet to a point on the south line of the north 576.12 of said Lot 3;

Thence westerly along said south line, North 89° 33' 00" West 352.00 feet to a point on a line having a bearing and distance of North 11° 16' 17" West 169.69 feet as shown on Parcel Map Exemption No. 2880 recorded December 18, 1985 as Instrument No. 85-1494484 Official Records of Los Angeles County;

Thence northerly along said line, North 11° 16' 17" West 169.69 feet to a point on a line parallel with and 20 feet southeasterly from that line having a bearing and distance of North 71° 40' 52" East 155.90 feet as shown on said Tract No. 21845;

Thence westerly along said parallel line, South 71° 40' 52" West 101.21 feet to a point on a line parallel with and 20 feet southerly from that line having a bearing and distance of North 87° 31' 21" East 192.00 feet as shown on said Tract No. 21845;

Thence continuing westerly along said parallel line, South 87° 31' 21" West 209.44 feet to a point on a line parallel with and 20 feet westerly from that line having a bearing and distance of North 20° 00' 00" West 130.15 feet as shown on said Tract No. 21845;

Thence northerly along said parallel line, North 20° 00' 00" West 133.23 feet to a point on the northwesterly line of said Tract No. 32693 having a bearing and distance of North 38° 02' 49" East 50.06 feet;

Thence northeasterly along said line, North 38° 02' 49" East 11.88 feet to the beginning of a tangent curve concave to the southeast having a radius of 83.00 feet;

Thence northeasterly 11.25 feet along said curve through a central angle of 7° 45' 49" to a point on the westerly line of Lot 12 of said Tract No. 21845, a radial line through said point bears North 44° 11' 22" West;

Thence southerly, easterly, and northeasterly along the westerly, southerly, and southeasterly lines of said Tract No. 21845 the following three courses;

1. southerly, South 20° 00' 00" East 130.15 feet;
2. easterly, North 87° 31' 21" East 192.00 feet;

Page 1 of 3

3.  northeasterly, North 71° 40' 52" East 155.90 feet to the most southerly corner of Lot 8 of said Tract No. 21845;

Thence northerly along the west line of said Lot 8, North 14° 22' 23" West 172.21 feet to the most westerly corner of said Lot 8, said westerly corner being on a curve concave to the west having a radius of 38.00 feet, a radial line through said point bears South 14° 22' 23" East;

Thence northeasterly and northerly 61.10 feet along said curve through a central angle of 92° 07' 30";

Thence northeasterly on a non-tangent line, North 39° 57' 15" East 22.31 feet;

Thence easterly, South 89° 58' 18' East 42.79 feet;

Thence easterly, North 74° 04' 18" East 89.25 feet to a point on the northeast line of said Lot 8 having a bearing and distance of North 24° 18' 16" West 102.04 feet;

Thence continuing easterly, North 74° 04' 18" East 16.32 feet;

Thence southeasterly, South 29° 58' 18" East 50.69 feet;

Thence southerly, South 0° 01' 42" West 43.62 feet;

Thence southwesterly, South 60° 01' 42" West 38.68 feet;

Thence southeasterly, South 29° 58' 18" East 71.40 feet;

Thence easterly, South 89° 58' 18" East 3.90 feet to a point of cusp with a curve concave to the south having a radius of 47.31 feet and to which point a radial line bears North 41° 01' 59" West;

Thence easterly 64.83 feet along said curve through a central angle of 78° 31' 33";

Thence southeasterly, South 52° 30' 26" East 10.44 feet to the beginning of a tangent curve concave to the northeast having a radius of 17.94 feet;

Thence continuing southeasterly and easterly 10.21 feet along said curve through a central angle of 32° 35' 49";

Thence continuing easterly, South 85° 06' 16" East 20.03 feet to the beginning of a tangent curve concave to the southwest having a radius of 41.86 feet;

Thence southeasterly and southerly 62.44 feet along said curve through a central angle of 85° 28' 12";

Thence continuing southerly, South 0° 21' 57" West 15.92 feet to the beginning of a tangent curve concave to the northeast having a radius of 12.96 feet;

Page 2 of 3

Thence southerly and southeasterly 15.27 along said curve through a central angle of 67° 31′ 21″ to the beginning of a non-tangent curve concave to the south having a radius of 30.67 feet and to which point a radial line bears North 28° 17′ 34″ West;

Thence easterly 21.11 feet along said curve through a central angle of 39° 25′ 55″ to the Point of Beginning.

Containing 141, 444 S.F. more or less

Exhibit "B" attached hereon and made a part hereof.

Atanacio Payan, PLS 7796

Date:  February 5, 2020

Page 3 of 3



# Exhibit 7

FOR REFERENCE ONLY: 20201531691

FIDELITY NATIONAL TITLE COMPANY

RECORDING REQUESTED BY:

Tony Russo
Crest Real Estate
11150 W Olympic Blvd #700
LA, CA 90064

MAIL TAX STATEMENTS AND
WHEN RECORDED MAIL TO:

Tree Lane, LLC
11301 W Olympic Bl #637
Los Angeles, CA 90064

30058359-T2

APN: portion of 4384-023-014

SPACE ABOVE THIS LINE IS FOR RECORDER'S USE

## GRANT DEED

THE UNDERSIGNED GRANTOR(S) DECLARE(S):

DOCUMENTARY TRANSFER TAX IS $ 0 ; CITY TRANSFER TAX $ 0
____ Computed on full value of property conveyed, or
____ Computed on full value less liens and encumbrances remaining at time of sale.
____ Unincorporated area   _X_ City of Los Angeles

THE RECORDING IS NOT FOR CONSIDERATION BUT FOR THE PURPOSE OF ADJUSTING THE BOUNDARY
LINES PER LOT LINE ADJUSTMENT CASE NO. AA-2019-3535-PMEX

For no additional consideration, receipt of which is hereby acknowledged,

**Zachary Vella,**
**a single man** ("Grantor")

hereby GRANT(S) to

**Tree Lane, LLC,**
**a California limited liability company** ("Grantee")

the following described real property in the
City of Los Angeles, County of Los Angeles,
State of California, more particularly described as follows:

"The value of the property in this
conveyance, exclusive of liens and
encumbrances is $100.00 or less, and there
no additional consideration received by the
grantor, R&T 11911."

LEGAL DESCRIPTION ATTACHED HERETO AS EXHIBIT "A" AND SHOWN
IN EXHIBIT "B" AND MADE A PART HEREOF BY REFERENCE

DEED APPROVED BY CITY OF
LOS ANGELES PLANNING
DEPARTMENT FOR RECORDING
TO ADJUST LOT LINES PER
LOT LINE ADJUSTMENT CASE NO.
AA-2019-3535-PMEX

Exempt from fee per GC27388.1 due to
the maximum fees being paid on documents
in this transaction

Dated: 01/16/2020

Signature

Zachary Vella
Name & Title

AKA Zachary Annson Vella

MAIL TAX STATEMENTS AS DIRECTED ABOVE

**This page is part of your document - DO NOT DISCARD**





## 20201531691



Pages:
0006

**Recorded/Filed In Official Records
Recorder's Office, Los Angeles County,
California**

**11/30/20 AT 08:00AM**

| | |
|---|---|
| FEES: | 54.00 |
| TAXES: | 0.00 |
| OTHER: | 0.00 |
| PAID: | 54.00 |

**PCOR SURCHARGE $20.00**



**L E A D S H E E T**



202011300230039

00019402529

011493355

**SEQ:
06**

**SECURE - 8:00AM**



**THIS FORM IS NOT TO BE DUPLICATED**

E08_201125_80

FIDELITY NATIONAL TITLE COMPANY

RECORDING REQUESTED BY:

Tony Russo
Crest Real Estate
11150 W Olympic Blvd #700
LA, CA 90064

MAIL TAX STATEMENTS AND
WHEN RECORDED MAIL TO:

Tree Lane, LLC
11301 W Olympic Bl #537
Los Angeles, CA 90064

30058359-72

APN: portion of 4384-023-014

SPACE ABOVE THIS LINE IS FOR RECORDER'S USE

# GRANT DEED

THE UNDERSIGNED GRANTOR(S) DECLARE(S):

DOCUMENTARY TRANSFER TAX IS $ 0 ; CITY TRANSFER TAX $ 0
_____ Computed on full value of property conveyed, or
_____ Computed on full value less liens and encumbrances remaining at time of sale.
_____ Unincorporated area   X   City of Los Angeles

THE RECORDING IS NOT FOR CONSIDERATION BUT FOR THE PURPOSE OF ADJUSTING THE BOUNDARY
LINES PER LOT LINE ADJUSTMENT CASE NO. AA-2019-3535-PMEX

For no additional consideration, receipt of which is hereby acknowledged,

**Zachary Vella,**
**a single man** ("Grantor")

hereby GRANT(S) to

**Tree Lane, LLC,**
**a California limited liability company** ("Grantee")

the following described real property in the
City of Los Angeles, County of Los Angeles,
State of California, more particularly described as follows:

"The value of the property in this
conveyance,exclusive of liens and
encumbrances is $100.00 or less,and there
no additional consideration received by the
grantor, R&T 11911."

LEGAL DESCRIPTION ATTACHED HERETO AS EXHIBIT "A" AND SHOWN
IN EXHIBIT "B" AND MADE A PART HEREOF BY REFERENCE

DEED APPROVED BY CITY OF
LOS ANGELES PLANNING
DEPARTMENT FOR RECORDING
TO ADJUST LOT LINES PER
LOT LINE ADJUSTMENT CASE NO.
AA-2019-3535-PMEX

Exempt from fee per GC27388.1 due to
the maximum fees being paid on documents
in this transaction

Dated: 01/16/2020

Signature

Zachary Vella
Name & Title
AKA Zachary Annson Vella

MAIL TAX STATEMENTS AS DIRECTED ABOVE

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

STATE OF _____ )
                                 )  ss:
COUNTY OF _____ )

On _____, before me, _____, Notary Public
                              (insert name)

personally appeared _____, who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature: _____

[Seal]

*See attached.*

**CALIFORNIA ALL-PURPOSE ACKNOWLEDGMENT**          CIVIL CODE § 1189

| A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document. |
|---|

State of California

County of _Los Angeles_ }

On _January 16, 2020_ before me, _Selena Chavez (Notary Public)_
     *Date*                   *Here Insert Name and Title of the Officer*

personally appeared _Zachary Annson Vella_
                     *Name(s) of Signer(s)*

who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

SELENA CHAVEZ
Notary Public · California
Los Angeles County
Commission # 2267925
My Comm. Expires Nov 20, 2022

Signature _Selena Chavez_

*Place Notary Seal and/or Stamp Above*         *Signature of Notary Public*

───────────────── OPTIONAL ─────────────────

*Completing this information can deter alteration of the document or fraudulent reattachment of this form to an unintended document.*

**Description of Attached Document**

Title or Type of Document: _____

Document Date: _____ Number of Pages: _____

Signer(s) Other Than Named Above: _____

**Capacity(ies) Claimed by Signer(s)**

| Signer's Name: _____ | Signer's Name: _____ |
|---|---|
| □ Corporate Officer – Title(s): _____ | □ Corporate Officer – Title(s): _____ |
| □ Partner – □ Limited □ General | □ Partner – □ Limited □ General |
| □ Individual    □ Attorney in Fact | □ Individual    □ Attorney in Fact |
| □ Trustee    □ Guardian of Conservator | □ Trustee    □ Guardian of Conservator |
| □ Other: _____ | □ Other: _____ |
| Signer is Representing: _____ | Signer is Representing: _____ |

©2017 National Notary Association

Exhibit A

## LEGAL DESCRIPTION

That portion of Lot 8 in Tract No. 21845, as per map filed in Book 619, Pages 83 and 84 of Maps, in the City of Los Angeles, County of Los Angeles, State of California, described as a whole as follows:

Beginning at the most southerly corner of said Lot 8;

Thence northerly along the west line of said Lot 8, North 14° 22' 23" West 172.21 feet to the most westerly corner of said Lot 8, said westerly corner being on a curve concave to the west having a radius of 38.00 feet, a radial line through said point bears South 14° 22' 23" East;

Thence northeasterly and northerly 61.10 feet along said curve through a central angle of 92° 07' 30";

Thence northeasterly on a non-tangent line, North 39° 57' 15" East 22.31 feet;

Thence easterly, South 89° 58' 18' East 42.79 feet;

Thence easterly, North 74° 04' 18" East 89.25 feet to a point on the northeast line of said Lot 8 having a bearing and distance of North 24° 18' 16" West 102.04 feet;

Thence southeasterly along the northeasterly line of said Lot 8, South 24° 18' 16" East 38.40 feet to the most easterly corner thereof;

Thence southwesterly along the southeast line of said Lot 8, South 24° 03' 26" West 183.98 feet;

Thence continuing southwesterly along the southeast line of said Lot 8, South52° 04' 00" West 86.21 feet to the Point of Beginning.

Containing 26, 855 S.F. more or less

Prepared by me or under
my direction and supervision

Atanacio Payan, PLS 7796
Date:  February 5, 2020

Page 1 of 1



# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is: 1100 Glendon Avenue, 14th Floor, Los Angeles, CA 90024.

A true and correct copy of the foregoing document entitled (*specify*): **FIRST AMENDED COMPLAINT FOR: (1) AVOIDANCE OF FRAUDULENT TRANSFER PURSUANT TO 11 U.S.C. § 544 AND CAL. CIV. CODE §§ 3439.04(a)(1), 3439.04(a)(2), AND, 3439.05; (2) RECOVERY OF AVOIDED TRANSFER FOR BENEFIT OF ESTATE PURSUANT TO 11 U.S.C. §§ 550(a)(1) AND 551 AND CAL. CIV. CODE § 3439.07(a)(1); (3) CANCELLATION OF INSTRUMENT; (4) TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE; (5) UNJUST ENRICHMENT/QUANTUM MERUIT/RESTITUTION; (6) FRAUD;. (7) FRAUDULENT MISREPRESENTATION; AND (8) CONVERSION** will be served or was served **(a)** on the judge in chambers in the form and manner by LBR 5005-2(d); and **(b)** in the manner stated below:

**1.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document.  On **August 22, 2025**, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

- Daniel A Lev    dainel.lev@gmlaw.com, cheryl.caldwell@gmlaw.com, dlev@ecf.courtdrive.com
- Ronald N Richards    ron@ronaldrichards.com, 7206828420@filings.docketbird.com
- Robyn B Sokol    rsokol@leechtishman.com, rsokol@leechtishman.com;lmoya@leechtishman.com;dmulvaney@leechtishman.com;NArango@LeechTishman.com;dbender@leechtishman.com;nmeyers@leechtishman.com
- United States Trustee (LA)    ustpregion16.la.ecf@usdoj.gov

☐ Service information continued on attached page

**2.  SERVED BY UNITED STATES MAIL**:
On **August 22, 2025**, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge <u>will be completed</u> no later than 24 hours after the document is filed.

Honorable Sheri Bluebond
United State Bankruptcy Court
Central District of California
255 E. Temple Street, Suite 1534
Los Angeles, CA  90012

☐ Service information continued on attached page

**3.  SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served):  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on **July 29, 2025**, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge <u>will be completed</u> no later than 24 hours after the document is filed.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| August 22, 2025 | Lydia Moya | /s/ Lydia Moya |
|---|---|---|
| *Date* | *Printed Name* | *Signature* |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*
4937-6297-2249, v. 4

**F 9013-3.1.PROOF.SERVICE**